# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| MATTHEW PEACH<br><br>Plaintiff,<br><br>vs.<br><br>LEROY McMATH, individually;<br>POWER ENTERTAINMENT CO,<br>INC; POWER ARTIST MUSIC CO.;<br>POWER ARTIST RECORDS, INC;<br>TOMMY BOY ENTERTAINMENT,<br>LLC d/b/a TOMMY BOY<br>DISTRIBUTION and TOMMY BOY<br>ARTISTS, LLC<br><br>Defendants. | CIVIL ACTION<br>FILE NO. |

## DECLARATION OF ATTORNEY, JOHN M. DUFFOO

My name is John M. Duffoo. I am an attorney at the Business Law Firm of John M. Duffoo, P.C. and I am counsel of record for Plaintiff in the above captioned action. I am over the age of 18 and competent in all respects to make this declaration. All the facts in this declaration are based on my personal knowledge, business records and documents produced by Defendants during a civil action previously litigated in the Superior Court of DeKalb County, State of Georgia.

1.    Plaintiff is a judgment creditor of Defendant Leroy McMath ("McMath"), POWER ENTERTAINMENT CO, INC ("PEC"); and POWER ARTIST

MUSIC CO. ("PAM") (collectively, "Judgment Debtors") arising from litigation in the Superior Court of DeKalb County, Georgia, (hereinafter "Georgia Superior Court Action") based on contract and various torts, including fraud, that resulted in a monetary judgment in Plaintiff's favor of $427,710.30.

**Georgia Superior Court Action & Notice of Claim to Defendants:**

2.  On June 8, 2022, the undersigned prepared and mailed a demand letter to Defendant McMath, threatening litigation if McMath failed to resolve the dispute and cease diverting music royalty payments from Plaintiff's Royalty Stream. Attached hereto as Exhibit "A" is a true and correct copy of the June 8, 2022 letter.

3.  On June 14, 2022, the undersigned prepared and mailed a Letter of Direction and Demand to Cease Converting Funds to co-Defendant, Tommy Boy Entertainment, LLC d/b/a Tommy Boy Distribution ("TBE LLC") and its managing member Thomas A. Silverman. Attached hereto as Exhibit "B" is a true and correct copy of the June 14, 2022 letter.

4.  On June 20, 2022, Plaintiff filed a lawsuit in the Superior Court of Gwinnett County, State of Georgia, Civil Action No: 22-A-05274-3 against Defendant, Leroy McMath alleging the following claims: (1) breach of contract and on account; (2) conversion; (3) tortious interference with

2

contractual business relations; (4) fraud; (5) punitive damages; (6) pre-judgment interest; (7) and attorney's fees under O.C.G.A. §§ 13-1-11 and 13-6-11. This Superior Court Action was subsequently amended to include co-Defendants, Power Entertainment Co, Inc and Power Artist Music Co. Thereafter, the Superior Court Action was transferred to the Superior Court of DeKalb County, State of Georgia, Civil Action No: 23CV6869-7 (hereinafter, the "Georgia Superior Court Action").

5. On June 27, 2022, the undersigned received an email communication on behalf of TBE LLC from an individual named David Parker, who identified himself as part of Legal & Business Affairs of Tommy Boy Entertainment LLC. Attached hereto as Exhibit "C" is a true and correct copy of the June 27, 2022 email.

6. On June 29, 2022, the undersigned counsel responded to TBE LLC via David Parker, by email with an attached letter dated the same day, stating in relevant part:

> "We have reason to believe that LeRoy McMath has acted in a fraudulent manner and converted my client's legal interest in royalties that Tommy Boy has been distributing appropriately for several years. Your email confirms our belief, wherein you state that McMath requested a "recoupable advance" from Tommy Boy. Tommy Boy has apparently used royalties owned by my client to pay back that advance. We want to think that Tommy Boy is a victim to LeRoy McMath's fraud, but if my client's ownership interest continues to be used to

pay McMath's advance, Tommy Boy is clearly participating in McMath's conversion of property. I suggest that we work together and put pressure on McMath to rectify this abuse of my client's property and putting your company at risk.

You have already been provided with copies of the two contracts demonstrating my client's interest in the assets that Tommy Boy has been directed to distribute. You have actual knowledge that my client owns certain interests in the asset. Continued action inconsistent with my client's ownership interest represents conversion of my client's property. In addition, attached is a Letter of Direction dated June 18, 2022, that Tommy Boy received from McMath on June 24th via email to accounts@tommyboy.com. See attached.

Knowing these facts, if Tommy Boy continues to assist McMath in his fraudulent activity, Tommy Boy may be opening itself to potential litigation."

Attached hereto as Exhibit "D" is a true and correct copy of the June 29, 2022 email and attached letter.

7.    On July 6, 2022, TBE LLC via David Parker, emailed Plaintiff's counsel stating as follows:

"Since the terms of the letters of direction seem to be in conflict and you have filed a lawsuit against Leroy McMath claiming among other matters a right to the royalties under the agreement, TBA must take the position of a stakeholder. TBA cannot account and pay royalties to anyone unless all parties to the complaint entered into a court approved settlement and dismiss the complaint and/or the judge in the matter orders TBA to pay a certain party"

4

Attached hereto as Exhibit "E" is a true and correct copy of the July 6, 2022, email.

8.   For approximately one year after the commencement of the Georgia Superior Court Action, TBE LLC, via David Parker, provided the undersigned with copies of monthly royalty statements, showing TBE LLC had ceased paying McMath and, as Mr. Parker had represented, were holding Plaintiff's Royalty Stream income pending the outcome of the Georgia Superior Court Action.

9.   After October 30, 2023, TBE LLC ceased providing monthly royalty statements. TBE LLC also did not release any royalties to Royalty Exchange or Plaintiff, even after receiving confirmation that the Georgia Superior Court Action was resolved in Plaintiff's favor in June 2025. To date, TBE LLC has continued to withhold the royalties that it was purportedly holding for Plaintiff, which is the subject of a lawsuit pending in the Southern District of New York. Attached hereto as Exhibit "F" is a true and correct copy of the emails between the undersigned and David Parker. (See Exhibit "F" pages 12 – 17).

**Collusion Between All Defendants:**

10. On October 16, 2023, Defendant McMath began conspiring with TBE LLC's CEO, Thomas Silverman about how to avoid paying Plaintiff's Royalty Stream income and specifically discussing the sale of the Masters (referring to Defendant McMath's retained control and ownership of sound recording copyrights in the music catalog) for less than its fair value. Attached hereto as Exhibit "G" is a true and correct copy of the emails from Leroy McMath to TBE LLC's CEO, Thomas Silverman dated October 16, 2023. Said emails were obtained from Defendant McMath during Post-Judgment Discovery.

11. On October 30, 2023, Leroy McMath and Thomas Silverman exchanged emails showing Defendants had full knowledge of Plaintiff's Georgia Superior Court Action. Emails with the subject "Power-masters" discuss other potential purchasers of the Masters and Thomas Silverman asked Leroy McMath, if he sold to the other potential buyers, would McMath "have to pay Peach the $100,000.00 you took as advance to get the suit dropped?". Defendant McMath responded: "My loyalty is with TB. Yes, they know about the deal, and royalty liabilities and the $100K". Attached hereto as Exhibit "H" is a true and correct copy of the emails between Leroy McMath and TBE LLC's CEO, Thomas Silverman dated October 30, 2023.

6

Said emails were obtained from Defendant McMath during Post-Judgment Discovery.

12. Between November 9, 2023 and November 11, 2023, Defendant McMath and Tom Silverman on behalf of TBE LLC and/or Tommy Boy Artists, LLC ("TBA LLC") colluded to hinder, delay, or defraud Plaintiff, who was then a present creditor of Defendant McMath. Defendant McMath requested Thomas Silverman's recommendation "as a friend". Thomas Silverman responded: "I suggest selling to me and I sell to you with a new company". In response, Defendant McMath, responded as follows:

> "I ready to sell to you. We can do a small sale price, like $100k. Then you can sell back with a new company as you stated. The sooner the better... so that the agreement with Royalty Exchange terminates, and future payments can be redirected to new owners. I agree the accounting needs to be Kept current, and artist needs to be paid when due."

Attached hereto as Exhibit "I" is a true and correct copy of the emails between Leroy McMath and TBE LLC's CEO, Thomas Silverman dated November 9 - 11, 2023. Said emails were obtained from Defendant McMath during Post-Judgment Discovery.

13. On November 17, 2023, Plaintiff filed a Motion for Summary Judgment on all his claims and Defendants' counterclaims in the Georgia Superior Court Action.

14. On December 7, 2023, twenty days after the filing of Plaintiff's Motion for Summary Judgment, Defendants secretly consummated a transaction purporting to transfer ownership of both (1) the "Masters," meaning control and ownership of sound recording copyrights in the music catalog, and (2) "all income ownership and collection rights of the Masters, regardless of when earned", meaning the Royalty Stream, to Tommy Boy Artists, LLC, a sister company of TBE LLC (hereinafter, "Tommy Boy Defendants"). Attached hereto as Exhibit "J" are true and correct copies of emails between Leroy McMath and David Parker of Tommy Boy dated December 6, 2023 through December 7, 2023.  Said emails were obtained from Defendant McMath during Post-Judgment Discovery.

15. The December 7, 2023 transaction was concealed from Plaintiff by Defendants until January 28, 2026 when production of the Asset Purchase Agreement dated December 7, 2023 was compelled in the Georgia Superior Court Action. Attached hereto as Exhibit "K" is a true and correct copy of emails between Defendant McMath and the undersigned with the Asset Purchase Agreement received from Leroy McMath via Dropbox during Post Judgment discovery of the Georgia Superior Court Action.

16. In May 2024, David Parker, acting on behalf of TBE LLC, concealed from Plaintiff's counsel that TBA LLC, an affiliate of TBE LLC, was the

purported "purchaser" of the music catalog that was the subject of the

ongoing Georgia Superior Court Action. Instead, TBE LLC refused to

provide additional monthly statements to Plaintiff, stating as follows:

> "**From:** David Parker <david.parker@tommyboy.com>
> **Sent:** Thursday, May 2, 2024 4:03 PM
> **To:** John Duffoo <john@jdbusinesslaw.com>
> **Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3
>
> Hi John,
>
> I now had the opportunity to discuss this matter with the principal of Tommy Boy.  As you know, the letters of direction are in no way binding on Tommy Boy.  I have pointed this out to you many times in the past.  Tommy Boy's providing statements was a courtesy I extended to you in anticipation of a quick resolution in the legal case involving Leroy McMath.  It is apparent that this case will drag on for some time and Tommy Boy will cease providing information as a courtesy or otherwise.  **As I have suggested to you in the past, if your client is willing to enter into a general release of all claims in favor of Tommy Boy we will provide whatever we have.**"
>
> And
>
> **From:** David Parker <david.parker@tommyboy.com>
> **Sent:** Friday, May 3, 2024 10:24 AM
> **To:** John Duffoo <john@jdbusinesslaw.com>
> **Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3
>
> John,
>
> You have misunderstood my last email.  I am not asking you to consider a general release rather to provide

Tommy Boy with an executed general release. Without the signed release, Tommy Boy will follow industry standards in such disputes. Those are providing a final non-appealable judgement in your favor or a full and final settlement of the outstanding litigation.

Please advise your client accordingly.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

See Exhibit "F" pages 8 & 9.

17. On June 14, 2024, the undersigned spoke by telephone with David Parker of TBE LLC concerning the disputed royalty proceeds. During that conversation, the undersigned advised Mr. Parker that TBE LLC could not continue holding disputed royalty proceeds indefinitely and that the proper method is to file an interpleader action. Mr. Parker responded, in substance, that TBE LLC is not going to spend any money doing that unless forced. Mr. Parker further stated he does not understand why Plaintiff even wants the catalog because it's plagued with problems. Then Mr. Parker stated that he has said too much and abruptly ended the call.

18. Through August 15, 2024, TBE LLC continued to pressure Plaintiff to sign a broad general release releasing TBE LLC of any past, present and future

claims, in exchange for the resumption of monthly royalty statements, while knowingly concealing the December 7, 2023 transaction. See Exhibit "F" emails between the undersigned and David Parker dated April 17, 2023 – August 15, 2024.

19. On October 22, 2024, after Plaintiff refused to sign the general release, TBE LLC ceased responding to the undersigned's emails. The final email sent by the undersigned requested: "While we wait for the court to rule on the pending motions, can Tommy Boy please confirm it's still holding my clients accumulated royalty payments from this music catalog? We believe Tommy Boy should be holding an estimated $175k balance." Neither David Parker nor any representative of Tommy Boy responded. Attached hereto as Exhibit "L" is a true and correct copy of the email from the undersigned to David Parker and Thomas Silverman dated October 22, 2024.

20. On January 3, 2025, the Superior Court of DeKalb County, Georgia, entered summary judgment in favor of Plaintiff on the issue of liability as to all claims asserted by Plaintiff against all Judgment Debtors, and on all counterclaims asserted by Judgment Debtors. Attached hereto as Exhibit "M" is a true and correct copy of the Court's Order on Various Motions.

21. On June 24, 2025, the Georgia Superior Court Action proceeded to trial, resulting in the entry of a monetary judgment against Leroy McMath,

11

POWER ENTERTAINMENT CO, INC; & POWER ARTIST MUSIC CO.

in the amount of $427,710.30. The judgment is itemized as follows:

- Principal damages: $121,701.50.

- Pre-judgment interest: $98,817.90.

- Additional monetary damages: $15,445.50.

- Punitive damages: $100,000.00.

- Attorney's fees pursuant to O.C.G.A 13-1-11: $22,076.94.

- Attorney's fees pursuant to O.C.G.A 13-6-11: $69,668.46

Attached hereto as Exhibit "N" is a true and correct copy of the Final Judgment.

22. After entry of the judgment against the Judgment Debtors, the undersigned counsel and Leroy McMath exchanged emails wherein Plaintiff discovered for the first time that the Judgment Debtors sold the music catalog to Tommy Boy (although the exact legal name of the purchasing Tommy Boy entity was still unknown). In said email Leroy McMath stated:

> **From:** leroy wbaball.net <leroy@wbaball.net>
> **Sent:** Wednesday, July 16, 2025 10:34 AM
> **To:** John Duffoo <john@jdbusinesslaw.com>
> **Subject:** Re: Peach v. McMath, et al.; CAFN: 23cv6869
>
> John I wanted to reach out to you to respond to this email. The $75K you are making reference to was money held my TB, owed from years back. That wasn't been releasing until this case was over. They paid me monies

for my medical bills using my masters as collateral, now they own the masters, and any future funds, will come from them."

Attached hereto as Exhibit "O" is a true and correct copy of the July 16, 2025 email from Defendant McMath to the undersigned.

23. In the same email, McMath stated his inability to pay the $427,710.30 final judgment and intention to declare himself bankrupt: "I suggest you contact TB directly. At the moment I don't have any money, I'm working with the attorney on my bankruptcy filing." (See Exhibit "O").

24. In the same email chain, McMath further asserts that the December 7, 2023, transaction was not an arms-length transaction conducted at a fair market price: "I have no problem with you getting your monies or money owed to me from TB. I feel like my masters and money was taken any way." (See Exhibit "O")

25. Subsequent to entry of the judgment in the Georgia Superior Court Action, Plaintiff commenced post judgment discovery upon the Judgment Debtors.

26. The Judgment Debtors failed to respond to any of Plaintiff's post judgment discovery and as a result, Plaintiff commenced a post judgment action against the Judgment Debtors on August 29, 2025, being Civil Action No. 25CV8093 filed in the Superior Court of DeKalb County, State of Georgia.

27. On January 27, 2026, a Motion to Hold the McMath Defendants in Contempt & to Incarcerate Leroy McMath, came for hearing and the Superior Court entered an Order finding as follows:

> After hearing evidence and argument, the Court finds that McMath has no acceptable reason for failing to respond to Plaintiff's post-judgment discovery requests and no acceptable reason for failing to comply with the Court's Order Compelling Defendants/Judgment Debtors to Respond to Post Judgment Discovery, entered on September 15, 2025. His failure has been willful.

Attached hereto as Exhibit "P" is a true and correct copy of the January 27, 2026 Order.

28. The Court gave Mr. McMath until February 3, 2026, to respond and further held: "If McMath has failed to provide all discovery responses by the compliance hearing, he shall be incarcerated." See Exhibit "P".

29. On January 28, 2026, following the Court's Order, the McMath Defendants began producing documents in response to Plaintiff's post judgment discovery, which finally included a copy of a document identified as "ASSET PURCHASE AGREEMENT". See Exhibit "K".

30. The Asset Purchase Agreement dated December 7, 2023 is entered into between Defendant Tommy Boy Artists, LLC ("Buyer"), on the one hand, and Power Artists Records, Inc., doing business as Power Production, Inc., Power Records, Triad Records, Inc., Power Entertainment, Inc., Wrap

Records, and any other affiliated entities, and Leroy McMath, in his individual capacity (jointly and severally referred to as the "Seller"), on the other hand. See Exhibit "K".

31. McMath Defendants' transfer of the Masters and related catalog rights stripped the Judgment Debtors of a significant music asset and thereby hindered, delayed and defrauded Plaintiff by placing that asset beyond reach of recovery on Plaintiff's monetary judgment.

32. The Asset Purchase Agreement states a purchase price of $115,000.00, which was not reasonably equivalent to the value of the income-producing music catalog and related rights transferred therein. See Exhibit "K", paragraph 5.1.

33. The McMath Defendants and TBA LLC further agreed that a subsequent payment would be made to the Seller as defined: "($75,000) (the "Contingent Payment") will be made to Seller on the date that is eighteen (18) months following the Closing Date; provided, however, the Contingent Payment a) shall not be due or payable in the event a lawsuit is filed in any jurisdiction which names Buyer or any of its affiliates whether or not as a result of or in connection with the matters contained in the lawsuit referred to in paragraph 18.2" of the Asset Purchase Agreement. See Exhibit "K".

34. Paragraph 18.2 of the Asset Purchase Agreement states: "Leroy McMath is a

party to a civil action filed by Mathew Peach on June 20, 2022, in the Superior Court, Gwinnet County, Georgia, civil case number 22-A-05274-3. Notwithstanding anything to the contrary contained herein, Seller shall hold harmless and indemnify Buyer for all costs and expenses including attorney fees and court costs that Buyer may incur or may arise as a result of this action or enforcement of any judgment or settlement." All parties to the concealed December 7, 2023, transaction had full knowledge of Mr. Peach's pending Georgia Superior Court Action before consummating the transaction.  See Exhibit "K".

35. The Asset Purchase Agreement is signed on behalf of Tommy Boy Artists, LLC, by Thomas Silverman, its CEO.  See Exhibit "K".

36. Through January 31, 2026, the McMath Defendants produced the aforementioned emails and Asset Purchase Agreement to Plaintiff's undersigned attorney via Dropbox, demonstrating collusive actions to hinder, delay, or defraud Plaintiff as a present creditor. McMath included a message as follows: "Sorry it to so long. This was a lot. Tom [Silverman], ask me to delete these emails. For some reason I did not.  I will take a break and start sending scans."  Attached hereto as Exhibit "Q" is the Dropbox email containing the message from Leroy McMath dated January 31, 2026.

37.    During post judgment discovery, Leroy McMath provided responses to post judgment interrogatories and requests for production.    Said responses demonstrate that he has no assets.    Attached hereto as Exhibit "R" is Leroy McMath's responses to Plaintiff's post judgment discovery.

FURTHER DECLARANT SAYETH NOT.

*I, John M. Duffoo, declare under penalty of perjury, as provided for by the laws of the United States, 28 U.S.C. § 1746 on this the* ___13th___ *day of July, 2026, that the above and foregoing statements are true and correct.*

By: _____

John M. Duffoo

This July 13, 2026.

s/John M. Duffoo, Esq.
GA Attorney Bar No. 231973
Attorney for Plaintiff
Business Law Firm of John M. Duffoo
P.O. Box 767355
Roswell, GA 30076
Telephone: (770) 312-6160
Email: John@jdbusinesslaw.com

17

## **LOCAL RULE 5.1 CERTIFICATION**

Counsel certifies that the DECLARATION was prepared in accordance with the type and font, 14-point Times New Roman, selections approved by Local Rule 5.1.

This July 13, 2026.

s/John M. Duffoo, Esq.
GA Attorney Bar No. 231973
Attorney for Plaintiff
Business Law Firm of John M. Duffoo
P.O. Box 767355
Roswell, GA 30076
Telephone: (770) 312-6160
Email: John@jdbusinesslaw.com

# EXHIBIT "A"

# EXHIBIT "A"

# EXHIBIT "A"



**BUSINESS LAW FIRM**
of John M. Duffoo, P.C.
Attorney at Law

Telephone: (770) 312-6160
8920 Eves Rd
No. 767355
Roswell, GA 30076
Email: John@Duffoolaw.com
www.Duffoolaw.com

June 8, 2022

LeRoy McMath
411 Beaver Ruin Rd
Lilburn, GA, 30047

LeRoy McMath
3631 Chamblee Tucker Rd.
Ste A, #178,
Atlanta, GA 30341

Re: Purchase Agreements:
-Dated 9/20/2018 Between LeRoy McMath and Matthew Smith
-Dated 12/6/2018 Between Matthew Smith and Matthew Peach

LeRoy McMath:

This law firm represents Matthew Peach. Matthew Peach is the successor in interest to a Purchase Agreement dated 9/20/2018, formerly between you, LeRoy McMath (Seller) and prior buyer, Matthew Smith. (See Exhibit "A")  My client subsequently became the assignee of the aforementioned contract on 12/6/2018. (See Exhibit "B")  You previously issued a Letter of Direction directing distributions to Royalty Exchange, Inc. (See Exhibit "C")  Distributions per said Letter of Direction were being made as demonstrated by Exhibit "D" attached hereto.

It is our understanding that you issued a subsequent letter of direction instructing TOMMY BOY MUSIC, LLC a/k/a Tommy Boy Distribution to divert subsequent distributions to you. Said direction was in breach of those agreement and the 9/20/2018 Letter of Direction.

My client demands that you cease interfering with its contractual and legal rights  As you are aware, the Letter of Direction, clearly provides that it was irrevocable. You knew this and have converted property of my client for personal and/or business use. The attached agreements state in relevant part:

> 1.2 - "Seller shall direct its royalty distributor, Tommy Boy ("Distributor"), and any other paying entity to pay the Assigned Royalties directly to Purchaser or Purchaser's administrator. Seller shall execute any document required by any paying entity necessary to assign the Assigned Royalties."

In the Purchase Agreement, it also states:

> 3.6 - "Any royalties collected by Seller after such a change that should have been paid to Purchaser or Purchaser's administrator per this agreement shall be paid directly to the Purchaser by the Seller no later than 15 days after Seller's receipt. Any delay in payment of royalties to the Purchaser will be subject to payment of interest at a rate of 2% per month."

1

My client has authorized me to file a lawsuit against you and any other entities that you have used to convert my client's assets and/or engage in fraudulent activity that is the proximate cause of my client's damages. We are preparing a lawsuit to include claims as follows: (1) Breach of Contract and Account; (2) Tortious interference with contractual and/or business relations; (3) Conversion of property; (4) Fraud; (5) Punitive Damages; (6) Interest; (7) Attorney's fees; and (8) Costs.

As you know, Fraud claims are no dischargeable in bankruptcy pursuant to 11 U.S.C. § 523. Based on the documented evidence, we have zero concern on your liability for fraud. Regardless of your conduct to date, my client does not wish to make legal trouble for you, if you cure the default and other wrongdoings.

Therefore, my client has authorized me to make the following settlement offer: Your conduct of converting distributions owed to my client has resulted in distrust in further business dealing with you. Continuing a business relationship with you is no longer possible. As such, my client has authorized me to offer you a settlement that includes releasing you from the amounts that you have converted from my client, believe to be approximately $50,000.00 and paying you an additional amount of $50,000.00 for the masters/copyrights of this music catalog, you relinquishing all control and interest. Total compensation being $100,000.00.

You are requested to reply to this correspondence by June 17, 2022. Further, please provide an accounting of all distributions received by you since the initial Letter of Direction dated 9/20/2018, attached as Exhibit "C" hereto.

Best Regards,

John M. Duffoo
Attorney at Law

Cc: leroy@wbaball.net; contact@seasidegrillellc.com;

2

3

# EXHIBIT "B"

# EXHIBIT "B"

# EXHIBIT "B"



# BUSINESS LAW FIRM
of John M. Duffoo, P.C.
Attorney at Law

Telephone: (770) 312-6160

8920 Eves Rd
No. 767355
Roswell, GA 30076
Email: John@Duffoolaw.com
www.Duffoolaw.com

June 14, 2022

## LETTER OF DIRECTION
## AND DEMAND TO CEASE CONVERTING FUNDS

Tommy Boy Entertainment, LLC
220 E 23RD ST
STE 400
NEW YORK NY 10010-4669

THOMAS A SILVERMAN
7 GRAMERCY PARK WEST
Unit #3C
NEW YORK NY  10003

Re: Purchase Agreements:
-Dated 9/20/2018 Between LeRoy McMath and Matthew Smith
-Dated 12/6/2018 Between Matthew Smith and Matthew Peach

Tommy Boy Entertainment, LLC:

This law firm represents Matthew Peach.  Matthew Peach is the successor in interest to a Purchase Agreement dated 9/20/2018, formerly between the seller, LeRoy McMath and prior buyer, Matthew Smith. (See Exhibit "A")  My client subsequently became the assignee of the aforementioned contract on 12/6/2018. (See Exhibit "B")  LeRoy McMath previously issued a Letter of Direction to you directing distributions to Royalty Exchange, Inc. (See Exhibit "C") You were making distributions per said Letter of Direction as demonstrated by Exhibit "D" attached hereto.

It is our understanding that Tommy Boy Entertainment, LLC a/k/a Tommy Boy Distribution was making routine distributions to Royalty Exchange, Inc. pursuant to the letter of direction for several years.  It is also our understanding that in December 2021, LeRoy McMath issued a subsequent letter of direction instructing Tommy Boy Entertainment, LLC a/k/a Tommy Boy Distribution to divert subsequent distributions to him, LeRoy McMath.  Said direction was in breach of those agreements and the initial irrevocable Letter of Direction, wherein it states that the direction shall be **irrevocable** by McMath in **perpetuity**. The Letter of Direction further states: "Tommy Boy Distribution is also hereby authorized and directed to accept all future requests from the Assignee with regard to changes to the payee, bank details, and account information associated with the related payments."

Additionally, each of the contracts assigning royalties to Matthew Peach, contains the following Power of Attorney:

Upon execution of this agreement and upon any change in the paying entity for the Assigned Royalties, Seller shall promptly, at Purchaser's request, execute all documents necessary to allow Purchaser to receive the Assigned Royalties

1

("Transfer Documents"). If Purchaser requests Seller to execute a Transfer Document and Seller fails to execute the document within 14 days after the request, **Seller appoints Purchaser, as Seller's true and lawful attorney, to execute all Transfer Documents in Seller's name.** Purchaser shall deliver to Seller copies of all Transfer Documents executed by Purchaser in the exercise of the power of attorney. The power of attorney granted to Purchaser is limited and specific to Transfer Documents.

As such, my client demands that you cease issuing distributions to LeRoy McMath or any company other than Royalty Exchange, Inc. as initially directed in Exhibit "C". Therefore, demand is made that you issue future distributions as follows:

Payments should be delivered together with all statements and any other correspondence to:

Royalty Exchange Inc.
1550 Larimer St. #769
Denver CO 80202
payments@royaltyexchange.com

As you are aware, the Letter of Direction, clearly provides that it was irrevocable. Tommy Boy should not have accepted any subsequent Letters of Direction from LeRoy McMath. The attached agreements state in relevant part:

> 1.2 - "Seller shall direct its royalty distributor, Tommy Boy ("Distributor"), and any other paying entity to pay the Assigned Royalties directly to Purchaser or Purchaser's administrator. Seller shall execute any document required by any paying entity necessary to assign the Assigned Royalties."

> 3.6 - "Any royalties collected by Seller after such a change that should have been paid to Purchaser or Purchaser's administrator per this agreement shall be paid directly to the Purchaser by the Seller no later than 15 days after Seller's receipt. Any delay in payment of royalties to the Purchaser will be subject to payment of interest at a rate of 2% per month."

You are requested to reply to this correspondence by June 17, 2022. We are continuing to investigate the involvement of all entities in the improper distribution/conversion of funds. Ignoring this correspondence may subject any entity that has conspired with LeRoy McMath in converting my client's funds to a civil lawsuit. Further, please provide an accounting of all distributions made to anyone other than Royalty Exchange since the initial Letter of Direction dated 9/20/2018, attached as Exhibit "C" hereto. We also request that you provide a copy of the Letter of Direction you relied on to cease making payments as directed in the 9/20/2018 Letter of Direction.

2

6

My contact information is (770) 312-6160 or john@duffoolaw.com.

We have made several attempts to contact your company; however no one answers your main number. We have also tried to contact Haylee Palmer without success.

Best Regards,

John M. Duffoo
Attorney at Law

Cc: tom@tommyboy.com

3

# EXHIBIT "C"

# EXHIBIT "C"

# EXHIBIT "C"

 **Gmail**

John Duffoo <john@duffoolaw.com>

## Agreement between Power Entertainment/Power Artist Music, Inc. and Tommy Boy Distribution

21 messages

**David Parker** <david.parker@tommyboy.com>                     Mon, Jun 27, 2022 at 3:46 PM
To: "john@duffoolaw.com" <john@duffoolaw.com>

Dear Mr. Duffoo,

I had an opputunity to review the file along with the unilateral  (not signed nor legally bound by Tommy Boy Distribution) Letter of Direction dated September 20, 2018 concerning Mr. McGrath's request to change the payee entitled to receive royalty statements and payments, if any.  The last two sentences state:

> "Tommy Boy Distribution's compliance with this letter will constitute an accommodation solely to me. Tommy Boy Distribution shall have no liability by reason of any erroneous payment or any failure to comply with this letter. I will indemnify and hold Tommy Boy Distribution harmless against any and all claims asserted against Tommy Boy Distribution and shall reimburse Tommy Boy Distribution for any and all damages, losses, or expenses incurred by Tommy Boy Distribution by reason of any failure to comply, erroneous payment or otherwise in connection with this letter."

The above language speaks for itself.

Subsequently Mr. McGrath requested a recoupable advance from Tommy Boy in exchange for an extension of the Term of the distribution agreement and other matters.  Tommy Boy is currently recouping that advance against Net Receipts.

I look forward to receiving from you a settlement agreement regarding this matter.

Best,

David Parker

Legal & Business Affairs

Tommy Boy Artists

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

# EXHIBIT "D"

# EXHIBIT "D"

# EXHIBIT "D"

 Gmail

**John Duffoo <john@duffoolaw.com>**

# Agreement between Power Entertainment/Power Artist Music, Inc. and Tommy Boy Distribution

**John Duffoo** <john@duffoolaw.com>                    Wed, Jun 29, 2022 at 9:11 AM
To: David Parker <david.parker@tommyboy.com>
Bcc: Matthew Peach <matt.peach@hotmail.com>

David,

Thanks for getting back to me.  Please see attached response to your email.  I believe you need to take a closer look at this matter.  My client's legal interests in the property have been converted.  LeRoy McMath's conduct has forced my client to file a lawsuit against him in Georgia.

Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: John@duffoolaw.com
Website: www.Duffoolaw.com

[Quoted text hidden]

 **Letter - Response to Parker June 27 Email.pdf**
1057K



**BUSINESS LAW FIRM**
of John M. Duffoo, P.C.
Attorney at Law

Telephone: (770) 312-6160

8920 Eves Rd
No. 767355
Roswell, GA 30076
Email: John@Duffoolaw.com
www.Duffoolaw.com

June 29, 2022

VIA EMAIL (only): david.parker@tommyboy.com

David Parker, Esq.
Tommy Boy Entertainment, LLC

      Re: Purchase Agreements:
         -Dated 9/20/2018 Between LeRoy McMath and Matthew Smith
         -Dated 12/6/2018 Between Matthew Smith and Matthew Peach

Tommy Boy Entertainment, LLC c/o Attorney David Parker:

This correspondence serves to respond to your June 27th email.   I appreciate you looking into this matter; however, I have great concern that you have not considered all relevant issues and facts.  At this point, we do not know if you are aware of all issues/facts, either because those issues/facts have not been made available to you or they have been hidden from you by LeRoy McMath.

We have reason to believe that LeRoy McMath has acted in a fraudulent manner and converted my client's legal interest in royalties that Tommy Boy has been distributing appropriately for several years.  Your email confirms our belief, wherein you state that McMath requested a "recoupable advance" from Tommy Boy.  Tommy Boy has apparently used royalties owned by my client to pay back that advance.  We want to think that Tommy Boy is a victim to LeRoy McMath's fraud, but if my client's ownership interest continues to be used to pay McMath's advance, Tommy Boy is clearly participating in McMath's conversion of property.  I suggest that we work together and put pressure on McMath to rectify this abuse of my client's property and putting your company at risk.

You have already been provided with copies of the two contracts demonstrating my client's interest in the assets that Tommy Boy has been directed to distribute.  You have actual knowledge that my client owns certain interests in the asset.  Continued action inconsistent with my client's ownership interest represents conversion of my client's property.  In addition, attached is a Letter of Direction dated June 18, 2022, that Tommy Boy received from McMath on June 24th via email to accounts@tommyboy.com.  See attached.

Knowing these facts, if Tommy Boy continues to assist McMath in his fraudulent activity, Tommy Boy may be opening itself to potential litigation.  I believe that McMath has used Tommy Boy in his effort to deprive my client from his investment/property.  I believe that he did this to fund a startup restaurant in Lilburn, Georgia known as Seaside Grille Of Lilburn (https://seasidegrillellc.com).

1

My client simply wants this matter to return to the status quo that existed prior to December 2021, wherein Tommy Boy was making payment to Royalty Exchange. At this point, you are aware that Tommy Boy is using a third party's money to repay McMath's advance. Surely, you can see this is not legal or appropriate. It is my understanding that the relevant masters (a.k.a sound recording) royalties contain 3 income streams; sales, streaming and synch. McMath sold off the sales and streaming rights; but McMath still gets paid regularly from Tommy Boy for synch deals. Tommy Boy's advance can be paid off with Leroy's remaining rights/synch income that is unsold.

Further, this is our second request that you provide an accounting of all distributions made to anyone other than Royalty Exchange since the initial Letter of Direction dated 9/20/2018. We also request that you provide a copy of the Letter of Direction you relied on to cease making payments as directed in the  9/20/2018 Letter of Direction.

Please note that a lawsuit has already been filed in Georgia against LeRoy McMath. If you do not want to volunteer the information that I have requested, we will seek judicial intervention and force production.

My contact information is (770) 312-6160 or john@duffoolaw.com.

Best Regards,

John M. Duffoo
Attorney at Law

2

13

6/18/2022

## Letter of Distribution

To whom it may concern:

As of June 17, 2022, Tommy Boy Distribution is hereby authorized and directed to pay to Royalty Exchange Inc. ("**Assignee**"), 100% of my interest in all "Net Receipts" as defined in our agreement payable to me under my current
distribution agreement with you. This direction shall be irrevocable by me in perpetuity. Payments to the Assignee should be delivered together with all statements and any other correspondence to the Assignee as follows:

Royalty Exchange Inc.
1550 Larimer St. #769
Denver, CO 80202
payments@royaltyexchange.com

Tommy Boy Distribution is also hereby authorized and directed to accept all future requests
from the Assignee with regard to changes to the payee, bank details, and account information associated with the related payments.

Tommy Boy Distribution compliance with this letter will constitute an accommodation solely to
me. Tommy Boy Distribution shall have no liability by reason of any erroneous payment or any
failure to comply with this letter. I will indemnify and hold Tommy Boy Distribution harmless
against any and all claims asserted against Tommy Boy Distribution and shall reimburse Tommy Boy Distribution for any and all damages, losses, or expenses incurred by Tommy Boy Distribution by reason of any failure to comply, erroneous payment or otherwise in connection with this letter.

Sincerely,

Leroy McMath
Power Entertainment Co

14

# EXHIBIT "E"

# EXHIBIT "E"

# EXHIBIT "E"

15

 **Gmail**                                                                                John Duffoo <john@duffoolaw.com>

**FOR SETTLEMENT PURPOSES ONLY Agreement between Power Entertainment/Power Artist Music, Inc. and Tommy Boy Distribution**
79 messages

**David Parker** <david.parker@tommyboy.com>                                                                Wed, Jul 6, 2022 at 2:13 PM
To: John Duffoo <john@duffoolaw.com>

FOR SETTLEMENT PURPOSES ONLY

Hi John,

It was nice speaking with you last week.  I am responding to the emails you sent on Wednesday June 29th and their attachments.

The second email sent at 4:45pm on Wednesday June 29th, attached a "Service Copy" of the complaint you filed on behalf of Matthew Peach, Plaintiff against John McMath & Doe 1, Defendents.  To the extent this was an attempt at service of process on Tommy Boy Artists, LLC, its members, executives and/or employees ("TBA"), be advised that I am <u>not</u> authorized to accept service of process in this or any other litigation.  To be clear, your attempted service is not effective.

Obviously there is a serious dispute between your client and Power Entertainment/McMath.  TBA has an exclusive, worldwide valid and enforcable agreement with Power Entertainment and has at all times abided by its terms and conditions.  To the extent you are alleging fraud, conspiracy, conversion, or any other wrongdoing by TBA under the agreement or otherwise, that is hereby denied in its entirely.

Pursuant to the amendment to the Agreement dated December 20, 2021, Power Entertainment requested an advance against royalties in the amount of $100,000.00.  It was agreed that the term of the Agreement would be extended and continue until the later of 1) three (3) years from the date of the advance or 2) the end of the month in which the advance is fully recouped.  Power Entertainment is prohibited from selling, assigning or otherwise hypothecating the Products or the underlying intellectual rights thereto.  Power Entertainment granted TBA the right of first refusal regarding any proposed sale of the catalog.

TBA received two (2) Letters of Direction the first dated September 20, 2018 which requested TBA to pay Royalty Exchange 100% of my interest in all "Net Receipts" as defined in and currently payable to me under my distribution agreement with you.  The other LOD dated June 18, 2022, requested TBA to pay Royalty Exchange fifty (50%) of Net Receipts on the same basis.  Both LODs have the identical language as follows:

"Tommy Boy Distribution's compliance with this letter will constitute an accommodation solely to me. Tommy Boy Distribution shall have no liability by reason of any erroneous payment or any failure to comply with this letter. I will indemnify and hold Tommy Boy Distribution harmless against any and all claims asserted against Tommy Boy Distribution and shall reimburse Tommy Boy Distribution for any and all damages, losses, or expenses incurred by Tommy Boy Distribution by reason of any failure to comply, erroneous payment or otherwise in connection with this letter."

 Since the terms of the letters of direction seem to be in conflict and you have filed a lawsuit against Leroy McMath claiming among other matters a right to the royalties under the agreement, TBA must take the position of a stakeholder.  TBA cannot account and pay royalties to anyone unless all parties to the complaint enter into a court approved settlement and dismiss the complaint and/or the judge in the matter orders TBA to pay a certain party.

I will do all I can to reasonably resolve this matter with you and McMath, however, I cannot put my client in any jeopardy legal or otherwise.  In furtherance to attempt to settle this matter, TBA is prepared to offer the following for settlement purposes only:

1. TBA will pay fifty (50%) of Net Receipts to Royalty Exchange with the other fifty (50%) applied to the unrecouped balance.
2. The complaint is to be withdrawn or in the alternative, your client agrees to hold harmless TBA in this matter including any litigation to include attorney fees and court costs.
3. All parties involved sign off on the above.

Please let me know if the above is acceptable to your client.

The foregoing is not intended to be a complete statement of the facts or the law relevant to this matter, nor of my client's legal and equitable rights and remedies and nothing hereinabove set forth or omitted shall be deemed a waiver or limitation of any right, remedy or cause of action of any kind whatsoever, all of which are hereby expressly reserved to my client.  All rights reserved.

Best,

David


David Parker

Legal & Business Affairs

Tommy Boy Artists


The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

17

# EXHIBIT "F"

# EXHIBIT "F"

# EXHIBIT "F"

# John Duffoo

| | |
|---|---|
| **From:** | David Parker <david.parker@tommyboy.com> |
| **Sent:** | Thursday, August 15, 2024 3:18 PM |
| **To:** | John Duffoo |
| **Subject:** | Re: Peach v. McMath, Power Entertainment 22-A-05274-3 |

John,

You initially stated when you first contacted me that this matter would be resolved quickly.  It is now going on September and their is still no resolution.  As I have stated in the past, Tommy Boy will release funds it may be holding and otherwise due upon proof of a final, non-appeable judgement or full and final settlement of the above matter.  My offer of having your client sign a general release in favor of Tommy Boy was rejected by you.  Anything short of that will be disregarded.

David


David Parker

Legal & Business Affairs

Tommy Boy Entertainment



The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Friday, August 9, 2024 12:19 PM
**To:** Tom Silverman; Tom Silverman
**Cc:** David Parker
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

Tommy Boy/ Thomas Silverman:

On July 11, 2024, a subpoena was served on you.  Attached is a copy.  Further attached is a good faith letter attempting to resolve your failure to respond prior to seeking an order compelling your responses.


Best Regards,

1

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No. 767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

---

**From:** John Duffoo
**Sent:** Thursday, July 11, 2024 6:10 PM
**To:** David Parker <david.parker@tommyboy.com>
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

Thanks for confirming David. As a courtesy, attached is the revised Subpoena sent directly to TB and Thomas Silverman.


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No. 767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

---

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Thursday, July 11, 2024 2:44 PM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

I am not an active attorney.

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product. If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

2

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Thursday, July 11, 2024 2:40 PM
**To:** David Parker
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

Ok thanks I will reissue.  This is typically not a problem that I run into.

Can you confirm that you are still an active attorney and if so, which state are you currently licensed?  I just want to make sure that all my communications are directed to the correct people as required by my State Bar Rules.

Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Thursday, July 11, 2024 12:02 PM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

Hi John,

Please see the attached copy of the email I sent to you on July 6, 2022, in which you were informed of my status.  I have highlighted the second paragraph to the effect that I am not authorized to accept service in this or any other matter regarding Tommy Boy entities or Tom Silverman.  Any attempted service on me by email or otherwise is invalid.

All rights reserved, etc.

David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

3

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Tuesday, July 9, 2024 6:32 PM
**To:** David Parker
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

Today, the attached subpoena was served on you for documents pertaining to Tommy Boy and the above legal action.  Since TB no longer desires to voluntarily cooperate with us, my client has authorized me to take involuntary actions, which will include, if necessary, legal action against TB for conversion and forcing TB to tender any funds it is holding into the Registry of the Court or other neutral 3rd party.

We request that before additional legal action in pursued, you will reconsider TB's current position.

Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

4

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Thursday, June 13, 2024 4:09 PM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

John,

As I discussed on the phone, I don't think we are on the same page regarding your client signing a release in favor of Tommy Boy.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Thursday, June 13, 2024 12:43 PM
**To:** David Parker
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

May 31st I sent you an email and followed up on June 7th.  Please advise on TB response.


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com


---

**From:** John Duffoo
**Sent:** Friday, June 7, 2024 3:49 PM
**To:** David Parker <david.parker@tommyboy.com>
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

5

David,

Following up on my email from May 31st.


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com


---

**From:** John Duffoo
**Sent:** Friday, May 31, 2024 3:11 PM
**To:** David Parker <david.parker@tommyboy.com>
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

I've been traveling and dealing with end of school parent duties, so I apologize for the delay.

While my client is not opposed to a general release, for that to be realistic at this point, the general release must include the following:
- Provide the missing statements (I believe from August 2023) up to current inclusive.
- Restart monthly royalty payments to Royalty Exchange for the benefit of Matthew Peach, as they were from December 2018-November 2021 before Leroy's alleged wrongful conduct commenced.
- Agree to release all accumulated money held to Matthew Peach (should be approx. $125k)
- Agree not to redirect future royalty payments to any other entity or individual without the signed agreement of BOTH Matthew Peach and Leroy McMath.

If TB can agree to these additional terms, then I believe my client will execute a general release.


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

6

24

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Tuesday, May 14, 2024 3:42 PM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

Hi John,

Please see the attached draft of the general release in this matter.  Let me have your comments.

Note that Mr. Silverman is out of the country until this weekend so I must reserve for any changes or comments he may have.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** David Parker
**Sent:** Friday, May 10, 2024 9:51 AM
**To:** John Duffoo
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

Hi John,

Was away for a couple of days.  I'll get the release out for your review.

David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Wednesday, May 8, 2024 4:28 PM
**To:** David Parker
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

Sorry for the delay, but I had a sick kid.  Yes, I believe I misunderstood your email.  Do you have a general release for my client to consider that would be acceptable to get Matthew's money released?

Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Friday, May 3, 2024 10:24 AM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

John,

You have misunderstood my last email.  I am not asking you to consider a general release rather to provide Tommy Boy with an executed general release.  Without the signed release, Tommy Boy will follow industry standards in such disputes.  Those are providing a final non-appealable judgement in your favor or a full and final settlement of the outstanding litigation.

Please advise your client accordingly.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

8

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Thursday, May 2, 2024 5:41 PM
**To:** David Parker
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

If your client wants my client to consider a general release, then it must resume payments to my client and deliver any money that Tommy Boy is holding.  Otherwise, I will advise my client to file a lawsuit seeking Tommy Boy to release my client's funds.  We are not extending the May 6th deadline.


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com


**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Thursday, May 2, 2024 4:03 PM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

Hi John,

I now had the opportunity to discuss this matter with the principal of Tommy Boy.  As you know, the letters of direction are in no way binding on Tommy Boy.  I have pointed this out to you many times in the past.  Tommy Boy's providing statements was a courtesy I extended tto you in anticipation of a quick resolution in the legal case involving Leroy McMath.  It is apparent that this case will drag on for some time and Tommy Boy will cease providing information as a courtesy or otherwise.  As I have suggested to you in the past, if your client is willing to enter into a general release of all claims in favor of Tommy Boy we will provide whatever we have.

The foregoing is without prejudice and is not meant to constitute an exhaustive analysis or statement of Tommy Boy's factual or legal position in this matter.  Nothing set forth herein or omitted herefrom is intended as, or shall be deemed to constitute, any admission against interest, or any waiver, relinquishment or limitation of any of Tommy Boy's rights, claims, interests, defenses or positions, whether factual or legal, whether at law or in equity, all of which are hereby expressly reserved.

Sincerely,
David Parker

9

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** David Parker
**Sent:** Monday, April 29, 2024 5:19 PM
**To:** John Duffoo
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

John,

I have set up a call for tomorrow morning with the powers that be and will email you thereafter.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Friday, April 26, 2024 11:59 AM
**To:** David Parker
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

We have been trying to get additional statements and ascertain the status of the McMath Advance, that we believe has been paid in full.  At this point, we have reached out to you for additional information, but have not heard back from you for approximately 1 month.  Since the McMath Advance has been repaid, there is no legal reason for continuing to hold the royalties that belong to Matthew Peach.  You have been provided with the agreements that govern the royalties and the last Letter of Direction dated 6/18/2022 that McMath sent authorizing you to send payments & statements to Royalty Exchange.  Attached is a copy for your review.

We request that any funds currently being held by Tommy Boy, be remitted to Royalty Exchange along with the corresponding statements.  Future royalties should be processed and remitted to Royalty Exchange going

10

forward. We do not wish to increase anyone's liability or expense; however if Tommy Boy continues to hold the funds that belong to Matthew Peach, we will consider legal action for conversion.

Since it has been over a month since we reached out to you, without response, if we do not hear from you by May 6th, I will presume that you no longer represent Tommy Boy and/or Tom Silverman and I will direct further communications directly to them.


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No. 767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

---

**From:** John Duffoo
**Sent:** Monday, April 22, 2024 4:09 PM
**To:** David Parker <david.parker@tommyboy.com>
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

My initial email was sent a month ago. Please provide additional statements. Also, please confirm that the amounts owed to TB has been fully paid?


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No. 767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

---

**From:** John Duffoo
**Sent:** Wednesday, March 27, 2024 9:19 AM
**To:** David Parker <david.parker@tommyboy.com>
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

11

David,

Following up on my email from March 22nd.

John

---

**From:** John Duffoo
**Sent:** Friday, March 22, 2024 2:16 PM
**To:** David Parker <david.parker@tommyboy.com>
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

Please provide me with additional statements.  I presume that the amounts owed to TB has been fully paid, please confirm?


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com



---

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Monday, October 30, 2023 2:11 PM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

Hi John,

As a courtesy, I am attaching April 2023 and July 2023 statements.  July will be sent separately.

Please advise as to the developments in the case and whether there have been any settlement discussions.  I would appreciate that very much.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

12

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Thursday, October 26, 2023 5:14 PM
**To:** David Parker
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

I'm missing the April 2023 Distribution Statement, can you please send ASAP?

Also, we received the May and June statement last month, do you have any more current Statements?  If so, please send.


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

---

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Friday, September 1, 2023 2:51 PM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

Hi John,

It's been a crazy couple of weeks.  As a courtesy to you, I am forwarding the accountings in this matter for the months of May and June 2023.  Due to its file size, June will be attached in a separate email.  I cannot find my copy of April and will get it to you ASAP.

Please bring me up to date as to the transfered court proceedings when you know more  and when we may expect to have a resolution of this matter.

Thank you very much.  All rights reserved, etc.

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Tuesday, August 29, 2023 2:58 PM
**To:** David Parker
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

Following up on additional statements?


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com


---

**From:** John Duffoo
**Sent:** Monday, August 21, 2023 10:09 AM
**To:** David Parker <david.parker@tommyboy.com>
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

Just updating you on this matter.  The litigation is ongoing; however, the Gwinnett County Court has transferred the lawsuit to Dekalb County, which is requesting that the parties mediate soon.  I have engaged opposing counsel for mediation purposes, and I'll let you know how those efforts progress.

Do you have additional accountings at this time?


Best Regards,

14

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

---

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Friday, June 16, 2023 9:44 AM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

Hi John,

Trust you are well.  As a courtesy to you, I am forwarding the accountings in this matter for the months of February and March 2023.  Due to its file size, March will be attached in a separate email.

Can you please bring me up to date as to the court proceedings and when we may expect to have a resolution of this matter.

Thank you very much.  All rights reserved, etc.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Tuesday, April 18, 2023 3:48 PM
**To:** David Parker
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

David,

Thanks.  McMath's attorney withdrew her motion to withdraw….so at this time he is still represented.

15

John

---

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Tuesday, April 18, 2023 3:39 PM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, Power Entertainment 22-A-05274-3

Hi John,

Attached are the accountings for the months of November 2022, December 2022, and January 2023.  December and January will be sent separately due to the size of the files.

You previously indicated that McMath's attorney withdrew from the case.  Please let me know if that is still true.

As you can see from the statements, Tommy Boy Entertainment holds Net Receipts in the amount of $38,560.73, in accordance with the distribution agreement and industry standards.

All rights reserved, etc.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Monday, April 17, 2023 5:26 PM
**To:** David Parker
**Subject:** Peach v. McMath, Power Entertainment 22-A-05274-3

David,

I'm transitioning to a new permanent email address.  The last statements received from you where on January 24th, which included the September and October statements.  No additional statements have been received.  Also, we expect this matter to be set for the June 2023 motions calendar.  Please confirm that you continue to hold the money in dispute in trust.  Please also confirm the amount currently held.

Best Regards,

John M. Duffoo

16

Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

17

35

# EXHIBIT "G"

# EXHIBIT "G"

# EXHIBIT G

36

 **Outlook**

---

**Power- masters**

---

**From** leroy wbaball.net <leroy@wbaball.net>

**Date** Mon 10/16/2023 10:00 AM

**To**   Thomas Silverman <thomas.silverman@tommyboy.com>

**Cc**   leroy wbaball.net <leroy@wbaball.net>


Good morning, Tom, hope all is well. I had a couple more investors follow up with me about Power Records masters. The attorneys are telling me I should sell the rights, which would void any claims peach believes he has with Power, and fight him in court for the back payments.
The investors are aware of the issues with the titles, no current royalty statements and the 35-year law, and say the master's value is fifty percent or less than what they would be if I had clear titles and my paperwork in order, they believe, no one will pay full price.

I had offers over the past three months and all the numbers were very low. One of the company said if I accept their offer, they could have me a check within seven days of accepting offer.
I really feel it would be in my best interest to sell everything, make other investment and move on. Tom, you and TB have always had my back.... Therefore, I feel if I'm going to sale these masters for less than value! I would rather offer to you or one of your entities.

Regards,
Leroy

# EXHIBIT H

# EXHIBIT H

# EXHIBIT H

38

 **Outlook**

---

## Re: [SPF ERROR] Re: Power-masters

---

**From** leroy wbaball.net <leroy@wbaball.net>

**Date** Mon 10/30/2023 1:49 PM

**To**      Tom Silverman <thomas.silverman@tommyboy.com>

Tom,
 My loyalty is with TB. Yes, they know about the deal, and royalty liabilities and the $100k,  I sent the investors an email telling them I will have to pass on their deal. Heck if I have to wait three more weeks I guess it want kill me.

Leroy

---

**From:** Tom Silverman <thomas.silverman@tommyboy.com>
**Sent:** Monday, October 30, 2023 1:30 PM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Subject:** Re: [SPF ERROR] Re: Power-masters

If you feel you need to move this week, I guess it's ok. It will take us 3 weeks to complete a deal with you.

Do buyers know about the distribution deal term? Do they know about potential artist royalty liabilities?
Will you have to pay Peach the $100,000 you took as advance to get the suit dropped?
Love Always,
Tom Silverman

> On Oct 30, 2023, at 1:24 PM, leroy wbaball.net <leroy@wbaball.net> wrote:
>
>
> Tom, they are not happy with me at the moment. The buyers think I dragged them out for two months now pulling out the deal. I told them I need a few hours to think about it.
> Are you ok with me selling to someone else?
>
> Leroy
>
> ---
> **From:** Tom Silverman <thomas.silverman@tommyboy.com>
> **Sent:** Monday, October 30, 2023 11:17 AM
> **To:** leroy wbaball.net <leroy@wbaball.net>
> **Subject:** Re: [SPF ERROR] Re: Power-masters

We are still interested.  It is just that we only closed the publishing deal a week ago and we need to digest that before we can eat again.  I told you it would take around three or four weeks to digest the publishing. What kind of LOD and what kind of a reduction in payment are they now talking about?

Love Always,
Tom
212-655-9555

---

**From:** Leroy McMath <leroy@wbaball.net>
**Date:** Monday, October 30, 2023 at 11:12 AM
**To:** Thomas Silverman <thomas.silverman@tommyboy.com>
**Subject:** Re: [SPF ERROR] Re: Power-masters

Don't know if this is going to work, they want a 1.) Release  2.) L.O.D and 3.)to pay less than what they agreed to.

   1.

---

**From:** leroy wbaball.net <leroy@wbaball.net>
**Sent:** Monday, October 30, 2023 11:01 AM
**To:** Tom Silverman <thomas.silverman@tommyboy.com>
**Subject:** Re: [SPF ERROR] Re: Power-masters

Fred and Brain Mckinsie

---

**From:** Tom Silverman <thomas.silverman@tommyboy.com>
**Sent:** Monday, October 30, 2023 10:55 AM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Subject:** Re: [SPF ERROR] Re: Power-masters

Who is the potential buyer?

Love Always,
Tom
212-655-9555

---

**From:** Leroy McMath <leroy@wbaball.net>
**Date:** Monday, October 30, 2023 at 10:43 AM
**To:** Thomas Silverman <thomas.silverman@tommyboy.com>
**Subject:** [SPF ERROR] Re: Power-masters

He just said if they purchased the masters, I would have to give them a letter stating that you are aware that I'm selling.

---

**From:** leroy wbaball.net
**Sent:** Monday, October 30, 2023 10:16 AM

**To:** Thomas Silverman <thomas.silverman@tommyboy.com>
**Subject:** Power-masters

Good morning, Tom I heard from the agent over the weekend. He was trying to get me to sign the documents for the master deal. He also said they would need a release letter from TB if I moved forward.
I told them I was looking at other options, $430K would really help my account this week! There seems to be a sense of urgency for them to get this deal done today.
 I will not sign a deal without your knowledge. Let me know your plans for acquiring the masters. Then I will know how to respond back.

Regards,
Leroy

# EXHIBIT I

# EXHIBIT I

# EXHIBIT I

 **Outlook**

---

### Re: [SPF ERROR] Power records- Masters

---

**From** leroy wbaball.net <leroy@wbaball.net>

**Date** Sat 11/11/2023 12:15 PM

**To**    Tom Silverman <thomas.silverman@tommyboy.com>

I ready to sell to you. We can do a small sale price, like $100k. Then you can sell back with a new company as you stated. The sooner the better... so that the agreement with Royalty Exchange terminates, and future payments can be redirected to new owners. I agree the accounting needs to be Kept current, and artist needs to be paid when due.
Regards

---

**From:** Tom Silverman <thomas.silverman@tommyboy.com>
**Sent:** Thursday, November 9, 2023 11:05 AM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Subject:** Re: [SPF ERROR] Power records- Masters

I suggested selling to me and I sell to you with a new company.  I think going forward, accounting to and paying artists regardless of their recoupment position would be necessary in the case of a new company.

Love Always,
Tom
212-655-9555

---

**From:** Leroy McMath <leroy@wbaball.net>
**Date:** Thursday, November 9, 2023 at 9:49 AM
**To:** Thomas Silverman <thomas.silverman@tommyboy.com>
**Subject:** [SPF ERROR] Power records- Masters

Tom, I understand it's hard to get a true value because of the issues with some of MC Breed masters, so where do we go now? the masters have been like this for over 30 years. I know it would take another two to three to clear. As a friend what would you recommend?
If you do not purchase, an entertainment attorney in L.A recommended forming a new company with partners, and sell Power Records to it. Then any agreement that was in place would be void.
thoughts???

# EXHIBIT J

# EXHIBIT J

# EXHIBIT J

44

 **Outlook**

---

## Re: [SPF ERROR] Re: PowerAPA

---

**From** David Parker <david.parker@tommyboy.com>

**Date** Thu 12/7/2023 10:08 AM

**To**   leroy wbaball.net <leroy@wbaball.net>

**Cc**   Tom Silverman <thomas.silverman@tommyboy.com>

Thank you!  I will prepare the agreement now and it will go thru Docusign for signature.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** leroy wbaball.net <leroy@wbaball.net>
**Sent:** Thursday, December 7, 2023 8:36 AM
**To:** David Parker
**Cc:** Tom Silverman
**Subject:** [SPF ERROR] Re: PowerAPA

Good Morning David,

I accept Tommy Boy offer. Please send over the agreement to be executed, and I will send back today.

Regards,
Leroy

---

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Wednesday, December 6, 2023 7:23 PM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Cc:** Tom Silverman <thomas.silverman@tommyboy.com>
**Subject:** Re: PowerAPA

Hi Leroy,

Thanks for you patience.  Tommy Boy is prepared to significantly raise our offer based on our close and successful business relationship over the years.

a. Purchase Price of $115,000 payable on closing.  We will delete the $20,000 holdback and instead provide for a 90 day period after the closing during which Seller will make available for Buyer inspection and pickup of all tapes, legal papers and related assets; and

b. $75,000 as a bonus payment _only 1) no lawsuit is filed_ naming Tommy Boy, 2) payable 18 months from the Closing Date, and, 3) any and all costs and expenses incurred due to claims (as opposed to the actual filing of a lawsuit) made contrary to the representations and warranties of Seller under the APA, will be deducted from the bonus amount payable.  Of course this provision will not limit Tommy Boy's other rights and remedies under the APA.

I believe that this is a very fair offer in light of the significant risks involved.  I would ask that we hear back from you tomorrow.  I am hoping you can agree to the above so that all parties know where they stand and we can move forward immediately to signing the agreement and paying the Purchase Price.

Thank you and have a good evening.  I look forward to hearing from you tomorrow.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** leroy wbaball.net <leroy@wbaball.net>
**Sent:** Wednesday, December 6, 2023 11:31 AM
**To:** David Parker
**Subject:** Re: [SPF ERROR] PowerAPA

Good deal. I did not text nor call him, didn't think it was a good idea. If the money is a deal breaker, Brian still has $300k on the table, I could put $50k in the attorney escrow account void the Royalty Exchange agreement and still walk away with $250k with no future expense to Tommy Boy.

Regards.

---

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Wednesday, December 6, 2023 10:30 AM
**To:** leroy wbaball.net <leroy@wbaball.net>

**Cc:** Tom Silverman <thomas.silverman@tommyboy.com>
**Subject:** Re: [SPF ERROR] PowerAPA

I'm waiting to hear to hear back from Tom.  His decision.
Best,
David

David Parker
Legal & Business Affairs
TommY BoY Entertainment
Direct 917-617-7774


On Dec 6, 2023, at 10:28 AM, leroy wbaball.net <leroy@wbaball.net> wrote:


David, I have a lot going on today. I'm sure does as well. i really appreciate if you could let me know this morning if we are going to close this deal. if what I sent you last night is not acceptable let me know as soon as possible, I have an option that I think could be a solution.

Regards
leroy

# EXHIBIT K

# EXHIBIT K

# EXHIBIT K

48

# John Duffoo

| | |
|---|---|
| **From:** | leroy wbaball.net <leroy@wbaball.net> |
| **Sent:** | Wednesday, January 28, 2026 1:42 PM |
| **To:** | John Duffoo |
| **Subject:** | Re: Peach v. McMath, et al.; Post Judgment File No.: 25CV8093-7 - related to CAFN: 23cv6869 |

Resent as a PDF in drop box. I was able to open the files.

Regards,

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Wednesday, January 28, 2026 1:02 PM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Subject:** RE: Peach v. McMath, et al.; Post Judgment File No.: 25CV8093-7 - related to CAFN: 23cv6869

Leroy,

Unfortunately, what you shared is not legible. This is all I see.

- <!DOCTYPE html>
- <!-- saved from
url=(0497)https://apps.docusign.com/sign/app?ti=71dbbdb0d0bf49749cc3589093feeca1&signing-config=%7B%22SigningAppDisabledFlags%22%3A%22%22%2C%22EnableKazmonTelemetryRecorder%22%3Atrue%2C%22NotaryFetchSettings%22%3A%7B%22LiveoakTokenRequestTimeoutSeconds%22%3A30%2C%22EnableRemoteNotaryAuth%22%3Atrue%2C%22IsThirdPartyNotary%22%3Afalse%2C%22LiveoakTokenExchangeOrigin%22%3A%22%22%7D%2C%22WebFormsSettings%22%3Anull%2C%22OneDSMessagingOrigins%22%3Anull%2C%22FocusedViewSource%22%3Anull%7D&site=NA4.docusign.net -->
- <html lang="en" dir="ltr" class="mouse-active"><head><meta http-equiv="Content-Type" content="text/html; charset=UTF-8">

Plus there is NO documents in the shared folder. I should see a PDF. You may need to download the documents from Docusign to your computer in a PDF format and then upload the document to the Dropbox folder. Example, I'm going to upload the recent court order and you will see what it is supposed to look like.

1



https://www.dropbox.com/scl/fi/en7o68ir34gfpe0ivwt4t/FILED-Order-on-Discovery-Deadline-and-Compliance-Hearing.pdf?rlkey=t5p7ru8jnhnxnn0so1vgjwt0z&st=zr07q4cx&dl=0


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No. 767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com


---

**From:** leroy wbaball.net <leroy@wbaball.net>
**Sent:** Wednesday, January 28, 2026 12:10 PM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, et al.; Post Judgment File No.: 25CV8093-7 - related to CAFN: 23cv6869

Attorney Duffoo, I was able to recovered from Docusign the master sales agreement dated December 7th 2023 between Power Artist Records and Tommy Boy Artist LLC. The contract is 14 pages, and over one hundred additional exhibits. Please advise how you would like to receive? expect answers to the post judgement request on or before Friday January 30th 2026.

Regards,

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Wednesday, January 28, 2026 10:21 AM
**To:** Bilic, Renata <rbilic2@dekalbcountyga.gov>; leroy wbaball.net <leroy@wbaball.net>
**Subject:** RE: Peach v. McMath, et al.; Post Judgment File No.: 25CV8093-7 - related to CAFN: 23cv6869

Thank you, Renata.

2

# John Duffoo

| | |
|---|---|
| **From:** | Dropbox <no-reply@dropbox.com> |
| **Sent:** | Wednesday, January 28, 2026 2:21 PM |
| **To:** | John Duffoo |
| **Subject:** | Leroy McMath sent you a file |

## Download them by February 4, 2026 at 11:59 PM GMT-05:00



Easily send large files

Hi John,

**Leroy McMath (leroy@wbaball.net) sent you a file.** It'll be available to download until **February 4, 2026 at 11:59 PM GMT-05:00**.

**Leroy left you a message:**

*"Post Judgement documents. Leroy McMath 1-28-26"*

   Complete_with_DocuSign_ASSET_PURCHASE_AGREEM.pdf
7.91 MB

**Download files**

This email was sent to john@jdbusinesslaw.com. If that isn't your email, report to Dropbox

© 2026 Dropbox

1

51

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of December 7, 2023 (the "Effective Date") by and among TOMMY BOY ARTISTS, LLC ("Buyer"), on the one hand, and POWER ARTISTS RECORDS, INC., doing business as POWER PRODUCTION, INC., POWER RECORDS, TRIAD RECORDS, INC., POWER ENTERTAINMENT, INC., WRAP RECORDS, and any other affiliated entities, and LEROY MCMATH, in his individual capacity (jointly and severally referred as the "Seller"), on the other hand.

## WITNESSETH

A.      WHEREAS, Buyer is in the business of acquiring ownership of and the right to receive royalties and all other income derived from sound recordings;

B.      WHEREAS, Seller owns certain rights and interests including but not limited to the copyrights, to the sound recordings performed and recorded by Eric Timmons p/k/a "Freak Nasty", Eric Breed p/k/a "MC Breed", Patrick Hall p/k/a "Gangsta Pat" and others, some of which are listed on the attached Schedule 1 (the "Masters");

C.      WHEREAS, Seller has entered into certain agreements in which all of the ownership interests including but not limited to copyrights, have been acquired, some of which are attached as Exhibit A hereto (the "Artist Agreements"); and

D.      WHEREAS, the Seller wishes to sell and Buyer wishes to acquire from the Seller, (1) one hundred percent (100%) of Seller' right, title and interest in and to the Masters, including but not limited the world-wide copyrights, as renewed and extended, in perpetuity, whether now known or hereafter discovered or developed; (2) all income ownership and collection rights of the Masters, regardless of when earned; (3) all right, title and interest relating to any Samples or derivative works of the Masters; (4) those physical materials of Seller, including all master tapes both physical and digital media, that relate to the Masters described in clause B above, artwork (e.g. record cover designs, films, and other commercial artwork for the promotion of Artist works), photographs, and digital and analog files of images used in manufacturing, production, marketing and promotion, music videos and all paper and computer files (including artist, production, and distribution contracts); and (5) all other rights and benefits of the Seller with respect to the Artist Agreements, production agreements, and any third party licenses for the use of the Masters (the properties and rights described in clauses (1) through (5) are, collectively, the "Assets").

NOW THEREFORE, in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged by the Parties, it is agreed as follows:

1.      **Purchase and Sale.**

        1.1      In each case set forth below, in consideration of and subject to receipt of the Purchase Price, Seller hereby irrevocably, unconditionally, absolutely and in perpetuity grants, sells, transfers and assigns (by way of present and future assignment, if applicable) to Buyer, in each case free and clear of all liens, claims, mortgages, encumbrances, securities interests, pledges, or other restrictions:

        (a)      One Hundred (100%) percent of Seller' economic rights of any nature whatsoever under or pursuant to the Assets, including, without limitation, the right to receive directly from any distributor of the Masters, One Hundred (100%) percent of income and collection rights consisting of income and royalties paid or credited on or after the Closing Date (regardless of when earned); and

        (b)      Absolutely, irrevocably and exclusively, one hundred (100%) percent of Seller' entire right, title and interest (whether vested, future or contingent) in and to the Masters, including, without

1

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

restriction or limitation, the right to own and administer, collect and retain, one hundred (100%) percent of all income of any nature whatsoever from any source throughout the universe related to such Masters (regardless of when earned) which Seller acknowledge may include forms or sources of income which may be later known or developed, including, without limitation, SoundExchange and other neighboring rights collection organizations throughout the world and payable after the Closing Date (regardless of when earned).  In consideration of receipt of the Purchase Price, the rights assigned to Buyer hereunder shall include, without limitation, the sole and exclusive rights throughout the universe, without restriction or limitation, to own and administer in their entirety, the Masters.  Concurrent with the execution of this Agreement, Seller shall execute a short form assignment of copyright, a form of which is attached hereto as Exhibit B, in respect of Buyer's interest in the Masters.

    1.2    The rights assigned to Buyer under this Agreement include, without limitation, Buyer's right, throughout the universe to: (a) Secure copyright in Buyer's name in the Masters in perpetuity and throughout the universe (including all renewals and extensions and revivals thereof); (b) Manufacture, stream, distribute and otherwise re-produce the Masters in any form and by any means, including electronically and digitally; (c) Publicly perform and broadcast and transmit and communicate to the public the Masters by any and all means; (d) Reproduce and exploit the Masters by means of physical and/or digital reproduction; (e) Re-mix, adapt and perform in other languages the Masters and make changes and additions of new matter in the vocals and instrumentation; (f) Grant perpetual and/or limited licenses for the synchronization of the Masters with visual images; (g) Reproduce, encode, use and/or exploit the Masters by way of electronic or digital transmission, broadcast or dissemination including without limitation via the internet; (h) Exercise and authorize others to exercise all other rights of whatsoever nature in and to the Masters; (i) Authorize or license others to exercise any or all of the above rights described in this Paragraph 1.2; (j) Grant so-called "sample" licenses (including, for the avoidance of doubt, the right to control the terms of all such "sample" licenses to be granted); (k) Subject to the terms and conditions hereof, the right to all claims of the Seller in respect of like benefits relating to the Masters; and (l) All other rights in and to the Masters, whether now known or hereafter to become known or developed.

2.    The Seller hereby, in favor of Buyer, irrevocably and unconditionally and forever waives, and agrees not to assert, any and all moral or similar rights that the Seller may have in relation to the Masters under the present or future laws of any jurisdiction.

3.    The Seller hereby irrevocably grants to Buyer (and Buyer's agents, administrators, and licensees) the non-exclusive right without payment of any kind, to accurately and in good faith use and authorize others to use Seller and Artist names (including professional names), approved likenesses, and approved biographical material, as well as any logos or trademarks related to the Seller and which are owned and or controlled, directly or indirectly, by the Seller (collectively, the "Name and Likeness") (a) in connection with the marketing and/or exploitation of the Masters, and/or (b) in reference to the fact that Buyer has acquired the Assets.  Upon request by Buyer, Seller shall deliver to Buyer approved likenesses of the Seller and Artists and approved biographical material for use by Buyer as expressly set forth herein, in each case with such approval not to be unreasonably withheld by Seller.

    3.1    If following the Closing Date, the Seller, or any other person on the Seller' behalf, receives any monies relating to any interest in or use or exploitation of the Masters on or after the Closing Date, then the Seller shall pay such monies to Buyer within five (5) Business Days of the Seller, the Seller's Representatives or any Person on the Seller's behalf, discovering that such monies have been paid to the Seller, or any such other Person on the Seller's behalf, alongside copies of all accounting statements and other documents actually received by or on behalf of Seller relating to such monies, which payment shall be made to Buyer without deduction or set-off of any kind (in each case, for which

    2

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Buyer shall be responsible for all of such taxable income associated with Buyer's receipt of such payment in accordance with applicable law). For the avoidance of doubt, any failure of the Seller to comply with the obligations set forth in this Paragraph 3.1 shall be deemed a material breach of this Agreement. In the event that any third party to whom a letter of direction is sent pursuant to the terms and conditions of this Agreement refuses to comply with the terms of such letter of direction, then the Parties will discuss in good faith a long-term solution to ensure Buyer's prompt receipt of the royalties or other income payable by such third party, including the possibility of establishing a separate account in Seller's name for receiving such royalties or income, but which account shall be under the exclusive control of Buyer.

3.2     If (but for or despite this Agreement) the Seller is or becomes entitled pursuant to any applicable rules to exercise and/or enjoy any statutory right of reversion, revival, renewal and/or extension of Copyright in respect of any of the Assets, then: (i) Buyer may exercise and/or enjoy such right in lieu of the Seller in connection with such Assets or, if and to the extent that is not permissible under applicable rules, upon written request and at the sole expense of Buyer, under the direction of Buyer, the Seller shall promptly exercise and/or make arrangements (or cause such other Seller affiliate to exercise and/or make arrangements) in relation to such right in compliance with Buyer's directions; and (ii) the resulting rights so acquired shall, to the fullest extent permissible, form part of the rights granted and assigned to Buyer under this Agreement. For the avoidance of doubt, the Seller (on behalf of the Seller and their respective affiliates, successors, assigns, heirs, and representatives) hereby expressly and irrevocably waive all so-called "termination rights" arising under Sections 203 or 304 of the U.S. Copyright Law in respect of the conveyance of the Assets to the Buyer.

3.3     Subject to the terms and conditions of this Agreement, on the Closing Date and at all times thereafter, Buyer shall assume and at all times thereafter shall pay and perform, satisfy and otherwise discharge all obligations and liabilities arising or accruing with respect to sales, licensing, exploitation or other activities occurring on or after the Closing Date (the "Assumed Liabilities"), pursuant to which Seller shall have no responsibility therefore, subject to Paragraph 7.3; provided, however, that nothing in this Paragraph 3.3 shall limit, waive or impair Buyer's rights to indemnification set forth under Paragraph 9 of this Agreement.

3.4     Except as otherwise specifically provided in Paragraph 3.3, Buyer shall not assume and shall in no event be liable for any liabilities or indebtedness of the Seller, or any of their affiliates, whether accrued before or after the Closing Date, absolute, matured, known or unknown, liquidated or unliquidated, contingent or otherwise, including, without limitation, the following (the "Excluded Liabilities"): (a) any liabilities of the Seller or any of its affiliates for federal, state, local or foreign taxes; (b) any liabilities for any amounts owing with respect to sales, exploitation, licensing or other activities involving the Assets and occurring on or before the Closing Date; (c) any liabilities in respect of any claims arising out of, relating to or otherwise in respect of ownership of the Assets or Masters prior to the Closing Date or any allegation of infringement, non-payment of royalties, or any other matter arising or occurring prior to the Closing Date with respect to the Masters; (d) any liabilities arising from overpayments or other errors prior to the Closing Date with respect to the payment or crediting of royalties to the Seller or any of its affiliates by any performance society or any other payor occurring on or before the Closing Date; (e) any liabilities arising from or relating to any actual or alleged breach or violation of any law or contract (whether written or oral) by the Seller or any of its affiliates, or actual or alleged default under any such law or contract by the Seller, or any of its affiliates; and (f) any liabilities of the Seller or any of its affiliates arising out of or in connection with this Agreement or contracts to which the Seller or any of their affiliates are a party or otherwise bound but not expressly assumed hereby.

3

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

4.      The Seller shall, at Buyer's reasonable request and sole cost and expense from time to time, execute and deliver to Buyer such additional documents, as may from time to time be reasonably necessary or desirable for the purpose of confirming, protecting and exercising any and all rights granted, transferred, assigned and sold to Buyer pursuant to this Agreement, including, without limitation, all documents requested by Buyer in order: (i) to renew and extend the copyrights in the Masters (and to file any related applications) in Buyer's (or its designee's) name; (ii) on the issuance of such renewals and extensions, to execute proper and formal assignments in Buyer's or its designee's name so as to secure to Buyer or its designee such renewals and extensions; and (iii) to exercise all manner of rights in respect of the Assets under the Artist and Production Agreements, any sound recording performance agreements, any licenses, and this Agreement.

4.1     In the event Seller fails to execute and/or deliver to Buyer or fails to cause any of its affiliates to execute and/or deliver to Buyer any such document directly applicable to such affiliate within five (5) business days after Buyer's written request therefor, the Seller hereby irrevocably grants to Buyer the limited right, power and authority as the Seller's attorney-in-fact solely to execute and deliver such applicable document in the Seller's name and on behalf of the Seller and Buyer shall thereafter provide Seller with a copy of each such document executed pursuant to the authority granted hereunder. The foregoing powers of attorney (i) are coupled with an interest and shall be irrevocable and survive the sale, merger, dissolution, or bankruptcy of the Seller granting the same, and (ii) may be exercised by Buyer (and its designees) either by signing separately as attorney-in-fact for the Seller or by a single signature of Buyer (or its designees) acting as attorney for all of the Seller. Concurrent with the execution of this Agreement, the Seller shall execute a power of attorney representing the foregoing in the form of Exhibits C-1 and C-2, and, within five (5) Business Days after Buyer's written request therefor, such other industry standard documents or instruments as Buyer deems necessary or appropriate to carry out the terms of this Agreement. In the event of any inconsistency between the provisions of such separate documents and the provisions of this Agreement, the provisions of this Agreement shall prevail. Buyer shall provide a copy to the Seller of any document that is executed pursuant to the aforesaid right and authority.

5.      **Payment and Closing**

5.1     In consideration of the covenants and agreements contained in this Agreement, Buyer shall pay as the "Purchase Price" the sum of One Hundred Fifteen Thousand Dollars ($115,000.00). The closing (the "Closing") of the transactions contemplated by this Agreement shall occur via electronic means concurrently with the execution and delivery of this Agreement, subject to Paragraph 5.4 hereof. The date the payment described in this Paragraph 5.1 is paid by Buyer is referred to as the "Closing Date." For all purposes hereunder, the effective time of the Closing shall be 12:01 a.m. Eastern Time on the Closing Date.

5.2     Buyer agrees that a payment of Seventy Five Thousand Dollars ($75,000.00) (the "Contingent Payment") will be made to Seller on the date that is eighteen (18) months following the Closing Date; provided, however, the Contingent Payment a) shall not be due or payable in the event a lawsuit is filed in any jurisdiction which names Buyer or any of its affiliates whether or not as a result of or in connection with the matters contained in the lawsuit referred to in paragraph 18.2; and b) the amount of the Contingent Payment shall be reduced by all amounts incurred by Buyer regarding any claim(s) or controversies (as opposed to the actual filing of a lawsuit) covered by Seller's representations and warranties hereunder. Such amounts shall include but not limited to, legal and other professional fees and expenses. This provision will not limit Tommy Boy's other rights and remedies under this Agreement.

4

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

5.2     Seller acknowledges that the Purchase Price shall include and reflect payment of amounts sufficient to fully repay and satisfy any and all unrecouped balances (if any) as of the Closing Date with respect to the Assets and Seller's royalty account with each such payor.

5.3     The payment of the Purchase Price referred to in Paragraph 5.1 shall be made to the Seller by bank wire no later than five (5) Business Days after the full execution and delivery of this Agreement (and all Exhibits, Schedules and Appendices hereto, executed by the Seller, as applicable) and satisfaction or waiver of all of Buyer's conditions to Closing (which, for the avoidance of doubt, shall include the completion by Buyer of all legal "due diligence" to Buyer's satisfaction).

5.4     At or prior to the Closing, the Seller will deliver, or cause to be delivered, to the Buyer (or as otherwise indicated below): (a) A general letter of direction in the form of Exhibit B hereto; (b) The power of attorney in the form of Exhibits C-1 and C-2 hereto; (c) The copyright assignment in the form of Exhibit D hereto; and (d) Such other agreements, instruments and documents reasonably necessary and requested by the Buyer in such form and substance reasonably acceptable to the Buyer (the "Transaction Documents").

5.5     Notwithstanding anything to the contrary contained in this Agreement, Buyer grants to Seller the non-exclusive license in the United States for a term not to exceed five (5) years from the date of closing, to use the name "Power Artists Records" and related logos on tee shirts and other clothing. No other rights are granted to the Power Artists Records name and logos and Seller shall not have the right to further license such name and logos to any third party.  Buyer shall not be liable for any such use by Seller.

5.6     For the period of ninety (90) days from the Closing Date, Seller shall provide Buyer with access to the Assets in the possession and/or control of Seller, wherever located for inspection and/or delivery to Buyer.  Assets shall include all legal files, artist, producer, and all other third party contracts and licenses, audio and video master tapes both analog and digital, cover art and films, promotion and marketing material, artist biographies and approved likenesses, and all other physical and digital material in the possession or control of Seller, wherever located.

6.     **No Royalties and Accountings.**  For the avoidance of doubt, except as otherwise explicitly set forth herein, no payment of royalties or any other sums shall be due from Buyer to the Seller (or any Seller affiliate) in respect of the Assets pursuant to the terms of this Agreement, and neither Buyer nor Seller shall be under any obligation under this Agreement to keep any books and/or records of account or prepare statements of account in relation to the Assets.

7.     **Seller Representations and Warranties.**  The Seller represents and warrants that the statements contained in this Paragraph 7 are correct and complete.

7.1     Seller has the right, power, and authority to enter into and perform this Agreement and to grant to Buyer all of the rights granted and assigned to Buyer under this Agreement, free of any encumbrances of any kind.

7.2     This Agreement (and the other transaction documents to which Seller is a party) has been duly and validly executed and delivered by or on behalf of and constitutes the valid and legally binding obligation of the Seller, enforceable against the Seller, in accordance with its terms and conditions.

7.3     Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement or the transaction documents to be executed and are delivered by the Seller will (a) violate any applicable rule or order to which the Seller are subject or (b) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any contract to which the Seller are a party or by which it is bound or to which any of the Assets are subject (or result in the imposition

5

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

of any encumbrance upon any of the Assets).  Seller is not required to give any notice to make any filing with, or obtain any authorization, consent, or approval of any governmental agency or any other person (including, without limitation, a party to any contract) in order for the Parties to consummate the transactions contemplated by this Agreement or the other transaction documents.

7.4      At the Closing, Seller shall have good and marketable title to the Assets (including, without limitation, Seller's title in all copyrights, including all extensions, renewals, and continuations thereof) throughout the world.  All of the Seller's interests in the Assets are fully and freely assignable. Seller is the valid holder of the Assets and is the valid recipient of all royalties payable to the Seller with respect to the Masters.  After giving effect to the Closing, Buyer will have good and marketable title to 100% of the Assets throughout the world.

7.5      Schedule 1 is a true, complete, and correct list of all Masters as of the Closing Date.

7.6      To the knowledge of the Seller, no Person is exploiting copyrights that infringe upon any of the Masters.

7.7      The consummation of the transactions contemplated by this Agreement will not result in the termination or impairment of any Person's rights in or to any of Masters and the registrations with respect thereto under the terms of any applicable contract to which the Seller is a party or otherwise bound, or by operation of law.  No Person holds a power of attorney on behalf of the Seller or relating to any interest in any of the Assets, which power of attorney could have the effect of diminishing the rights of Buyer in the Assets after the Closing Date.

7.8      No action by or with the authority or consent of the Seller or any of Seller's affiliate has been taken or omitted which would destroy or impair the protection of any of the Masters under U.S. Copyright Law.

7.9      No Person other than the Seller have any right (by contract, statute or otherwise) to assign, license, exploit, dispose of, transfer, use or grant rights to any other person with respect to the Assets.

7.10     The Masters are original and are unencumbered works capable of copyright protection under U.S. Copyright Law and (to the extent that the Masters were first published or simultaneously published in a country that had at the time of such publication acceded to the Berne Convention for the Protection of Literary and Artistic Works) the Berne Convention for the Protection of Literary and Artistic Works.  To the knowledge of the Seller, the copyrights in each of the Masters is validly subsisting.

7.11     The Masters do not and will not (a) infringe the copyright or any other legally protected rights of any third party or (b) knowingly contain anything that is criminally obscene or defamatory, nor any other unlawful content.  The Masters are original and are unencumbered works capable of copyright protection under U.S. Copyright Law.  Except as set forth on the attached disclosure schedules, there are no settlement agreements or similar documents applicable to any of the Masters in respect of any claims arising from or related to any claim of ownership.  To the best of Seller' knowledge, there are no allegations asserted by any third party of infringement, non-payment of royalties, or any other matters with respect to the Masters except as listed on the Schedules.

7.12     Buyer shall not be required to obtain the approval or consent of or consult with any person with respect to the exploitation of the Masters by any means or in any manner whether now known or hereafter invented or otherwise howsoever after the date of this Agreement.

7.13     Seller is the sole owner of all of the rights expressed to be granted and assigned to Buyer under this Agreement in respect of the Assets, and Seller has not previously assigned, licensed, charged or otherwise dealt with or encumbered any right, title or interest in or to any sound recording work comprising the Masters so that the rights granted to Buyer under this Agreement would be impaired, and will not purport to do so hereafter.

6

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

7.14    Seller has not filed or received from any Artist (or threatened to file or receive from any Artist) any notices of termination of transfers for any of the Assets pursuant to Sections 203(a) and 304(c) of the United States Copyright Act (17 U.S.C. 101, et seq.) or their foreign equivalents.

7.15    To the knowledge of the Seller, no direct license for the public performance of the Masters has been issued, and the Seller has not been paid (directly or through its agents) any direct license fee in respect of the public performance of any of the Masters.

7.16    a. Seller is not insolvent, and Seller has no intention to file any voluntary petition initiating any proceeding under the United States Bankruptcy Code or the insolvency laws of any state or the making of an assignment for the benefit of creditors.

b. No custodian or receiver has been appointed or any distress, execution or other process been levied in respect of Seller's right (as applicable) to receive any sums under the Publishing Agreements, the Society Agreements, the Recording Agreements, or other Contract in connection with the Assets, and no events have occurred (or shall occur through the Closing Date in accordance with the terms and conditions of this Agreement), which would justify any such proceedings.

c. No Order has been made by, or petition presented to, any court of competent jurisdiction for the appointment of an administrator in respect of Seller or Seller's Affiliates, and no such Order shall be made through the Closing Date in accordance with the terms and conditions of this Agreement.

d. No administrator of Seller has been appointed by any Person entitled to appoint such an administrator pursuant to any insolvency or bankruptcy statute or rule or otherwise, nor have any documents been filed with any court of competent jurisdiction for the appointment of such an administrator, nor has any notice of intention to appoint such an administrator been given by any such person, and none of the foregoing shall take place through the Closing Date in accordance with the terms and conditions of this Agreement.

7.17    Buyer shall not assume any liability, debt, or obligation of Seller.

7.18    Seller has not entered into any contract which would have the effect of reducing the monies that would otherwise be payable to or collectable in respect of the Assets, and Seller shall not enter into such a contract after the date hereof.

7.19    There are no unrecouped advances or other recoupable sums paid to or on behalf of Seller or any person on Seller' behalf in connection with the Masters that may in any way, directly or indirectly, adversely impact the Assets, or have any adverse effect on Buyer's rights and interests under this Agreement, including, without limitation, Buyer's right to be paid by any royalty payor without regard to recoupment of any sums.

7.20    Except as set forth on the Schedules, Seller is not, directly, or indirectly, liable, responsible, or required (by contract or otherwise) to account to or make royalty or other payments to any mixer, producer, side artist, engineer, musician, or any other person in respect of the exploitation of the Masters, or receipt of any royalties related thereto.

7.21    Each Artist and production third party agreement is valid and binding on the Seller in accordance with its terms and is in full force and effect.  Neither the Seller nor, to Seller' knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) or has provided or received any notice of any intention to terminate, any Artist and production third party agreement.  No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Artist and production third party agreement or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.  There are no disputes pending or threatened under any Artist and production third party agreement.

7.22    Seller has been advised by Buyer to take independent legal advice in relation to this Agreement and Seller has, in fact, taken such independent legal advice.

7

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

7.23    The execution hereof and the consummation of the transaction contemplated hereby shall not cause the Buyer to be required to make any payments of any nature to acquire the Assets other than as set forth herein, or trigger any royalties, fees, compensation or other payments of any type, nature or description whatsoever to be made under any third party agreement or otherwise, except for royalty and other contractually required payments in the ordinary course of business.

7.24    The transaction contemplated by this Agreement does not constitute a so- called "bulk sales transaction" or require Seller or Buyer to give notice to any of Seller's creditors.

7.25    After the Closing Date, there will be no indebtedness or liabilities pertaining to or affecting the Assets except for those contracts with the Artists, producers, or other third parties who are entitled to royalties based on the use of the Masters.

7.26    There are no letters of direction regarding payments pertaining to the Assets.

7.27    No person has any so-called "first negotiation right," "right of first refusal," or "matching right" with regard to the Assets or any portion thereof.

8.    **Buyer's Representations and Warranties.**  Buyer represents and warrants that:

8.1    Buyer is a limited liability company duly formed and validly existing under the laws of Delaware.  Buyer has the power and authority to execute and deliver this Agreement and perform its obligations pursuant to this Agreement including, without limitation, the timely payment of the Purchase Price.

8.2    This Agreement has been duly executed and delivered on behalf of Buyer and, assuming the due authorization, execution and delivery hereof by Seller, constitutes a legal, valid and binding agreement enforceable against Buyer in accordance with its terms except (a) as such enforceability may be subject to bankruptcy, moratorium, insolvency, reorganization, voidable preference, fraudulent conveyance and other similar laws affecting the rights and remedies of creditors and obligations of debtors generally, and (b) rules of law or equity governing specific performance, injunctive relief, and other equitable remedies.

8.3    Neither the execution and the delivery of this Agreement or the transaction documents by the Buyer nor the consummation of the transactions contemplated by this Agreement or the transaction documents will (i) violate any law or order to which the Buyer is subject or any provision of its governing or formation documents or (ii) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice to or consent under any contract to which the Buyer is a party or by which it is bound or to which any of its assets is subject.

8.4    Buyer is not a party to any claim or order which is reasonably likely to adversely affect its ability to consummate the transactions contemplated by this Agreement;

8.5    Buyer is solvent and able to pay its debts as they fall due and shall be solvent and able to pay its debts as they fall due through the Closing Date; and

8.6    Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement, and Buyer is not subject to any contract with any third party which would result in any claw back, refund or forfeiture of the Purchase Price from the Seller after the Closing.

9.    **Indemnification**

9.1    All of the representations and warranties of Seller contained in this Agreement shall survive the Closing and continue in full force and effect for a period of six years thereafter, provided, that the representations and warranties in Paragraphs 7.1, 7.4, 7.12, 7.16, and 7.27, shall survive indefinitely. All of the representations and warranties of the Buyer contained in Paragraph 8 shall survive the Closing and continue in full force and effect for a period of three years thereafter.  All covenants and agreements

8

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

of the Parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.  Notwithstanding the foregoing, if written notice of any matter setting forth in reasonable detail a claim for a breach of any representation or warranty is given to the Buyer or Seller, as the case may be, in writing pursuant to this Agreement prior to the end of the applicable survival period, any such representation or warranty that would otherwise terminate shall be deemed to survive solely with respect to such matter until such matter is resolved.

9.2     Seller shall indemnify, hold harmless and defend the Buyer, its affiliates and representatives from and against the entirety of any and all losses which the Buyer, its affiliates or representatives may suffer, directly or indirectly, through and after the date of the claim for indemnification resulting from, arising out of, relating to, in the nature of, or caused by: (a) any breach of (or in the event any third party alleges facts that, if true, would mean Seller have breached) any representation or warranty of Seller contained in this Agreement (including, without limitation, in any Schedule, Exhibit or other document furnished or to be furnished to Buyer pursuant to this Agreement), provided, however, that for the purposes of determining the breach of any representation or warranty for purposes of Paragraph 7, or the amount of any losses suffered by Buyer, its affiliates and representatives, "materiality" and similar qualifications set forth in such representations and warranties shall be ignored; (b) any breach of (or in the event any third party alleges facts that, if true, would mean Seller has breached) any material covenant or agreement of Seller contained herein; (c) any Excluded Liabilities; (d) any act or unexcused omission of Seller which results in any uncured breach, rejection and/or termination of any third party agreement affecting the Assets; and (e) any third-party claims described on the Schedules; provided, that Buyer makes a written claim for indemnification against Seller within the applicable survival period.

9.3     Buyer shall indemnify, hold harmless and defend the Seller from and against the entirety of any and all losses which Seller may suffer, directly or indirectly, through and after the date of the claim for indemnification resulting from, arising out of, relating to, in the nature of, or caused by: (a) any breach of (or in the event any third party alleges facts that, if true, would mean Buyer has breached) any representation or warranty of Buyer contained in this Agreement (including, without limitation, in any schedule, certificate, exhibit or other document furnished or to be furnished to Seller pursuant to this Agreement), provided, however, that for the purposes of determining the breach of any representation or warranty for purposes of Paragraph 8, or the amount of any losses suffered by Seller, "materiality" and similar qualifications set forth in such representations and warranties shall be ignored; (b) any breach of (or in the event any third party alleges facts that, if true, would mean Buyer has breached) any covenant or agreement of Buyer contained herein; and (c) any Assumed Liabilities; provided, that Seller makes a written claim for indemnification against Buyer within the survival period.

10.     **Third Party Claims.**

(a) If any third party shall notify any Party (the "Indemnified Party") with respect to any matter (a "Third Party Claim") which may give rise to a claim for indemnification against any other Party (the "Indemnifying Party") under this Paragraph 10, then the Indemnified Party shall issue a Claim Notice (as defined below) to the Indemnifying Party with respect thereto.

(b) Any Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (i) the Indemnifying Party notifies the Indemnified Party in writing within ten (10) Business Days following the receipt of the Claim Notice that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Losses which the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (ii) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief, a determination of the validity or enforceability of any intellectual property rights of Buyer, or any criminal or civil remedy sought by a

9

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Governmental Authority, (iii) settlement of, or an adverse judgment with respect to, the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice adverse to the continuing business interests or the reputation of the Indemnified Party, and (iv) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently, provided, however, that if counsel defending such Third Party Claim shall advise the Parties of a potential conflict of interest arising from the existence of one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party or its affiliates, then the Indemnified Party may retain separate counsel to defend it and in that event the reasonable fees and expenses of such separate counsel shall be paid by the Indemnifying Party if applicable under this Paragraph 10.

(c) So long as the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with Paragraph 10(b), (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (ii) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party, which consent will not be unreasonably withheld and (iii) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party, which consent will not be unreasonably withheld, except the Indemnifying Party may consent to the entry of judgment or settlement without the consent of the Indemnified Party if the judgment or settlement is solely for money damages which will be borne entirely by the Indemnifying Party.

(d) In the event any of the conditions in Paragraph 10(b) is or becomes unsatisfied, (i) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim in any manner it reasonably may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, any Indemnifying Party in connection therewith), (ii) the Indemnifying Party will advance and reimburse the Indemnified Party promptly and periodically for the actual, documented, reasonable costs of defending against the Third Party Claim (including reasonable outside attorneys' fees and expenses), and (iii) the Indemnifying Party will remain responsible for any Losses which the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Paragraph 10.

(e) A Party suffering losses or a party that determines that any occurrence or claim may result in losses that gives or could give rise to a claim for indemnification under this Paragraph 10 shall promptly notify the other party thereof in writing (a "Claim Notice") in accordance with Paragraph 13.1. The Claim Notice shall contain a brief description of the nature of the losses suffered and, if practicable, an aggregate dollar value estimate of the losses which may be suffered in the future. No delay in the issuance of a Claim Notice shall relieve any party from any obligation under this Paragraph 10, unless and solely to the extent such party is thereby materially prejudiced.

11.     In respect of any claim by one party against the other for any direct breach or violation of this Agreement (as opposed to a Third Party Claim), neither party will be liable to the other party for any losses until such claim is either settled pursuant to a binding, written settlement agreement or the subject of a definitive ruling of a court of competent jurisdiction in accordance with paragraph 16.

12.     The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its

Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation or warranty is, was or might be inaccurate.

12.1    Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this Paragraph 12, the Indemnifying Party shall satisfy its obligations within ten (10) Business Days of such agreement or adjudication by wire transfer of immediately available funds.  The Parties hereto agree that should an Indemnifying Party not make full payment of any such obligations within such ten (10) Business Day period, any amount payable shall accrue interest from and including the date of agreement of the Indemnifying Party or adjudication to but excluding the date such payment has been made at a rate equal to eight percent (8%) per annum.  Such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed, compounding daily.

13.    **Notices.**

13.1    Any notice to be given under this Agreement shall be in writing, sent by pre-paid overnight internationally recognized courier service, with signature of receipt required (e.g., Fed Ex, UPS, DHL), personal delivery, or by certified mail, return receipt requested, postage prepaid, or via electronic mail of a PDF document with a copy sent via the overnight courier, and shall be served: (a) To Buyer: Thomas Silverman, 149 East 23rd St., Suite 6, New York, NY 10156 and a simultaneous email copy to david.parker@tommyboy.com.  (b) to Seller: Power Artist Records, Inc., Leroy McMath, 3577 Chamblee Tucker Rd., Suite A178, Atlanta, Georgia 30341 and a simultaneous email copy to leroy@wbaball.net or such other address as the recipient may designate by notice given in accordance with this Paragraph 13.1.

13.2    A notice shall be deemed to have been received on the date on which such notice is delivered by personal delivery, the next Business Day after being deposited with an internationally recognized courier service, five (5) days after depositing in the mail, and on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient.

14.    **Confidentiality.** The Parties acknowledge that this Agreement and the terms and conditions herein contained are and shall be confidential and shall not be disclosed by any Party at any time, other than as required by legal process, applicable law or in an action to enforce the terms hereof, or to comply with the terms hereof, or to perform such Party's obligations hereunder (including disclosure to various third parties solely to the extent necessary to effect the transactions contemplated by this Agreement).  Notwithstanding anything contained in the preceding sentence, the terms hereof may be disclosed by any Party (a) to its Representatives, so long as the recipient of the disclosure is first advised of the aforesaid confidentiality obligations and agrees to be bound thereby, (b) as required by applicable Law to be disclosed, provided that the Party required to make such disclosure gives the other Party prompt written notice of such requirement prior to such disclosure (to the extent legally permissible) and assistance in obtaining an order protecting the information from public disclosure, (c) in connection with any legal proceeding to enforce the terms of this Agreement, or (d) as necessary to register a copyright or file an assignment of copyright with the U.S. Copyright Office or any foreign societies or registries.  Furthermore, the first sentence of this Paragraph 14 shall not limit in any way the ability of Buyer, or any Buyer affiliate, following Seller' receipt of the Purchase Price, to undertake the commercial exploitation of the Assets, including by recording assignments in the United States Copyright Office, sending "letters of direction", and exercising its rights hereunder.  Additionally, Buyer and Seller shall each have the right to make media statements regarding Buyer's acquisition of the Assets, provided that each Party shall have the right to pre-approve the text of the other Party's release(s) (and that no release which identify the Seller, or the Assets purchased shall include the Purchase Price), which approval neither Party shall unreasonably withhold or delay.  In connection with the foregoing, it is agreed that

11

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Buyer, subject to the Seller' aforesaid pre-approval of Buyer's text, shall have the right to issue the first media release pertaining to the acquisition of the Assets and Buyer shall have the right to approve the timing of any release which Seller wish to make, which approval Buyer shall not unreasonably withhold or delay.

15.    **Assignment.**  Subject to the terms and conditions of this Agreement, this Agreement is binding on the Parties and their respective successors and permitted assigns, including, without limitation, the Buyer affiliates.  Subject to the terms and conditions of this Agreement, including, without limitation, third party rights, Seller shall not: (a) assign, charge or otherwise dispose of any or all of its rights under this Agreement; or (b) delegate any or all of Seller' obligations under this Agreement without the prior written approval of Buyer.  Buyer has the right to assign this Agreement and/or Buyer's rights and/or obligations under this Agreement (in whole or in part, and including to one or more co-investors, financing sources or other financial participants) without restriction, provided, that any assignee of Buyer's rights must assume Buyer's applicable obligations under this Agreement.

16.    **Governing Law.**  This Agreement and any related dispute or claim (contractual or non-contractual) shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles.

(a)    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURT OF THE UNITED STATES OF AMERICA, SOUTHERN DISTRICT OF NEW YORK OR THE COURTS OF THE STATE OF NEW YORK, CITY OF NEW YORK AND COUNTY OF NEW YORK, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 16.

17.    Seller agrees that irreparable damage would occur if any provision of this Agreement were not performed by Seller in accordance with the terms hereof and that Buyer shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which it is entitled at law or in equity, provided, that nothing herein shall be interpreted to mean Seller cannot oppose such relief.

12

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

18.     Notwithstanding anything to the contrary contained herein, the parties acknowledge that Tommy Boy Publishing, LLC an affiliate of Buyer, ("Publisher") has previously been granted the non-exclusive right to negotiate and grant master use sound recording licenses for the Masters on behalf of and owned or controlled by Seller, or any other entity owned or controlled by Leroy McMath, its successors and assigns, including but not limited to licenses for synchronizations, samples, and game use, throughout the world and in any and all media now known or hereafter to become known or developed.  Publisher's non-exclusive right is for a period of fifteen (15) years.  For the avoidance of doubt, all sums due under such licenses shall be split equally between Publisher as musical composition owner and Buyer as master sound recording owner and Publisher shall instruct each licensee to directly pay the master recording owner's share to Buyer.

18.1     The Masters are exclusively distributed throughout world by Tommy Boy Distribution (the "Distribution Agreement").  The Assets are subject to and shall remain under the terms and conditions of the Distribution Agreement, as renewed and extended.

18.2     Leroy McMath is a party to a civil action filed by Matthew Peach on June 20, 2022, in the Superior Court, Gwinnett County, Georgia, civil case number 22-A-05274-3.  Notwithstanding anything to the contrary contained herein, Seller shall hold harmless and indemnify Buyer for all costs and expenses including attorney fees and court costs that Buyer may incur or may arise as a result of this action or enforcement of any judgement or settlement.

19.     **Miscellaneous.**

19.1     No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.

19.2     No failure to exercise or delay in exercising any right or remedy under this Agreement shall operate as a waiver of that or any other right or remedy.  Any waiver by either Party of any right or remedy under this Agreement shall not be deemed to be a waiver of such right or remedy for the future. All rights and remedies under this Agreement are cumulative and, except as otherwise stated in this Agreement, do not exclude, or limit any other rights or remedies of either Party.

19.3     This Agreement (including any Schedules, Exhibits and/or other attachments) contains the entire agreement of the Parties, and supersedes all prior or contemporaneous agreements (whether oral or written) between the Parties, in relation to the subject matter of this Agreement and cannot be changed, modified, amended, cancelled, or terminated except by an express written instrument signed by the Party against which the instrument is to be enforced.  In entering into this Agreement, neither Party is relying on any representation or other assurance except as expressly set out or referred to in this Agreement, although nothing in this Agreement shall limit or exclude any liability for fraud.

19.4     The illegality, invalidity, unenforceability, or incompleteness of any provision of this Agreement shall not affect the continuation in force of the remainder of this Agreement.  The Parties shall negotiate in good faith to replace any such provision, or (in the absence of agreement) any such provision shall apply with whatever modification is necessary to make it lawful, valid, and enforceable, while giving effect (to the greatest extent possible) to the intention of the Parties.

19.5     Nothing in this Agreement constitutes a partnership, joint venture, relationship of agency or contract of employment between the Parties (or between either Party and any other Person referred to in this Agreement).  Neither Party shall be bound by any representation and/or omission of the other and nothing in this Agreement shall in any way authorize either Party to incur expenses on the other Party's behalf and/or for its account.

19.6     This Agreement may be executed with digital or electronic signatures and may be entered into in any number of counterparts (including, if electronically transmitted, by scanned copies sent by email).

13

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

**IN WITNESS WHEREOF,** the parties have executed this Agreement the date first above written.

**POWER ARTIST RECORDS, INC.** doing business as POWER PRODUCTION, INC., POWER RECORDS, TRIAD RECORDS, INC., POWER ENTERTAINMENT, INC., WRAP RECORDS, and any other affiliated entities

**TOMMY BOY ARTISTS, LLC**

By: _Thomas Silverman_

┌─DocuSigned by:
└─BAC1B3F016ED420...
Thomas Silverman, CEO

By: ┌─DocuSigned by:
└─6792D7C4914A431...
Leroy McMath, CEO

┌─DocuSigned by:
└─6792D7C4914A431...
**LEROY McMATH,** in his individual capacity

14

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# SCHEDULE 1

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET AL.
DATED
DECEMBER 7, 2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| ARTIST/Writer | ALBUM | YEAR |
|---|---|---|
| FREAK NASTY/ERIC TIMMONS | CONTROVERSEE 1996 | |
| | Intro<br>I Want 2 F*ck<br>Dirty Mouth<br>Bump That Rump<br>Commercial<br>P.G.P.B.<br>Da' Dip<br>Boot Up (Who Ya Wit)<br>Controversee (Start)<br>Down Low<br>Boom Boom Bomb<br>Rumors Pt. 1<br>Respect<br>Have This Ever Happened 2-U<br>Deep Deep South<br>F*ckie S*ckie (At Freaknasty Party)<br>Cut Up<br>Rumors Pt. 2 | |
| FREAK NASTY/ERIC TIMMONS | WHICH WAY IS UP 2000 | |
| | Intro<br>Everyday Thing<br>Bring it On<br>On My Mind (Time After Time)<br>I Got it Like That<br>Keep it Real<br>Do What U Feel<br>It's Me<br>Lil' Power<br>Bounce 2 This (Groove<br>That Type<br>Push 'Em Up<br>Do What U Feel | |
| | | |
| | | |

67

| | | |
|---|---|---|
| | | |
| **MC BREED/ERIC BREED** | **FUNKAFIED 1994** | |
| | Underground Address<br>What You Want<br>Smokin'<br>Late Nite Creep (Booty Call)<br>Teach My Kids<br>This Is How We Do It 1<br>One Time<br>Seven Years<br>The Deal Is Da Funk<br>Shootin' From The HIp<br>Break Yourself<br>Back Up in Ya!<br>This Is How We Do It 2<br>Flava Uv Phony<br>B.R. Double E.D.<br>Ol' School | |
| MC BREED/ERIC BREED | **IT'S ALL GOOD 1999** | |
| | Intro<br>Gotta Get Mine<br>Gangsta Shit<br>Tricks<br>It's All Good<br>She Likes It<br>Work It From the Bottom<br>Let's Go to da Club<br>Business Never Personal<br>Rule No.1<br>Smok Wit a Nigga<br>Boom Boom | |
| | | |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  | **THE NEW BREED        1993** |  |
|---|---|---|
| MC BREED/ERIC BREED | Intro<br>Tight<br>Gotta Get Mine<br>Flashbacks<br>Comin' Real Again<br>Just Another Clip<br>Watch Your Own Back<br>Conversations<br>Everyday Ho<br>Ain't 2 Good<br>Something 2 Smoke 2<br>Outro |  |
|  | MC BREED& DFC 1991 |  |
| **MC BREED/ERIC BREED** | Underground Slang<br>Job Corp<br>That's Life<br>Ain't No Future In Yo' Frontin'<br>Just Kickin It<br>Better Terms<br>I Will Excel<br>Get Loose<br>Black For Black<br>Guanja<br>More Power |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | 20 Below 1992 | |
|---|---|---|
| **MC BREED/ERIC BREED** | Life of a Flintstone<br>Shout Out<br>No Frontin' Myself<br>Jealous Pimp<br>Whenever You Want Me<br>Be Myself<br>Great Depression<br>Little Child Runnin Wild<br>Ain't to Be Fucked With<br>Dis Mode<br>Flash's Groove<br>Ain't Too Much Worried<br>20 Below | |
| **GHETTO MAFIA** | **DRAW THE LINE 1994** | |
| **RODERICK BABER/FRED PILGRIM** | Intro<br>Downtown Glory<br>Facts of Life<br>Draw The Line<br>A-Town<br>Mr. President<br>Cost to Be the Boss<br>Special Delivery<br>One Less B----<br>Everyday Thang In Da Hood<br>Organized Crime<br>Real Motha-----<br>Life of a Sniper | |
| **GHETTO MAFIA** | **FULL BLOODED NIGGAZ 1995** | |
| **RODRICK BABER/FRED PILGRIM** | The Chair<br>Organized Crime<br>Snap Shot<br>I Ain't Going Down<br>This Is a Stick Up<br>Clean Getaway<br>Real Motha Fuckas<br>All Out<br>What Dem Gon Do<br>Creepin | |

70

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| STEADY MOBBIN' | CRIME BUDDIES 2001 | |
|---|---|---|
| | I Am (feat. Philley 45)<br>On Our Job (feat. 504 Riders)<br>Band to Dis (feat. Butch Cassidy)<br>Big Fishes (feat. Messy Marv)<br>Call It What You Want<br>Lets Get it Crackin (feat. Nate Dagg)<br>Luv Ones (Feat. Delinquents)<br>Sounds Like a Busta<br>Flipside (feat. S. Knight)<br>Stop Poppin Shit (feat. The Outlaws)<br>Zoning (feat. Sho Dawg)<br>A Favor (feat. Guce)<br>Hott (feat. Sons of Funk)<br>Show Me Whatcha Twerkin<br>Bang with Me (Feat. Black Mafia Family)<br>Fuck Whatcha Talkin Bout<br>Crime Buddies | |
| GANGSTA PAT | ALL ABOUT COMIN UP 1992 | |
| PATRICK HALL | All About Comin Up<br>Stay Away from Cali<br>I'm Still the Gangsta<br>Gangsta Groove<br>Spend the Night<br>My Neighborhood<br>Gangsta Boogie<br>Watookmesolong<br>Fatal Attraction<br>Gangstas need Love Too<br>My Name Ain't Rover<br>Dedication | |
| | | |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | SEX, MONEY & MURDER 1994 | |
|---|---|---|
| **GANGSTA PAT** **PATRICK HALL** | Intro<br>That Type<br>That Girl<br>Can<br>Can't Mess Wit Me<br>Blunted Up<br>Homicidal Lifestyle<br>The Saga Continues<br>Let it Flow<br>Real G's Don't Die<br>Shootin' on Narcs Part II<br>Sex, Money, Murder<br>Gangsta Luv<br>Stupid<br>Pimp'N Ain't Dead<br>Natural High<br>That Type of Gangsta Remix<br>Dedication | |
| **GANGSTA PAT & STREET** | **HOMICIDAL LIFESTYLE 1997** | |
| **PATRICK HALL** | Instructions<br>I Wanna Smoke<br>Creep with a Nigga (feat. Lil Tee)<br>Killa<br>Empty tha Clip<br>How Deep is Yo Luv (feat. Hollo Point)<br>Boddies on My 9<br>Dead Presidents<br>Blunted Up<br>Homicidal Lifestyle<br>Lay Me Down (feat. Lil Tee)<br>Deadly Verses '97 (feat. Lil Tee)<br>I Wanna Smoke (feat. Psycho)<br>Murdur | |
| | | |

72

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  | DEADLY VERSES 1995 |  |
|---|---|---|
| GANGSTA PAT PATRICK HALL | Deadly Verses (feat. The Villian) I Wanna Smoke (feat. Psycho) Projects Smoke with the Devil Tear the Club Up Pat is Back O.J. Murder Story Killa Killa Mo Murder Heaven or Hell |  |
|  |  |  |
|  |  |  |
| CHERRELLE | RIGHT TIME 1999 |  |
| CHERYL NORTON | Intro The Right Time (feat. Keith Murray) Stop Loving You Just Tell Me Don't Sleepin' With The Enemy Interlude Next To You Baby Come To Me (feat. Alexander O'Neal) Never Leave You Lonely Into My Eyes Pillow Talk Let It Go Saturday Love (feat. Alexander O'Neal) Outro |  |
|  |  |  |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| THE HARD BOYZ | TRAPPED IN THE GAME 1996 | |
|---|---|---|
| DARRELL GILBERT<br>CHARLES HOOD | G' State Soldier<br>Root of All Evil<br>4 Niggas in 1<br>Ghetto World<br>Trapped in the Game<br>Niggas in the Street<br>Time to Pray<br>Sick Psychotic Thoughts<br>Armed Robbery (Intro)<br>Thin Ice<br>Sawed Off Pump<br>Outro Groove<br>(How Ya Gonna)Jacka Jacka<br>Superfly | |
| DFC | THINGS IN THA HOOD 1994 | |
| ALPHA BREED<br>BOBBY THOMPSON | A Piece of Mind<br>Put your Loc On<br>Caps Get Peeled<br>Mo Love<br>Things in tha Hood<br>Pass the Hotter<br>2-2 the chest<br>Death b-4 Dishonesty<br>Hands on My Nine<br>Roll With the Calan<br>Digga bigga Ditch<br>You can Get the Dick<br>Da Bomb<br>Things in tha Hood | |

| Release Artist | Release Title | Release ISRC |
|---|---|---|
| Black Dave | Big Mama (Original Mix) | USTB11200119 |
| | Grind, Grind (Original Mix) | USTB11200112 |
| | Hoez in the Club  (Original Mix) | USTB11200120 |
| | I Got What You Want (Original Mix) | USTB11200114 |
| | I Got's No Love (Original Mix) | USTB11200118 |
| | Intro (Original Mix) | USTB11200110 |
| | Next Stop The Ghetto (Original Mix) | USTB11200111 |
| | Shut'em Down (Original Mix) | USTB11200115 |
| | Tear It Up (Original Mix) | USTB11200113 |
| | This is Not 4 Free     (Radio Mix) | USTB11200121 |
| | This is Not 4 Free feat. Kilo (Original Mix) | USTB11200116 |
| | What They Want (Original Mix) | USTB11200117 |
| | | |
| Bone & C-Breezy & Rapping 4 Tay | Ride Or Die (Original ) | US25T9920801 |
| | | |
| Bossman | Ain't No Love (Original ) | US25T9920811 |
| | | |
| Candy Fresh | Another Weekend Night | USTB11200236 |
| | Bad to the Bone | USTB11200233 |
| | Black Widow (with X-2-C) | USTB11200227 |
| | Do it Again | USTB11200231 |
| | Get Off | USTB11200232 |
| | Homie, You Ain't Got an Ounce of Mac in You | USTB11200224 |
| | Just the Way I Like It | USTB11200230 |
| | Move that Body | USTB11200235 |
| | Payback is Hell | USTB11200228 |
| | Real Golddigger | USTB11200223 |
| | Take Your Time to Do Right | USTB11200229 |
| | To the Beat to the Bass | USTB11200234 |
| | Tricky Brothers | USTB11200226 |
| | You Got to Be Real | USTB11200225 |
| | | |
| Cherrelle | Baby Come To Me (feat. Alexander O'Neal) (Original Mix) | USTB11200022 |
| | Don't (Original Mix) | USTB11200018 |
| | Interlude (Original Mix) | USTB11200020 |
| | Into My Eyes (Original Mix) | USTB11200024 |
| | Intro (Original Mix) | USTB11200014 |
| | Just Tell Me (Original Mix) | USTB11200017 |
| | Let It Go (Original Mix) | USTB11200026 |
| | Never Leave You Lonely (Original Mix) | USTB11200023 |
| | Next To You (Original Mix) | USTB11200021 |
| | Outro (Original Mix) | USTB11200028 |
| | Pillow Talk (Original Mix) | USTB11200025 |
| | Saturday Love (feat. Alexander O'Neal) (Original Mix) | USTB11200027 |
| | Sleepin' With The Enemy (Original Mix) | USTB11200019 |
| | Stop Loving You (Original Mix) | USTB11200016 |
| | The Right Time | (blank) |
| | The Right Time (feat. Keith Murray) (Original Mix) | USTB11200015 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | | |
|---|---|---|
| DFC | 2-2 the Chest | USTB11600121 |
| | A Piece of Mind (Intro) | USTB11600115 |
| | Caps Get Peeled | USTB11600117 |
| | Da Bomb | USTB11600127 |
| | Death B4 Dishonesty | USTB11600122 |
| | Digga Bigga Ditch | USTB11600125 |
| | Hands on My Nine | USTB11600123 |
| | Mo' Love | USTB11600118 |
| | Pass the Hooter | USTB11600120 |
| | Put Your Locs On | USTB11600116 |
| | Roll with the Clan | USTB11600124 |
| | Thing in Tha Hood | USTB11600128 |
| | Things in Tha Hood | USTB11600119 |
| | You Can Get the Dick | USTB11600126 |
| | | |
| DJ Stag | Da Mississippi Pop | USTB11200244 |
| | Dance the Way You Like Making Love | USTB11200240 |
| | Deejays Get Lonely Too | USTB11200242 |
| | Dis is for Dem Booty Shakers | USTB11200239 |
| | Intro | USTB11200237 |
| | Let Me See Ya Pump It | USTB11200238 |
| | Party Time | USTB11200241 |
| | Pop that Booty | USTB11200247 |
| | Shake Dem Silicone Titties | USTB11200243 |
| | Talk to the Hands | USTB11200245 |
| | The Thrill is Gone | USTB11200246 |
| | | |
| Don Baller | Tongue Out (feat. Yung Joc) | QZ8QS1800182 |
| | Tongue Out (feat. Yung Joc) (Radio Edit) | QZ8QS1800181 |
| | | |
| Down South | 2 Much Booty (Original Mix) | USTB11200182 |
| | Bump that Rump (Original Mix) | USTB11200184 |
| | Get Down on It (Original Mix) | USTB11200185 |
| | Getting' Money (Original Mix) | USTB11200186 |
| | I'll Na Na (Original Mix) | USTB11200189 |
| | Knees & Boes (Original Mix) | USTB11200188 |
| | Nails Did (Original Mix) | USTB11200181 |
| | Oh!, Oh!, Oh! (Original Mix) | USTB11200183 |
| | Swang that Booty (Original Mix) | USTB11200187 |
| | U-Eh (Original Mix) | USTB11200180 |
| | | |
| Frankie | Frankie Leg (Radio Edit) | USTB11104206 |
| | | |
| Frankie Lons | Frankie Leg | USTB11104213 |
| | | |
| Freak Nasty | Boom Boom Bomb | US25T9920904 |
| | Boot Up (Who Ya Wit) | US25T9920901 |
| | Bounce 2 This (Groove) (Original Mix) | USTB11200158 |
| | Bring it On (Original Mix) | USTB11200151 |
| | Bump That Rump | US25T9920897 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | | |
|---|---|---|
| | Commercial | US25T9920898 |
| | Controversee (Start) | US25T9920902 |
| | Controversee...That's Life...And That's the Way It Is | (blank) |
| | Cut Up | US25T9920910 |
| | Da' Dip | US25T9920900 |
| | Deep Deep South | US25T9920908 |
| | Dirty Mouth | US25T9920896 |
| | Do What U Feel (Freaky Mix) | USTB11200155 |
| | Do What U Feel (Original Mix) | USTB11200161 |
| | Down Low (Remix) | US25T9920903 |
| | Everyday Thing (Original Mix) | USTB11200150 |
| | F*ckie S*ckie (At Freaknasty Party) | US25T9920909 |
| | Have This Ever Happened 2-U | US25T9920907 |
| | I Got it Like That (Original Mix) | USTB11200153 |
| | I Want to F*ck | US25T9920895 |
| | Intro | US25T9920894 |
| | Intro (Original Mix) | USTB11200149 |
| | It's Me (Original Mix) | USTB11200156 |
| | Keep it Real (Original Mix) | USTB11200154 |
| | Lil' Power (Original Mix) | USTB11200157 |
| | On My Mind (Time After Time) (Original Mix) | USTB11200152 |
| | Outro (Original Mix) | USTB11200162 |
| | P.G.P.B. | US25T9920899 |
| | Push 'Em Up (Original Mix) | USTB11200160 |
| | Respect | US25T9920906 |
| | Rumors Pt. 1 | US25T9920905 |
| | Rumors Pt. 2 | US25T9920911 |
| | That Type (Original Mix) | USTB11200159 |
| G.A.N. | Controversey | USTB11600035 |
| | Creep | USTB11600033 |
| | Get Away | USTB11600037 |
| | Get It How U Live | USTB11600029 |
| | Heads or Tails | USTB11600036 |
| | Hey | USTB11600032 |
| | In My Shoes | USTB11600025 |
| | Jump-Bounce | USTB11600028 |
| | Love the Doe | USTB11600024 |
| | Memory Lane | USTB11600030 |
| | Murder Music | USTB11600031 |
| | Still Breath | USTB11600023 |
| | Survivor | USTB11600026 |
| | The Message | USTB11600034 |
| | Who U Fuck'n Wit | USTB11600038 |
| | Young Lungs | USTB11600027 |
| Gangsta Pat | #1 Suspect | USTB11200255 |
| | All About Comin' Up (Original Mix) | US25T9920853 |
| | Blunted Up (Original Mix) | US25T9920881 |
| | Blunted Up (Skit) | US25T9920750 |

77

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | |
|---|---|
| Boddies on My 9 (Original Mix) | US25T9920748 |
| Bodies on My 9 | USTB11200257 |
| Bouncing to a Murder | USTB11200260 |
| Can't Mess Wit Me (Original Mix) | US25T9920880 |
| Creep wit a Nigga (feat. Lil Tee) (Original Mix) | US25T9920744 |
| Dead Presidents | USTB11200258 |
| Dead Presidents (Original Mix) | US25T9920749 |
| Deadly Verses | USTB11200248 |
| Deadly Verses '97 (feat. Lil Tee) (Original Mix) | US25T9920753 |
| Deadly Verses (feat. The Villian) (Original Mix) | US25T9920791 |
| Dedication (Original Mix) | US25T9920864 |
| | US25T9920893 |
| Empty tha Clip (Original Mix) | US25T9920746 |
| Fatal Attraction (Original Mix) | US25T9920861 |
| Gangsta Boogie (Original Mix) | US25T9920859 |
| Gangsta Groove (Original Mix) | US25T9920856 |
| Gangsta Luv (Original Mix) | US25T9920888 |
| Gangsta's Need Love 2 | USTB11200250 |
| Gangstas Need Love Too (Original Mix) | US25T9920862 |
| Get Ya Weight Up | USTB11200262 |
| Heaven or Hell (Original Mix) | US25T9920800 |
| Homicidal Lifestyle (Original Mix) | US25T9920751 |
| | US25T9920882 |
| Homicidal Lifestyles | USTB11200252 |
| How Deep is Yo Luv (feat. Hollo Point) (Original Mix) | US25T9920747 |
| I Wanna Smoke | USTB11200251 |
| I Wanna Smoke (feat. Psycho) (Original Mix) | US25T9920754 |
| | US25T9920792 |
| I Wanna Smoke (Remix) | US25T9920743 |
| I'm Still The Gangsta (Original Mix) | US25T9920855 |
| Instructions (Original Mix) | US25T9920742 |
| Intro (Original Mix) | US25T9920877 |
| Killa (Skit) | US25T9920745 |
| Killa Killa (Original Mix) | US25T9920798 |
| Lay Me Down (feat. Lil Tee) (Original Mix) | US25T9920752 |
| Let It Flow | US25T9920884 |
| Mo Murder (Original Mix) | US25T9920799 |
| Murdur (Original Mix) | US25T9920755 |
| My Name Ain't Rover (Original Mix) | US25T9920863 |
| My Neighborhood (Original Mix) | US25T9920858 |
| Natural High (Original Mix) | US25T9920891 |
| O.J. Murder Story | USTB11200254 |
| O.J. Murder Story (Original Mix) | US25T9920797 |
| Pat is Back (Original Mix) | US25T9920796 |
| Pimp'N Ain't Dead (Original Mix) | US25T9920890 |
| Pimpin Ain't Dead | USTB11200261 |
| Projects (Original Mix) | US25T9920793 |
| Real G's Don't Die (Original Mix) | US25T9920885 |
| Sex, Money & Murder | USTB11200259 |
| Sex, Money, Murder (Original Mix) | US25T9920887 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  |  |  |
|---|---|---|
|  | Shootin' On Narcs (Part II) | US25T9920886 |
|  | Shooting on Narcs | USTB11200249 |
|  | Smoke with the Devil (Original Mix) | US25T9920794 |
|  | Spend The Night (Original Mix) | US25T9920857 |
|  | Stay Away From Cali (Original Mix) | US25T9920854 |
|  | Stupid (Original Mix) | US25T9920889 |
|  | Tear the Club Up | USTB11200253 |
|  | Tear the Club Up (Original Mix) | US25T9920795 |
|  | That Girl (Original Mix) | US25T9920879 |
|  | That Type (Original Mix) | US25T9920878 |
|  | That Type Of Gangsta (Remix) | US25T9920892 |
|  | The Saga Continues (Original Mix) | US25T9920883 |
|  | Watookmesolong (Original Mix) | US25T9920860 |
|  | What's the Biz Jones | USTB11200256 |
|  |  |  |
| Gangsta Pat & DFC | 2-2 The Chest (Original Mix) | USTB11200076 |
|  | Body on My 9 (Original Mix) | USTB11200072 |
|  | Caps Get Peeled (Original Mix) | USTB11200067 |
|  | Dead Presidents (Original Mix) | USTB11200078 |
|  | Deadly Verses (Original Mix) | USTB11200066 |
|  | Get Heated (Original Mix) | USTB11200065 |
|  | Homicidal Lifestyle (Original Mix) | USTB11200077 |
|  | I Wanna Smoke (Original Mix) | USTB11200070 |
|  | Intro (Original Mix) | USTB11200064 |
|  | My Day (Original Mix) | USTB11200069 |
|  | Sex, Money, Murder (Original Mix) | USTB11200073 |
|  | Skit (Original Mix) | USTB11200074 |
|  | Southside Player (Original Mix) | USTB11200071 |
|  | Street Muthafuckas (Original Mix) | USTB11200079 |
|  | Tear Da Club Up (Original Mix) | USTB11200068 |
|  | The Projects (Original Mix) | USTB11200075 |
|  |  |  |
| George Clinton | This is How We Do It 1 | USTB11600104 |
|  | This is How We Do It 2 | USTB11600111 |
|  |  |  |
| Ghetto Mafia | A-Town | US25T9920777 |
|  | All Out (Original Version) | US25T9920763 |
|  | Bonus Track (Original Version) | US25T9920766 |
|  | Clean Getaway (Original Version) | US25T9920759 |
|  | Cost to be the Boss | US25T9920775 |
|  | Creepin (Original Version) | US25T9920765 |
|  | Downtown Glory | US25T9920779 |
|  | Draw the Line | US25T9920773 (blank) |
|  | Everyday Thang in Da Hood | US25T9920769 |
|  | Facts of Life | US25T9920776 |
|  | Full Blooded Niggaz | (blank) |
|  | I Ain't Going Down (Original Version) | US25T9920758 |
|  | Intro | US25T9920767 |
|  | Life of a Sniper | US25T9920768 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  |  |  |
|---|---|---|
|  | Mr. President | US25T9920771 |
|  | One Less B---- | US25T9920778 |
|  | Organized Crime | US25T9920772 |
|  | Organized Crime (Original Version) | US25T9920760 |
|  | Real Motha ------ | US25T9920774 |
|  | Real Motha F..... (Original Version) | US25T9920764 |
|  | Snap Shot (Original Version) | US25T9920757 |
|  | Special Delivery | US25T9920770 |
|  | The Chair (Original Version) | US25T9920756 |
|  | This is a Stick Up (Original Version) | US25T9920762 |
|  | What Dem Gon Do (Silent) | US25T9920761 |
| Ice Buck | Back that Country Thang on Me (feat. Nellie "Tiger" Trav | QZ8QS2100003 |
|  | Back that Country Thang on Me (feat. Nellie "Tiger" Trav | QZ8QS2100004 |
| Jake The Flake | Dayton Don't Play (Original Mix) | US25T9920871 |
|  | Drug Dealer (Original Mix) | US25T9920866 |
|  | F.A.N.G. feat. Shoestring from the Dayton Family & D.F.( | US25T9920875 |
|  | Goin' Way Out feat. Shoestring (Original Mix) | US25T9920867 |
|  | Interlude (Original Mix) | US25T9920869 |
|  | Intro (Original Mix) | US25T9920865 |
|  | Lawless (Original Mix) | US25T9920868 |
|  | Out 2 Get Rich | (blank) |
|  | Out 2 Get Rich (Original Mix) | US25T9920873 |
|  | Refuse to Loose (Original Mix) | US25T9920874 |
|  | Streets is All I Know (Remix) | US25T9920876 |
|  | The Way Life Goes (Original Mix) | US25T9920872 |
|  | Time to Go Legit (Original Mix) | US25T9920870 |
| Jake the Flake & The Flint Thugs | Ain't No Superman (Original Mix) | US25T9920832 |
|  | Bouncin to a Murder (Original Mix) | US25T9920838 |
|  | Chromotose in the Brain (Original Mix) | US25T9920830 |
|  | Fake as a Snack Cake (Original Mix) | US25T9920829 |
|  | Fang (Original Mix) | US25T9920831 |
|  | Good Fellas (Original Mix) | US25T9920840 |
|  | Hold Yo Nuts (Original Mix) | US25T9920828 |
|  | Intro (Original Mix) | US25T9920827 |
|  | Money, Mack, Murder (Original Mix) | US25T9920834 |
|  | My Own Boss (Original Mix) | US25T9920836 |
|  | On the Edge (Original Mix) | US25T9920837 |
|  | Payback's a Motherfucker (Original Mix) | US25T9920835 |
|  | Streets is All I Know (Original Mix) | US25T9920833 |
|  | Them Niggaz Lucky (Original Mix) | US25T9920839 |
| Jessie Clay | You Changed | QZ8QS1800190 |
| Leroy McMath & Curtis Butler | About the Author (Original Mix) | USTB11200013 |
|  | Acknowledgements (Original Mix) | USTB11200001 |
|  | Ch 1: The Game (Original Mix) | USTB11200004 |
|  | Ch 2: How Labels Grow (Original Mix) | USTB11200005 |

| | | |
|---|---|---|
| | Ch 3: Finding the Right Artist (Original Mix) | USTB11200006 |
| | Ch 4: Artist Advances (Original Mix) | USTB11200007 |
| | Ch 5: Calling the Shots (Original Mix) | USTB11200008 |
| | Ch 6: Marketing Your Label and Your Artist (Original Mix | USTB11200009 |
| | Ch 7: Distribution (Original Mix) | USTB11200010 |
| | Ch 8: Becoming a Music Millionaire (Original Mix) | USTB11200011 |
| | Ch 9: Final Words (Original Mix) | USTB11200012 |
| | Introduction (Original Mix) | USTB11200003 |
| | Preface (Original Mix) | USTB11200002 |
| Lil D 50% | Ball Ball (Original ) | US25T9920810 |
| Mack the Jack'A | Back to the States | USTB11200203 |
| | Connections | USTB11200208 |
| | | USTB11200210 |
| | Dreaming (Replay Version of Am I Dreaming) | USTB11200211 |
| | Family Touchings | USTB11200218 |
| | Fuck' Em All | USTB11200222 |
| | Here Comes the Mack | USTB11200214 |
| | I Got to be a Millionsire | USTB11200212 |
| | I Keeps it Real | USTB11200207 |
| | In the Doe | USTB11200215 |
| | Jackin' Anonymous | USTB11200217 |
| | Let's Ride | USTB11200209 |
| | Lock Down | USTB11200220 |
| | Mack the Jack'A | USTB11200204 |
| | My Life is a Battlefield | USTB11200206 |
| | Out of Bounds | USTB11200216 |
| | Scrilla | USTB11200221 |
| | Tell Me Why | USTB11200205 |
| | This Here Thangm | USTB11200219 |
| | Watch Yo Back | USTB11200213 |
| MC Breed | 2 for the Show | (blank) |
| | 2-2 Da Chest (feat. DFC) | USTB11600284 |
| | 20 Below | USTB11600087 |
| | Ain't 2 Good | US25T9920824 |
| | Ain't to be Fucked With | USTB11600086 |
| | Ain't Too Much Worried | USTB11600091 |
| | B.R. Double E.D. | USTB11600113 |
| | Babysittin' (Original Mix) | USTB11200140 |
| | Back Up in Ya! | USTB11600110 |
| | Be Myself | USTB11600093 |
| | Better Now (feat. Big Mike) | USTB11600288 |
| | Bitches (feat. Too Short & Richie Rich) (Original Mix) | USTB11200138 |
| | Boom Boom | US25T9920852 |
| | Break Yourself | USTB11600109 |
| | Business Never Personal | US25T9920849 |
| | Comin' Real Again | US25T9920819 |
| | Conclusion (feat. Too Short) | USTB11600289 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  |  |  |
|---|---|---|
|  | Conversations | US25T9920822 |
|  | Dis Mode | USTB11600088 |
|  | Everyday Ho | US25T9920823 |
|  | Everyday Thang in Da Hood (feat. Ghetto Mafia) | USTB11600286 |
|  | Flash's Groove | USTB11600090 |
|  | Flashbacks | US25T9920818 |
|  | Flava Uv Phony | USTB11600112 |
|  | Funkafied | (blank) |
|  | Gangsta Gansta (Original Mix) | USTB11200145 |
|  | Gangsta Shit | US25T9920843 |
|  | Gotta Get Mine | US25T9920817 |
|  | Gotta Get Mine (feat. 2Pac) | USTB11600281 |
|  | Gotta Get Mine (feat. Tupac) (Remix) | US25T9920842 |
|  | Great Depressioin | USTB11600094 |
|  | Intro | US25T9920816 |
|  |  | US25T9920841 |
| McBreed | It's All Good | US25T9920845 |
|  | Jealous Pimp | USTB11600097 |
|  | Just Another Clip | US25T9920820 |
|  | Late Night Creep (Booty Call) | USTB11600102 |
|  | Let's Go to Da Club (feat. Erotic D) | USTB11600291 |
|  | Lets Go To Da Club | US25T9920848 |
|  | Life of a Flintstone | USTB11600096 |
|  | Little Child Running Wild | USTB11600089 |
|  | M.C. Breed Presents The Thugz - Volume 1 | (blank) |
|  | Mack the Jack A Mack the Jack A (Original Mix) | USTB11200143 |
|  | Mo Money (Paycheck & M.C. Breeed) (Original Mix) | USTB11200142 |
|  | Mo Money to Get (feat. Paycheck) | USTB11600283 |
|  | Money Holders (feat. Mr. No Love) (Original Mix) | USTB11200148 |
|  | No Frontin' Allowed | USTB11600092 |
|  | No Future (feat. Bootleg & M.C. Breed) (Original Mix) | USTB11200146 |
|  | No Future (feat. Bootleg) | USTB11600287 |
|  | Ol' School | USTB11600114 |
|  | One Time | USTB11600105 |
|  | Outro | US25T9920826 |
|  | Provider (feat. Se) (Original Mix) | USTB11200144 |
|  | Rebel Slave (feat. Southclick) | USTB11600285 |
|  | Rule No. 1 (feat. Pimp C of UGK) | US25T9920850 |
|  | Sesshead Funk Junky (feat. 8-Ball & MJG) | USTB11600282 |
|  | Seven Years | USTB11600106 |
|  | She Likes It (Skit) | US25T9920846 |
|  | Shootin' from the Hip | USTB11600108 |
|  | Shout Out | USTB11600098 |
|  | Skanless (feat. Breed Madam Dame & T-Double of DFC) | USTB11200141 |
|  | Slack'N on Yo Pimpin' (feat. Boss Witch) (Original Mix) | USTB11200147 |
|  | Smoke with a Nigga (Feat. Mr. Ku) | US25T9920851 |
|  | Smokin' | USTB11600101 |
|  | Something 2 Smoke 2 | US25T9920825 |
|  | Teach My Kids | USTB11600103 |
|  | The Deal is Da Funk | USTB11600107 |

|  | The New Breed | (blank) |
|---|---|---|
|  | Think About It (feat. Hardboyz) | USTB11600290 |
|  | Thug Promise (Original Mix) | USTB11200136 |
|  | Tight | US8924960010 |
|  | Tricks (feat. Too $hort) | US25T9920844 |
|  | Try Me Dog (Original Mix) | USTB11200137 |
|  | Underground Address | USTB11600099 |
|  | Watch Your Own Back | US25T9920821 |
|  | Westside Thing (Westside 4th Ward) (Original Mix) | USTB11200139 |
|  | What You Want | USTB11600100 |
|  | Whenever You Want Me | USTB11600095 |
|  | Work It From the Bottom | US25T9920847 |
| MC Breed & DFC | Ain't No Future In Yo' Frontin' | US25T9920783 |
|  | Better Terms | US25T9920785 |
|  | Black For Black | US25T9920788 |
|  | Get Loose | US25T9920787 |
|  | Guanja | US25T9920789 |
|  | I Will Excell | US25T9920786 |
|  | Job Corp | US25T9920781 |
|  | Just Kickin It | US25T9920784 |
|  | M.C. Breed & DFC | (blank) |
|  | More Power | US25T9920790 |
|  | That's Life | US25T9920782 |
|  | Underground Slang | US25T9920780 |
| MC Breed & Too Short | Do Thang (Original ) | US25T9920805 |
| MC Breed & Tupac | Gotta Get Mine (Remix) | US25T9920809 |
| Ray Ray | Nails Did | USTB11600067 |
|  |  | USTB11600068 |
|  |  | USTB11600069 |
|  |  | USTB11600070 |
|  |  | USTB11600071 |
| Sang | Bonus Track (Original ) | US25T9920814 |
|  |  | US25T9920815 |
| Sang & C-Breezy | All My Niggas (Original ) | US25T9920813 |
|  | Fuck Everybody (Original ) | US25T9920812 |
| Sang & Coyleone | The Game Ain't Change (Original ) | US25T9920807 |
| Soullow | I.F.W.U. (feat. Mony Karlo & JMon) | QZ8QS1800174 |
|  |  | QZ8QS1800175 |
| South Click | Beyond the Millenium (Original Mix) | USTB11200088 |
|  | Breakout (Original Mix) | USTB11200089 |
|  | Busta Free (Original Mix) | USTB11200087 |

83

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | | |
|---|---|---|
| | Carolina Backwoods (Original Mix) | USTB11200093 |
| | Carolina Bounce | USTB11600042 |
| | Comtemplated the Crime (Original Mix) | USTB11200090 |
| | Daze of Old (Original Mix) | USTB11200084 |
| | December 31, 1999 | USTB11600040 |
| | Donnie Damon | USTB11600052 |
| | First Blow (Original Mix) | USTB11200092 |
| | Good Cop Bad Cop | USTB11600054 |
| | Good Girl Gone Bad | USTB11600050 |
| | Intro | USTB11600039 |
| | Introduction (Original Mix) | USTB11200080 |
| | Kakilak | USTB11600051 |
| | Late Night | USTB11600044 |
| | Letter from War | USTB11600043 |
| | Night Rider | USTB11600046 |
| | P.O.W. (Original Mix) | USTB11200094 |
| | Pain | USTB11600041 |
| | Rebel Slave | USTB11600047 |
| | Rebel Slave (Original Mix) | USTB11200082 |
| | Shots of Fire | USTB11600049 |
| | Sign of the Times (Original Mix) | USTB11200081 |
| | Simply Beautiful (Original Mix) | USTB11200086 |
| | Smoke | USTB11600045 |
| | Smoke (Original Mix) | USTB11200085 |
| | Some Folks | USTB11600055 |
| | South | USTB11600053 |
| | The Best | USTB11600048 |
| | We Be Spittin (Original Mix) | USTB11200095 |
| | We Don't Need (Original Mix) | USTB11200083 |
| | With Me or Against Me (Original Mix) | USTB11200091 |
| | | |
| Southside Hustlaz | 365 Days | USTB11600060 |
| | Friendz | USTB11600064 |
| | Hard Hitters | USTB11600056 |
| | Haters Keep Hating | USTB11600058 |
| | In Decatur | USTB11600061 |
| | K.G. Pheeno G. and Charles | USTB11600062 |
| | Perfect Contender | USTB11600057 |
| | | USTB11600063 |
| | Southern Poetry | USTB11600059 |
| | Strictly 4 My Folk | USTB11600065 |
| | Watch Ya Back | USTB11600066 |
| | | |
| Spuddy-G | Game First (Original ) | US25T9920808 |
| | | |
| Steady Mobb'n | A Favor (feat. Guce) (Original Mix) | USTB11200174 |
| | Band to Dis (feat. Butch Cassidy) (Original Mix) | USTB11200165 |
| | Bang with Me (feat. Black Mafia Family) (Original Mix) | USTB11200177 |
| | Big Fishes (feat. Messy Marv) (Original Mix) | USTB11200166 |
| | Call it What You Want (Remix) | USTB11200167 |

84

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | | |
|---|---|---|
| | Crime Buddies (Original Mix) | USTB11200179 |
| | Flipside (feat. S. Knight) (Original Mix) | USTB11200171 |
| | Fuck Whatcha Talkin Bout (Original Mix) | USTB11200178 |
| | Hott (feat. Sons of Funk) (Original Mix) | USTB11200175 |
| | I Am (feat. Philley 45) (Original Mix) | USTB11200163 |
| | Lets Get it Crackin (feat. Nate Dogg) (Original Mix) | USTB11200168 |
| | Luv Ones (feat. Delinquents) (Original Mix) | USTB11200169 |
| | On Our Job (feat. 504 Riders) (Original Mix) | USTB11200164 |
| | Show Me Whatcha Twerkin (Original Mix) | USTB11200176 |
| | Sounds Like a Busta (Original Mix) | USTB11200170 |
| | Stop Poppin Shit (feat. The Outlaws) (Original Mix) | USTB11200172 |
| | Zoning (feat. Sho Dawg) (Original Mix) | USTB11200173 |
| Tha Boss Bitch | Boss Bitch (Original Mix) | USTB11200130 |
| | Can't Nobody do it Better feat. Corrosion & Kokaine (Ori | USTB11200135 |
| | Cock It Man (Original Mix) | USTB11200132 |
| | Creepin' feat. Corrosion (Original Mix) | USTB11200131 |
| | I Told You (Original Mix) | USTB11200127 |
| | Intro feat. Raise Up Clique (Original Mix) | USTB11200123 |
| | Psycho | (blank) |
| | Psycho feat. Krazy Z (Original Mix) | USTB11200126 |
| | Raise Up Army feat. Corrosion (Original Mix) | USTB11200134 |
| | Slackin' on Yo Pimpin' (Original Mix) | USTB11200128 |
| | Tear It Up feat. Corrosion (Original Mix) | USTB11200124 |
| | Warning feat. Dj Sticky Boots (Original Mix) | USTB11200122 |
| | What You Want feat. Bar-None & Von G (Original Mix) | USTB11200129 |
| | Why You Hatin' feat. Jason, Coop & Mikes (Original Mix) | USTB11200125 |
| | Womb to the Tomb feat Raise Up Clique (Original Mix) | USTB11200133 |
| The Botany Boyz | Money In My Live (Original ) | US25T9920802 |
| The Hard Boys | 3 Counts (Original ) | US25T9920732 |
| | A-Town Hard Heads | (blank) |
| | A-Town Hard Heads (Original ) | US25T9920733 |
| | Armed Robery (Original ) | US25T9920738 |
| | At 2 O'Clock (Original ) | US25T9920740 |
| | Crimminal Behavior (Original ) | US25T9920735 |
| | Death Row (Original ) | US25T9920741 |
| | Ez Pimpin (Original ) | US25T9920729 |
| | Fletch (Original ) | US25T9920731 |
| | Groupies (Original ) | US25T9920736 |
| | Hell Bound (Original Mix) | USTB11200102 |
| | Here They Come (Original Mix) | USTB11200103 |
| | I Now Know (Original Mix) | USTB11200106 |
| | Jock Itch (Original ) | US25T9920730 |
| | Let's Roll (Original Mix) | USTB11200107 |
| | Lets Straighten It Out (Original Mix) | USTB11200109 |
| | Listen to 'Em Rumors (Original Mix) | USTB11200096 |
| | Lost Cause (Original Mix) | USTB11200108 |
| | Mission to Nowhere (Original ) | US25T9920737 |

|  |  |  |
|---|---|---|
|  | P.M.S. feat. Ghetto E from The Dayton Family (Original N | USTB11200100 |
|  | Players (Original ) | US25T9920739 |
|  | Prelude (Original ) | US25T9920727 |
|  | Sick Psychotic Thoughts (Original Mix) | USTB11200101 |
|  | Street Mutha Fuckas (Original ) | US25T9920728 |
|  | Strong In the Game (Original ) | US25T9920734 |
|  | This About It feat. MC Breed (Original Mix) | USTB11200097 |
|  | Thugz Like Us (Original Mix) | USTB11200098 |
|  | Trapped Remix feat. Spice 1 (Original Mix) | USTB11200104 |
|  | War Stories (Original Mix) | USTB11200105 |
|  | Who Do You Fear (Original Mix) | USTB11200099 |
| The Hard Boyz | (How Ya Gonna) Jacka Jacka | USTB11600074 |
|  | 4 Niggas in 1 (feat. Loose Screws & D.F.C.) | USTB11600075 |
|  | A-Town Hard Heads (Original Mix) | USTB11200199 |
|  | Armed Robbery | USTB11600072 |
|  | Come Real (Original Mix) | USTB11200198 |
|  | G State Soldier | USTB11600082 |
|  | Ghetto World | USTB11600080 |
|  | Groupies (Original Mix) | USTB11200200 |
|  | Here They Come (Original Mix) | USTB11200196 |
|  | Money Holders   (Original Mix) | USTB11200191 |
|  | Niggas in the Street | USTB11600081 |
|  | Only Time Will Tell (Original Mix) | USTB11200190 |
|  | Outro Groove | USTB11600085 |
|  | Root of All Evil | USTB11600077 |
|  | Sawed Off Pump | USTB11600073 |
|  | Sick Psychotic Thoughts | USTB11600079 |
|  | Sick Psychotic Thoughts (Original Mix) | USTB11200192 |
|  | Skat'n on Thin Ice (Original Mix) | USTB11200195 |
|  | Superfly | USTB11600083 |
|  | Thin Ice | USTB11600078 |
|  | Thin Line (Original Mix) | USTB11200193 |
|  | Time to Play | USTB11600084 |
|  | Trapped   (Original Mix) | USTB11200197 |
|  | Trapped in the Game | (blank) |
|  | Trapped in the Game (feat. Spice 1) | USTB11600076 |
|  | Will I See (Original Mix) | USTB11200194 |
| The Looters | Take Yo Time (Original ) | US25T9920803 |
| Unorthodox | No Local (Original ) | US25T9920804 |
| Warlox | Ballin (Original ) | US25T9920806 |

# EXHIBIT A

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET AL.
DATED
DECEMBER 7, 2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER PRODUCTION, INC.
P.O. BOX 485
SAGINAW, MICHIGAN 48605

## AGREEMENT

AGREEMENT dated the ___OCT, 6th  1990___ by and between the
___ERIC BREED  D.B.A / MC BREED and DFC___
_____ Michigan (herein referred to as "you") and Power Production,
Inc., Company, Saginaw, Michigan, (herein referred to as "Company").

## WITNESSETH

In Consideration of the mutual promises and covenants herein
contained, the parties hereby agree as follows:

### 1.    TERM

(a.)  The term hereof (the "Term") shall consist of an initial
period of one (1) year commencing on the date hereof (the "First
Contract Year") plus the additional "Contract Years", if any, for which
such Term may be extended by Company's exercise of one or more of the
options granted to Company below (unless otherwise extended or suspended
as provided herein).

(b.)  You hereby irrevocably grant to Company four (4)
separate consecutive options to extend the Term for a "Second", "Third",
"Fourth", and a "Fifth" Contract Year, respectively, such Contract Years
to consist of one (1) year each.  Each such option shall be deemed to be
exercised by Company unless it shall give you written notice to the
contrary at least thirty (30) days prior to the date that the then
current Contract Year would otherwise expire.

### 2.    RECORDING SERVICES

During the Term of this Agreement you shall render to Company
your exclusive services as a recording artist for the purpose of making
Master Recordings and as otherwise set forth herein.

### 3.    RECORDING COMMITMENT

(a.)  During each Contract Year, you shall render your
services to Company in accordance with the terms and conditions hereof
in connection with recording the minimum number of Sides (the "Minimum
Recording Commitment") set forth in the following schedule:

**EXHIBIT "A"**

88

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| CONTRACT YEAR | MINIMUM RECORDING COMMITMENT |
|---|---|
| First | One (1) Album |
| Second | One (1) Album |
| Third | One (1) Album |
| Fourth | One (1) Album |
| Fifth | One (1) Album |

4.    RECORDING PROCEDURE

(a)    In connection with Master Recordings to be made hereunder, the following matters shall be determined by Company:

(i)    Selection of the producer.

(ii)    Selection of material to be recorded (including the number of Compositions to be recorded), and

(iii)    Selection of dates of recording and studios where recording is to take place, including the cost of recording therein. The scheduling and booking of all studio time will be done by Company.

(b)    Each Master Recording made hereunder shall be subject to Company's approval as satisfactory for the manufacture and sale of Phonograph Records.

5.    RECORDING COSTS

(a)    Company will pay all minimum union scale payments required to be made to you in connection with Master Recordings made hereunder, all costs of all non-royalty instrumental, vocal and other personnel and all costs for arrangements and copying incurred by Company hereunder, and all other amounts which are required to be paid by Company pursuant to any applicable law or any collective bargaining agreement between Company and any union representing persons who render services in connection with Master Recordings made hereunder.

(b)    All amounts described in Paragraph 5(a) above plus all other amounts paid by Company representing expenses incurred in connection with the making of Master Recordings hereunder (including, without limitation, all studio and engineering charges) are herein sometimes called "Recording Costs" and shall constitute Advances.

(c)    You agree that such payments will be declared production costs and shall not become due and payable until company receives production cost from one of the record companies referred in schedule A" Attached hereto.

89

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

6.    ADVANCES

All monies paid to you, or on your behalf, with reference to this Agreement, other than royalties paid pursuant to Paragraph 8 hereof, shall constitute Advances unless otherwise expressly agreed in writing by an authorized officer of Company.

7.    GRANT OF RIGHTS

(a)    All Master Recordings made hereunder from the inception of recording thereof, and Phonograph Records manufactured therefrom, together with the performances embodied thereon, shall be the sole property of Company, free from any claims whatsoever by you or any other Person, and Company shall have the exclusive right to copyright such Master Recordings in its name as the owner and author thereof and to secure any and all renewals and extensions of such copyright. Solely for the purposes of any applicable copyright law, all Persons rendering services in connection with the recording of such Master Recordings shall be deemed "employees for hire" of Company.

(b)    Without limiting the generality of the foregoing, Company and any Person authorized by Company shall have the unlimited right, throughout the world, to manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made hereunder, and to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing.

(c)    Company and any Licensee of Company each shall have the right, and may grant to others the right, to reproduce, print, publish, or disseminate in any medium your name, portraits, pictures and likeness and·biographical material concerning you, as news or information, or for the purposes of trade, or for advertising purposes; provided, however, that no direct endorsement by you of any product or service shall be used without your written consent. During the Term of this Agreement, you shall not authorize any Party other than Company to use your name or ·likeness in connection with the advertising or sale of Phonograph Records. As used in this Agreement, "your name" shall include any professional names or sobriquets.

8.    ROYALTIES

Conditioned upon your full and faithful performance of all the terms and conditions hereof, you will be paid royalties on Net sales of records as hereinafter set forth less all royalties paid to producer/producers as set forth in Paragraph 18.

(a) Company will pay you as a basic royalty, the percentage set forth in the following schedule, of the applicable Royalty Base Price in respect of One Hundred (100%) percent of Net Sales of Phonograph Records in disc form, consisting entirely of Master Recordings performed by you and recorded hereunder and sold by Company or its Licensees through normal retail channels for distribution in the United States of America.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

CONTRACT YEAR        BASIC ROYALTY RATE

First        1st year 12% percent of Retail Selling Price or
Royalty rate negotiated by company with one of the
record distributors set forth in Schedule "A" whichever
is greater

(b)  In respect of Phonograph Records sold in the form of
prerecorded tape, the royalty payable to you therefor shall be the same
as the applicable royalty rate which would have been payable to you if
such Records were sold in disc form, and such royalties shall at all
times be computed on the basis of One Hundred (100%) percent Net Sales
of such Records.

(c)  In respect of Phonograph Records sold to consumers
through any mail order or record club operation (the "Club Operation"),
the royalty rate shall be one-half (½) of the otherwise applicable
royalty rate (but in no event shall you be entitled to receive in excess
of fifty (50%) percent of Company's net royalty receipts from such Club
Operation after deduction of all royalties payable to the producers of
such Master Recordings and all RPM and other applicable third party
payments), and such royalties shall at all times be computed on the
basis of eighty-five (85%) percent of Net Sales of such Records.
Notwithstanding the foregoing, no royalty shall be payable to you with
respect to (i) Phonograph Records received by members of any such Club
Operation in an introductory offer in connection with joining it or upon
recommending that another join it or as a result of the purchase of a
required number of Records, including, without limitation, Records
distributed as "bonus" or "free" Records, or (ii) Phonograph Records for
which such Club Operation is not paid.

(d)  In respect of Master Recordings leased by Company to
others for the distribution of Phonograph Records through broadcast or
other advertisements utilizing key-outlet distributors, the royalty
payable to you shall be thirty (30) percent of the net royalties

Page 4

91

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

received by Company from such key-outlet distributors after deduction of all royalties payable to the producers of such Master Recordings and all AFM and other applicable third party payments.

(e)  In respect of Phonograph Records sold to educational institutions or libraries or to armed forces post exchanges, the royalty shall be one-half (½) of the otherwise applicable royalty rate, and such royalties shall at all times be computed on the basis of One Hundred (100%) percent of Net Sales of such Records.

(f)  With respect to Phonograph Records bearing a special label or a suggested retail list price which is at least $3.00 less than the suggested retail list price used for the top line Phonograph Records released by Company or by its Licensees in any territory, the royalty rate payable to you in respect of such Phonograph Records shall be one-half (½) of the otherwise applicable royalty rate, and such royalty shall at all times by computed on the basis of One Hundred (100%) percent of Net Sales of such Records.

(g)  In respect of Phonograph Records sold by Company or its Licensees for distribution outside of the United States of America, or licensed or otherwise furnished by Company or its Licensees to others for its manufacture and distribution outside of the United States of America, the royalty rate payable to you therefor shall be one-half (½) of the applicable royalty rate which would have been payable to you therefor if such Records had been sold for distribution in the United States of America, and such royalties shall at all times be computed on the basis of One Hundred (100%) percent of Net Sales of such Records.

9.        MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in Paragraph 8 hereof:

(a)  (i)  With respect to Phonograph Records embodying Master Recordings made hereunder, together with other master recordings, the royalty rate payable to you shall be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides contained thereon embodying Master Recordings made hereunder and the denominator of which is the total number of Sides contained on such Record, and

(ii) With respect to Phonograph Records embodying Master Recordings made hereunder which embody your performances, together with the performances of another artist(s) to whom Company is obligated to pay royalties in respect of the sale of Phonograph Records derived from such Master Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodies on such Master Recording.

Page 5

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

(b) (i) No royalties shall be payable to you in respect of Phonograph Records sold by Company or its licensees until payment for such Records has been received by Company, or for Phonograph Records sold as cut-outs after the listing of such Records has been deleted from the catalog of Company or the particular Licensee, or for scrap at a salvage or close-out price, or for less than fifty (50%) percent of Company's or its Licensees' regular wholesale price for such Records, or in respect of Phonograph Records distributed for promotional purposes or Phonograph Records distributed to radio stations or for use on transportation carriers and facilities to promote or stimulate the sale of Phonograph Records, or in respect of Phonograph Records sold or distributed as "free" or "no-charge" or "bonus" Records (whether or not intended for resale), and

(ii) Notwithstanding anything to the contrary contained in Paragraph 9(b)(i) above, in respect of the sale by Company to its dealers or distributors of Phonograph Records subject to a discount or merchandising plan, the number of Records deemed to have been sold shall be determined by reducing the number of Records shipped by the percentage of discount granted, and if a discount is granted in the form of "free" or "no-charge" Records, such "free" or "no-charge" Records shall not be deemed included in the number of Records sold. However, such discounts (or "free" or "no-charge" Records) shall not exceed twenty (20%) percent of Records shipped for LPs, computed on a cumulative basis, and thirty (30%) percent of Records shipped for single Records, computed on a cumulative basis.

(c) No royalty shall be payable to you unless and until Company has recouped all Advances and all Recording Costs in connection with the Master Recordings made hereunder from the royalties payable to you in respect of Net Sales of Phonograph Records embodying such Master Recordings, and after such recoupment, royalties shall be paid to you only on those Records sold by Company or its Licensees after such recoupment.

(d) Company shall have the right to withhold a portion of your royalties as a reserve for returns and/or credits, which reserve shall be determined by Company in its reasonable judgment.

(e) The royalty rate applicable to a given Master Recording shall be the royalty rate specified herein for the Contract Year in which such Master Recording was recorded.

10.  ROYALTY ACCOUNTINGS

(a) Company shall compute royalties payable to you hereunder as of June 30th and December 31st for each preceding six (6) month period during which Records as to which royalties are payable hereunder are sold, and will render a statement and pay such royalties, less any unrecouped Advances and any other permissible offsets prior to each succeeding September 30th and March 31st, respectively. Company may deduct from any royalty or other payment under this agreement any amount you may owe Company under this Agreement or any other agreement between you and Company or Company's subdivisions or affiliates.

(b) Royalties for Records sold for distribution outside of

93

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

the United States of America (herein "foreign sales") shall be computed in the national currency in which Company is paid by its licensees and shall be paid to you at the same rate of exchange at which Company is paid. For accounting purposes, foreign sales shall be deemed to occur in the same semi-annual accounting periods in which Company's licensees account to Company therefor. If Company is unable, for reasons beyond its control, to receive payment for such sales in United States dollars in the United States of America, royalties therefor shall not be credited to your account during the continuance of such inability; if any accounting rendered to you hereunder during the continuance of such inability requires the payment of royalties to you, Company will, at your request and if Company is able to do so, deposit such royalties to your credit in such foreign currency in a foreign depository at your expense.

(c) At any time within one (1) year after any royalty statement is rendered to you hereunder, you shall have the right to give Company written notice of your intention to examine Company's books and records with respect to such statement. Such examination shall be commenced within three (3) months after the date of such notice, at your sole cost and expense, by any certified public accountant or attorney designated by you, provided he is not then engaged in an outstanding examination of Company's books and records on behalf of a person other than you. Such examination shall be made during Company's usual business hours at the place where Company maintains the books and records which relate to you and which are necessary to verify the accuracy of the statement or statements specified in your notice to Company and your examination shall be limited to the foregoing. Your right to inspect Company's books and records shall be only as set forth in this Paragraph 10(c) and Company shall have no obligation to produce such books and records more than once with respect to each statement rendered to you.

(d) Unless notice shall have been given to Company as provided in Paragraph 10(c) hereof, each royalty statement rendered to you shall be final, conclusive and binding on you and shall constitute an account stated. You shall be foreclosed from maintaining any action, claim or proceeding against Company in any forum or tribunal with respect to any statement or accounting rendered hereunder unless such action, claim or proceeding is commenced against Company in a court of competent jurisdiction within two (2) years after the due date of such statement or accounting.

(e) You acknowledge that Company's books and records contain confidential trade information. Neither you nor your representatives will communicate to others or use on behalf of any other person any facts or information obtained as a result of such examination of Company's books and records.

11. **WARRANTIES, REPRESENTATIONS, RESTRICTIONS AND INDEMNITIES**

(a) You warrant and represent that:

(1) You have the right and power to enter into and fully perform this Agreement;

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

(ii)  Company shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Company pursuant to this Agreement, except as specifically provided in this Agreement;

(iii)  You are, or will become, and will remain (to the extent necessary to enable the performance of this Agreement) a member in good standing of all labor unions or guilds, which may be lawfully required for the performance of your services hereunder; and

(iv)  Neither the "Materials" nor any use of the Materials by Company will violate or infringe upon the rights of any Person.  "Materials" as used in this subparagraph means any musical, artistic and literary materials, ideas and other intellectual properties, furnished by you and contained in or used in connection with any Recordings made hereunder  or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

(b)    (i)  During the Term of this Agreement, you will not enter in to any agreement which would interfere with the full and prompt performance of you obligations hereunder, and you will not perform or render any services for the purpose of making Phonograph Records or Master Recordings for any person other than Company.  After the expiration of the Term of this Agreement, for any reason whatsoever, you will not perform any Composition which shall have been recorded hereunder for any person other than Company for the purpose of making Phonograph Records or Master Recordings prior to the date five (5) years subsequent to the expiration date of the Term of this Agreement.

(ii)  You will not at any time record, manufacture, distribute or sell, or authorize or knowingly permit your performances to be recorded by any party for any purpose without an express written agreement prohibiting the use of such Recording on Phonograph Records in violation of the foregoing restrictions.

(c)  In the event that you shall become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing recording restrictions, you shall notify Company thereof and shall cooperate with Company in the event that Company commences any action or proceeding against such third party.

(d)  Your services hereunder are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and Company shall be entitled to injunctive relief to enforce the provisions of this Agreement.

(e)  You will at all times indemnify and hold harmless Company and any Licensee of Company from and against any and all claims, damages, liabilities, costs and expense, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty, representation or agreement made by you herein.  You will reimburse Company and/or its Licensees on demand for any payment made at any time after the date hereof in respect of any liability or claim in respect of which Company or its Licensees are entitled to be indemnified.

Page 8

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

## 12. DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below:

(a) "Master Recording" - each and every recording of sound whether or not coupled with a visual image, by any method and on any other substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

(b) "Person" and "Party" - any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

(c) "Records", "Phonograph Records" and "Recordings" - all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, embodying (i) sound alone; or (ii) sound coupled with visual images, e.g. "sight and sound" devices.

(d) "Retail Selling Price" - with respect to Records sold for distribution in the United States of America, the suggested retail selling price or suggested retail list price, as the case may be, except that the suggested retail selling price for 12-inch 45 rpm single records shall be deemed to be the suggested retail selling price of a 7-inch 45 rpm single record; and with respect to Records sold for distribution outside of the United States of America, the suggested retail list price of such Records, in, at Company's election, the country of manufacture, the United States of America or the country of sale.

(e) "Royalty Base Price" - the applicable suggested Retail Selling Price of Phonograph Records less all taxes and less the applicable Container Charge.

(f) "Container Charge" - (i) with respect to disc Phonograph Records, twelve (12%) percent of the applicable Retail Selling Price of such Phonograph Records; and (ii) with respect to Phonograph Records in non-disc configurations, twenty-four (24%) percent of the applicable Retail Selling Price of such Phonograph Records; and (iii) with respect to 7-inch "single" Phonograph Records contained in non-standard color sleeves, ten (10%) percent of the applicable Retail Selling Price of such Phonograph Records.

(g) "Net Sales" - gross sales less returns and credits of any nature.

(h) "Advance" - amount recoupable by Company from royalties to be paid to you or on your behalf pursuant to this or any other agreement.

(i) "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

Page 9

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

(j) "Controlled Composition" - a composition written, owned or controlled by you and/or any Person in which you have a direct or indirect interest.

(k) "Album" - one (1) twelve-inch, 33-1/3 rpm Record, or the equivalent thereof, embodying thereon not less than with (8) Sides nor more than eleven (11) Sides, whether or not released, which are recorded in connection with a specific album project.

(l) "Side" - a Recording of sufficient playing time to constitute one (1) Side of a 45 rpm Record, but not less than two and one-quarter (2-¼) minutes of continuous sound.

(m) "Sales Through Normal Retail Channels in the United States of America" - sales other than as described in subparagraphs 8(c), (d), (e), (f) and (g) hereof.

(n) "Licensees" - includes, without limitation, subsidiaries, wholly or partly owned, and other divisions of Company and any of Company's licensees.

13.  SUSPENSION AND TERMINATION

(a) If at any time you fail (except solely for Company's refusal without cause to allow you to perform) to fulfill your recording commitment herein within the times set forth herein, then, without limiting Company's rights, Company shall have the option, exercisable by notice to you to extend the expiration date of the then current period of the Term hereof, and/or to suspend Company's obligation to you hereunder (including, without limitation, Company's obligation to make payments to you hereunder) for the period of the default, plus such additional time as is necessary so that Company shall have no less than sixty (60) days after completion of your recording commitment within which to exercise its option, if any, for the next following Contract Year.

(B)  If in respect of any Contract Year of the Term of this Agreement, Company fails, without cause, to allow you to fulfill your Minimum Recording Commitment and if, within thirty (30) days after the expiration date of such Contract Year you shall notify Company of your desire to permit you to fulfill said Minimum Recording Commitment, then Company shall permit you to fulfill said Minimum Recording Commitment, then Company shall permit you to fulfill said Minimum Recording Commitment by notice to you to such effect within sixty (60) days of Company's receipt of your notice.  Should Company fail to give such notice, you shall have the option within thirty (30) days after the expiration of said sixty (60) day period to give notice that you wish to terminate the Term of this Agreement.  Upon receipt by Company of such notice, the Term of this Agreement shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations which survive the separation of the Term (e.g. warranties, rerecording restrictions and obligation to pay royalties). In the event you fail to give Company either notice within the period specified therefor, Company shall be under no obligation to you for failing to permit you to fulfill such Minimum Recording Commitment.

Page 10

by the terms of such agreement, to be included in this Agreement shall be deemed incorporated herein.

(c)  No breach of this Agreement on the part of Company shall be deemed material, unless you shall have given Company notice of such breach and Company shall fail to discontinue the practice complained of or otherwise cure such breach, within sixty (60) days after receipt of such notice, if such breach is reasonably capable of being fully cured within such sixty (60) day period, or, if such breach is not reasonably capable of being fully cured within such sixty (60) day period, if Company commences to cure such breach within such sixty (60) day period and proceeds with reasonable diligence to complete the curing of such breach.

(d)  This Agreement has been entered into in the State of Michigan, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of Michigan applicable to contracts entered into and performed entirely within the State of Michigan, with respect to the determination of any claim, dispute or disagreement, which may arise out of the interpretation, performance, or breach of this Agreement.  Any process in any action or proceeding commenced in the courts of the State of Michigan or elsewhere arising out of any such claim, dispute or disagreement, may, among other methods, be served upon you by delivering or mailing the same, via registered or certified mail, addressed to you at the address first above written or such other address as you may designate pursuant to Paragraph 15 hereof.  Any such delivery or mail service shall be deemed to have the same force and effect as personal service with the State of Michigan or the jurisdiction in which such action or proceeding may be commenced.

(e)  If any part of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having the jurisdiction to make such determination, the remainder of this Agreement shall remain in full force and effect.

17. Any royalty rate that Company receives from any record company listed in Schedule "A" in respect to Paragraph 8A, 8B, 8C, 8D, 8E, 8F, 8G that is increased, the increased royalty rate shall apply and replace any or all royalty rates in those paragraphs.

18. (a)  On the first LP and second LP and all configurations from singles from these LP's including but not limited to 7" records, 12" records, tapes, cassettes, CD's, etc.  The company will receive a royalty of four (4%) percent of the retail sale price of all product sold.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

(b) If royalties are paid on a pro-rated basis per Paragraphs 8A, 8B, 8C, 8D, 8E, 8F, 8G, then The Company's royalties will be paid on a like pro-rated basis.

(c) The Company's fee for producing Each LP equal to  80%  percent of the production budget.

19. Company will use their best efforts to sign an agreement with one of the record companies listed in Schedule "A:.

20. You will receive an Artist Advance equal to twenty (20%) percent of the production budget on LP  on each LP
on each LiP

21. When Company enters into an Agreement for manufacture, distribution or any reason pertaining to You with a third party, You agree to consent to all changes that may be necessary in order to conform to such third party agreement.

22. (a) (i) All Selections embodied in any Masters recorded hereunder which are written or composed by you, Artist, or the individual producer(s), in whole or in part, alone or in collaboration with others, or which are owned or controlled, in whole or in part, directly or indirectly, by you, Artist, or the individual producer(s) or any person, firm or corporation in which you, Artist, or the individual producer(s) have a direct or an indirect interest are hereinafter collectively referred to as "Controlled Compositions." Each Controlled Composition is hereby licensed to us, for the United States, at a rate equal to three-fourths (3/4) of the minimum compulsory license rate under the copyright law of the United States in effect at the time of the completion of the recording of the Master embodying such Controlled Composition (hereinafter the "U.S. Rate"). Each Controlled Composition is hereby licensed to us, for Canada, at a rate of two (2¢) cents (hereinafter the "Canadian Rate"). Copyright royalties in respect of Controlled Compositions shall be paid on the basis of records sold, less returns and credits, except that: (A) the copyright royalty rate in respect of sales of records on a budget record line or mid-priced record line or in respect of records sold through a record club shall be of the United States or Canadian rate, as the case may be; and (B) no copyright royalties shall be payable with respect to the following: records furnished as free or bonus records to members, applicants, or other participants in any record club or other direct mail distribution method; records distributed for promotional purposes to radio stations,

Page 13

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

television stations or networks, record reviewers, or other customary recipients of promotional records; so-called "promotional sampler" records; records sold as scrap or "cut-outs"; or records furnished on a so-called "no charge" or "free goods" basis or sold at less than fifty (50%) percent of their regular wholesale price to distributors, subdistributors, dealers, or others, whether or not the recipients thereof are affiliated with us or the distributor of records hereunder.

In witness whereof, the parties hereto have executed this Agreement as of the day and year first indicated above.

POWER PRODUCTION, INC.

By: _____
　　　Leroy McMath

_____
ARTIST

_____
ARTIST

_____
ARTIST

_____
ARTIST

100

DocuSign Envelope ID: 206877E6-AC3F-4E26-9CB6-B3D1CCD2AD8C

**POWER RECORDS**
**6350 McDONOUGH DRIVE, SUITE A**
**NORCROSS, GEORGIA 30093**

Mr. Eric Timmons
C/O Hard Hood Recordings
P.O. Box 1203
Jonesboro, Georgia 30237-1203

Re:    Modification of Record Distribution Agreement between Power Records
       (Company) and Eric Timmons d/b/a Hard Hood Recordings
       (Manufacturer)

Dear Mr. Timmons:

In consideration of the exchange of the sum of ten dollars ($10) between and among the parties hereto and the premises and mutual promises set forth below, this document when signed by you shall serve as a Modification of the Record Distribution Agreement (the Agreement) made effective as of _____March 26th_____, 1996, by and between Power Records (Company) and Eric Timmons d/b/a Hard Hood Recordings (Manufacturer) for the commercial distribution Masters embodying the performances of the recording artist and/or group principally comprising Eric Timmons, professionally known as "Freak Nasty" (Artist). Artist has signed below as an inducement for Company to enter into this Modification with Manufacturer. Artist's signature also signifies Artist's acceptance of obligations specific to Artist as set forth herein.

Company, Manufacturer and eric Timmons hereby agree to the following modifications and new contractual terms and conditions:

1.    Company has received from Manufacturer and Artist a First Album under the Agreement, which First Album Company has caused to be distributed for sale. Company agrees to pay to Eric Timmons as Artist and Manufacturer for and on behalf of Manufacturer an Advance recoupable from amounts payable to Manufacturer for a Second Album and a Third Album, if requested by Company, to be distributed under the Agreement. Each said Advance shall be paid in accordance with the following schedule:

| Album | Amount of Advance |
|---|---|
| Second Album | $50,000 |
| Third Album | $50,000 |

2.    Company, Manufacturer and Artist agree, acknowledge and confirm that the recording services of Artist during the term of the Agreement are exclusive to Manufacturer, and, further, that all Recordings thereby created through the performance of Artist shall be exclusively distributed by Company in accordance with the terms and conditions of said Agreement. All of said Recordings of Artist the creation of which have been or are financed by Company through payment of said Advances described above, or otherwise financed by mutual agreement of the parties, including the First Album distributed under the Agreement which First Album is under titled "Controversee ... That's Life ... And That's The Way It Is" released by Company through distribution arrangements

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

with Triad Records, Inc. as product no. TR 2111-2 (all of which Recordings may sometimes hereinafter for convenience be referred to as "Company-financed Recordings"), shall be the sole, exclusive and perpetual property of Company subject to payment by Company to Manufacturer for distribution therefor in accordance with the terms and conditions of the Agreement and this Modification. Company's ownership rights in said Company-financed Recordings entitles Company among other things to all right title and interest in the copyright in and to the Recordings. If permissible under copyright law the Recordings shall be considered works-made-for-hire for Company. Further, and particularly if such Recordings are not considered as works-made-for-hire for Company, said Recordings are deemed transferred to Company under the Agreement and this Modification together with all rights and title in and to same. Manufacturer and Artist agree to execute any documents which may be necessary to carry out the intent of this provision including any documents necessary to evidence Company's exclusive rights under US copyright law. Manufacturer shall obtain or solicit Company's assistance in obtaining full ownership rights in Recordings created through the services of third party producers (that is, producers other than Artist) not later than delivery of the masters for said Recordings to Company and preferably prior to creation of said masters by said third-party producers. Manufacturer shall take all measures, or solicit Company's assistance in taking all measures, necessary to perfect Company's full ownership rights in Recordings hereunder under US copyright law such that the rights granted to Company hereunder shall be fully effective.

3. Eric Timmons individually, as Artist and as a duly authorized representative of Eric Timmons Music or such other music publishing entity controlled or owned by him hereby assigns, conveys and grants to Company or Company's publishing designee and their successors and assigns one-half (1/2) of the worldwide right, title and interest, including all copyright, the right to copyright and any and all renewal rights, in the Compositions written wholly or in part by Eric Timmons which Compositions are embodied in said Recordings. The intent of this provision is that Company or its publishing designee shall serve as Co-Publisher of said Compositions with Eric Timmons' publishing designee. The Compositions shall be registered for copyright by Company, or Company's publishing designee, jointly in the name of Company, or its publishing designee, and Eric Timmons' publishing designee. In the event that Eric Timmons either individually or through Eric Timmons Music or such other publishing designee of Eric Timmons has previously registered for copyright any Compositions to which this provision is applicable, particularly any Compositions embodied in the Recordings of the First Album (titled "Controversee ... That's Life ... And That's The Way It Is" released by Company through distribution arrangements with Triad Records, Inc. as product no. TR 2111-2), Eric Timmons, Eric Timmons Music or such other publishing designee of Eric Timmons shall execute all documents necessary under copyright law to transfer one-half (1/2) that interest in said previously registered Composition to Company or Company's publishing designee to be administered hereunder. Company or its publishing designee as Administrator has the sole, exclusive and worldwide right to perform publisher duties and responsibilities including but not limited to the rights to administer and exploit the

Power Records/Hard Wood/Hot/February 2, 1997

102

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Compositions, to print, publish, sell, dramatize, use and license any and all uses of the Compositions, to execute in its own name any and all licenses and agreements whatsoever affecting or respecting the Compositions. Company or its publishing designee is entitled to receive and collect all Gross Receipts derived from the Compositions and shall pay to Eric Timmons as writer one-half (or 50%) of the Net Income thereby derived, and, further, shall pay to Eric Timmons' publishing designee as co-publisher one-fourth (or 25%) of the Net Income thereby derived. Net Income is Gross Income less an Administration Fee (which Administration Fee is not to exceed 10% of the Gross Receipts), copyright registration fees, royalties legally required to be paid to third parties, costs associated with advertising/promotion/exploitation of the Compositions, legal fees and other costs attributed solely to the Compositions. Eric Timmons as writer/author/composer of the Compositions and Eric Timmons' publishing designee as co-publisher of the Compositions shall receive their public performance royalties throughout the world directly from their own affiliated performing rights society, as is customary in the music industry, and shall have no claim whatsoever against Company or Company's publishing designee for any royalties received by Company or Company's publishing designee from any performing rights society which makes payment directly (or indirectly other than through Company or Company's publishing designee) to writers, authors and composers and/or co-publishers. Company or Company's publishing designee shall make payments and render accounting statements to Eric Timmons and Eric Timmons' publishing designee under this paragraph with-in ninety (90) days after the last days of June and December in each year. Objections, questions or disputes relating to any accounting statements shall be waived unless received in writing by Company or its publishing designee within one (1) year after receipt thereof. With respect to payments to be made to Eric Timmons, Eric Timmons Music or such other publishing designee of Eric Timmons it is understood and agreed by the parties that because of the relationship existing between Artist and Manufacturer, neither Company nor Company's publishing designee shall not be required to pay mechanical license fees on behalf of Manufacture to Eric Timmons or Eric Timmons' publishing designee.

4.   Upon proper notification by Manufacturer to Company that samples of third party recordings have been incorporated into the Recordings hereunder Company shall assist Manufacturer in clearing said samples.

5.   Company may in its sole discretion, upon notice to Manufacturer, arrange for advertising and promotional services to be provided by third parties to further the commercial exploitation of the Recordings. Costs for such third-party advertising and promotional services shall be paid for by Company and shall be recoupable from amounts payable to Manufacture and/or Artist under the Agreement.

6.   Manufacturer and Artist shall execute, acknowledge and deliver to Company or Company's publishing designee, or shall cause the execution, acknowledgment and delivery to Company or Company's publishing designee of, and hereby grants Company and its publishing designee an irrevocable power of attorney to execute on behalf of Manufacturer and Artist, such further instruments as Company or Company's publishing designee shall

3 of 4

Power Records/Hard Head/Head/February 2, 1997

103

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

deem necessary to effect the intent and purpose of this Modification and Agreement(s).

7.     The terms and conditions of any agreement entered into by Company with a third party (Third Party Agreement) to facilitate the distribution and sale of Manufacturer's recordings shall supersede any conflicting terms and conditions which are contained in the Record Distribution Agreement and/or this Modification.

8.     Eric Timmons agrees to produce one (1) album for each of two (2) artists to be designated by Company, that is, a total of two (2) albums, upon payment of a Producer's Advance of $15,000.  Company and Eric Timmons agree to enter into a more formal Producer's Agreement at the time said albums are produced, however, for expediency, the basic terms and conditions are set forth in this paragraph and shall be controlling unless and until a more formal agreement is entered into.  It is agreed that one of said two artists shall be the recording artist professionally known as DJ SHAGG.   Eric Timmons shall be paid a Producer's Royalty of three percent (3%) of the Retail List Price less Company's customary applicable costs for, including but not limited to, taxes, mechanical license fees, container charges, from which Producer's Royalty said Producer's Advance shall be recoupable.   Payments and statements shall be rendered with-in ninety (90) days after the last days of June and December in each year.   Compositions written or controlled by Eric Timmons as Producer under this provision shall be co-published by Company's publishing designee and Eric Timmons' publishing designee under the same terms as conditions set forth in paragraph 3, above.   Eric Timmons as Producer shall execute, acknowledge and deliver to Company or its designee all documents necessary to perfect Company's full ownership in masters produced hereunder and hereby grants Company and its publishing designee an irrevocable power of attorney to execute on his behalf such further instruments as Company or Company's publishing designee shall deem necessary to effect the intent and purpose of this agreement for Producer's services.

Acceptance of the terms and conditions of this Modification and new contractual terms and conditions is indicated by the signatures below.

For Company:
Power Records

Leroy McMath, President                        Manufacture                            Date   3/26/96

Power Records/Hard Hood/Mod/February 2, 1997

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318


## EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this _18_ day of _MARCH_, 1993 by and between Power Artists Records, Inc., C/O Law Offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, GA 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and _ALPHA (CAPONE) BREED_ professionally known as _DFC_ (hereinafter referred to as the "Artist(s)").

### WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and

WHEREAS, the Artist is a singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1.    That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for such period of time as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the particular period in which such failure to record occurs. The dates, therefore, for the exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs.

The musical compositions to be recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be

105

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 2

performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minumum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minumum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the Company shall be entitled to equitable and injunctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to, based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

(a) A royalty of _____twenty_____ (_20_) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 3

production for the promotion or advertising purposes;

(b)  One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

(c)  With respect to phonograph records which embody compositions in addition to the composition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

(d)  One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.  Notwithstanding anything to the contrary contained herein,

(a)  In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records;

(b)  No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;

(c)  If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.  Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records had been sold separately and not so packaged. Company shall charge seven per cent (7%) of retail list price of records manufactured as its 'container deduction' and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist preconsents to a higher cost.

7.  The Company will compute such royalties within sixty (60)

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

**Page 4**

days after June 30th and December 31st of each year, during which records made hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any unrecouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.     All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of _____

**ALPHA BREED**

and       payments       and       statements       rendered       to

**4794   WOODSPRING DRIVE    MARIETTA GA.   30066**

at              the              following              address:

shall be deemed rendered to and received by the Artist hereunder.

9.     All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the foregoing or any rights granted herein, but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

(a)     The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use throughout the world, or to refrain therefrom the performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

(b)     The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction; and to use as descriptive of the Artist the phrase, "EXCLUSIVE POWER ARTISTS RECORDS RECORDING ARTIST" or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by it;

(c)     The sole and exclusive right in, title to and ownership

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 5

of all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

(d) The sole and exclusive right, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

(e) The right to incorporate in records to be made hereunder, instrumentations, orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and artist does hereby agree to record commercials whenever requested by company during the term or any extension of this agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respect to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of ONE ( 1 ) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for FOUR ( 4 ) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of a minimum of TWO ( 2 ) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 6

15.    The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company.   For the period in which a bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16.    This agreement is subject to all rules and regulations of any union having jurisdiction.  No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this agreement.

17.    For the purposes of this agreement, the following definitions shall apply:

Recording Costs:        Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

Record:  All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

Production Expenses:  All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.    INDEMNIFICATION

(a)    Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract.  Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies.  Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will be given a reasonable opportunity to defend any such claim.

(b)    Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder.  Upon the written request of an indemnitee, the indemnitor will assume the defense of any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense

110

## Page 7

thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

### 19. LEGALITY OF PROVISION AND APPLICABLE LAW.

(a) If any clause, sentence, paragraph or part of this agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

(b) The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

(c) Any claim and the relationship of the parties hereto arising out of this Agreement or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration Association governing one-member panels. The parties hereto agree to be bound by the award of such arbitration and judgement upon the award rendered by the artibrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay one-half (1/2) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

### 21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

111

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 8

## 22. OWNERSHIP OF MASTERS

Artist hereby acknowledges and agrees that each master recorded under the attached Exclusive Artists Recording Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) is prepared as part of an LP-Master which constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered a work made for hire. I further acknowledge that Company is the exclusive owner of copyright with respect to each such master and any "sound recording" or "phonorecord" or "copy" manufactured therefrom (individually and collectively called the "Work"), and that Company has the right to exercise all rights of the copyright proprietor with respect thereto, including, but not limited to, all exclusive rights specified in 17 U.S.C. 106 and the exclusive right to register copyright in the name of Company.

Notwithstanding any other provisions hereof, I agree that to the extent, if any, that I may be deemed an "author" of any Work, I hereby grant and assign the Company, exclusively, perpetually and throughout the universe, all exclusive right, title and interest in and to such Work, including, but not limited to, all exclusive rights of the copyright owner as specified in 17 U.S.C. 106. I hereby grant to Company a power of attorney irrevocable and coupled with an interest to execute for me and in my name, all documents and instruments necessary or appropriate to effectuate the intents and purposes of this Paragraph 22 and to accomplish, evidence and perfect the rights granted to Company pursuant to this Paragraph 22, including but not limited to documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to Company.

23. Notwithstanding paragraph 4, or any other provision of this Agreement, if Company enters into an agreement under which Company acts as a production company for delivery of a master or masters containing Artist's performances, then the royalty payments provided for under paragraph 4 are inapplicable and Artist shall be paid one-half of "Net Royalties" received from the commercialization of said master or masters. To determine Net Royalties, Company shall be allowed to deduct any unreimbursed costs incurred by it in preparing said masters that are designated as recoupable costs under this Agreement.

24. CO-PUBLISHING
You and we agree to co-publish any and all compositions written by you, alone or in collaboration with others, to the extent of your authorship, which are written by you or recorded as a master demo during the term of this agreement. The publisher's share on all such compositions shall be divided in a manner whereby our publishing designee shall own fifty percent (50%) and your publishing designee shall own fifty percent (50%), with our publishing designee having administration rights thereto, for which an administration fee of no greater than ten percent (10%) of the gross receipts shall be charged.

112

25. **ADVANCEMENT:** Company hereby agrees to advance to artist(s) the amount of Two Thousand Dollars ($2,000.00) as a signing bonus, to be distributed as follows: One Thousand Dollars ($1,000.00) upon signing agreement and One Thousand Dollars ($1,000.00) the day the artist(s) starts recording.

**VIDEO:** Company hereby agrees to produce promotional videos with an approved production budget of Fifteen Thousand Dollars ($15,000.00). The decision to produce videos for all LP's hereunder shall be within the sole discretion of the company. All advances for the production of videos hereunder shall be fifty percent (50%) recoupable from artist's royalties hereunder (excluding mechanicals), and one hundred percent (100%) recoupable from royalties earned by artist in respect of the exploitation of the video.

**PROMOTIONS/MARKETING:** Company hereby agrees to provide independent promotions and marketing for the initial LP hereunder, with an approved budget up to a maximum of Twenty Thousand Dollars ($20,000.00). The decision to hire independent promotion and market for all subsequent LP hereunder shall be within the sole direction of company.

28. All payments hereunder shall be paid directly to artist(s) from distributed label upon being due.

113

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

In witness whereof, the duly authorized individuals, representatives, officers of the parties hereto have executed and delivered this agreement the day and year hereinabove first written.

Attest:      ARTIST: _Bobby T Thompson_

Witness

By: _Bobby T Thompson_

_633 W. FliNT PARK BlVD_
_FliNT mi_
(Address)

(Telephone Number)

(Date of Birth)

By: _Alpha Breed_

Witness

_4794 WOODSPRING DRIVE_
_MARIETTA GA 30066_
(Address)

(Social Security No.)

(Date of Birth)

Attest:      COMPANY: POWER ARTISTS RECORDS, INC.

_Alpha Breed_

By: _Leroy McMath_
LEROY MCMATH, PRESIDENT

114

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318

## EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this _18_ day of _MARCH_, 1993 by and between Power Artists Records, Inc., C/O Law Offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, GA 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and _Bobby T. Double E Thompson_ professionally known as _D.F.C_ (hereinafter referred to as the "Artist(s)").

### WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and

WHEREAS, the Artist is a singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for such period of time as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the particular period in which such failure to record occurs. The dates, therefore, for the exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs.

The musical compositions to be recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be

115

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 2

performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the Company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performaces hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to, based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

(a) A royalty of __twenty__ ( __20__ ) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned; other than those records given away or sold by the Company at approximately the cost of

116

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

**Page 3**

production for the promotion or advertising purposes;

(b) One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

(c) With respect to phonograph records which embody compositions in addition to the composition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

(d) One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5. Notwithstanding anything to the contrary contained herein,

(a) In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records;

(b) No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;

(c) If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6. Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records had been sold separately and not so packaged. Company shall charge seven per cent (7%) of retail list price of records manufactured as its 'container deduction' and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist preconsents to a higher cost.

7. The Company will compute such royalties within sixty (60)

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 4

days after June 30th and December 31st of each year, during which records made hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any unrecouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.    All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of **Bobby TERRELL ThompSON** and payments and statements rendered at **633 W Flint Park Blvd Flint mich** at the following address: shall be deemed rendered to and received by the Artist hereunder.

9.    All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company.  Without limiting the foregoing or any rights granted herein, but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

(a)    The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use throughout the world, or to refrain therefrom the performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

(b)    The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "EXCLUSIVE POWER ARTISTS RECORDS RECORDING ARTIST" or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by it;

(c)    The sole and exclusive right in, title to and ownership

118

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

**Page 5**

of all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

(d) The sole and exclusive right, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

(e) The right to incorporate in records to be made hereunder, instrumentations, orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and artist does hereby agree to record commercials whenever requested by company during the term or any extension of this agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respect to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of ONE ( 1 ) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for FOUR ( 4 ) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of a minimum of TWO ( 2 ) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 6

15.   The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company.   For the period in which a bona fide dispute exists between the Company and the Artist,   the Company shall report on, but not be required to pay, royalties.

16.   This agreement is subject to all rules and regulations of any union having jurisdiction.   No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this agreement.

17.   For the purposes of this agreement, the following definitions shall apply:

Recording Costs:         Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

Record:   All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

Production Expenses:   All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.   INDEMNIFICATION

   (a)   Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract.   Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will be given a reasonable opportunity to defend any such claim.

   (b)   Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder.   Upon the written request of an indemnitee, the indemnitor will assume the defense of any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense

120

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 7

thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISION AND APPLICABLE LAW.

(a) If any clause, sentence, paragraph or part of this agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdition to be invalid, such judgement shall not affect the remainder of this agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

(b) The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

(c) Any claim and the relationship of the parties hereto arising out of this Agreement or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration Association governing one-member panels. The parties hereto agree to be bound by the award of such arbitration and judgement upon the award rendered by the artibrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay one-half (1/2) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 8

## 22. OWNERSHIP OF MASTERS

Artist hereby acknowledges and agrees that each master recorded under the attached Exclusive Artists Recording Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) is prepared as part of an LP-Master which constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered a work made for hire. I further acknowledge that Company is the exclusive owner of copyright with respect to each such master and any "sound recording" or "phonorecord" or "copy" manufactured therefrom (individually and collectively called the "Work"), and that Company has the right to exercise all rights of the copyright proprietor with respect thereto, including, but not limited to, all exclusive rights specified in 17 U.S.C. 106 and the exclusive right to register copyright in the name of Company.

Notwithstanding any other provisions hereof, I agree that to the extent, if any, that I may be deemed an "author" of any Work, I hereby grant and assign the Company, exclusively, perpetually and throughout the universe, all exclusive right, title and interest in and to such Work, including, but not limited to, all exclusive rights of the copyright owner as specified in 17 U.S.C. 106. I hereby grant to Company a power of attorney irrevocable and coupled with an interest to execute for me and in my name, all documents and instruments necessary or appropriate to effectuate the intents and purposes of this Paragraph 22 and to accomplish, evidence and perfect the rights granted to Company pursuant to this Paragraph 22, including but not limited to documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to Company.

23. Notwithstanding paragraph 4, or any other provision of this Agreement, if Company enters into an agreement under which Company acts as a production company for delivery of a master or masters containing Artist's performances, then the royalty payments provided for under paragraph 4 are inapplicable and Artist shall be paid one-half of "Net Royalties" received from the commercialization of said master or masters. To determine Net Royalties, Company shall be allowed to deduct any unreimbursed costs incurred by it in preparing said masters that are designated as recoupable costs under this Agreement.

## 24. CO-PUBLISHING

You and we agree to co-publish any and all compositions written by you, alone or in collaboration with others, to the extent of your authorship, which are written by you or recorded as a master demo during the term of this agreement. The publisher's share on all such compositions shall be divided in a manner whereby our publishing designee shall own fifty percent (50%) and your publishing designee shall own fifty percent (50%), with our publishing designee having administration rights thereto, for which an administration fee of no greater than ten percent (10%) of the gross receipts shall be charged.

25. **ADVANCEMENT:** Company hereby agrees to advance to artist(s) the amount of Two Thousand Dollars ($2,000.00) as a signing bonus, to be distributed as follows: One Thousand Dollars ($1,000.00) upon signing agreement and One Thousand Dollars ($1,000.00) the day the artist (s) starts recording.

**VIDEO:** Company hereby agrees to produce promotional videos with an approved production budget of Fifteen Thousand Dollars ($15,000.00). The decision to produce videos for all LP's hereunder shall be within the sole discretion of the company. All advances for the production of videos hereunder shall be fifty percent (50%) recoupable from artist's royalties hereunder (excluding mechanicals), and one hundred percent (100%) recoupable from royalties earned by artist in respect of the exploitation of the video.

**PROMOTIONS/MARKETING:** Company hereby agrees to provide independent promotions and marketing for the initial LP hereunder, with an approved budget up to a maximum of Twenty Thousand Dollars ($20,000.00). The decision to hire independent promotion and market for all subsequent LP hereunder shall be within the sole direction of company.

26. All payments hereunder shall be paid directly to artist(s) from distributed label upon being due.

123

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

IN WITNESS WHEREOF, the duly authorized individuals, representatives, officers of the parties to have executed and delivered this Agreement the day and year hereinabove first written.

Attest:     ARTIST:  _Alpha BREED_

_____          By: _Alpha Breed_
Witness

                                 _4794 WOOD SPRING DRIVE_
                                 _MARIETTA GA 30066_
                                 (Address)

                                 _____
                                 (Telephone Number)

                                 _____
                                 (Date of Birth)

                                 By: _Bobby T Thompson_

_____
Witness

                                 _____
                                 (Address)

                                 _____
                                 (Social Security No.)

                                 _____
                                 (Date of Birth)

Attest:   COMPANY: POWER ARTISTS RECORDS, INC.

_Bobby T Thompson_      By: _Jimmy McMath_
                             LEROY MCMATH, PRESIDENT

124

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318

## EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 9th day of June, 1992 by and between Power Artists Records, Inc., C/O Law Offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, GA 30318 and/or it's associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and PATRICK ALEXANDER HALL professionally known as "GANGSTA PAT" (hereinafter referred to as the "Artist(s)").

### WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and

WHEREAS, the Artist is a singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for such period of time as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the particular period in which such failure to record occurs. The dates, therefore, for the exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs.

The musical compositions to be recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be

125

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D7CCD2AD8C

Page 2

performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minumum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minumum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the Company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performaces hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to, based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder;

(a) A royalty of _twenty_ (_20_) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of

126

Page 3

production for the promotion or advertising purposes;

(b)    One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

(c)    With respect to phonograph records which embody compositions in addition to the composition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

(d)    One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.    Notwithstanding anything to the contrary contained herein,

(a)    In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records;

(B)    No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;

(c)    If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.    Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records had been sold separately and not so packaged. Company shall charge seven per cent (7%) of retail list price of records manufactured as its "container deduction" and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist preconsents to a higher cost.

7.    The Company will compute such royalties within sixty (60)

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 4

days after June 30th and December 31st of each year, during which records made hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any unrecouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8. All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of _____ Patrick A. Hall and payments and statements rendered to Patrick A. Hall at the following address: 4884 Autumn Leaf Drive, Memphis, Tennessee 38116 shall be deemed rendered to and received by the Artist hereunder.

9. All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the foregoing or any rights granted herein, but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

(a) The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use throughout the world, or to refrain therefrom the performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

(b) The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", by any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by it;

(c) The sole and exclusive right in, title to and ownership

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 5

of all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

(d)  The sole and exclusive right, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

(e)  The right to incorporate in records, to be made hereunder, instrumentations, orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10.  Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11.  The Artist does hereby agree to perform exclusively for the Company for films and or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12.  The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respect to his right to execute this agreement and perform its terms and conditions hereunder.

13.  The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14.  This agreement shall be for a period of ___one___ ( 1 ) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for ___two___ ( 2 ) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of a minimum of ___two___ ( 2 ) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 6

15.  The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company.  For the period in which a bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16.  This agreement is subject to all rules and regulations of any union having jurisdiction.  No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this agreement.

17.  For the purposes of this agreement, the following definitions shall apply:

Recording Costs:    Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

Record:   All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

Production Expenses:  All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.  INDEMNIFICATION

(a)   Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract.  Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies.  Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will be given a reasonable opportunity to defend any such claim.

(b)   Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder.  Upon the written request of an indemnitee, the indemnitor will assume the defense of any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 7

thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISION AND APPLICABLE LAW.

(a) If any clause, sentence, paragraph or part of this agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

(b) The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

(c) Any claim and the relationship of the parties hereto arising out of this Agreement or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration Association governing one-member panels. The parties hereto agree to be bound by the award of such arbitration and judgement upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 8

IN WITNESS WHEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTAND THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARILY WAIVED YOUR RIGHT TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO AGREEMENT WITHOUT THE BENEFIT OF LEGAL REPRESENTATION.

Attest:   ARTIST

_William B. Seale_                    BY: _Patrick Q. Hall_
WITNESS   _Attorney at Law_                ARTIST

                                        _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_

Attest:   COMPANY

_____              BY: _Leroy McMath        President_

ORIGINAL

132

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318

## EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this _18_ day of _MARCH_, 19_93_ by and between Power Artists Records, Inc., C/O Law Offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, GA 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred _ALPHA (CAPONE) BREED_ as "Company") and, professionally _DFC_ known as (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and

WHEREAS, the Artist is a singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1.    That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for such period of time as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the particular period in which such failure to record occurs. The dates, therefore, for the exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs.

The musical compositions to be recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be

133

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 2

performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minumum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minumum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the Company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performaces hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to, based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

    (a) A royalty of ___twenty___ ( 20 ) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 3

production for the promotion or advertising purposes;

(b)    One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

(c)    With respect to phonograph records which embody compositions in addition to the composition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

(d)    One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.    Notwithstanding anything to the contrary contained herein,

(a)    In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records;

(b)    No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;

(c)    If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.    Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records had been sold separately and not so packaged. Company shall charge seven per cent (7%) of retail list price of records manufactured as its 'container deduction' and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist preconsents to a higher cost.

7.    The Company will compute such royalties within sixty (60)

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 4

days after June 30th and December 31st of each year, during which records made hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any unrecouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.    All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of _____
ALpHA BREED
and payments and statements rendered
4794 WOODSPRING DRIVE  MARIETTA GA. 30066
at the following address;
_____
shall be deemed rendered to and received by the Artist hereunder.

9.    All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company.  Without limiting the foregoing or any rights granted herein, but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

(a)    The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use throughout the world, or to refrain therefrom the performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

(b)    The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "EXCLUSIVE POWER ARTISTS RECORDS RECORDING ARTIST" or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by it;

(c)    The sole and exclusive right in, title to and ownership

136

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 5

of all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

(d) The sole and exclusive right, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

(e) The right to incorporate in records to be made hereunder, instrumentations, orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and artist does hereby agree to record commercials whenever requested by company during the term or any extension of this agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respect to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of ONE ( 1 ) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for FOUR ( 4 ) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of a minimum of TWO ( 2 ) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 6

15.   The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company.   For the period in which a bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16.   This agreement is subject to all rules and regulations of any union having jurisdiction.   No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this agreement.

17.   For the purposes of this agreement, the following definitions shall apply:

Recording Costs:      Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

Record:   All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

Production Expenses:   All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.   INDEMNIFICATION

     (a)   Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract.   Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will be given a reasonable opportunity to defend any such claim.

     (b)   Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder.   Upon the written request of an indemnitee, the indemnitor will assume the defense of any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense

Page 7

thereof, such participation to be at the expense of the
indemnitee. Settlement by the indemnitee without the
indemnitor's prior written consent shall release the indemnitor
from the indemnity as to the claim, demand or action so settled.

19.  LEGALITY OF PROVISION AND APPLICABLE LAW.

(a)  If any clause, sentence, paragraph or part of this
agreement or the application thereof to any person, shall for any
reason be adjudged by a court of competent jurisdition to be
invalid, such judgement shall not affect the remainder of this
agreement, which shall continue in full force and effect but such
judgement shall be limited and confined in its operation to the
clause, sentence, paragraph or part thereof directly involved in
the controversy in which such judgement shall have been rendered
and to the person involved.

(b)  The parties agree that this agreement shall be
interpreted and governed pursuant to the Laws of the State of
Georgia even though one party hereto may be a resident of another
state.

(c)  Any claim and the relationship of the parties hereto
arising out of this Agreement or the breach thereof shall be
settled by arbitration in the City of the principal place of
business of the party against whom a claim is sought to be
enforced, in accordance with the rules and regulations then
obtaining of the American Arbitration Association governing one-
member panels. The parties hereto agree to be bound by the award
of such arbitration and judgement upon the award rendered by the
artibrators may be entered in any court having jurisdiction
thereof.

20.  The Company agrees to pay one-half (1/2) of the statutory
per selection rate (inclusive of playing time formula, if any) to
Artist as mechanical royalties for records sold on any song
written or controlled by Artist.

21.  ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the
parties with respect to the subject matter hereof, and no
modification, amendment, waiver, termination or discharge of this
agreement shall be binding upon Artist or Company unless
confirmed by written instrument signed by an officer of the
Company and Artist. No waiver of any provision of or default
under this agreement shall affect the rights of either party
thereafter.

139

Page 8

## 22. OWNERSHIP OF MASTERS

Artist hereby acknowledges and agrees that each master recorded under the attached Exclusive Artists Recording Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) is prepared as part of an LP-Master which constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered a work made for hire. I further acknowledge that Company is the exclusive owner of copyright with respect to each such master and any "sound recording" or "phonorecord" or "copy" manufactured therefrom (individually and collectively called the "Work"), and that Company has the right to exercise all rights of the copyright proprietor with respect thereto, including, but not limited to, all exclusive rights specified in 17 U.S.C. 106 and the exclusive right to register copyright in the name of Company.

Notwithstanding any other provisions hereof, I agree that to the extent, if any, that I may be deemed an "author" of any Work, I hereby grant and assign the Company, exclusively, perpetually and throughout the universe, all exclusive right, title and interest in and to such Work, including, but not limited to, all exclusive rights of the copyright owner as specified in 17 U.S.C. 106. I hereby grant to Company a power of attorney irrevocable and coupled with an interest to execute for me and in my name, all documents and instruments necessary or appropriate to effectuate the intents and purposes of this Paragraph 22 and to accomplish, evidence and perfect the rights granted to Company pursuant to this Paragraph 22, including but not limited to documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to Company.

23. Notwithstanding paragraph 4, or any other provision of this Agreement, if Company enters into an agreement under which Company acts as a production company for delivery of a master or masters containing Artist's performances, then the royalty payments provided for under paragraph 4 are inapplicable and Artist shall be paid one-half of "Net Royalties" received from the commercialization of said master or masters. To determine Net Royalties, Company shall be allowed to deduct any unreimbursed costs incurred by it in preparing said masters that are designated as recoupable costs under this Agreement.

## 24. CO-PUBLSHING

You and we agree to co-publish any and all compositions written by you, alone or in collaboration with others, to the extent of your authorship, which are written by you or recorded as a master demo during the term of this agreement. The publisher's share on all such compositions shall be divided in a manner whereby our publishing designee shall own fifty percent (50%) and your publishing designee shall own fifty percent (50%), with our publishing designee having administration rights thereto, for which an administration fee of no greater than ten percent (10%) of the gross receipts shall be charged.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

25. <u>ADVANCEMENT</u>:   Company hereby agrees to advance to artist(s) the amount of Two Thousand Dollars ($2,000.00) as a signing bonus, to be distributed as follows:  One Thousand Dollars ($1,000.00) upon signing agreement and One Thousand Dollars ($1,000.00) the day the artist (s) starts recording.

<u>VIDEO</u>:    Company hereby agrees to produce promotional videos with an approved production budget of Fifteen Thousand Dollars ($15,000.00).  The decision to produce videos for all LP's hereunder shall be within the sole discretion of the company.  All advances for the production of videos hereunder shall be fifty percent (50%) recoupable from artist's royalties hereunder (excluding mechanicals), and one hundred percent (100%) recoupable from royalties earned by artist in respect of the exploitation of the video.

<u>PROMOTIONS/MARKETING</u>:    Company hereby agrees to provide independent promotions and marketing for the initial LP hereunder, with an approved budget up to a maximum of Twenty Thousand Dollars ($20,000.00).  The decision to hire independent promotion and market for all subsequent LP hereunder shall be within the sole direction of company.

28. All payments hereunder shall be paid directly to artist(s) from distributed label upon being due.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

representatives, officers of the parties who have executed and delivered this agreement the day and year hereinabove first written.

Attest:    ARTIST: _Bobby T Thompson_

_____    By: _Bobby T Thompson_
Witness

_633 w. Flint Park Blvd_
_Flint mi_
(Address)

_____
(Telephone Number)

_____
(Date of Birth)

_____    By: _Alpha Breed_
Witness

_4794 Woodspring Drive_
_Marietta Ga 30066_
(Address)

_____

_____
(Social Security No.)

_____
(Date of Birth)

Attest:    COMPANY: POWER ARTISTS RECORDS, INC.

_Alpha Breed_    By: _Larry McMath_
                     LEROY MCMATH, PRESIDENT

142

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318


EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 6th day of June, 1990 by and between Power Artist Records, Inc., C/O Law offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, Ga 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and Eric Breed professionally known as M.C Breed (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and WHEREAS, the Artist is singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1.  That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for period of time as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the particular period in which such failure to record occurs. The dates, therefore, for exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The Company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs.

    The musical compositions to recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2.  During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company,

143

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3.   The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to , based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4.   The Company agrees to pay the Artist for the services rendered hereunder:
    a.   A royalty of twenty (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of production for the promotion or advertising purposes;
    b.   One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;
    c.   With respect to phonograph records which embody compositions in addition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;
    d.   One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.   Notwithstanding anything to the contrary contained herein,
    a.   In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records.
    b.   No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;
    c.   If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing





DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6. Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records have been sold separately and not so packaged. Company shall charge seven percent (7%) of retail list price of records manufactured as its container deduction and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist pre-consents to a higher cost.

7. The Company will compute such royalties whit sixty (60) days after June 30th and December 31st of each year, during which records mad hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any recouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8. All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of Eric Breed _4794 WOO Spring DRIVE Marrietta GA 30066_ and payments and statements rendered to _____ at the following address: _____ shall be deemed rendered to and received by the Artist hereunder.

9. All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the forgoing or any rights granted herein but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

    a. The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

    b. The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by its;

    c. The sole and exclusive right in, title to and ownership of all masters, matrices, records or other reproductions of the performances embodies in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

    d. The sole and exclusive rights, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

e. The right to incorporate in records to be made hereunder, instrumentations orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and Artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this Agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and/or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respects to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of two (2) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for three (3) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of aa minimum of ten (10) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

15. The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16. This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this Agreement.

17. For the purposes of this Agreement, the following definitions shall apply:

RECORDING COST:    Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

RECORD:    All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

PRODUCTION EXPENSES:    All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18. INDEMNIFICATION

a. Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations



146

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will b given a reasonable opportunity to defend any such claim.

b. Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense o any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISIONS AND APPLICABLE LAW.

a. If any clauses, sentence, paragraph or part of this Agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this Agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

b. The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

c. Any claim and the relationship of the parties hereto arising out of this Agreement, or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration association governing one-member panels. The parties hereto agree to be bound by the award arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

IN WITNESS HWEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTANT THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SEERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL





DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

OR HAVE KNOWINGLY AND VOLUNTARITLY WAIVED YOUR RIGHTS TO SUCH LEGAL COUNSEL AND
DESIRE TO ENTER INTO AGREEMENT WITHOU THE BENEFIT OF LEGAL REPRESENTATION.

WITNESS                                                 BY:

Attest: COMPANY

_____          BY:
                                              LEROY MCMATHV/President

                                              6-6-1990

148

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OFMICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318


EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 6th day of April 1996 by and between Power Artist Records, Inc., C/O Law offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, Ga 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and Eric Timmons professionally known as **Freak Nasty** (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and WHEREAS, the Artist is singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for period as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the period in which such failure to record occurs. The dates, therefore, for exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The Company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs. The musical compositions to recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the company shall be entitled to equitable and injunctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to , based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

   a. A royalty of twenty (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of production for the promotion or advertising purposes. Advance of ($15,000) to be recouped from royalties.

   b. One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

   c. With respect to phonograph records which embody compositions in addition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

   d. One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5. Notwithstanding anything to the contrary contained herein,

   a. In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records.

   b. No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records.

   c. If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6. Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records have been sold separately and not so packaged, Company shall charge seven percent (7%) of retail list price of records manufactured as its container deduction and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist pre-consents to a higher cost.

7. The Company will compute such royalties whit sixty (60) days after June 30th and December 31st of each year, during which records mad hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any recouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8. All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of Eric Timmons, _____ and payments and statements rendered to _____ at the following address: 2181 East Point St. East Point GA 30344 _____ shall be deemed rendered to and received by the Artist hereunder.

9. All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the forgoing or any rights granted herein but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

   a. The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of performances to be recorded hereunder, upon such terms and conditions as the Company may approve.

   b. The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by its;

   c. The sole and exclusive right in, title to and ownership of all masters, matrices, records or other reproductions of the performances embodies in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

   d. The sole and exclusive rights, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise.

151

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

    e. The right to incorporate in records to be made hereunder, instrumentations orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and Artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this Agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and/or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respects to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however, no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of two (2) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for three (3) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof, the Artist will perform for the Company for the recording of aa minimum of ten (10) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

15. The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16. This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this Agreement.

17. For the purposes of this Agreement, the following definitions shall apply:

    RECORDING COST: Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

    RECORD: All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

    PRODUCTION EXPENSES: All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18. INDEMNIFICATION

    a. Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will b given a reasonable opportunity to defend any such claim.

b. Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense o any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISIONS AND APPLICABLE LAW.

a. If any clauses, sentence, paragraph or part of this Agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this Agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

b. The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

c. Any claim and the relationship of the parties hereto arising out of this Agreement, or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration association governing one-member panels. The parties hereto agree to be bound by the award arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

IN WITNESS HWEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTANT THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SEERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL

153

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

OR HAVE KNOWINGLY AND VOLUNTARITLY WAIVED YOUR RIGHTS TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO AGREEMENT WITHOU THE BENEFIT OF LEGAL REPRESENTATION.

Attest: ARTIST

_____
WITNESS

BY: _____
Eric Timmions d/b/a Hard Hood Recordings

Attest: COMPANY

_____

BY: _____
LEROY MCMATH / President

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS CO, INC.
568 FOURTEEN STREET, NW
ATLANTA, GA 30318


EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 5th day of April 1992 by and between Power Artist Music Co, Inc., 568 Fourteen street, NW Atlanta, Ga 30318 and/or its associates, subsidiaries, nominees, successors, and assign (hereinafter referred to as "Company") and Darrell Gilbert and Charles Hood professionally known as The Hard Boys (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and WHEREAS, the Artist is singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for period as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the period in which such failure to record occurs. The dates, therefore, for exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The Company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs. The musical compositions to recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company; and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique,

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

and extraordinary and the company shall be entitled to equitable and injunctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to , based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

   a. A royalty of twenty (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of production for the promotion or advertising purposes. Advance of ($5,000) to be recouped from royalties.

   b. One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned.

   c. With respect to phonograph records which embody compositions in addition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

   d. One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5. Notwithstanding anything to the contrary contained herein,

   a. In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records.

   b. No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records.

   c. If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6. Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records have been sold separately and not so packaged, Company shall charge seven percent (7%) of retail list price of records manufactured as its container deduction and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist pre-consents to a higher cost.

7. The Company will compute such royalties whit sixty (60) days after June 30th and December 31st of each year, during which records mad hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any recouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8. All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of Charles Hood and Darrell Gilbert, and payments and statements rendered to Hard Boys Production P.O Box 942161 Atlanta, Ga 31141, shall be deemed rendered to and received by the Artist hereunder.

9. All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the forgoing or any rights granted herein but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

   a. The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of performances to be recorded hereunder, upon such terms and conditions as the Company may approve.

   b. The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by its;

   c. The sole and exclusive right in, title to and ownership of all masters, matrices, records or other reproductions of the performances embodies in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

   d. The sole and exclusive rights, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise.

   e. The right to incorporate in records to be made hereunder, instrumentations orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of

157

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

recordings made hereunder, and Artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this Agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and/or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respects to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however, no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of two (2) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for two (2) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof, the Artist will perform for the Company for the recording of aa minimum of ten (10) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

15. The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16. This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this Agreement.

17. For the purposes of this Agreement, the following definitions shall apply:

RECORDING COST:   Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

RECORD:   All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

PRODUCTION EXPENSES:   All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18. INDEMNIFICATION

a. Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

advised thereof and each party will b given a reasonable opportunity to defend any such claim.

b. Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense o any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISIONS AND APPLICABLE LAW.

a. If any clauses, sentence, paragraph or part of this Agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this Agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

b. The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

c. Any claim and the relationship of the parties hereto arising out of this Agreement, or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration association governing one-member panels. The parties hereto agree to be bound by the award arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

IN WITNESS HWEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTANT THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SEERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARITLY WAIVED YOUR RIGHTS TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO AGREEMENT WITHOU THE BENEFIT OF LEGAL REPRESENTATION.

Attest: ARTIST

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

BY: _Charles Hark_

WITNESS

By: _Derrck Gibert_

Attest: COMPANY

BY: _LEROY MCMATH / President_

_April 5TH 1992_

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318


EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 6th day of July 1992 by and between Power Artist Records, Inc., C/O Law offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, Ga 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and Roderick barber and Fred Pilgrim professionally known as **Ghetto Mafia** (hereinafter referred to as the "Artist(s)").
WITNESSETH:
WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and WHEREAS, the Artist is singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for period as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the period in which such failure to record occurs. The dates, therefore, for exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The Company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs. The musical compositions to recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the company shall be entitled to equitable and injunctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to , based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

   a. A royalty of twenty (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of production for the promotion or advertising purposes.

   b. One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

   c. With respect to phonograph records which embody compositions in addition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

   d. One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5. Notwithstanding anything to the contrary contained herein,

   a. In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records.

   b. No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records.

   c. If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6. Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records have been sold separately and not so packaged, Company shall charge seven percent (7%) of retail list price of records manufactured as its container deduction and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist pre-consents to a higher cost.

7. The Company will compute such royalties whit sixty (60) days after June 30th and December 31st of each year, during which records mad hereunder are sold, for the preceding six (6) month period, and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any recouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8. All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of Roderick Barber and Fred Pilgrim, _____,and payments and statements rendered to _____ _____ at the following address: _____ _____shall be deemed rendered to and received by the Artist hereunder.

9. All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the forgoing or any rights granted herein but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

    a. The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of performances to be recorded hereunder, upon such terms and conditions as the Company may approve.

    b. The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by its;

    c. The sole and exclusive right in, title to and ownership of all masters, matrices, records or other reproductions of the performances embodies in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

    d. The sole and exclusive rights, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

e. The right to incorporate in records to be made hereunder, instrumentations orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and Artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this Agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and/or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respects to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of two (2) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for three (3) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof, the Artist will perform for the Company for the recording of aa minimum of ten (10) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

15. The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16. This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this Agreement.

17. For the purposes of this Agreement, the following definitions shall apply:

RECORDING COST: Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

RECORD: All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

PRODUCTION EXPENSES: All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18. INDEMNIFICATION

a. Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations

164

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will b given a reasonable opportunity to defend any such claim.

b. Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense o any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISIONS AND APPLICABLE LAW.

a. If any clauses, sentence, paragraph or part of this Agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this Agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

b. The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

c. Any claim and the relationship of the parties hereto arising out of this Agreement, or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration association governing one-member panels. The parties hereto agree to be bound by the award arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

IN WITNESS HWEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTANT THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SEERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL

OR HAVE KNOWINGLY AND VOLUNTARITLY WAIVED YOUR RIGHTS TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO AGREEMENT WITHOU THE BENEFIT OF LEGAL REPRESENTATION.

Attest: ARTIST

WITNESS

BY: _____
ARTIST

Attest: COMPANY

_____

BY: _____
LEROY MCMATH / President

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318

## EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this _18_ day of _MARCH_, 19_93_ by and between Power Artists Records, Inc., C/O Law Offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, GA 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred _Bobby T. Double E Thompson_ to as "Company") and _____, professionally _D.F.C_ known as _____ (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and

WHEREAS, the Artist is a singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1.    That  the Artist will render his exclusive personal services

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 2

performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minumum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minumum number of record sides required to be recorded during any subsequent period.

2.    During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the Company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3.    The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performaces hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to, based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4.    The Company agrees to pay the Artist for the services rendered hereunder:

     (a)    A royalty of ___twenty___ ( _20_ ) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 3

production for the promotion or advertising purposes;

(b)    One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

(c)    With respect to phonograph records which embody compositions in addition to the composition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

(d)    One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America.  Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.  Notwithstanding anything to the contrary contained herein,

(a)  In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records;

(b)    No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;

(c)    If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.  Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records had been sold separately and not so packaged. Company shall charge seven per cent (7%) of retail list price of records manufactured as its 'container deduction' and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist preconsents to a higher cost.

7.    The Company will compute such royalties within sixty (60)

169

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 4

days after June 30th and December 31st of each year, during which records made hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any unrecouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.    All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of _____ Bobby TERRELL Thompson and payments and statements rendered to 633 W Flint Park Blvd Flint mich at the following address: _____

shall be deemed rendered to and received by the Artist hereunder.

9.    All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the foregoing or any rights granted herein, but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

      (a)    The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use throughout the world, or to refrain therefrom the performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

      (b)    The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "EXCLUSIVE POWER ARTISTS RECORDS RECORDING ARTIST" or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by it;

      (c)    The sole and exclusive right in, title to and ownership

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 5

of all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

(d)  The sole and exclusive right, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

(e)  The right to incorporate in records to be made hereunder, instrumentations, orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10.  Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and artist does hereby agree to record commercials whenever requested by company during the term or any extension of this agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11.  The Artist does hereby agree to perform exclusively for the Company for films and or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12.  The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respect to his right to execute this agreement and perform its terms and conditions hereunder.

13.  The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14.  This agreement shall be for a period of ___ONE___ (_1_) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for _FOUR_____ (_4_) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of a minimum of _TWO_____ (_2_) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D7CCD2AD8C

Page 6

15. The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which a bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16. This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this agreement.

17. For the purposes of this agreement, the following definitions shall apply:

Recording Costs: Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

Record: All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

Production Expenses: All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18. INDEMNIFICATION

(a) Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will be given a reasonable opportunity to defend any such claim.

(b) Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense of any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 7

thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19.  LEGALITY OF PROVISION AND APPLICABLE LAW.

(a)  If any clause, sentence, paragraph or part of this agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdition to be invalid, such judgement shall not affect the remainder of this agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

(b)  The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

(c)  Any claim and the relationship of the parties hereto arising out of this Agreement or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration Association governing one-member panels. The parties hereto agree to be bound by the award of such arbitration and judgement upon the award rendered by the artibrators may be entered in any court having jurisdiction thereof.

20.  The Company agrees to pay one-half (1/2) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21.  ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 8

## 22. OWNERSHIP OF MASTERS

Artist hereby acknowledges and agrees that each master recorded under the attached Exclusive Artists Recording Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) is prepared as part of an LP-Master which constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered a work made for hire. I further acknowledge that Company is the exclusive owner of copyright with respect to each such master and any "sound recording" or "phonorecord" or "copy" manufactured therefrom (individually and collectively called the "Work"), and that Company has the right to exercise all rights of the copyright proprietor with respect thereto, including, but not limited to, all exclusive rights specified in 17 U.S.C. 106 and the exclusive right to register copyright in the name of Company.

Notwithstanding any other provisions hereof, I agree that to the extent, if any, that I may be deemed an "author" of any Work, I hereby grant and assign the Company, exclusively, perpetually and throughout the universe, all exclusive right, title and interest in and to such Work, including, but not limited to, all exclusive rights of the copyright owner as specified in 17 U.S.C. 106. I hereby grant to Company a power of attorney irrevocable and coupled with an interest to execute for me and in my name, all documents and instruments necessary or appropriate to effectuate the intents and purposes of this Paragraph 22 and to accomplish, evidence and perfect the rights granted to Company pursuant to this Paragraph 22, including but not limited to documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to Company.

23. Notwithstanding paragraph 4, or any other provision of this Agreement, if Company enters into an agreement under which Company acts as a production company for delivery of a master or masters containing Artist's performances, then the royalty payments provided for under paragraph 4 are inapplicable and Artist shall be paid one-half of "Net Royalties" received from the commercialization of said master or masters. To determine Net Royalties, Company shall be allowed to deduct any unreimbursed costs incurred by it in preparing said masters that are designated as recoupable costs under this Agreement.

## 24. CO-PUBLSHING

You and we agree to co-publish any and all compositions written by you, alone or in collaboration with others, to the extent of your authorship, which are written by you or recorded as a master demo during the term of this agreement. The publisher's share on all such compositions shall be divided in a manner whereby our publishing designee shall own fifty percent (50%) and your publishing designee shall own fifty percent (50%), with our publishing designee having administration rights thereto, for which an administration fee of no greater than ten percent (10%) of the gross receipts shall be charged.

174

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

25. <u>ADVANCEMENT</u>:    Company hereby agrees to advance to artist(s) the amount of Two Thousand Dollars ($2,000.00) as a signing bonus, to be distributed as follows:  One Thousand Dollars ($1,000.00) upon signing agreement and One Thousand Dollars ($1,000.00) the day the artist (s) starts recording.

<u>VIDEO</u>:    Company hereby agrees to produce promotional videos with an approved production budget of Fifteen Thousand Dollars ($15,000.00).  The decision to produce videos for all LP's hereunder shall be within the sole discretion of the company.  All advances for the production of videos hereunder shall be fifty percent (50%) recoupable from artist's royalties hereunder (excluding mechanicals), and one hundred percent (100%) recoupable from royalties earned by artist in respect of the exploitation of the video.

<u>PROMOTIONS/MARKETING</u>:    Company hereby agrees to provide independent promotions and marketing for the initial LP hereunder, with an approved budget up to a maximum of Twenty Thousand Dollars ($20,000.00).  The decision to hire independent promotion and market for all subsequent LP hereunder shall be within the sole direction of company.

28. All payments hereunder shall be paid directly to artist(s) from distributed label upon being due.

175

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

IN WITNESS WHEREOF, the duly authorized individuals, representatives, officers of the parties who have executed and delivered this Agreement the day and year hereinabove first written.

Attest:    ARTIST: _ALphA BREED_

_____          By: _Alpha Breed_____
Witness

                                       _4794 WOOD SPRING DRIVE_
                                       _MARIETTA GA 30066_
                                            (Address)

                                       _____
                                            (Telephone Number)


                                       _____
                                            (Date of Birth)

                                       By: _Bobby 7 Thompson_____
_____
Witness

                                       _____

                                       _____
                                            (Address)

                                       _____

                                            (Social Security No.)

                                       _____
                                            (Date of Birth)

Attest:    COMPANY: POWER ARTISTS RECORDS, INC.

_Bobby 7 Thompson_          By: _Jimmy McMath_____
                                       LEROY MCMATH, PRESIDENT

176

# POWER ARTIST MUSIC DBA

## POWER RECORDINGS

This RECORD COMPANY hereinafter referred to as the "Agreement" executed and effective this 26th day of September 2000, by and between Steady Mobb'n (Billy Moore and Aaron Edmonds) (hereinafter referred to as the "Artist"} and POWER ARTIST MUSIC DBA (POWER RECORDINGS) (hereinafter referred to as the "Company"):

### IT IS HEREBY UNDERSTOOD

a. Company is an organization, which specializes in the management, recording, recording distribution and representation of musical artists;

b. Company is familiar with the musical abilities of Artist and has the expertise, ability, industry contacts and resources to assist Artist in the furtherance of his/her career.

c. Artist performs under the name "(Steady Mobb'n)"

d. Company and Artist wish to enter into this Agreement to provide for the production and distribution of the Recording.

### IT IS, THEREFORE, AGREED AS FOLLOWS:

A. **TERM.** The effectiveness of this Agreement shall commence with its execution by all of the parties and shall continue thereafter for a period of 2 and 2 options (1)years.

B. **PRODUCTION OF RECORDING.** The Recording shall be produced in the following manner:

1. **PRODUCTION.** Company agrees to produce one master recording consisting of songs written Artist and Staff writers, Performed by Artist (hereinafter referred to as the "Songs"). The resulting recording (hereinafter referred to as the "Recording") shall include music of not less than forty (40) minutes in playing duration and shall be of a quality which is equal to master recordings normally produced for commercial distribution.

2. **CONTRIBUTION BY ARTIST.** Artist agrees to fully cooperate with the Company, in good faith, in the production of the Recording; to contribute to such production the music and lyrics embodied in the Songs; to arrange, direct and perform the Songs in such a manner as to facilitate the production of the Recording; and to observe the remaining duties and obligations of this Agreement otherwise strictly.

3. **COST.** Company shall be responsible for all costs incurred in the production of the Recording, including the prepayment of all travel, hotel and meal costs incurred by Artist in attending the recording sessions referenced in Section B.5 herein. Company may recover such receipted expenses pursuant to the production of master recordings or advancement of the Artist's career. Company's production, promotion, manufacturing and all other bonafide expenses relating to Artist are deemed recoupable from gross income.

4. **ARTIST CONTROL.** Company and Artist shall be jointly responsible for all decisions regarding the artistic content of the Recording.

5. **DATES AND LOCATION OF RECORDING SESSIONS.** The recording sessions necessary to produce the Recording shall occur at studios and facilities chosen by Company in Chicago (city) Ill (State),

177

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

6.   **ADDITIONAL MUSICIANS.**   Company shall provide and compensate sufficient and competent musicians to properly perform the Songs, as arranged and directed by Artist and Producer. Company may recover such cost pursuant to Section B3. Herein.

7.   **TITLE.**   The title of the Recording shall be chosen by agreement between the Company and the Artist.

8.   **COMPLETION AND RELEASE.**   The Recording shall be completed and prepared for release and distribution on or before October, 2000. Company and Artist acknowledge that time is of the essence in the completion of the Recording, and each agree to exercise all reasonable means to achieve such completion.

9.   **ASSIGNMENT OF EXCLUSIVE RIGHTS BY ARTIST.**   Upon the timely occurrence and performance of all material events and obligations required to produce the Recording, Artist shall assign to the Company all of his/her rights, title, and interest in and to the following property, for distribution an commercial exploitation in the United States and Canada:

    a.   The Songs
    b.   Artist's performance of the Songs contained in the Recording,
    c.   The title of the Recording.

10.   **LICENSE FOR USE OF NAME AND IMAGE.**   Upon the timely occurrence and performance of all material events and obligations required to produce the Recording, Artist shall grant to the Company the exclusive license to use the name "Steady Mobb'n (Billy Moore and Aaron Edmond)", and the Artist's photographic image, in the promotion and distribution of the Recording.

11.   **FORM OF ASSIGNMENT AND LICENSE DOCUMENTS.**   The form of documents to be executed by artist, pursuant to Section C and D herein shall be identical to the "Assignments" and "License" respectively attached hereto s Exhibits "C" and "D", and incorporated herein by this reference.

12.   **COPYRIGHT.**   Upon Artist's assignment of the Songs pursuant to Section C herein, Company shall proceed to obtain and secure a copyright for each of the said Songs. Each such copyright shall be the sole property of the Company.

13.   **DISTRIBUTION.**   Commencing with the completion of the Recording and continuing for the term of the Agreement, Company will diligently use its best efforts to secure distribution of the Recording throughout the world, through one or more major distribution companies (including record companies, film companies, or any other company). Any such contract entered into between Company and any such record distribution company shall be subject to the terms of this Agreement.

14.   **ROYALTIES.**   In accordance with the rights granted by Artist to Company herein, Company intends to contract with a record distribution company for distribution of the Recording. Company will be entitled to receive royalties or licensing fees (herein collectively referred to as the "Royalties") as a result of such contract. Royalties shall include ny compensation received by Company pursuant to Section B3 and B6 , herein. In the event that Royalties are insufficient to complete such reimbursement, Artist shall not be liable for such costs. The remainder of such Royalties, if any, shall be allocated and distributed between Company and Artist, in the following proportion:

_____ (75%) Percent to Company

_____ (25%) Percent to Artist

15.   **B.M.I. MEMBERSHIP.**   Within a reasonable time after the execution of this Agreement, Artist shall apply for registration and membership with Broadcast Music Inc.(BMI), a music licensing organization. Company shall b responsible for any cost or expense associated with such application

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

or with the Artist's membership in BMI during the term of this Agreement and the Distribution Period. Company may recover such costs pursuant to Section B#, herein.

16. **NON-CICUMVENTION.** Artist shall not detrimentally interfere with the efforts of Company to distribute the Recording through one or more distribution companies or enter into any contract inconsistent with the rights of distribution assigned to Company hereunder. Artist shall not contact any such potential distribution company except through the office of the Company.

17. **ADDITIONAL PERSONL SERVICES.** For the term of this Agreement, Artist agrees to appear at one or more performances to promote the distribution of the Recording. Company shall schedule and arrange such performances, but Artist shall have the right of prior approval of the location, date and time of each such performance. The total number of performances during the term of this Agreement shall not exceed ___. Company shall be responsible for travel, hotel and meal costs incurred by Artist in attending each such performance, Artist shall be paid one-half (1/2) of the net revenues received by Company for such performances. Such compensation shall be received by Artist within fifteen (15) days fro Company's receipt thereof. Company may recover such costs (including travel costs and compensation paid to Artist) pursuant to Section B3, herein.

18. **ASSIGNMENT BY COMPANY.** Prior to completion of the Recording, the rights and obligations of the Company existing hereunder are personal and unique, and shall not be assigned without the prior written consent of Artist. Subsequent to the completion of the Recording, Company may assign its rights and obligations existing hereunder without the consent of Artist.

19. **ASSIGNMENT BY ARTIST.** The rights and obligations of Artist existing hereunder are personal and unique, and shall not be assigned without prior written consent of Company.

20. **CONDITION SUBSEQUENT.** If Company does not enter into a binding contract for the distribution of the Recording during the Distribution Period, the assignment and license from Artist to Company granted pursuant to Sections C and D hereunder shall be deemed rescinded by the agreement of the parties.

21. **RIGHTS OF INSPECTION.** At any time during the term of this Agreement upon prior written notice to Company, Artist or his/her designated representative shall be permitted access to the books and records of Company which in any way pertain to Artist, for inspection by Artist or Artist's designated representative. Such books and records shall include, but shall not be limited to, any documents or records which evidence the receipt or disbursements of Royalties. Company shall maintain such books and records at its principal office.

22. **MISCELLANEOUS.**
   a) **BINDING EFFECT.** This Agreement shall be binding upon the successors and assigns of the parties.
   b) **ARBITRATION.** In the event of a dispute between Company and Artist regarding the terms, construction or performance of this Agreement, such dispute shall be settled by binding arbitration in Atlanta(city, state) Ga, according to the rules of the American Arbitration Association for the settlement of commercial disputes, then in effect. The award or decision resulting therefrom shall be subject to immediate enforcement in Georgia (state) court of competent jurisdiction.
   c) **JURISDICTION/APPLICABLE LAW.** Company and Artist hereby submit to the jurisdiction of the courts of Illinois (state) for the enforcement of this Agreement or any arbitration award or decision arising herefrom. This Agreement shall be enforced or construed according to the laws of the State of Georgia.
   d) **ATTORNEY'S FEES.** In the event that a party is forced to obtain an attorney to enforce the terms of this Agreement, the party prevailing in such action of enforcement shall be entitled to the recovery of attorney's fees incurred in such action.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

    e)    **COVENANT OF GOOD FAITH AND FAIR DEALING.** Company and Artist agree to perform their obligations under this Agreement, in all respects, in good faith.

    f)    **INDEPENDENT CONTRACTOR.** In the performance of his/her obligations of this Agreement, Artist shall be deemed an independent contractor.

    g)    **INCORPORATION OF RECITALS.** The recitals contained at the beginning of this Agreement are incorporated herein by this reference.

23.    **NOTICES.** Any notices or delivery required herein shall be deemed completed when hand-delivered, delivered by agent, or placed in the U.S. Mail, postage prepaid, to the parties at the addresses listed herein.

**THE PARTIES AGREE** to the terms and obligations and so execute on the day and date first above mentioned.

_____
Artist

_____
Company

_____
Artist

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

**POWER ARTISTS MUSIC CO, INC.**
6121 Oakbrook PWY
Norcross, Ga 30093

EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 10th day of April 1999 by and between Power Artist Music Co, Inc., 6121 Oakbrook PWY Norcross Ga, 30093 and/or its associates, subsidiaries, nominees, successors, and assign(hereinafter referred to as "Company") and Cheryl Norton professionally known as **CHERRELLE** (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and WHEREAS, the Artist is singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for period as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the period in which such failure to record occurs. The dates, therefore, for exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The Company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs. The musical compositions to recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique,

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

and extraordinary and the company shall be entitled to equitable and injunctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to , based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

   a. A royalty of twenty (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of production for the promotion or advertising purposes. Advance of ($15,000) to be recouped from royalties.

   b. One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

   c. With respect to phonograph records which embody compositions in addition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

   d. One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5. Notwithstanding anything to the contrary contained herein,

   a. In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records.

   b. No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records.

   c. If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6. Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records have been sold separately and not so packaged, Company shall charge seven percent (7%) of retail list price of records manufactured as its container deduction and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist pre-consents to a higher cost.

7. The Company will compute such royalties whit sixty (60) days after June 30th and December 31st of each year, during which records mad hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any recouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8. All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of Career Builders, and payments and statements rendered to Lil Can Production 9101 w Sarah Las Vegas NV 89117 shall be deemed rendered to and received by the Artist hereunder.

9. All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the forgoing or any rights granted herein but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

   a. The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of performances to be recorded hereunder, upon such terms and conditions as the Company may approve.

   b. The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by its;

   c. The sole and exclusive right in, title to and ownership of all masters, matrices, records or other reproductions of the performances embodies in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

   d. The sole and exclusive rights, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise.

   e. The right to incorporate in records to be made hereunder, instrumentations orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

recordings made hereunder, and Artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this Agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and/or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respects to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however, no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of two (2) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for three (3) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof, the Artist will perform for the Company for the recording of aa minimum of ten (10) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

15. The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16. This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this Agreement.

17. For the purposes of this Agreement, the following definitions shall apply:

RECORDING COST:    Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

RECORD:    All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

PRODUCTION EXPENSES:    All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18. INDEMNIFICATION

a. Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

advised thereof and each party will b given a reasonable opportunity to defend any such claim.

b. Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense o any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISIONS AND APPLICABLE LAW.

a. If any clauses, sentence, paragraph or part of this Agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this Agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

b. The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

c. Any claim and the relationship of the parties hereto arising out of this Agreement, or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration association governing one-member panels. The parties hereto agree to be bound by the award arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

IN WITNESS HWEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTANT THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SEERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARITLY WAIVED YOUR RIGHTS TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO AGREEMENT WITHOU THE BENEFIT OF LEGAL REPRESENTATION.

Attest: ARTIST

BY: _____
ARTIST

_____  .
**WITNESS**

**Attest: COMPANY**

BY: _____  L, M
LEROY MGMATH / President

_____

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# EXHIBIT B

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET
AL. DATED
DECEMBER 7, 2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

## LETTER OF DIRECTION

From:  Power Artists Records, Inc.

TO:     ALL   RECORD   DISTRIBUTORS,        TO:     ALL OTHER PARTIES IN INTEREST
        DSPS   AND   THIRD   PARTY
        LICENSEES

TO:     SOUNDEXCHANGE AND OTHER CMOS

Dated: December 7, 2023

Ladies and Gentlemen:

This letter is being delivered in connection with Power Artists Records, Inc. (the "Assignor") in respect of Assignor's interests in the sound recordings set out in Schedule 1 (to the extent of Assignor's interests, the "Masters").

Please be advised that Assignor has, among other things, assigned and granted to Tommy Boy Artists, LLC ("Assignee"), its licensees, successors, administrators, representatives and assigns, the exclusive right throughout the world with respect to the Masters subject to that certain asset purchase agreement dated as of December 7, 2023, by and between Assignee, on the one hand, and the Assignor, for itself and on behalf of its present and future sound recording designees:

1. To license and cause others to license the use of the Masters;

2. To administer and grant rights in and to the Masters and the copyrights therein;

3. To collect all monies payable solely with respect to exploitations of the Masters occurring before or after the date hereof; and.

With effect from the date of this letter, Assignor hereby irrevocably direct you to pay Assignee one hundred percent (100%) of all royalties and income earned or credited to Assignor solely with respect to exploitations of the Masters occurring before or after the date hereof solely in respect of Assignor's interests in the Masters.

Please send copies of full royalty statements in relation to the Masters to Assignee at 149 East 23rd St., Suite 6, New York, NY 10159, Attn: Thomas Silverman and a simultaneous email copy to thomas.silverman@tommyboy.com or as Assignee shall direct.

Payment to Assignee should be made to the following account, details of which are:

Bank Name:
Account Name:
ABA Routing No.:
Account No.:
Reference:

Email Address for Statements: thomas.silverman@tommyboy.com

The foregoing authorization and direction shall remain in full force and effect until modified or terminated by the Assignee.


Very truly yours,

POWER ARTISTS RECORDS, INC.


By: _____
Leroy McMath, President


ACCEPTED AND AGREED:

TOMMY BOY ARTISTS, LLC


By: _____
Thomas Silverman, CEO

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# EXHIBIT C-1

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET
AL. DATED
DECEMBER  7, 2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# POWER OF ATTORNEY
## OF
### LEROY MCMATH

Reference is hereby made to that certain asset purchase agreement dated as of December 7, 2023 (the "APA"), whereby I, Leroy McMath ("I," "me," "my" or "McMath"), having a principal address located at 3577 Chamblee Tucker Rd., Suite A178, Atlanta, Georgia 30341, sold to Tommy Boy Artists, LLC, a Delaware limited liability company ("Attorney-in-Fact" or "Tommy Boy"), and Tommy Boy acquired from me certain interests in certain sound recordings. Subject to the terms and conditions of the APA, I hereby do make, constitute and appoint Tommy Boy to act in my name and on my behalf in any lawful way solely with respect to the following purposes, only in the event that I shall fail to execute and deliver any of the same within five (5) business days after my receipt of Attorney-in-Fact's written request to me therefore:

(i)    the preparation, execution, submission and filing of those documents and forms relating to the renewal or extension of any of the copyrights relating to those sound recordings set forth on Schedule 1 hereto (the "Masters") (and to file any and all related applications) (collectively, the "Renewals") in Tommy Boy's (or its designee's) name;

(ii)   upon the issuance of such Renewals, the preparation and execution of proper and formal assignments in Tommy Boy's (or its designee's) name so as to secure such Renewals;

(iii)  subject to the terms and conditions of the APA to exercise all manner of permitted rights solely with respect to the Masters under those certain Agreements listed on Exhibit A (the "Agreements");

(iv)   subject to the terms and conditions of the APA to execute such other documents or instruments as Tommy Boy reasonably deems necessary or appropriate to carry out the terms of the APA.

This Power of Attorney shall start immediately upon its full execution and the full execution of the APA.  This Power of Attorney and all authority conferred hereby are granted solely for the limited purposes of completing those transactions contemplated under the APA. This Power of Attorney is subject to all of the terms and conditions of the APA.

In case any provision of this Power of Attorney shall be invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

[Signature Page Follow]

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

This Power of Attorney shall be governed and construed by the laws of the State of New York.

Date: December    , 2023

_____
       LEROY MCMATH

## ACKNOWLEDGMENT

STATE OF GEORGIA    )
                       )    ss:
COUNTY OF FULTON   )

Subscribed and sworn to (or affirmed) before me on this _____ day of December, 2023, Leroy McMath proved to me on the basis of satisfactory evidence to be the person who appeared before me by physical presence. I certify under PENALTY OF PERJURY under the laws of the State of Georgia that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Signature _____
           Signature of Notary

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# EXHIBIT C-2

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET
AL. DATED
DECEMBER 7, 2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

## POWER OF ATTORNEY
## OF
## POWER ARTISTS RECORDS, INC.

Reference is hereby made to that certain asset purchase agreement dated as of December 7, 2023 (the "APA"), whereby I, Leroy McMath, owner and president of Power Artists Records, Inc. doing business as Power Production, Inc., Power Records, Triad Records, Inc., and Power Entertainment ("Power"), having a principal place of business located at 3577 Chamblee Tucker Rd., Suite A178, Atlanta, Georgia 30341, sold to Tommy Boy Artists, LLC, a Delaware limited liability company ("Attorney-in-Fact" or "Tommy Boy"), and Tommy Boy acquired from Power certain interests in certain sound recordings.  Subject to the terms and conditions of the APA, Power hereby makes, constitutes and appoints Tommy Boy to act in my name and in my capacity in any lawful way solely with respect to the following purposes, only in the event that I shall fail to execute and deliver any of the same within five (5) business days after my receipt of Attorney-in-Fact's written request to me therefore:

(i)     the preparation, execution, submission and filing of those documents and forms relating to the renewal or extension of any of the copyrights relating to those sound recordings set forth on Schedule 1 hereto (the "Masters") (and to file any and all related applications) (collectively, the "Renewals") in Tommy Boy's (or its designee's) name;

(ii)    upon the issuance of such Renewals, the preparation and execution of proper and formal assignments in Tommy Boy's (or its designee's) name so as to secure such Renewals;

(iii)   subject to the terms and conditions of the APA to exercise all manner of permitted rights solely with respect to the Masters under those certain Agreements listed on Exhibit A (the "Agreements");

(iv)    subject to the terms and conditions of the APA to execute such other documents or instruments as Tommy Boy reasonably deems necessary or appropriate to carry out the terms of the APA.

This Power of Attorney shall start immediately upon its full execution and the full execution of the APA.  This Power of Attorney and all authority conferred hereby are granted solely for the limited purposes of completing those transactions contemplated under the APA. This Power of Attorney is subject to all of the terms and conditions of the APA.

In case any provision of this Power of Attorney shall be invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

[Signature Page Follows]

194

This Power of Attorney shall be governed and construed by the laws of the State of New York.

Date: December    , 2023

Power Artists Records, Inc. doing business as
Power Production, Inc., Power Records, Triad
Records, Inc., Power Entertainment, Inc., and Wrap Records
("Power")

By: _____
        LEROY McMATH, President and Owner

## ACKNOWLEDGMENT

STATE OF GEORGIA     )
                       )   ss:
COUNTY OF FULTON    )

Subscribed and sworn to (or affirmed) before me on this _____ day of December, 2023, by Leroy McMath in his capacity as President and Owner of Power Artists Records, Inc., a Georgia corporation, and proved to me on the basis of satisfactory evidence to be the person who appeared before me by physical presence. I certify under PENALTY OF PERJURY under the laws of the State of Georgia that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Signature _____
               Signature of Notary

# EXHIBIT D

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET AL.
DATED
DECEMBER 7,  2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

## ASSIGNMENT OF COPYRIGHTS

Power Artists Records, Inc. doing business as Power Production, Inc., Power Records, Triad Records, Inc., Power Entertainment, Inc. and Wrap Records ("Assignor"), for good and valuable consideration, receipt of which is hereby acknowledged, hereby irrevocably and unconditionally forever assigns, sells, transfers and conveys to Tommy Boy Artists, LLC ("Assignee"), its successors and assigns, effective as of the date hereof, one hundred percent (100%) of the Assignor's entire right, title and interest throughout the world and the universe, in and to the sound recordings listed on the attached <u>Schedule 1</u> inc1uding, without limitation, an undivided one hundred percent (100%) of Assignor's ownership interest in and to the copyrights and any other rights now known or which may hereafter be recognized or come into existence relating to the sound recordings listed on the attached <u>Schedule 1</u>, and any and all renewals, extensions and revivals of such copyrights, reversionary interests and all other rights and interests of every kind whatsoever under and subject to applicable laws, treaties, regulations and directives now or hereafter enacted or in effect.

IN WITNESS WHEREOF, Assignor has executed this instrument on this ___ day of December, 2023.

**Power Artists Records, Inc. doing business as**
**Power Production, Inc., Power Records,**
**Triad Records, Inc., Power Entertainment, Inc.**
**and Wrap Records**

By: _____
       Leroy McMath, President and Owner

## ACKNOWLEDGEMENT

STATE OF GEORGIA          )
                                          )   ss:
COUNTY OF                    )

Subscribed and sworn to (or affirmed) before me on this _____ day of December, 2023, Leroy McMath, President and Owner of Power Artists Records, Inc., a Georgia corporation, on behalf of the corporation and proved to me on the basis of satisfactory evidence to be the person who appeared before me by physical presence.  I certify under PENALTY OF PERJURY under the laws of the State of Georgia that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Signature _____
                Signature of Notary

# EXHIBIT L


# EXHIBIT L


# EXHIBIT L

## John Duffoo

| | |
|---|---|
| **From:** | John Duffoo |
| **Sent:** | Tuesday, October 22, 2024 12:00 PM |
| **To:** | David Parker; tom@tommyboy.com; thomas.silverman@tommyboy.com |
| **Cc:** | Matthew Peach |
| **Subject:** | RE: Peach v. McMath, Power Entertainment 22-A-05274-3 |

All,

As you know there are several motions pending and I want to bring you up to date on a new motion filed this month by Leroy's attorney to withdraw from the case. Leroy's own attorney no longer wants to represent him as he doesn't pay his legal bills. This lawsuit looks very unfavorable for him. While we wait for the court to rule on the pending motions, can Tommy Boy please confirm it's still holding my clients accumulated royalty payments from this music catalog?. We believe Tommy Boy should be holding an estimated $175k balance.

Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No. 767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

**From:** John Duffoo
**Sent:** Friday, August 30, 2024 9:26 AM
**To:** David Parker <david.parker@tommyboy.com>
**Cc:** tom@tommyboy.com; thomas.silverman@tommyboy.com
**Subject:** RE: Peach v. McMath, Power Entertainment 22-A-05274-3

All,

Attached is a filed copy of the Motion to Compel.

Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.

1

# EXHIBIT M

# EXHIBIT M

# EXHIBIT M

FILED 1/3/2025 12:26 PM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

IN THE SUPERIOR COURT OF DEKALB COUNTY
STATE OF GEORGIA

MATTHEW PEACH,

    Plaintiff,

    v.

LEROY MCMATH; POWER
ENTERTAINTMENT CO. INC.; and
POWER ARTIST MUSIC CO.,

    Defendants.

Civil Action File No.
23CV6869-7

## ORDER ON VARIOUS MOTIONS

Before the Court for consideration are Plaintiff's Motion for Summary Judgment, Defendants' Motion to Withdraw Admissions, and Defendants' Motion for Summary Judgment.

### DEFENDANTS' MOTION TO WITHDRAW ADMISSIONS

The Court first addresses Defendants' Motion to Withdraw Admissions because it directly affects the parties' cross-motions for summary judgment.

This lawsuit is about a disagreement over royalties to certain musical works. Plaintiff Matthew Peach ("Peach") is suing three Defendants, Leroy McMath ("McMath"), Power Entertainment Co., Inc., and Power Artist Music Co. (jointly referred to as the "Corporate Defendants"), on seven counts: breach of contract and on account, conversion, tortious interference with contractual/business relations, fraud, punitive damages, pre-judgment interest, and attorney's fees under OCGA §§ 13-1-11 and 13-6-11. Defendants counterclaimed for seven counts: unjust enrichment, conversion, fraud, negligent misrepresentation, tortious interference with contract, punitive damages, and contractual attorney's fees.

Peach served discovery requests on each Defendant, including requests for admission ("RFA"). None of the three Defendants responded to the RFA. Based on the unanswered RFA, Peach moved for summary judgment, whereupon Defendants moved to withdraw the admissions.

Under OCGA § 9-11-36 (a) (1), "[a] party may serve upon any other party a written request for the admission. . . of the truth of any matters" that are not privileged and are relevant to the pending action. See also OCGA § 9-11-26 (b) (1). Under OCGA § 9-11-36 (b), "[a]ny matter admitted under this Code section is conclusively established unless the court, on motion, permits withdrawal or amendment of the admission." The standard for withdrawing admissions is summarized in the recent case of *WellPath, LLC v. Cox*, 370 Ga. App. 800, 803-04 (2024):

> There is a two-pronged test to be employed when considering a motion to withdraw admissions. A court may grant a motion to withdraw (1) when the presentation of the merits will be subserved thereby and (2) the party obtaining the admission fails to satisfy the court that the withdrawal will prejudice maintaining his action or defense on the merits. If the movant satisfies the court on the first prong, the burden is on the respondent to satisfy the second prong. Both prongs must be established. If the movant fails to make the required showing to satisfy the first prong of the test, then the trial court is authorized to deny the motion to withdraw the admissions. To demonstrate that the merits of an action would be served by allowing withdrawal of admissions, the moving party must show that the admitted requests either were refutable by admissible evidence having a modicum of credibility or were incredible on their face, *and* that the denial was not offered solely for the purposes of delay.

Id at 803-04 (case citations and punctuation omitted; emphasis original). "The first prong of the test is not perfunctorily satisfied." *Intersouth Properties, Inc. v. Contractor Exch., Inc.*, 199 Ga. App. 726, 727 (2) (1991). A movant's "desire to have a trial, standing alone, is not sufficient to satisfy the test." *JCG Farms of Alabama, LLC v. Morgan*, 348 Ga. App. 629, 631 (2019). Likewise, "[m]erely being forced to go to trial is not such a prejudice as will" satisfy the second prong of the test. *Brankovic v. Snyder*, 259 Ga.App. 579, 583 (2003).

In *WellPath*, the plaintiff suffered injuries from a vehicle collision and sued the driver of the colliding vehicle. After deposing the driver, the plaintiff added WellPath as a defendant under the theory of vicariously liability for the driver's alleged negligence based on the doctrine of respondeat superior. In response to a request for admission, WellPath initially admitted that the driver was its employee/agent but then moved to withdraw the admission based on evidence that the driver was an independent contractor. The trial court denied WellPath's motion to withdraw, and the Court of Appeals reversed because the driver's deposition testimony and an affidavit submitted by WellPath attesting to the driver's status as an independent contractor "had the 'modicum of credibility' required to establish the first prong of the test and was not 'per se incredible.'" 370 Ga. at 805. The Court in *WellPath* also criticized the trial court for ruling only "on the first part of the first prong, . . it did not rule on the second part of the first prong," i.e., whether the denial was offered solely for the purposes of delay.

In contrast to *WellPath*, the evidence in *Crumpton v. Samples*, 365 Ga. App. 143 (2022), was insufficient to withdraw the admissions. In *Crumpton*, a prospective buyer of a business sued Crumpton for the return earnest money. The buyer's RFA went unanswered, and the buyer moved for summary judgment. Crumpton responded, stating an intention to move to withdraw the admissions and requesting oral argument. A hearing was scheduled, and Crumpton had over a month and a half to prepare. Crumpton waited until two days before the hearing to file a motion to withdraw the admissions with a supporting affidavit. The trial court's denial of Crumpton's motion was affirmed on appeal. The denial was supported by the trial court's finding that Crumpton's "affidavit lacked a 'modicum of credibility' and that Crumpton had not offered 'otherwise admissible evidence' to support his position that the admissions should be withdrawn." Id at 147. The trial court also rejected Crumpton's argument that the requests were incredible on

Order on Various Motions
Page 3 of 9

their face, finding instead that the requests were "sufficiently factually tailored to the ultimate issues in this case." Id.

Here, Peach served McMath with discovery requests that included 61 RFA on August 8, 2022, and served each Corporate Defendant with discovery requests that included 62 RFA on October 19, 2022. Because Defendants filed a joint Motion to Dismiss for Improper Venue, discovery was stayed for 90 days until January 4, 2023. OCGA § 9-11-12 (j) (1). Discovery ended on July 6, 2023, without Defendants answering any RFA. On November 17, 2023, Peach moved for summary judgment, relying heavily, though not solely, on the unanswered RFA. On November 20, 2023, over a year after being served with the RFA, Defendants moved to withdraw the admissions

Filed concurrently with Defendants' motion for summary judgment and motion to withdraw admissions was the Affidavit of Leroy McMath, which was filed in two parts, a 31-page filing and a 53-page filing described as "(Continued)." The Affidavit in full contains 53 averments, and Defendants expressly relied on McMath's Affidavit in their Motion for Summary Judgment but not in their Motion to Withdraw Admissions. The 53 averments span six pages, and they reference:

> Exhibit A as the Articles of Incorporation for Power Entertainment Co., Inc;
> Exhibit B as the Articles of Incorporation for Power Artist Music Co.;
> Exhibit C as the August 15, 2010 Distribution Agreement;
> Exhibit D is skipped;
> Exhibit E as the September 18, 2018 Purchase Agreement;
> Exhibit F as the September 20, 2018 Letter of Direction;
> Exhibit G as Power Artists Exclusive Artist Recording Agreements; and
> Exhibit H as Power Artists Songwriter Term Contracts.

The references to Exhibits A, B, and C are accurate. The remaining references do not align with the actual attachments. The Purchase Agreement referenced as Exhibit E is labeled Exhibit D.

<div align="center">

Order on Various Motions
Page 4 of 9

</div>

The Letter of Direction referenced as Exhibit F is attached twice, once as a low-quality copy that has no exhibit label and is placed before Exhibit C and secondly as a higher quality copy labeled as Exhibit E. The Power Artists Songwriter Term Contracts referenced as Exhibit H are labeled Exhibit G. The Power Artists Exclusive Artist Recording Agreements referenced as Exhibit G are not attached.

To sum up the contents of the record as it pertains to the admissions, Peach submitted 62 admissions in August and October of 2022, and Defendants filed 53 averments with incomplete attachments in November 2023. Defendants offer no explanation or analysis as to how McMath's 53 averments refute any of the 62 admitted requests.

In contrast to *WellPath* and more akin to *Crumpton*, Defendants have failed to carry their burden of proving the first prong. Defendants were required to show that the admitted requests either were refutable by admissible evidence having a modicum of credibility or were incredible on their face. Defendants do not contend, nor is there any evidence to show, that any of the RFA were incredible on their face. Nor have Defendants produced or pointed to admissible, credible evidence rebutting the admissions. Furthermore, Defendants offer no reason for not responding to discovery, for waiting four months after the close of discovery before seeking to withdraw the admissions, or for relying on McMath's 53 averments to deny the 61 RFA posed to McMath and the 62 RFA posed to the Corporate Defendants. Defendants' sole and bare assertion is that "this motion is not being interposed for any purpose of delay. Rather, it is being made to ensure that this case is decided on its merits." Lacking any reason or reasoning to support this assertion, the Court finds that Defendants have not met their burden of satisfying either portion of the first prong of the two-prong test to set aside admissions. Therefore, the Court DENIES the Motion to Withdraw Admissions.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

To prevail at summary judgment under OCGA § 9-11-56(c), the movant must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmovant, without the necessity of weighing the evidence or determining the credibility of the witnesses, warrant judgment as a matter of law. *Lau's Corp., Inc. v. Haskins*, 261 Ga. 491, 491 (1991). "A defendant may do this by either presenting evidence negating an essential element of the plaintiff's claims or establishing from the record an absence of evidence to support such claims. Thus, the rule with regard to summary judgment is that a defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case, but may point out by reference to the evidence in the record that there is an absence of evidence to support any essential element of the nonmoving party's case." *Cowart v. Widener*, 287 Ga. 622, 623 (2010) (citations and punctuation omitted). If the movant meets its burden then the opposing party cannot rest on its pleadings and must come forward with rebuttal evidence giving rise to a triable issue or suffer judgment against him. Id. "[E]vidence offered on motion for summary judgment is held to the same standards of admissibility as evidence at trial." *Taylor v. Golden Corral Corp.*, 255 Ga.App. 860, 862(1) (citation and punctuation omitted). It is the duty of each party to summary judgment to present his case in full. See *Sharfuddin v. Drug Emporium*, 230 Ga.App. 679, 681(2) (1998).

Here, Defendants' admissions along with the pleadings, the Affidavit of Peach with its 37 attached exhibits, and the Affidavit of John M. Duffoo, establish that Peach is entitled to summary judgment in its favor and against Defendants on all of its claims and Defendants' counterclaims.

Peach's claim for breach of contract is established by the Affidavit of Peach, the Affidavit of Duffoo, and RFA 1 to 8 and 55 to 58, with Defendants admitting that they owed Plaintiff

$48,855.67 plus interest of $2,485.57 as of June 20, 2022, inclusive of all credits and/or setoffs, and their steadfast refusal to pay is unjustified by any reason in law or fact.

Peach's claim of "on account" is established by RFA 26 to 28 (28 to 30 for the Corporate Defendants), with Defendants admitting that the amount owed to Plaintiff is accurate, liquidated, and continues month to month.

Peach's claim for conversion is established by the Affidavit of Peach, the Affidavit of Duffoo, and RFA 53 to 60 (54 to 61 for the Corporate Defendants), with Defendants admitting to sending a Letter of Direction that wrongfully redirected royalty payments from Plaintiff to Defendants.

Peach's claim for tortious interference with contractual/business relations is established by the Affidavit of Peach and RFA 49 to 52 (50 to 53 for the Corporate Defendants), with Defendants admitting to (1) improper action or wrongful conduct without privilege; (2) acting purposely and with malice with the intent to injure; (3) causing third parties to fail to meet contractual obligations; and (4) the tortious conduct proximately caused damage to Peach.

Peach's claim for fraud is established by RFA 41 to 48 (42 to 49 for the Corporate Defendants), with Defendants admitting that they (1) made willful and/or reckless false representation(s) as a method of obtaining Peach's royalty payments; (2) acted with scienter; (3) intended to induce Peach and/or third parties to act; (4) that Peach justifiable relied on Defendants' misrepresentations; and (5) Peach suffered damages as a result of Defendants' fraud."

Peach's claim for punitive damages was expressly pled in the Complaint and is established by the Affidavit of Peach and RFA 38 to 40 (39-41 for the Corporate Defendants), with Defendants admitting that Defendants' actions and/or inactions prove by clear and convincing evidence willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise

the presumption of conscious indifference to consequences. OCGA § 51-12-5.1 (b). More specifically, Defendants admitted that they acted with a know or willful disregard of Peach's rights and should pay the maximum amount of $250,000.00 as punishment and deterrence.

Peach's claim for bad faith attorney's fees under OCGA § 13-6-11 is established by the Affidavit of Peach, the Affidavit of Duffoo, and RFA 61 (62 for the Corporate Defendants), with Defendants admitting to being stubbornly litigious.

All defenses to Peach's claims fail. McMath's 17 defenses raised in his answer and the Corporate Defendants' 19 defenses raised in their answer are refuted by RFA 9 to 25 (9 to 27 for the Corporate Defendants), with Defendants admitting that the defenses are unsupported by law or fact.

Finally, Defendants' seven counterclaims are refuted by RFA 29 to 37 (31-38 for the Corporate Defendants), with Defendants admitting that each of their counterclaims fail as a matter of law.

Defendants have failed to come forward with rebuttal evidence giving rise to a triable issue on any of Plaintiff's claims, defenses thereto, or on their counterclaims. The Court hereby GRANTS Peach's Motion for Summary Judgment and DENIES Defendants' Motion for Summary Judgment.

## FINAL HEARING ON DAMAGES

As of November 2023, Peach calculated damages against Defendants in the principal amount of $121,701.50; interest in the amount of $49,875.61; financial damages associated with Defendants' distributor and paid via Peach's royalties in the amount of $15,445.50, punitive damages in the amount of $250,000.00, attorney's fees pursuant to O.C.G.A. §13-1-11 as

calculated by statute in the amount of $17,183.31; attorney's fees pursuant to O.C.G.A. §13-6-11 in the amount of $46,410.00; and costs of $755.12; plus post-judgment interest.

The Court shall hold a final hearing at which the parties shall present full evidence of all damages, including the current principal owed, interest, financial damages, punitive damages, and attorney's fees and costs.

SO ORDERED, this 3rd day of January 2025.

Hon. LaTisha Dear Jackson
DeKalb Superior Court, Div. 7
Stone Mountain Judicial Circuit

eserved:    John M. Dufoo, Esq. – counsel for Plaintiff
Le'Asa M. Otey, Esq. – counsel for Defendants

# EXHIBIT N

# EXHIBIT N

# EXHIBIT N

FILED 6/24/2025 4:05 PM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

## IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MATTHEW PEACH,

    **Plaintiff,**

v.

LEROY McMATH,
POWER ENTERTAINMENT CO, INC.,
and POWER ARTIST MUSIC CO.,

    **Defendants.**

CIVIL ACTION FILE
NO. 23CV6869-7

## FINAL JUDGMENT

This Court having previously granted Plaintiff judgment on all his claims, including: (1) breach of contract and on account; (2) conversion; (3) tortious interference with contractual business relations; (4) fraud; (5) punitive damages; (6) pre-judgment interest; (7) and attorney's fees under O.C.G.A §§ 13-1-11 and 13-6-11, per the Order entered on January 3, 2025; and this action having been called for trial before the Honorable LaTisha Dear Jackson on the issue of damages; and Plaintiff Matthew Peach having appeared with counsel, Defendant Leroy McMath having appeared self-represented, and co-Defendants Power Entertainment Co, Inc. & Power Artist Music Co. having failed to appear through counsel; and the Court having granted Plaintiff's Motion for Bench Trial; and the case having been duly tried with Plaintiff presenting testimony supported by Plaintiff's Trial Exhibits "A" thought "O" and Defendant McMath having had a full and fair opportunity to challenge Plaintiff's presentation and to present his own evidence and argument; this Court renders the following judgment:

**IT IS HEREBY ORDERED AND ADJUDGED** that Plaintiff MATTHEW PEACH recover from the Defendants LEROY McMATH, POWER ENTERTAINMENT CO, INC., and

211

POWER ARTIST MUSIC CO., jointly and severally, the amount of **$427,710.30**, which comprises the following:

1. Principal amount of damages owed by Defendants to Plaintiff are: **$121,701.50.**

2. Pre-judgment interest owed by Defendants to Plaintiff is: **$98,817.90.**

3. Additional monetary damages owed by Defendants to Plaintiff are: **$15,445.50.**

4. The Court having previously found that Defendants admitted that they acted with a known or willful disregard of Plaintiff's rights, punitive damages are awarded to Plaintiff in amount of **$100,000.00** as punishment and deterrence pursuant to OCGA § 51-12-5.1.

5. Attorney's fees owed by Defendants to Plaintiff pursuant to OCGA § 13-1-11(a)(2) are: **$22,076.94** (Principal of $121,701.50 plus prejudgment interest of $98,817.90 equals $220,519.40; 15% of the first $500 is $75.00; 10% of the remaining $220,019.40 is $22,001.94; and $75.00 plus $22,001.94 totals $22,076.94).

6. Finding that Defendants acted in bad faith, were stubbornly litigious, and caused Plaintiff unnecessary trouble and expense; and based on evidence of actual costs and fees and the reasonableness of those costs and fees, the expenses of litigation owed by Defendants to Plaintiff pursuant to OCGA § 13-6-11 are: **$69,668.46** (comprising the $90,345.40 as shown in Plaintiff's Trial Exhibit O plus $1,400.00 for the four hours of trial minus the $22,076.94 awarded under OCGA § 13-1-11).[1]

7. Post Judgment interest at the legal rate.

**JUDGMENT ENTERED** this the 24th day of June 2025.

Hon. LaTisha Dear Jackson
DeKalb Superior Court, Div. 7
DeKalb Judicial Circuit

eserved: John M. Duffoó, Esq. – Counsel for Plaintiff
eserved: LeRoy McMath, leroy@wbaball.net

---

[1] When the Court orally pronounced judgment at the end of trial, it awarded expenses of litigation under OCGA § 13-6-11 for the full amount established by Plaintiff's Trial Exhibit O. However, awarding Plaintiff attorney's fees under both OCGA §§ 13-1-11 and 13-6-11 against the same Defendants would constitute an impermissible double recovery. Therefore, this written judgment corrects the oral pronouncement to avoid overlapping attorney's fees awards.

# EXHIBIT O

# EXHIBIT O

# EXHIBIT O

# John Duffoo

| | |
|---|---|
| **From:** | leroy wbaball.net <leroy@wbaball.net> |
| **Sent:** | Wednesday, July 16, 2025 12:35 PM |
| **To:** | John Duffoo |
| **Subject:** | Re: Peach v. McMath, et al.; CAFN: 23cv6869 |

I'm aware. Just wanted to reach out. On another note. I have no problem with you getting your monies or money owed to me from TB. I feel like my masters and money was taken any way.

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Wednesday, July 16, 2025 11:01 AM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Subject:** RE: Peach v. McMath, et al.; CAFN: 23cv6869

Leroy,

That is fine that you are considering bankruptcy; however, please note that judgments based on Fraud are non-dischargeable, therefore, even if you file my client will seek an order that its judgment survive bankruptcy discharge.

Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com

---

**From:** leroy wbaball.net <leroy@wbaball.net>
**Sent:** Wednesday, July 16, 2025 10:34 AM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, et al.; CAFN: 23cv6869

John I wanted to reach out to you to respond to this email. The $75K you are making reference to was money held my TB, owed from years back. That wasn't been releasing until this case was over. They paid me monies for my medical bills using my masters as collateral, now they own the masters, and any future funds, will come from them.
I suggest you contact TB directly. At the moment I don't have any money, I'm working with the attorney on my bankruptcy filing.

Regards,

1

# EXHIBIT P

# EXHIBIT P

# EXHIBIT P

IN THE SUPERIOR COURT OF DEKALB COUNTY
STATE OF GEORGIA

MATTHEW PEACH,

        Plaintiff/Judgment Creditor,

v.

LEROY McMATH;
POWER ENTERTAINMENT CO, INC.;
and POWER ARTIST MUSIC CO.,

        Defendant(s)/Judgment Debtors.

CIVIL ACTION FILE NO.
25CV8093-7

Related to 23CV6869-7

## ORDER FOR FINAL DISCOVERY DEADLINE
## AND SETTING COMPLIANCE HEARING

This post-judgment discovery action came before the Court for a hearing on January 27, 2026. Plaintiff Matthew Peach appeared via his counsel of record, and Defendant Leroy McMath appeared self-represented.

After hearing evidence and argument, the Court finds that McMath has no acceptable reason for failing to respond to Plaintiff's post-judgment discovery requests and no acceptable reason for failing to comply with the Court's Order Compelling Defendants/Judgment Debtors to Respond to Post Judgment Discovery, entered on September 15, 2025. His failure has been willful.

**The Court hereby ORDERS McMath to immediately respond to all of Plaintiff's post-judgment discovery requests. The parties shall report to the DeKalb County Courthouse, Courtroom 7B, in person at 9:00 a.m. on Tuesday, February 3, 2026, for a compliance hearing.** If McMath has failed to provide all discovery responses by the compliance hearing, he shall be incarcerated. If Plaintiff's attorney informs the Court that all discovery has been received prior to the compliance hearing, the parties will be excused from reporting.

**SO ORDERED**, this 27th day of January 2026.

Hon. LaTisha Dear Jackson
DeKalb Superior Court, Div. 7
DeKalb Judicial Circuit

eserved:     John M. Duffoó, Esq. – Counsel for Plaintiff

emailed:     Leroy McMath, leroy@wbaball.net

mailed:     Leroy McMath, Power Entertainment Co, Inc., and Power Artist Music Co.
            5160 E Ponce De Leon Ave. Unit J, Stone Mountain, GA 30083

# EXHIBIT Q

# EXHIBIT Q

# EXHIBIT Q

## John Duffoo

| | |
|---|---|
| **From:** | Dropbox <no-reply@dropbox.com> |
| **Sent:** | Saturday, January 31, 2026 8:57 PM |
| **To:** | John Duffoo |
| **Subject:** | Leroy McMath sent you 31 files |

## Download them by February 7, 2026 at 11:59 PM GMT-05:00



Easily send large files

Hi John,

**Leroy McMath (leroy@wbaball.net) sent you 31 files.** They'll be available to download until **February 7, 2026 at 11:59 PM GMT-05:00.**

**Leroy left you a message:**

*"Sorry it to so long. This was a lot. Tom, ask me to delete these emails. For some reason I did not. I will take a break and start sending scans.*
*"*


Sent Items - leroy wbaball.net - 6.pdf
130.18 KB

Sent Items - leroy wbaball.net - 16.pdf
91.37 KB

David Parker leroy wbaball.net - 3.pdf
137.22 KB

David Pleroy wbaball.net - #1.pdf
117.91 KB


Sent Items - leroy wbaball.net - 14.pdf
122.45 KB

### and 26 more items

**Download files**

This email was sent to john@jdbusinesslaw.com. If that isn't your email, report to Dropbox

1

# EXHIBIT R

# EXHIBIT R

# EXHIBIT R

Post Judgement Interrogatories

1. Power Artist Music Co inc -(███-3045) Power Entertainment CO-(███-9455)
2. Leroy McMath ███-72- 2613
3. I have not filed (Documents from IRS attached)
4. No inventory, materials or work in progress.
5. 3577 Chamblee Tucker Road, #178 Atlanta Ga 30341 - 8735 Dunwoody Place Atlanta, Ga
6. I do not own any safe deposit boxes.
7. I do not have any property to share.
8. I have no loans or mortgages due to me.
9. Removed myself as a member from First Venture Group, INC
10. See attached page- Creditors
11. No clients, business has been closed for 4 years.
12. Social Security see attachment. The company has no on going business activities
13. I do not own any real estate.
14. I do not own any interest in any business.
15. No one owes me money
16. Please see exhibits attached __
17. Debtors does not own personal property.
18. 2021 Toyota Tacoma Sr. Was leased and Surrendered to Southeast Finance.
19. Due to illness First Venture Group, Inc. has been closed.
20. I have no employees
21. No employees
22. Company received $115,000 from Tommy Boy Artist.
23. Tommy Boy Artist LLC - $205k- 149 East 23rd Street Suit 6 New York, New York 10156
24. No landlord for the business. The business is closed. 3577 Chamble Tucker Road Atlanta Ga 30341 - Residential: 5160 E Prince De Leon Avenue Stone Mountain, Ga 30083
25. No accounts Receivable other than Tommy Boy-artist.
26. There are no contracts. The company is closed.
27. None. The company is closed.
28. I do not own any of the requested.
29. I do not have or own any life insurance policies.
30. None
31. I have no customers. Business closed.
32. I don't own anything of value.
33. Power Entertainment, now owned by Tommy Boy Artist.

34. No professional liscense.

35. None

36. None

37. Tommy Boy Artist LLC

38. Power Artist Records dba Triad I use the company as a sub label.

39. Dollar 1999 own by Simitar Entertainment Filed Bankruptcy 2000 and sold assets.

40. Music Game and Chasing Your Dreams owned by Tommy Boy Publishing via with Power Artist Music.

41. I own no music catalogs they are owned by Tommy Boy.


Post Judgement Request Production:


1. See attachement.

2. No financial statements given in the last five years.

3. No insurance was applied.

4. Don't have any.

5. I have not applied for credit

6. Letters confirmation of non-filing - see attachments

7. No lease available

8. No commercial landlord Companies are closed.

9. None

10. I do not have any safe deposit boxes

11. Have never processed.

12. No life insurance policies

13. Tommy Boy Artist LLC.

14. None

15. Statement from IRS of non-filings attached.

16. See attached copies of emails.

17. The sale of company, contract sent via dropbox.

18. Tommy Boy Artist agreement

19. None

20. Tommy Boy Artist LLC.

21. None

22. None

23. None

24. None
25. See Tommy Boy agreement.
26. None
27. None
28. None
29. None
30. None leased vehicle surrendered in 2023.
31. None
32. None
33. No customers business closed
34. Tommy Boy Artist, LLC.
35. No payroll business closed
36. None
37. None
38. The debtor have never processed. Now own by Tommy Boy
39. None
40. No documents – I was DBA as Triad. It was a distribution are for company.
41. Dollar attached as an exhibit
42. Copy attached now owned by Tommy Boy Publishing
43. Contract is attached as an exhibit
44. Contract attached as exhibit