UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MATTHEW PEACH<br><br>Plaintiff,<br><br>vs.<br><br>LEROY McMATH, individually;<br>POWER ENTERTAINMENT CO,<br>INC; POWER ARTIST MUSIC CO.;<br>POWER ARTIST RECORDS, INC;<br>TOMMY BOY ENTERTAINMENT,<br>LLC d/b/a TOMMY BOY<br>DISTRIBUTION and TOMMY BOY<br>ARTISTS, LLC<br><br>Defendants. | CIVIL ACTION<br>FILE NO. |

## DECLARATION OF MATTHEW PEACH IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

I, Matthew Peach, state that I am of legal age, being over the age of eighteen, with full authority to make the statements contained herein based on personal knowledge, business records and documents produced by Defendants during a civil action previously litigated in the Superior Court of DeKalb County, State of Georgia. I declare under penalty of perjury that the following is true and correct, and if called as a witness I could competently testify to the matters stated herein:

1.    I am the Plaintiff in the above captioned matter and the statements made herein are based on my personal knowledge, business records and/or records obtained during the course of litigation.

2.    I am a judgment creditor of Defendant Leroy McMath ("McMath"), POWER ENTERTAINMENT CO, INC ("PEC"); and POWER ARTIST MUSIC CO. ("PAM") (collectively, "Judgment Debtors") arising from litigation in the Superior Court of DeKalb County, Georgia, (hereinafter "Georgia Superior Court Action") based on contract and various torts, including fraud, that resulted in a monetary judgment in my favor of $427,710.30.

3.    I am familiar with the methods by which I make, record, keep, and maintain business records.  I have access to the business records pertaining to my business transaction, this litigation against the Defendants and documents obtained during a civil action previously litigated in the Superior Court of DeKalb County, State of Georgia, which are recorded at the time or near the time of the occurrence of transactions or events stated therein and from information transmitted by someone with knowledge. The business records are made, recorded, kept, and maintained in the normal course of my regularly conducted business activity.  The making, recording, maintaining and/or keeping of the business records attached to this declaration are in the regular practice of my regularly conducted business activity.

4. On August 3, 2018, Defendant McMath entered into an agreement with Royalty Exchange, Inc. to facilitate the sale of an income-producing asset, namely the right to receive the music royalty income generated by a catalog of 1990s hip hop recordings owned and controlled by producer and record label owner Leroy McMath through his record label Power Entertainment Co., Inc. (hereinafter referred to in this Declaration as the "Royalty Stream"). Royalty Exchange is an online marketplace for the buying and selling of royalty assets and rights, including but not limited to music, book publishing, television and film royalties. Attached hereto as Exhibit "A" is a true and correct copy of the Listing Agreement between Leroy McMath and Royalty Exchange, Inc.

5. On September 20, 2018, to facilitate the redirection of payments to the new Royalty Stream assignee, McMath issued an irrevocable Letter of Direction instructing his distributor, co-Defendant Tommy Boy Entertainment, LLC d/b/a Tommy Boy Distribution ("TBE LLC") to pay the Royalty Stream to Royalty Exchange, acting as payment administrator for the Royalty Stream assignee. Attached hereto as Exhibit "B" is a true and correct copy of the initial Letter of Direction.

6. On December 6, 2018, I agreed to pay $415,000.00 to become the assignee of the aforementioned Royalty Stream. This assignment granted me the right to

3

receive the Royalty Stream income while Defendant McMath retained the 'Masters', including the control and ownership of the sound recording copyrights in the music catalog. Thus, after the 2018 transaction, neither Defendant McMath nor the Georgia Corporate Defendants retained the right to re-sell, reassign, encumber, transfer or otherwise interfere with my rights in and to the Royalty Stream previously sold to me. Attached hereto as Exhibit "C" is a true and correct copy of the Purchase Agreements for the royalties.

7. Following the December 2018 transaction, Royalty Exchange, acting as payment administrator for Plaintiff, received the Royalty Stream income from McMath's distributor, TBE LLC, and forwarded it to Plaintiff without incident for nearly three years.

8. On or about October 26, 2021, McMath wrongfully issued a subsequent Letter of Direction to TBE LLC, causing the distributor to suddenly cease paying the Royalty Stream to Royalty Exchange (as the administrator for Plaintiff) and begin paying the Royalty Stream to McMath's company and co-Defendant, Power Artist Music Inc.  Attached hereto as Exhibit "D" is a true and correct copy of the October 26, 2021 Letter of Direction.

9. On December 20, 2021, Leroy McMath, via co-Defendants, Power Entertainment & Power Artist Music, Inc. entered into a fraudulent agreement with Tommy Boy Distribution for a royalty pre-payment (also commonly

known as a royalty loan or advance) of $100,000.00, whereby said loan was to be repaid from my Royalty Stream. Attached hereto as Exhibit "E" is a true and correct copy of the business records demonstrating the $100,000.00 advance payment to Defendants.

**Georgia Superior Court Action & Notice of Claim to Defendants:**

10. On June 8, 2022, I authorized my attorney to prepare and mail a demand letter to Defendant McMath, threatening litigation if McMath failed to resolve the dispute and cease diverting music royalty payments from my Royalty Stream. Attached hereto as Exhibit "F" is a true and correct copy of the June 8, 2022 letter.

11. On June 14, 2022, I authorized my attorney to prepare and mail a Letter of Direction and Demand to Cease Converting Funds to co-Defendant, TBE LLC and its managing member Thomas A. Silverman. Attached hereto as Exhibit "G" is a true and correct copy of the June 14, 2022 letter.

12. On June 20, 2022, I filed a lawsuit in the Superior Court of Gwinnett County, State of Georgia, Civil Action No: 22-A-05274-3 against Defendant, Leroy McMath alleging the following claims: (1) breach of contract and on account; (2) conversion; (3) tortious interference with contractual business relations; (4) fraud; (5) punitive damages; (6) pre-judgment interest; (7) and attorney's fees under O.C.G.A §§ 13-1-11 and 13-6-11. This Superior Court Action was

subsequently amended to include co-Defendants, Power Entertainment Co, Inc and Power Artist Music Co.  Thereafter, the Superior Court Action was transferred to the Superior Court of DeKalb County, State of Georgia, Civil Action No: 23CV6869-7 (hereinafter, the "Georgia Superior Court Action").

13. Between December 2021 and June 2022, TBE LLC transferred the aggregate sum of $121,701.50 to McMath and his companies. On information and belief, those payments were made by TBE LLC with full knowledge that McMath had already sold the right to receive those payments - i.e., the Royalty Stream - to me; Plaintiff Matthew Peach.

14. For approximately one year after the commencement of the Georgia Superior Court Action, TBE LLC, via David Parker, provided my counsel with copies of monthly royalty statements, showing they had ceased paying McMath and, as Mr. Parker had represented, were holding my Royalty Stream income pending the outcome of the Georgia Superior Court Action.

15. On October 16, 2023, the Defendant McMath began conspiring with TBE LLC's CEO, Thomas Silverman about how to avoid paying my Royalty Stream income and specifically discussing the sale of the Masters (referring to Defendant McMath's retained control and ownership of sound recording copyrights in the music catalog) for less than its fair value.  Attached hereto as Exhibit "H" is a true and correct copy of the emails from Leroy McMath to

TBE LLC's CEO, Thomas Silverman dated October 16, 2023 obtained through post judgment discovery in the Superior Court Action.

16. On October 30, 2023, Leroy McMath and Thomas Silverman exchanged emails showing Defendants had full knowledge of my Georgia Superior Court Action. Emails with the subject "Power-masters" discuss other potential purchasers to the Masters and Thomas Silverman asked Leroy McMath, if he sold to the other potential buyers, would McMath "have to pay Peach the $100,000.00 you took as advance to get the suit dropped?". Defendant McMath responded: "My loyalty is with TB. Yes, they know about the deal, and royalty liabilities and the $100K". Attached hereto as Exhibit "I" is a true and correct copy of the emails between Leroy McMath and TBE LLC's CEO, Thomas Silverman dated October 30, 2023 obtained through post judgment discovery in the Superior Court Action.

17. Between November 9, 2023 and November 11, 2023, Defendant McMath and Tom Silverman on behalf of TBE LLC and/or Tommy Boy Artists, LLC ("TBA LLC") colluded to hinder, delay, or defraud me, whilst I was a present creditor of Defendant McMath. Defendant McMath requested Thomas Silverman's recommendation "as a friend". Thomas Silverman responded: "I suggest selling to me and I sell to you with a new company". In response, Defendant McMath, responded as follows:

> "I ready to sell to you. We can do a small sale price, like
> $100k. Then you can sell back with a new company as you
> stated. The sooner the better... so that the agreement with
> Royalty Exchange terminates, and future payments can be
> redirected to new owners. I agree the accounting needs to
> be Kept current, and artist needs to be paid when due."

Attached hereto as Exhibit "J" is a true and correct copy of the emails between Leroy McMath and TBE LLC's CEO, Thomas Silverman dated November 9 - 11, 2023 obtained through post judgment discovery in the Superior Court Action.

18. The foregoing communications demonstrate actual intent to hinder, delay, or defraud Plaintiff and give rise to several factors recognized as badges of fraud under O.C.G.A. § 18-2-74(b). In the alternative, the communications also demonstrate that the contemplated transfer was to be made without receiving a reasonably equivalent value in exchange.

19. On November 17, 2023, I filed a Motion for Summary Judgment on all my claims and Defendants' counterclaims in the Georgia Superior Court Action.

20. On December 7, 2023, twenty days after the filing of my Motion for Summary Judgment, Defendants secretly consummated a transaction purported to transfer ownership of both (1) the "Masters," meaning control and ownership of sound recording copyrights in the music catalog, and (2) "all income ownership and collection rights of the Masters, regardless of when earned", meaning the Royalty Stream, to Tommy Boy Artists, LLC, a sister company of TBE LLC (hereinafter, "Tommy Boy Defendants"). Attached hereto as

Exhibit "K" are true and correct copies of emails between Leroy McMath and David Parker of Tommy Boy dated December 6, 2023 through December 7, 2023.

21. The December 7, 2023 transaction was concealed from me and my counsel by Defendants until January 28, 2026 when production of the Asset Purchase Agreement dated December 7, 2023 was compelled in the Georgia Superior Court Action.

22. On January 3, 2025, the Superior Court of DeKalb County, Georgia, entered summary judgment in favor of Plaintiff on the issue of liability as to all claims asserted by Plaintiff against all Judgment Debtors, and on all counterclaims asserted by Judgment Debtors. Attached hereto as Exhibit "L" is a true and correct copy of the Court's Order on Various Motions.

23. On June 24, 2025, the Georgia Superior Court Action proceeded to trial, resulting in the entry of a monetary judgment against Leroy McMath, POWER ENTERTAINMENT CO, INC; & POWER ARTIST MUSIC CO. in the amount of $427,710.30. The judgment is itemized as follows:

- Principal damages: $121,701.50.

- Pre-judgment interest: $98,817.90.

- Additional monetary damages: $15,445.50.

- Punitive damages: $100,000.00.

- Attorney's fees pursuant to OCGA 13-1-11: $22,076.94.

- Attorney's fees pursuant to OCGA 13-6-11: $69,668.46

Attached hereto as Exhibit "M" is a true and correct copy of the Final Judgment.

24. The Asset Purchase Agreement dated December 7, 2023 is entered into between, Defendant Tommy Boy Artists, LLC ("Buyer"), on the one hand, and Power Artists Records, Inc., doing business as Power Production, Inc., Power Records, Triad Records, Inc., Power Entertainment, Inc., Wrap Records, and any other affiliated entities, and Leroy McMath, in his individual capacity (jointly and severally referred as the "Seller"), on the other hand. Attached hereto as Exhibit "N" is a true and correct copy of the Asset Purchase Agreement.

25. McMath Defendants' transfer of the Masters and related catalog rights stripped the Judgment Debtors of a significant music asset and thereby hindered, delayed and defrauded me by placing that asset beyond reach of recovery on my monetary judgment.

26. The McMath Defendants' purported transfer of the Royalty Stream, or any rights thereto, was wrongful because those rights had previously been sold to me. Defendants have used the December 7, 2023 Asset Purchase Agreement to control that income and divert royalty income from me.

27.   Unless enjoined by this Court, the Tommy Boy Defendants will continue to exercise dominion and control over the Royalty Stream proceeds belonging to me and will continue to withhold, deplete, offset, or apply those proceeds for their own benefit, including to fund expenses and liabilities they claim to have incurred in connection with disputes arising from the December 7, 2023 transaction.

28.   The Asset Purchase Agreement states a purchase price of $115,000.00, which was not reasonably equivalent to the value of the income-producing music catalog and related rights transferred therein. I paid $415,000 in 2018 for the Royalty Stream alone, and the Royalty Stream monthly income has tripled during my ownership since December 2018. Yet the December 7, 2023 Asset Purchase Agreement purported to transfer the Masters, related catalog rights, and Royalty Stream rights for only $115,000 (See Exhibit "N", paragraph 5.1). A genuine, arms-length transaction for this music catalog would be concluded at a sale price between $1,200,000 - $1,500,000.

29.   Accordingly, the December 7, 2023 transaction is voidable whether characterized as: (a) a purported transfer of payment rights previously sold to me; (b) a transfer of the Masters and related catalog rights still held by the McMath Defendants; or (c) a transfer of both. In each instance, the transaction was structured to impair my ability to collect on my claim by diverting or

placing beyond reach the asset value and income-producing capacity of the catalog.

30. The McMath Defendants and TBA LLC further agreed that a subsequent payment would be made to Seller as defined: "($75,000) (the "Contingent Payment") will be made to Seller on the date that is eighteen (18) months following the Closing Date; provided, however, the Contingent Payment a) shall not be due or payable in the event a lawsuit is filed in any jurisdiction which names Buyer or any of its affiliates whether or not as a result of or in connection with the matters contained in the lawsuit referred to in paragraph 18.2" of the Asset Purchase Agreement. See Exhibit "N".

31. Paragraph 18.2 of the Asset Purchase Agreement states: "Leroy McMath is a party to a civil action filed by Mathew Peach on June 20, 2022, in the Superior Court, Gwinnet County, Georgia, civil case number 22-A-05274-3. Notwithstanding anything to the contrary contained herein, Seller shall hold harmless and indemnify Buyer for all costs and expenses including attorney fees and court costs that Buyer may incur or may arise as a result of this action or enforcement of any judgment or settlement." All parties to the concealed December 7, 2023, transaction had full knowledge of Mr. Peach's pending Georgia Superior Court Action before consummating the transaction. See Exhibit "N".

32.   The Asset Purchase Agreement is signed on behalf of Tommy Boy Artists, LLC, by Thomas Silverman, its CEO. See Exhibit "N".

33.   Through January 31, 2026, the McMath Defendants produced the aforementioned emails and Asset Purchase Agreement to my attorney via Dropbox, demonstrating collusive actions to hinder, delay, or defraud me as a present creditor. McMath included a message as follows: "Sorry it to so long. This was a lot. Tom [Silverman], ask me to delete these emails. For some reason I did not.  I will take a break and start sending scans."  Attached hereto as Exhibit "O" is the Dropbox email containing the message from Leroy McMath dated January 31, 2026.

FURTHER DECLARANT SAYETH NOT.

*I, Matthew Peach, declare under penalty of perjury, as provided for by the laws of the United States, 28 U.S.C. § 1746 on this the 10th day of July, 2026, that the above and foregoing statements are true and correct.*

By:

_____

Matthew Peach

# **LOCAL RULE 5.1 CERTIFICATION**

Counsel certifies that the DECLARATION was prepared in accordance with the type and font, 14-point Times New Roman, selections approved by Local Rule 5.1.

This July 10, 2026.

s/John M. Duffoo, Esq.
GA Attorney Bar No. 231973
Attorney for Plaintiff
Business Law Firm of John M. Duffoo
P.O. Box 767355
Roswell, GA 30076
Telephone: (770) 312-6160
Email: John@jdbusinesslaw.com

# EXHIBIT "A"

# EXHIBIT "A"

# EXHIBIT "A"

## LISTING AGREEMENT

This listing agreement is dated <u>08/03/2018</u>, and is between ROYALTY EXCHANGE, INC., a Delaware corporation ("**Company**"), and Leroy McMath individually and on behalf of Power Entertainment ("**Seller**") whose address is <u>3577 Chamblee Tucker rd St 178 Atlanta GA 30341</u>.

Seller owns an interest in the royalty or income stream indicated in exhibit A("**Asset**").

Company owns and operates a marketplace that attracts and educates investors to facilitate sales of royalty and income streams.

Seller wants to retain Company to exclusively list the Asset for sale on Company's marketplace.

The parties therefore agree as follows:

**1.    Term.**The rights and obligations of the parties begin on the date stated above and end upon (1) the Closing of the sale of the Asset; or (2) either party's written notice to the other party of its intent to terminate this agreement, except that Seller shall not terminate during the six-month period after the execution date of this agreement. A sale is considered closed when the Net Proceeds of the sale have been disbursed to Seller (**"Closing"**).

**2.    Seller's Obligations and Statements of Fact.**

**2.1    Information**In order to facilitate the Closing, Seller shall provide all information reasonably requested by Company, and all information provided shall be complete and accurate. Seller acknowledges that information provided may be posted on Company's marketplace and made available to third parties for review. If Company determines information provided by Seller to be incomplete or inaccurate, Company may terminate this agreement.

**2.2    Starting Price and Obligation to Sell**Seller shall set a starting price for the Asset, which is the minimum amount that Seller is willing to accept in a sale (**"Starting Price"**). Seller may reduce the Starting Price at any time. Seller shall sell the Asset to the bidder who makes the highest bid at or above the Starting Price (**"Winning Bid"**). After a Winning Bid is declared and Company receives the buyer's funds, Seller shall promptly take all steps necessary to transfer the Asset to the buyer, including but not limited to signing documents, giving notices, and providing information (**"Transfer Steps"**). If Company determines that a Winning Bid is invalid, Company may cancel the sale and re-list the Asset for auction at the

Starting Price.

**2.3** **Nonperformance Damages**If Seller fails to promptly complete the Transfer Steps after a Winning Bid is declared, Company will notify Seller of Seller's nonperformance. No later than seven days after Company's notice to Seller of Seller's nonperformance, Seller shall either complete the Transfer Steps or pay Company the fee indicated in section 5 as damages. This section does not apply if Seller is unable to complete the Transfer Steps through no fault of its own.

**2.4** **Statements of Fact**Seller states that it is the sole owner the Asset and has full authority to enter this agreement and sell the Asset. Seller also states that the Asset is free and clear from all encumbrances and the performance of Seller's obligations does not infringe the rights of any third party. Seller has reviewed the list of **"Current Distributors"** in exhibit A and the list is complete and accurate. No other distributors collect royalties as defined in the Asset description.

**2.5** **Acknowledgment**Seller acknowledges that Seller is irrevocably assigning the income rights defined in the Asset description, regardless of which distributor collects those rights. Unless specifically excluded in the Asset description, if any distributor other than a Current Distributor collects royalties for the Asset, the buyer will be entitled to those royalties.

**3.** **Marketplace Listing.** All information presented in the marketplace listing is Seller's sole responsibility. Before Company makes the Asset available for bid on the marketplace, Seller shall review the proposed listing and confirm in writing that all information presented is complete and accurate. Company may withdraw the Asset from the marketplace if the Starting Price is not met within 15 days after Company makes the Asset available for bid. Seller shall not bid itself or cause another to bid on Seller's own Asset.

**4.** **Exclusivity.**Seller shall not attempt to sell the Asset outside of this agreement. If Seller sells the Asset during the six-month period after the execution date of this agreement, Seller shall pay Company the fee indicated in section 5 no later than 15 days after the sale. Seller hereby exclusively authorizes Company to receive funds directly from any buyer and facilitate the closing for any assignment of the Asset to any third party during the Term.

**5.** **Company Fee.**When the Asset is sold under this agreement or against the exclusivity provision in section 4, Seller shall pay Company a fee of 15% of the Winning Bid, payable out of the Seller's proceeds of the sale.

**6.      Next Distribution Escrow.**Seller acknowledges that all income for the Asset paid after the sale, regardless of when earned, will belong to the buyer, and that Seller's distributor may not change the payee in time for the next distribution. To ensure that the buyer properly receives all distributions after the sale, Seller agrees that Company will withhold, in escrow, 10% of the Winning Bid from Seller's proceeds until Company confirms that the buyer has properly received a distribution. No later than 10 days after Company confirms that the buyer has properly received a distribution, Company will release the escrowed amount to Seller, less any amount that should have been paid to the buyer.

**7.      Disbursement of Proceeds.**Company will disburse the **"Net Proceeds"** of the sale, which equals the Winning Bid minus the Company Fee and next distribution escrow, to Seller no later than five business days after Company verifies that Seller's royalty distributor has confirmed the transfer of the Asset to the buyer.

**8.      Indemnification.**Seller shall indemnify and defend Company against all losses and liabilities arising from actions brought by third parties, including reasonable attorneys' fees, related to Seller's provision and omission of information and Seller's statements of fact in section 2.

**9.      No Advice by Company.**Seller acknowledges that Company is not a law, financial, or tax firm and does not provide legal, financial, or tax advice. Seller states that it has had sufficient opportunity to consult with its own legal counsel, financial advisors, and tax advisors regarding the sale of the Asset.

**10.     Miscellaneous.**

**10.1     Governing Law and Forum.**The laws of the State of Colorado govern all matters arising from this agreement and the exclusive forum shall be a federal or state court in Denver County, Colorado.

**10.2     Entirety and Amendment.**This agreement constitutes the entire understanding of the parties and no amendment will be valid unless it is in writing and signed by both parties. Any non-disclosure agreement signed by the parties prior to this agreement is hereby terminated.

**10.3     Assignment.**Seller shall not assign this agreement without Company's prior written consent.

The parties are signing this agreement on the date stated in the introductory clause.

ROYALTY EXCHANGE, INC.                    POWER ENTERTAINMENT

By: _____*Gary Young*_____          By: _____*Leroy Mcmath*_____

     Gary Young                          Leroy McMath
     Chief of Staff

## Exhibit A

**Asset:** 100% of Seller's interest in the rightsholder's share of all royalties attributable to the sound recordings listed in Exhibit B, currently distributed by Tommy Boy Records/Warner Music Group.

**Current Distributors:** Tommy Boy Records/Warner Music Group

**Starting Price:** $300,000

**Company Fee:** 15%

**Exhibit B**

| Release Title | ISRC |
| --- | --- |
| 12/31/1999 | USTB11600040 |
| (How Ya Gonna) Jacka Jacka | USTB11600074 |
| #1 Suspect | USTB11200255 |
| 2 for the Show | |
| 2 Much Booty (Original Mix) | USTB11200182 |
| 2-2 Da Chest (feat. DFC) | USTB11600284 |
| 2-2 the Chest | USTB11600121 |
| 2-2 The Chest (Original Mix) | USTB11200076 |
| 20 Below | USTB11600087 |
| 3 Counts (Original ) | US25T9920732 |
| 365 Days | USTB11600060 |
| 4 Niggas in 1 (feat. Loose Screws & D.F.C.) | USTB11600075 |
| A Favor (feat. Guce) (Original Mix) | USTB11200174 |
| A Piece of Mind (Intro) | USTB11600115 |
| A-Town | US25T9920777 |
| A-Town Hard Heads | |
| A-Town Hard Heads (Original ) | US25T9920733 |
| A-Town Hard Heads (Original Mix) | USTB11200199 |
| About the Author (Original Mix) | USTB11200013 |
| Acknowledgements (Original Mix) | USTB11200001 |
| Ain't 2 Good | US25T9920824 |
| Ain't No Future In Yo' Frontin' | US25T9920783 |
| Ain't No Love (Original ) | US25T9920811 |
| Ain't No Superman (Original Mix) | US25T9920832 |

| | |
|---|---|
| Ain't to be Fucked With | USTB11600086 |
| Ain't Too Much Worried | USTB11600091 |
| All About Comin' Up | |
| All About Comin' Up (Original Mix) | US25T9920853 |
| All My Niggas (Original ) | US25T9920813 |
| All Out (Original Version) | US25T9920763 |
| Another Weekend Night | USTB11200236 |
| Armed Robbery | USTB11600072 |
| Armed Robery (Original ) | US25T9920738 |
| At 2 O'Clock (Original ) | US25T9920740 |
| B.R. Double E.D. | USTB11600113 |
| Baby Come To Me (feat. Alexander O'Neal) (Original Mix) | USTB11200022 |
| Babysittin' (Original Mix) | USTB11200140 |
| Back to the States | USTB11200203 |
| Back Up in Ya! | USTB11600110 |
| Bad to the Bone | USTB11200233 |
| Ball Ball (Original ) | US25T9920810 |
| Ballin (Original ) | US25T9920806 |
| Band to Dis (feat. Butch Cassidy) (Original Mix) | USTB11200165 |
| Bang with Me (feat. Black Mafia Family) (Original Mix) | USTB11200177 |
| Bass Kings Volume 1 | |
| Be Myself | USTB11600093 |
| Better Now (feat. Big Mike) | USTB11600288 |
| Better Terms | US25T9920785 |
| Beyond the Millenium (Original Mix) | USTB11200088 |
| Big Fishes (feat. Messy Marv) (Original Mix) | USTB11200166 |

| | |
|---|---|
| Big Mama (Original Mix) | USTB11200119 |
| Bitches (feat. Too Short & Richie Rich) (Original Mix) | USTB11200138 |
| Black For Black | US25T9920788 |
| Black Widow (with X-2-C) | USTB11200227 |
| Blunted Up (Original Mix) | US25T9920881 |
| Blunted Up (Skit) | US25T9920750 |
| Boddies on My 9 (Original Mix) | US25T9920748 |
| Bodies on My 9 | USTB11200257 |
| Body on My 9 (Original Mix) | USTB11200072 |
| Bonus Track (Original ) | US25T9920815 |
| Bonus Track (Original ) | US25T9920814 |
| Bonus Track (Original Version) | US25T9920766 |
| Boom Boom | US25T9920852 |
| Boom Boom Bomb | US25T9920904 |
| Boot Up (Who Ya Wit) | US25T9920901 |
| Boss Bitch (Original Mix) | USTB11200130 |
| Bounce 2 This (Groove) (Original Mix) | USTB11200158 |
| Bouncin to a Murder (Original Mix) | US25T9920838 |
| Bouncing to a Murder | USTB11200260 |
| Break Yourself | USTB11600109 |
| Breakout (Original Mix) | USTB11200089 |
| Bring it On (Original Mix) | USTB11200151 |
| Bump That Rump | US25T9920897 |
| Bump that Rump (Original Mix) | USTB11200184 |
| Business Never Personal | US25T9920849 |

| | |
|---|---|
| Busta Free (Original Mix) | USTB11200087 |
| Call it What You Want (Remix) | USTB11200167 |
| Can't Mess Wit Me (Original Mix) | US25T9920880 |
| Can't Nobody do it Better feat. Corrosion & Kokaine (Original Mix) | USTB11200135 |
| Caps Get Peeled | USTB11600117 |
| Caps Get Peeled (Original Mix) | USTB11200067 |
| Carolina Backwoods (Original Mix) | USTB11200093 |
| Carolina Bounce | USTB11600042 |
| Ch 1: The Game (Original Mix) | USTB11200004 |
| Ch 2: How Labels Grow (Original Mix) | USTB11200005 |
| Ch 3: Finding the Right Artist (Original Mix) | USTB11200006 |
| Ch 4: Artist Advances (Original Mix) | USTB11200007 |
| Ch 5: Calling the Shots (Original Mix) | USTB11200008 |
| Ch 6: Marketing Your Label and Your Artist (Original Mix) | USTB11200009 |
| Ch 7: Distribution (Original Mix) | USTB11200010 |
| Ch 8: Becoming a Music Millionaire (Original Mix) | USTB11200011 |
| Ch 9: Final Words (Original Mix) | USTB11200012 |
| Chromotose in the Brain (Original Mix) | US25T9920830 |
| Clean Getaway (Original Version) | US25T9920759 |
| Cock it Man (Original Mix) | USTB11200132 |
| Come Real (Original Mix) | USTB11200198 |
| Comin' Real Again | US25T9920819 |
| Commercial | US25T9920898 |
| Comtemplated the Crime (Original Mix) | USTB11200090 |
| Conclusion (feat. Too Short) | USTB11600289 |
| Connections | USTB11200208 |

| | |
|---|---|
| Connections | USTB11200210 |
| Controversee (Start) | US25T9920902 |
| Controversee...That's Life...And That's the Way It Is | |
| Controversey | USTB11600035 |
| Conversations | US25T9920822 |
| Cost to be the Boss | US25T9920775 |
| Creep | USTB11600033 |
| Creep wit a Nigga (feat. Lil Tee) (Original Mix) | US25T9920744 |
| Creepin (Original Version) | US25T9920765 |
| Creepin' feat. Corrosion (Original Mix) | USTB11200131 |
| Crime Buddies (Original Mix) | USTB11200179 |
| Crimminal Behavior (Original ) | US25T9920735 |
| Cut Up | US25T9920910 |
| Da Bomb | USTB11600127 |
| Da Dip | USTB11004112 |
| Da Dip | USTB11004102 |
| Da Dip | USTB11004101 |
| Da Mississippi Pop | USTB11200244 |
| Da' Dip | US25T9920900 |
| Dance the Way You Like Making Love | USTB11200240 |
| Dayton Don't Play (Original Mix) | US25T9920871 |
| Daze of Old (Original Mix) | USTB11200084 |
| Dead Presidents | USTB11200258 |
| Dead Presidents (Original Mix) | US25T9920749 |
| Dead Presidents (Original Mix) | USTB11200078 |
| Deadly Verses | USTB11200248 |

| | |
|---|---|
| Deadly Verses | |
| Deadly Verses '97 (feat. Lil Tee) (Original Mix) | US25T9920753 |
| Deadly Verses (feat. The Villian) (Original Mix) | US25T9920791 |
| Deadly Verses (Original Mix) | USTB11200066 |
| Death B4 Dishonesty | USTB11600122 |
| Death Row (Original ) | US25T9920741 |
| Dedication (Original Mix) | US25T9920893 |
| Dedication (Original Mix) | US25T9920864 |
| Deejays Get Lonely Too | USTB11200242 |
| Deep Deep South | US25T9920908 |
| Digga Bigga Ditch | USTB11600125 |
| Dirty Mouth | US25T9920896 |
| Dis is for Dem Booty Shakers | USTB11200239 |
| Dis Mode | USTB11600088 |
| Do it Again | USTB11200231 |
| Do Thang (Original ) | US25T9920805 |
| Do What U Feel (Freaky Mix) | USTB11200155 |
| Do What U Feel (Original Mix) | USTB11200161 |
| Don't (Original Mix) | USTB11200018 |
| Donnie Damon | USTB11600052 |
| Down Low (Remix) | US25T9920903 |
| Downtown Glory | US25T9920779 |
| Draw the Line | |
| Draw the Line | US25T9920773 |
| Dreaming (Replay Version of Am I Dreaming) | USTB11200211 |
| Drug Dealer (Original Mix) | US25T9920866 |
| Empty tha Clip (Original Mix) | US25T9920746 |

Document Ref: ZA4J9-QQRPO-PUAC7-RLF6X

| | |
|---|---|
| Everyday Ho | US25T9920823 |
| Everyday Thang in Da Hood | US25T9920769 |
| Everyday Thang in Da Hood (feat. Ghetto Mafia) | USTB11600286 |
| Everyday Thing (Original Mix) | USTB11200150 |
| Ez Pimpin (Original ) | US25T9920729 |
| F.A.N.G. feat. Shoestring from the Dayton Family & D.F.C. (Original Mix) | US25T9920875 |
| F*ckie S*ckie (At Freaknasty Party) | US25T9920909 |
| Facts of Life | US25T9920776 |
| Fake as a Snack Cake (Original Mix) | US25T9920829 |
| Family Touchings | USTB11200218 |
| Fang (Original Mix) | US25T9920831 |
| Fatal Attraction (Original Mix) | US25T9920861 |
| First Blow (Original Mix) | USTB11200092 |
| Flash's Groove | USTB11600090 |
| Flashbacks | US25T9920818 |
| Flava Uv Phony | USTB11600112 |
| Fletch (Original ) | US25T9920731 |
| Flint Thug Compilation | |
| Flipside (feat. S. Knight) (Original Mix) | USTB11200171 |
| Frankie Leg | USTB11104213 |
| Frankie Leg (Radio Edit) | USTB11104206 |
| Frankie Leg (Radio Edit) | |
| Friendz | USTB11600064 |
| Fuck Everybody (Original ) | US25T9920812 |
| Fuck Whatcha Talkin Bout (Original Mix) | USTB11200178 |
| Fuck' Em All | USTB11200222 |

Document Ref: ZA4J9-QQRPO-PUAC7-RLF6X

| | |
|---|---|
| Full Blooded Niggaz | |
| Funkafied | |
| G State Soldier | USTB11600082 |
| Game First (Original ) | US25T9920808 |
| Gangsta Boogie (Original Mix) | US25T9920859 |
| Gangsta Gansta (Original Mix) | USTB11200145 |
| Gangsta Groove (Original Mix) | US25T9920856 |
| Gangsta Luv (Original Mix) | US25T9920888 |
| Gangsta Shit | US25T9920843 |
| Gangsta's Need Love 2 | USTB11200250 |
| Gangstas Need Love Too (Original Mix) | US25T9920862 |
| Get Away | USTB11600037 |
| Get Down on It (Original Mix) | USTB11200185 |
| Get Heated (Original Mix) | USTB11200065 |
| Get It How U Live | USTB11600029 |
| Get Loose | US25T9920787 |
| Get Off | USTB11200232 |
| Get Ya Weight Up | USTB11200262 |
| Getting' Money (Original Mix) | USTB11200186 |
| Ghetto World | USTB11600080 |
| Goin' Way Out feat. Shoestring (Original Mix) | US25T9920867 |
| Good Cop Bad Cop | USTB11600054 |
| Good Fellas (Original Mix) | US25T9920840 |
| Good Girl Gone Bad | USTB11600050 |
| Gotta Get Mine | US25T9920817 |
| Gotta Get Mine (feat. 2Pac) | USTB11600281 |
| Gotta Get Mine (feat. Tupac) (Remix) | US25T9920842 |

| | |
|---|---|
| Gotta Get Mine (Remix) | US25T9920809 |
| Great Depressioin | USTB11600094 |
| Greatest Hits: His Deadliest Verses | |
| Grind, Grind (Original Mix) | USTB11200112 |
| Groupies (Original ) | US25T9920736 |
| Groupies (Original Mix) | USTB11200200 |
| Guanja | US25T9920789 |
| Hands on My Nine | USTB11600123 |
| Hard Hitters | USTB11600056 |
| Haters Keep Hating | USTB11600058 |
| Have This Ever Happened 2-U | US25T9920907 |
| Heads or Tails | USTB11600036 |
| Heaven or Hell (Original Mix) | US25T9920800 |
| Hell Bound (Original Mix) | USTB11200102 |
| Here Comes the Mack | USTB11200214 |
| Here They Come (Original Mix) | USTB11200103 |
| Here They Come (Original Mix) | USTB11200196 |
| Hey | USTB11600032 |
| Hoez in the Club(Original Mix) | USTB11200120 |
| Hold Yo Nuts (Original Mix) | US25T9920828 |
| Homicidal Lifestyle | |
| Homicidal Lifestyle (Original Mix) | USTB11200077 |
| Homicidal Lifestyle (Original Mix) | US25T9920751 |
| Homicidal Lifestyle (Original Mix) | US25T9920882 |
| Homicidal Lifestyles | USTB11200252 |
| Homie, You Ain't Got an Ounce of Mac in You | USTB11200224 |

| | |
|---|---|
| Hott (feat. Sons of Funk) (Original Mix) | USTB11200175 |
| How Deep is Yo Luv (feat. Hollo Point) (Original Mix) | US25T9920747 |
| I Ain't Going Down (Original Version) | US25T9920758 |
| I Am (feat. Philley 45) (Original Mix) | USTB11200163 |
| I Got it Like That (Original Mix) | USTB11200153 |
| I Got to be a Millionsire | USTB11200212 |
| I Got What You Want (Original Mix) | USTB11200114 |
| I Got's No Love (Original Mix) | USTB11200118 |
| I Keeps it Real | USTB11200207 |
| I Now Know (Original Mix) | USTB11200106 |
| I Told You (Original Mix) | USTB11200127 |
| I Wanna Smoke | USTB11200251 |
| I Wanna Smoke (feat. Psycho) (Original Mix) | US25T9920754 |
| I Wanna Smoke (feat. Psycho) (Original Mix) | US25T9920792 |
| I Wanna Smoke (Original Mix) | USTB11200070 |
| I Wanna Smoke (Remix) | US25T9920743 |
| I Want to F*ck | US25T9920895 |
| I Will Excell | US25T9920786 |
| I'll Na Na (Original Mix) | USTB11200189 |
| I'm Still The Gangsta (Original Mix) | US25T9920855 |
| In Decatur | USTB11600061 |
| In My Shoes | USTB11600025 |
| In the Doe | USTB11200215 |
| Instructions (Original Mix) | US25T9920742 |
| Interlude (Original Mix) | US25T9920869 |
| Interlude (Original Mix) | USTB11200020 |

| | |
|---|---|
| Into My Eyes (Original Mix) | USTB11200024 |
| Intro | US25T9920767 |
| Intro | US25T9920894 |
| Intro | US25T9920816 |
| Intro | US25T9920841 |
| Intro | USTB11200237 |
| Intro | USTB11600039 |
| Intro (Original Mix) | USTB11200014 |
| Intro (Original Mix) | US25T9920877 |
| Intro (Original Mix) | USTB11200064 |
| Intro (Original Mix) | US25T9920827 |
| Intro (Original Mix) | USTB11200110 |
| Intro (Original Mix) | US25T9920865 |
| Intro (Original Mix) | USTB11200149 |
| Intro feat. Raise Up Clique (Original Mix) | USTB11200123 |
| Introduction (Original Mix) | USTB11200080 |
| Introduction (Original Mix) | USTB11200003 |
| It's All Good | US25T9920845 |
| It's All Good | |
| It's Me (Original Mix) | USTB11200156 |
| Jackin' Anonymous | USTB11200217 |
| Jealous Pimp | USTB11600097 |
| Job Corp | US25T9920781 |
| Jock Itch (Original ) | US25T9920730 |
| Jump-Bounce | USTB11600028 |
| Just Another Clip | US25T9920820 |
| Just Kickin It | US25T9920784 |

Document Ref: ZA4J9-QQRPO-PUAO7-RLF6X

| | |
|---|---|
| Just Tell Me (Original Mix) | USTB11200017 |
| Just the Way I Like It | USTB11200230 |
| Just the Way I Like It | |
| K.G. Pheeno G. and Charles | USTB11600062 |
| Kakilak | USTB11600051 |
| Keep it Real (Original Mix) | USTB11200154 |
| Killa (Skit) | US25T9920745 |
| Killa Killa (Original Mix) | US25T9920798 |
| Knees & Boes (Original Mix) | USTB11200188 |
| Late Night | USTB11600044 |
| Late Night Creep (Booty Call) | USTB11600102 |
| Lawless (Original Mix) | US25T9920868 |
| Lay Me Down (feat. Lil Tee) (Original Mix) | US25T9920752 |
| Let It Flow | US25T9920884 |
| Let It Go (Original Mix) | USTB11200026 |
| Let Me See Ya Pump It | USTB11200238 |
| Let's Go to Da Club (feat. Erotic D) | USTB11600291 |
| Let's Ride | USTB11200209 |
| Let's Roll (Original Mix) | USTB11200107 |
| Lets Get it Crackin (feat. Nate Dogg) (Original Mix) | USTB11200168 |
| Lets Go To Da Club | US25T9920848 |
| Lets Straighten It Out (Original Mix) | USTB11200109 |
| Letter from War | USTB11600043 |
| Life of a Flintstone | USTB11600096 |
| Life of a Sniper | US25T9920768 |
| Lil' Power (Original Mix) | USTB11200157 |

| | |
|---|---|
| Listen to 'Em Rumors (Original Mix) | USTB11200096 |
| Little Child Running Wild | USTB11600089 |
| Lock Down | USTB11200220 |
| Lost Cause (Original Mix) | USTB11200108 |
| Love the Doe | USTB11600024 |
| Luv Ones (feat. Delinquents) (Original Mix) | USTB11200169 |
| M.C. Breed & DFC | |
| M.C. Breed Presents The Thugz – Volume 1 | |
| Mack the Jack A Mack the Jack A (Original Mix) | USTB11200143 |
| Mack the Jack'A | USTB11200204 |
| Memory Lane | USTB11600030 |
| Mission to Nowhere (Original ) | US25T9920737 |
| Mo Money (Paycheck & M.C. Breeed) (Original Mix) | USTB11200142 |
| Mo Money to Get (feat. Paycheck) | USTB11600283 |
| Mo Murder (Original Mix) | US25T9920799 |
| Mo' Love | USTB11600118 |
| Money Holders(Original Mix) | USTB11200191 |
| Money Holders (feat. Mr. No Love) (Original Mix) | USTB11200148 |
| Money In My Live (Original ) | US25T9920802 |
| Money, Mack, Murder (Original Mix) | US25T9920834 |
| More Power | US25T9920790 |
| Move that Body | USTB11200235 |
| Mr. President | US25T9920771 |
| Murder Music | USTB11600031 |
| Murdur (Original Mix) | US25T9920755 |
| My Day (Original Mix) | USTB11200069 |
| My Life is a Battlefield | USTB11200206 |

Document Ref: ZA4J9-QQRPO-PUAO7-RLF6X

| | |
|---|---|
| My Name Ain't Rover (Original Mix) | US25T9920863 |
| My Neighborhood (Original Mix) | US25T9920858 |
| My Own Boss (Original Mix) | US25T9920836 |
| Nails Did | USTB11600067 |
| Nails Did | USTB11600070 |
| Nails Did | USTB11600069 |
| Nails Did | USTB11600071 |
| Nails Did | USTB11600068 |
| Nails Did (Original Mix) | USTB11200181 |
| Natural High (Original Mix) | US25T9920891 |
| Never Leave You Lonely (Original Mix) | USTB11200023 |
| Next Stop the Ghetto | |
| Next Stop The Ghetto (Original Mix) | USTB11200111 |
| Next To You (Original Mix) | USTB11200021 |
| Niggas in the Street | USTB11600081 |
| Night Rider | USTB11600046 |
| No Frontin' Allowed | USTB11600092 |
| No Future (feat. Bootleg & M.C. Breed) (Original Mix) | USTB11200146 |
| No Future (feat. Bootleg) | USTB11600287 |
| No Local (Original ) | US25T9920804 |
| O.J. Murder Story | USTB11200254 |
| O.J. Murder Story (Original Mix) | US25T9920797 |
| Oh!, Oh!, Oh! (Original Mix) | USTB11200183 |
| Ol' School | USTB11600114 |
| On My Mind (Time After Time) (Original Mix) | USTB11200152 |

Document Ref: ZA4J9-QQRPO-PUAC7-RLF6X

| | |
|---|---|
| On Our Job (feat. 504 Riders) (Original Mix) | USTB11200164 |
| On the Edge (Original Mix) | US25T9920837 |
| One Less B---- | US25T9920778 |
| One Time | USTB11600105 |
| Only Time Will Tell (Original Mix) | USTB11200190 |
| Organized Crime | US25T9920772 |
| Organized Crime (Original Version) | US25T9920760 |
| Out 2 Get Rich | |
| Out 2 Get Rich (Original Mix) | US25T9920873 |
| Out of Bounds | USTB11200216 |
| Outro | US25T9920826 |
| Outro (Original Mix) | USTB11200162 |
| Outro (Original Mix) | USTB11200028 |
| Outro Groove | USTB11600085 |
| P.G.P.B. | US25T9920899 |
| P.M.S. feat. Ghetto E from The Dayton Family (Original Mix) | USTB11200100 |
| P.O.W. (Original Mix) | USTB11200094 |
| Pain | USTB11600041 |
| Party Time | USTB11200241 |
| Pass the Hooter | USTB11600120 |
| Pat is Back (Original Mix) | US25T9920796 |
| Payback is Hell | USTB11200228 |
| Payback's a Motherfucker (Original Mix) | US25T9920835 |
| Perfect Contender | USTB11600063 |
| Perfect Contender | USTB11600057 |
| Pillow Talk (Original Mix) | USTB11200025 |

Document Ref: ZA4J9-QQRPO-PUAC7-RLF6X

| | |
|---|---|
| Pimp'N Ain't Dead (Original Mix) | US25T9920890 |
| Pimpin Ain't Dead | USTB11200261 |
| Players (Original ) | US25T9920739 |
| Pop that Booty | USTB11200247 |
| Potential Murder Suspects | |
| Preface (Original Mix) | USTB11200002 |
| Prelude (Original ) | US25T9920727 |
| Projects (Original Mix) | US25T9920793 |
| Provider (feat. Se) (Original Mix) | USTB11200144 |
| Psycho | |
| Psycho feat. Krazy Z (Original Mix) | USTB11200126 |
| Push 'Em Up (Original Mix) | USTB11200160 |
| Put Your Locs On | USTB11600116 |
| Raise Up Army feat. Corrosion (Original Mix) | USTB11200134 |
| Real G's Don't Die (Original Mix) | US25T9920885 |
| Real Golddigger | USTB11200223 |
| Real Motha ------ | US25T9920774 |
| Real Motha F..... (Original Version) | US25T9920764 |
| Rebel Slave | USTB11600047 |
| Rebel Slave (feat. Southclick) | USTB11600285 |
| Rebel Slave (Original Mix) | USTB11200082 |
| Refuse to Loose (Original Mix) | US25T9920874 |
| Respect | US25T9920906 |
| Ride Or Die (Original ) | US25T9920801 |
| Roll with the Clan | USTB11600124 |
| Root of All Evil | USTB11600077 |

| | |
|---|---|
| Rule No. 1 (feat. Pimp C of UGK) | US25T9920850 |
| Rumors Pt. 1 | US25T9920905 |
| Rumors Pt. 2 | US25T9920911 |
| Saturday Love (feat. Alexander O'Neal) (Original Mix) | USTB11200027 |
| Sawed Off Pump | USTB11600073 |
| Scrilla | USTB11200221 |
| Sesshead Funk Junky (feat. 8-Ball & MJG) | USTB11600282 |
| Seven Years | USTB11600106 |
| Sex, Money & Murder | USTB11200259 |
| Sex, Money, Murder (Original Mix) | US25T9920887 |
| Sex, Money, Murder (Original Mix) | USTB11200073 |
| Shake Dem Silicone Titties | USTB11200243 |
| She Likes It (Skit) | US25T9920846 |
| Shootin' from the Hip | USTB11600108 |
| Shootin' On Narcs (Part II) | US25T9920886 |
| Shooting on Narcs | USTB11200249 |
| Shots of Fire | USTB11600049 |
| Shout Out | USTB11600098 |
| Show Me Whatcha Twerkin (Original Mix) | USTB11200176 |
| Shut'em Down (Original Mix) | USTB11200115 |
| Sick Psychotic Thoughts | USTB11600079 |
| Sick Psychotic Thoughts (Original Mix) | USTB11200192 |
| Sick Psychotic Thoughts (Original Mix) | USTB11200101 |
| Sign of the Times (Original Mix) | USTB11200081 |
| Simply Beautiful (Original Mix) | USTB11200086 |
| Skanless (feat. Breed Madam Dame & T-Double of DFC) (Original Mix) | USTB11200141 |

| | |
|---|---|
| Skat'n on Thin Ice (Original Mix) | USTB11200195 |
| Skit (Original Mix) | USTB11200074 |
| Slack'N on Yo Pimpin' (feat. Boss Witch) (Original Mix) | USTB11200147 |
| Slackin' on Yo Pimpin' (Original Mix) | USTB11200128 |
| Sleepin' With The Enemy (Original Mix) | USTB11200019 |
| Smoke | USTB11600045 |
| Smoke (Original Mix) | USTB11200085 |
| Smoke with a Nigga (Feat. Mr. Ku) | US25T9920851 |
| Smoke with the Devil (Original Mix) | US25T9920794 |
| Smokin' | USTB11600101 |
| Snap Shot (Original Version) | US25T9920757 |
| Some Folks | USTB11600055 |
| Something 2 Smoke 2 | US25T9920825 |
| Sounds Like a Busta (Original Mix) | USTB11200170 |
| South | USTB11600053 |
| Southern Poetry | USTB11600059 |
| Southside Player (Original Mix) | USTB11200071 |
| Special Delivery | US25T9920770 |
| Spend The Night (Original Mix) | US25T9920857 |
| Stay Away From Cali (Original Mix) | US25T9920854 |
| Still Breath | USTB11600023 |
| Stop Loving You (Original Mix) | USTB11200016 |
| Stop Poppin Shit (feat. The Outlaws) (Original Mix) | USTB11200172 |
| Street Mutha Fuckas (Original ) | US25T9920728 |
| Street Muthafuckas (Original Mix) | USTB11200079 |
| Streets is All I Know (Original Mix) | US25T9920833 |

| | |
|---|---|
| Streets is All I Know (Remix) | US25T9920876 |
| Strictly 4 My Folk | USTB11600065 |
| Strong In the Game (Original ) | US25T9920734 |
| Stupid (Original Mix) | US25T9920889 |
| Superfly | USTB11600083 |
| Survivor | USTB11600026 |
| Swang that Booty (Original Mix) | USTB11200187 |
| Take Yo Time (Original ) | US25T9920803 |
| Take Your Time to Do Right | USTB11200229 |
| Talk to the Hands | USTB11200245 |
| Teach My Kids | USTB11600103 |
| Tear Da Club Up (Original Mix) | USTB11200068 |
| Tear It Up (Original Mix) | USTB11200113 |
| Tear It Up feat. Corrosion (Original Mix) | USTB11200124 |
| Tear the Club Up | USTB11200253 |
| Tear the Club Up (Original Mix) | US25T9920795 |
| Tell Me Why | USTB11200205 |
| That Girl (Original Mix) | US25T9920879 |
| That Type (Original Mix) | US25T9920878 |
| That Type (Original Mix) | USTB11200159 |
| That Type Of Gangsta (Remix) | US25T9920892 |
| That's Life | US25T9920782 |
| The Best | USTB11600048 |
| The Chair (Original Version) | US25T9920756 |
| The Deal is Da Funk | USTB11600107 |
| The Game Ain't Change (Original ) | US25T9920807 |

| | |
|---|---|
| The Message | USTB11600034 |
| The New Breed | |
| The Projects (Original Mix) | USTB11200075 |
| The Right Time | |
| The Right Time (feat. Keith Murray) (Original Mix) | USTB11200015 |
| The Saga Continues (Original Mix) | US25T9920883 |
| The Thrill is Gone | USTB11200246 |
| The Way Life Goes (Original Mix) | US25T9920872 |
| Them Niggaz Lucky (Original Mix) | US25T9920839 |
| Thin Ice | USTB11600078 |
| Thin Line (Original Mix) | USTB11200193 |
| Thing in Tha Hood | USTB11600128 |
| Things in Tha Hood | USTB11600119 |
| Things in Tha Hood | . |
| Think About It (feat. Hardboyz) | USTB11600290 |
| This About It feat. MC Breed (Original Mix) | USTB11200097 |
| This Here Thangm | USTB11200219 |
| This is a Stick Up (Original Version) | US25T9920762 |
| This is How We Do It 1 | USTB11600104 |
| This is How We Do It 2 | USTB11600111 |
| This is Not 4 Free(Radio Mix) | USTB11200121 |
| This is Not 4 Free feat. Kilo (Original Mix) | USTB11200116 |
| Thug Promise (Original Mix) | USTB11200136 |
| Thugz Like Us (Original Mix) | USTB11200098 |
| Tight | US8924960010 |
| Time to Go Legit (Original Mix) | US25T9920870 |

| | |
|---|---|
| Time to Play | USTB11600084 |
| To the Beat to the Bass | USTB11200234 |
| Trapped(Original Mix) | USTB11200197 |
| Trapped in the Game | |
| Trapped in the Game (feat. Spice 1) | USTB11600076 |
| Trapped Remix feat. Spice 1 (Original Mix) | USTB11200104 |
| Tricks (feat. Too $hort) | US25T9920844 |
| Tricky Brothers | USTB11200226 |
| Try Me Dog (Original Mix) | USTB11200137 |
| U-Eh (Original Mix) | USTB11200180 |
| Underground Address | USTB11600099 |
| Underground Hitz | |
| Underground Slang | US25T9920780 |
| War Stories (Original Mix) | USTB11200105 |
| Warning feat. Dj Sticky Boots (Original Mix) | USTB11200122 |
| Watch Ya Back | USTB11600066 |
| Watch Yo Back | USTB11200213 |
| Watch Your Own Back | US25T9920821 |
| Watookmesolong (Original Mix) | US25T9920860 |
| We Be Spittin (Original Mix) | USTB11200095 |
| We Don't Need (Original Mix) | USTB11200083 |
| Westside Thing (Westside 4th Ward) (Original Mix) | USTB11200139 |
| What Dem Gon Do (Silent) | US25T9920761 |
| What They Want (Original Mix) | USTB11200117 |
| What You Want | USTB11600100 |
| What You Want feat. Bar-None & Von G (Original Mix) | USTB11200129 |
| What's the Biz Jones | USTB11200256 |

| | |
|---|---|
| Whenever You Want Me | USTB11600095 |
| Who Do You Fear (Original Mix) | USTB11200099 |
| Who U Fuck'n Wit | USTB11600038 |
| Why You Hatin' feat. Jason, Coop & Mikes (Original Mix) | USTB11200125 |
| Will I See (Original Mix) | USTB11200194 |
| With Me or Against Me (Original Mix) | USTB11200091 |
| Womb to the Tomb feat Raise Up Clique (Original Mix) | USTB11200133 |
| Work It From the Bottom | US25T9920847 |
| You Can Get the Dick | USTB11600126 |
| You Got to Be Real | USTB11200225 |
| Young Lungs | USTB11600027 |
| Zoning (feat. Sho Dawg) (Original Mix) | USTB11200173 |

Document Ref: ZA4J9-QQRPO-PUAC7-RLF6X

# Signature Certificate

Document Ref.: ZA4J9-QQRPO-PUAC7-RLF6X

Document signed by:



**Gary Young**

Verified E-mail:
gary@royaltyexchange.com

107.77.198.81    26 Jul 2018 19:44:13 UTC



*Gary Young*



**Leroy Mcmath**

Verified E-mail:
leroy@wbaball.net

174.218.130.90    07 Aug 2018 18:11:02 UTC

*Leroy Mcmath*

Document completed by all parties on:
07 Aug 2018 18:11:02 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



# EXHIBIT "B"

# EXHIBIT "B"

# EXHIBIT "B"

09/20/2018

## Letter of Direction

To whom it may concern:

As of  September 20, 2018, Tommy Boy Distribution is hereby authorized and directed to pay to Royalty Exchange Inc. ("**Assignee**"), 100% of my interest in all "Net Receipts" as defined in and currently payable to me under my distribution agreement with you dated August 15, 2010 (attached for reference). This direction shall be irrevocable by me in perpetuity.

Payments to the Assignee should be delivered together with all statements and any other correspondence to the Assignee as follows:

Royalty Exchange Inc.
1550 Larimer St. #769
Denver, CO 80202
payments@royaltyexchange.com

Tommy Boy Distribution is also hereby authorized and directed to accept all future requests from the Assignee with regard to changes to the payee, bank details, and account information associated with the related payments.

Tommy Boy Distribution's compliance with this letter will constitute an accommodation solely to me. Tommy Boy Distribution shall have no liability by reason of any erroneous payment or any failure to comply with this letter. I will indemnify and hold Tommy Boy Distribution harmless against any and all claims asserted against Tommy Boy Distribution and shall reimburse Tommy Boy Distribution for any and all damages, losses, or expenses incurred by Tommy Boy Distribution by reason of any failure to comply, erroneous payment or otherwise in connection with this letter.

Sincerely,

*Leroy McMath*

Leroy McMath
Power Entertainment

# Signature Certificate

Document Ref.: LUCNN-7FG4W-YKZYS-CDTMC

Document signed by:



### Leroy Mcmath

Verified E-mail:
leroy@wbaball.net

65.82.136.222    Date: 20 Sep 2018 21:03:15 UTC

*Leroy Mcmath*

Document completed by all parties on:
20 Sep 2018 21:03:15 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



# EXHIBIT "C"

# EXHIBIT "C"

# EXHIBIT "C"

# PURCHASE AGREEMENT

This purchase agreement is dated 12/06/2018 , and is between Matthew Smith ("**Seller**") whose address is 2472 S. Josephine Street Denver, CO 80210 and Matthew Peach ("**Purchaser**") whose address is Flat 440 Nell Gwynn House, London, SW3 3BB, United Kingdom

The parties agree as follows:

**1.    Assignment.**

  **1.1**    Effective December 6, 2018 ("**Effective Date**") and in consideration of the Purchase Price in Section 2, Seller hereby assigns to Purchaser 100% of Seller's interest in the rightsholder's share of all royalties attributable to the related Works ("**Assigned Royalties**"). "**Works**" are the sound recordings listed in Attachment A.

  **1.2**    Seller shall direct its royalty distributor, Tommy Boy ("**Distributor**"), and any other paying entity to pay the Assigned Royalties directly to Purchaser or Purchaser's administrator. Seller shall execute any document required by any paying entity necessary to assign the Assigned Royalties.

  **1.3**    The term of this assignment is for the full duration of Seller's interest in the copyright of the Works, including any extensions and renewals.

  **1.4**    This assignment is for the right to receive income only, and is not an assignment of whole or partial ownership or control of the copyright in the Works. This assignment is subject to the terms and conditions of Seller's membership with Seller's Distributor and the Distributor's rules and regulations.

  **1.5**    The assignment includes the right to receive all income earned from any source with respect to the Assigned Royalties that has not been received by Seller prior to the Effective Date and a 100% share of all existing or potential causes of action including, without limitation, those for infringement, underpayment or non-payment of the Assigned Royalties. The assignment also includes the right to receive the Assigned Royalties from any current or future income source, unless specifically excluded in Section 1.1.

**2.    Purchase Price.** Purchaser agrees to pay Seller U.S. $415,000 as the purchase price for the Assigned Royalties (the "**Purchase Price**") to be held in escrow until completion of the

transaction.

## 3.    Seller's Obligations and Statements of Fact.

**3.1**    Seller is the sole owner of its interest in the Assigned Royalties and has full authority to enter this agreement and perform its obligations. The Assigned Royalties are free and clear from all encumbrances and to Seller's knowledge the performance of its obligations does not infringe the rights of any third party. No person holds a power of attorney on Seller's behalf affecting the assigned interest.

**3.2**    Seller is and shall remain a member in good standing with its Distributor and has not and shall not do anything that would impair Purchaser's right to receive the Assigned Royalties. Promptly after the Effective Date, Seller shall take all actions necessary to enable Purchaser to notify Seller's Distributor or any other paying entity that the Seller's rights have been assigned to Purchaser.

**3.3**    No one has or may validly claim a reversionary interest in any of the Assigned Royalties prior to the expiration of the copyrights and no valid adverse claim exists with respect to the Assigned Royalties or any other rights assigned by Seller. Seller is not bound by any action or agreement that would prevent it from performing its obligations and no current or prior employee of Seller has any actual or potential claim against Seller or the Assigned Royalties that would in any way impair the rights being assigned to Purchaser.

**3.4**    All material conditions to the assignment have been satisfied including, without limitation, the obtaining of any approval, the giving of any notice, the making of any filing, and the satisfying of any payments or claims of any third party. No third party has a right of first refusal with respect to the Assigned Royalties.

**3.5**    All taxes accrued or owing through the date of execution of this agreement related to the Assigned Royalties, including without limitation any sales or transfer taxes resulting from the transaction, if any, have been or will be paid by Seller.

**3.6**    Seller acknowledges that an administrator may collect the Assigned Royalties on Purchaser's behalf. If Seller ever intends to re-register, remove, move, re-direct or disassociate any of the Works from Seller's Distributor or any other entity that pays the Assigned Royalties to Purchaser as of the Effective Date, Seller shall send written notification to Purchaser and Purchaser's administrator 60 days prior to any change. Notice shall include the titles of all of the Works that are the subject matter of the change and the particular change to be made. Seller

shall cooperate with Purchaser and Purchaser's administrator and take whatever actions are necessary so that the Assigned Royalties will continue to be paid to Purchaser or Purchaser's administrator uninterruptedly. Any royalties collected by Seller after such a change that should have been paid to Purchaser or Purchaser's administrator per this agreement shall be paid directly to the Purchaser by the Seller no later than 15 days after Seller's receipt. Any delay in payment of royalties to the Purchaser will be subject to payment of interest at a rate of 2% per month.

3.7     If Purchaser's administrator is not available or no longer functions as Purchaser's administrator, Seller shall communicate directly with Purchaser with regard to all aspects of this agreement.

3.8     Seller has not and will not enter into any agreement with respect to the Works or the Assigned Royalties that would conflict with the terms of this agreement. Seller has not settled any claim nor waived any right and will not settle any claim or waive any right concerning any of the Assigned Royalties or the Works that would conflict with the terms of this agreement.

4.     **Purchaser's Statement of Fact and Acknowledgment.** Purchaser states that it has the full authority to enter and perform its obligations under this agreement. Purchaser acknowledges that Seller's Distributor or other paying entity may need to approve the assignment and may not prorate royalty payments earned before and after the Effective Date. Therefore, Purchaser may not receive payment from the Distributor or other paying entity until the next accounting statement after the Effective Date, and may need to rely on Section 6 for any post-Effective Date payments sent to Seller.

5.     **Income After Assignment.** All of the Assigned Royalties paid after the Effective Date, regardless of when earned or when the performances from which such royalties derive occurred, are the sole property of Purchaser. If any such sums are received by or on behalf of Seller after the Effective Date, Seller shall transmit or cause the recipient to transmit the Assigned Royalties immediately upon receipt to Purchaser. All such sums not transmitted within 15 days after receipt shall accrue interest at the rate of 2% per month.

6.     **Indemnity.** Seller shall indemnify Purchaser and Purchaser's administrator against all losses and liabilities, including reasonable attorneys' fees, related to any alleged breach of, or failure by Seller to perform any of Seller's obligations under this agreement. Purchaser or Purchaser's administrator shall notify Seller of any claim presented to Purchaser or Purchaser's administrator by a third party and Seller shall have the right to participate in the defense of any such claim with counsel of Seller's choosing at Seller's sole cost and expense.

**7.    Additional Documents and Power of Attorney.** Upon execution of this agreement and upon any change in the paying entity for the Assigned Royalties, Seller shall promptly, at Purchaser's request, execute all documents necessary to allow Purchaser to receive the Assigned Royalties ("**Transfer Documents**"). If Purchaser requests Seller to execute a Transfer Document and Seller fails to execute the document within 14 days after the request, Seller appoints Purchaser, as Seller's true and lawful attorney, to execute all Transfer Documents in Seller's name. Purchaser shall deliver to Seller copies of all Transfer Documents executed by Purchaser in the exercise of the power of attorney. The power of attorney granted to Purchaser is limited and specific to Transfer Documents.

**8.    Fees.** The parties may have separate agreements with Royalty Exchange with respect to all fees payable to Royalty Exchange. The parties acknowledge that any fee charged to the Seller shall be paid to Royalty Exchange out of the Purchase Price, and any fee charged to the Purchaser shall be paid to Royalty Exchange in addition to the Purchase Price.

**9.    Notices.** Any notice required by this agreement shall be in writing and sent to the address in the introductory clause unless the party has given a new address to the other party.

**10.    Entirety and Amendment.** This agreement constitutes the entire understanding of the parties and no amendment will be valid unless it is in writing and signed by both parties.

**11.    Attorneys' Fees.** If any proceeding is brought for the enforcement of this agreement, or because of a dispute in connection with any of its provisions, the prevailing party is entitled to recover reasonable attorneys' fees and other costs incurred in the proceeding, in addition to any other relief to which it may be entitled.

**12.    Binding Upon Successors.** This agreement is binding upon and inures to the benefit of the successors, assigns, heirs, executors and legal representatives of the parties.

**13.    Expenses.** The parties shall pay all of their own costs and expenses (including legal fees) in performing due diligence and in negotiating and performing their obligations under this agreement.

**14.    Confidentiality.** Except as otherwise required by law, the parties shall not, without the other party's written consent, disclose to any third party any confidential information supplied by the other party in connection with this agreement, except that such confidential information may

be disclosed to either party's counsel, accountants and other professionals on a need-to-know basis related to this agreement.

**15.     Representation By Legal Counsel.** The parties acknowledge that they have had the opportunity to retain legal counsel with respect to this agreement and any choice by either party not to be represented is made independently.

The parties are signing this agreement on the date stated in the introductory clause.


By:     *Matthew Smith*

        Matthew Smith



By:     *Matthew Peach*

        Matthew Peach

## Attachment A

The Works

Document Ref: JIGR3-NQUVC-VKUB8-O3XXQ

| Release Title | Release Type | UPC | ISRC |
|---|---|---|---|
| #1 Suspect | Track | | USTB11200255 |
| (How Ya Gonna) Jacka Jacka | Track | | USTB11600074 |
| 2 for the Show | Album | 661868011463 | |
| 2 Much Booty (Original Mix) | Track | | USTB11200182 |
| 20 Below | Track | | USTB11600087 |
| 20 Below | Album | 661868011166 | |
| 2-2 Da Chest (feat. DFC) | Track | | USTB11600284 |
| 2-2 the Chest | Track | | USTB11600121 |
| 2-2 The Chest (Original Mix) | Track | | USTB11200076 |
| 3 Counts (Original ) | Track | | US25T9920732 |
| 365 Days | Track | | USTB11600060 |
| 4 Niggas in 1 (feat. Loose Screws & D.F.C.) | Track | | USTB11600075 |
| A Favor (feat. Guce) (Original Mix) | Track | | USTB11200174 |
| A Piece of Mind (Intro) | Track | | USTB11600115 |
| About the Author (Original Mix) | Track | | USTB11200013 |
| Acknowledgements (Original Mix) | Track | | USTB11200001 |
| Ain't 2 Good | Track | | US25T9920824 |
| Ain't No Future In Yo' Frontin' | Track | | US25T9920783 |
| Ain't No Love (Original ) | Track | | US25T9920811 |
| Ain't No Superman (Original Mix) | Track | | US25T9920832 |
| Ain't to be Fucked With | Track | | USTB11600086 |
| Ain't Too Much Worried | Track | | USTB11600091 |
| All About Comin' Up | Album | 892496001049 | |
| All About Comin' Up (Original Mix) | Track | | US25T9920853 |
| All My Niggas (Original ) | Track | | US25T9920813 |
| All Out (Original Version) | Track | | US25T9920763 |
| And Da Street Muthaf*ckas | Album | 661868004267 | |
| Another Weekend Night | Track | | USTB11200236 |
| Armed Robbery | Track | | USTB11600072 |
| Armed Robery (Original ) | Track | | US25T9920738 |
| At 2 O'Clock (Original ) | Track | | US25T9920740 |
| A-Town | Track | | US25T9920777 |
| A-Town Hard Heads | Album | 892496001087 | |
| A-Town Hard Heads (Original ) | Track | | US25T9920733 |
| A-Town Hard Heads (Original Mix) | Track | | USTB11200199 |
| B.R. Double E.D. | Track | | USTB11600113 |
| Baby Come To Me (feat. Alexander O'Neal) (Original Mix) | Track | | USTB11200022 |
| Babysittin' (Original Mix) | Track | | USTB11200140 |
| Back to the States | Track | | USTB11200203 |
| Back Up in Ya! | Track | | USTB11600110 |
| Bad to the Bone | Track | | USTB11200233 |
| Ball Ball (Original ) | Track | | US25T9920810 |
| Ballin (Original ) | Track | | US25T9920806 |
| Band to Dis (feat. Butch Cassidy) (Original Mix) | Track | | USTB11200165 |
| Bang with Me (feat. Black Mafia Family) (Original Mix) | Track | | USTB11200177 |
| Bass Kings Volume 1 | Album | 661868005066 | |
| Be Myself | Track | | USTB11600093 |
| Better Now (feat. Big Mike) | Track | | USTB11600288 |
| Better Terms | Track | | US25T9920785 |
| Beyond the Millenium (Original Mix) | Track | | USTB11200088 |
| Big Fishes (feat. Messy Marv) (Original Mix) | Track | | USTB11200166 |
| Big Mama (Original Mix) | Track | | USTB11200119 |
| Bitches (feat. Too Short & Richie Rich) (Original Mix) | Track | | USTB11200138 |

Document Ref: JIGR3-NQUVC-VKUB8-O3XXQ

| | | | |
|---|---|---|---|
| Black For Black | Track | | US25T9920788 |
| Black Widow (with X-2-C) | Track | | USTB11200227 |
| Blunted Up (Original Mix) | Track | | US25T9920881 |
| Blunted Up (Skit) | Track | | US25T9920750 |
| Boddies on My 9 (Original Mix) | Track | | US25T9920748 |
| Bodies on My 9 | Track | | USTB11200257 |
| Body on My 9 (Original Mix) | Track | | USTB11200072 |
| Bonus Track (Original ) | Track | | US25T9920815 |
| Bonus Track (Original ) | Track | | US25T9920814 |
| Bonus Track (Original Version) | Track | | US25T9920766 |
| Boom Boom | Track | | US25T9920852 |
| Boom Boom Bomb | Track | | US25T9920904 |
| Boot Up (Who Ya Wit) | Track | | US25T9920901 |
| Boss Bitch (Original Mix) | Track | | USTB11200130 |
| Bounce 2 This (Groove) (Original Mix) | Track | | USTB11200158 |
| Bouncin to a Murder (Original Mix) | Track | | US25T9920838 |
| Bouncing to a Murder | Track | | USTB11200260 |
| Break Yourself | Track | | USTB11600109 |
| Breakout (Original Mix) | Track | | USTB11200089 |
| Bring it On (Original Mix) | Track | | USTB11200151 |
| Bump That Rump | Track | | US25T9920897 |
| Bump that Rump (Original Mix) | Track | | USTB11200184 |
| Business Never Personal | Track | | US25T9920849 |
| Busta Free (Original Mix) | Track | | USTB11200087 |
| Call it What You Want (Remix) | Track | | USTB11200167 |
| Can't Mess Wit Me (Original Mix) | Track | | US25T9920880 |
| Can't Nobody do it Better feat. Corrosion & Kokaine (Original Mix) | Track | | USTB11200135 |
| Caps Get Peeled | Track | | USTB11600117 |
| Caps Get Peeled (Original Mix) | Track | | USTB11200067 |
| Carolina Backwoods (Original Mix) | Track | | USTB11200093 |
| Carolina Bounce | Track | | USTB11600042 |
| Ch 1: The Game (Original Mix) | Track | | USTB11200004 |
| Ch 2: How Labels Grow (Original Mix) | Track | | USTB11200005 |
| Ch 3: Finding the Right Artist (Original Mix) | Track | | USTB11200006 |
| Ch 4: Artist Advances (Original Mix) | Track | | USTB11200007 |
| Ch 5: Calling the Shots (Original Mix) | Track | | USTB11200008 |
| Ch 6: Marketing Your Label and Your Artist (Original Mix) | Track | | USTB11200009 |
| Ch 7: Distribution (Original Mix) | Track | | USTB11200010 |
| Ch 8: Becoming a Music Millionaire (Original Mix) | Track | | USTB11200011 |
| Ch 9: Final Words (Original Mix) | Track | | USTB11200012 |
| Chromotose in the Brain (Original Mix) | Track | | US25T9920830 |
| Clean Getaway (Original Version) | Track | | US25T9920759 |
| Cock it Man (Original Mix) | Track | | USTB11200132 |
| Come Real (Original Mix) | Track | | USTB11200198 |
| Comin' Real Again | Track | | US25T9920819 |
| Commercial | Track | | US25T9920898 |
| Comtemplated the Crime (Original Mix) | Track | | USTB11200090 |
| Conclusion (feat. Too Short) | Track | | USTB11600289 |
| Connections | Track | | USTB11200210 |
| Connections | Track | | USTB11200208 |
| Controversee (Start) | Track | | US25T9920902 |
| Controversee...That's Life...And That's the Way It Is | Album | 892496001353 | |
| Controversey | Track | | USTB11600035 |
| Conversations | Track | | US25T9920822 |

Document Ref: JIGR3-NQUVC-VKUB8-O3XXQ

| | | | |
|---|---|---|---|
| Cost to be the Boss | Track | | US25T9920775 |
| Creep | Track | | USTB11600033 |
| Creep wit a Nigga (feat. Lil Tee) (Original Mix) | Track | | US25T9920744 |
| Creepin (Original Version) | Track | | US25T9920765 |
| Creepin' feat. Corrosion (Original Mix) | Track | | USTB11200131 |
| Crime Buddies | Album | 661868004960 | |
| Crime Buddies (Original Mix) | Track | | USTB11200179 |
| Crimminal Behavior (Original ) | Track | | US25T9920735 |
| Cut Up | Track | | US25T9920910 |
| Da Bomb | Track | | USTB11600127 |
| Da Dip | Ringtone | | USTB11004101 |
| Da Dip | Ringback | | USTB11004102 |
| Da Dip | Single | 892496000165 | |
| Da Dip | UGM | | USTB11004103 |
| Da Dip | Track | | USTB11004112 |
| Da' Dip | Track | | US25T9920900 |
| Da Mississippi Pop | Track | | USTB11200244 |
| Dance the Way You Like Making Love | Track | | USTB11200240 |
| Dayton Don't Play (Original Mix) | Track | | US25T9920871 |
| Daze of Old (Original Mix) | Track | | USTB11200084 |
| Dead Presidents | Track | | USTB11200258 |
| Dead Presidents (Original Mix) | Track | | US25T9920749 |
| Dead Presidents (Original Mix) | Track | | USTB11200078 |
| Deadly Verses | Track | | USTB11200248 |
| Deadly Verses | Album | 892496001063 | |
| Deadly Verses (feat. The Villian) (Original Mix) | Track | | US25T9920791 |
| Deadly Verses (Original Mix) | Track | | USTB11200066 |
| Deadly Verses '97 (feat. Lil Tee) (Original Mix) | Track | | US25T9920753 |
| Death B4 Dishonesty | Track | | USTB11600122 |
| Death Row (Original ) | Track | | US25T9920741 |
| December 31, 1999 | Album | 661868010763 | |
| December 31, 1999 | Track | | USTB11600040 |
| Dedication (Original Mix) | Track | | US25T9920893 |
| Dedication (Original Mix) | Track | | US25T9920864 |
| Deejays Get Lonely Too | Track | | USTB11200242 |
| Deep Deep South | Track | | US25T9920908 |
| Deep in the Game - The Soundtrack | Compilation | 664602600022 | |
| Digga Bigga Ditch | Track | | USTB11600125 |
| Dirty Mouth | Track | | US25T9920896 |
| Dis is for Dem Booty Shakers | Track | | USTB11200239 |
| Dis Mode | Track | | USTB11600088 |
| Do it Again | Track | | USTB11200231 |
| Do Thang (Original ) | Track | | US25T9920805 |
| Do What U Feel (Freaky Mix) | Track | | USTB11200155 |
| Do What U Feel (Original Mix) | Track | | USTB11200161 |
| Donnie Damon | Track | | USTB11600052 |
| Don't (Original Mix) | Track | | USTB11200018 |
| Down Low (Remix) | Track | | US25T9920903 |
| Downtown Glory | Track | | US25T9920779 |
| Draw the Line | Album | 892496001001 | |
| Draw the Line | Track | | US25T9920773 |
| Dreaming (Replay Version of Am I Dreaming) | Track | | USTB11200211 |
| Drug Dealer (Original Mix) | Track | | US25T9920866 |
| Empty tha Clip (Original Mix) | Track | | US25T9920746 |

| | | | |
|---|---|---|---|
| Everyday Ho | Track | | US25T9920823 |
| Everyday Thang in Da Hood | Track | | US25T9920769 |
| Everyday Thang in Da Hood (feat. Ghetto Mafia) | Track | | USTB11600286 |
| Everyday Thing (Original Mix) | Track | | USTB11200150 |
| Ez Pimpin (Original ) | Track | | US25T9920729 |
| F*ckie S*ckie (At Freaknasty Party) | Track | | US25T9920909 |
| F.A.N.G. feat. Shoestring from the Dayton Family & D.F.C. (Original Mix) | Track | | US25T9920875 |
| Facts of Life | Track | | US25T9920776 |
| Fake as a Snack Cake (Original Mix) | Track | | US25T9920829 |
| Family Touchings | Track | | USTB11200218 |
| Fang (Original Mix) | Track | | US25T9920831 |
| Fatal Attraction (Original Mix) | Track | | US25T9920861 |
| First Blow (Original Mix) | Track | | USTB11200092 |
| Flashbacks | Track | | US25T9920818 |
| Flash's Groove | Track | | USTB11600090 |
| Flava Uv Phony | Track | | USTB11600112 |
| Fletch (Original ) | Track | | US25T9920731 |
| Flint Thug Compilation | Album | 892496001162 | |
| Flipside (feat. S. Knight) (Original Mix) | Track | | USTB11200171 |
| Frankie Leg | Video | 661868001969 | USTB11104213 |
| Frankie Leg (Radio Edit) | Track | | USTB11104206 |
| Frankie Leg (Radio Edit) | Ringback | | USTB11104212 |
| Frankie Leg (Radio Edit) | Single | 661868001761 | |
| Friendz | Track | | USTB11600064 |
| Fuck' Em All | Track | | USTB11200222 |
| Fuck Everybody (Original ) | Track | | US25T9920812 |
| Fuck Whatcha Talkin Bout (Original Mix) | Track | | USTB11200178 |
| Full Blooded Niggaz | Album | 892496001025 | |
| Funkafied | Album | 661868011265 | |
| G State Soldier | Track | | USTB11600082 |
| Game First (Original ) | Track | | US25T9920808 |
| Gangsta Boogie (Original Mix) | Track | | US25T9920859 |
| Gangsta Gansta (Original Mix) | Track | | USTB11200145 |
| Gangsta Groove (Original Mix) | Track | | US25T9920856 |
| Gangsta Luv (Original Mix) | Track | | US25T9920888 |
| Gangsta Shit | Track | | US25T9920843 |
| Gangsta's Need Love 2 | Track | | USTB11200250 |
| Gangstas Need Love Too (Original Mix) | Track | | US25T9920862 |
| Get Away | Track | | USTB11600037 |
| Get Down on It (Original Mix) | Track | | USTB11200185 |
| Get Heated (Original Mix) | Track | | USTB11200065 |
| Get It How U Live | Track | | USTB11600029 |
| Get Loose | Track | | US25T9920787 |
| Get Off | Track | | USTB11200232 |
| Get Ya Weight Up | Track | | USTB11200262 |
| Getting' Money (Original Mix) | Track | | USTB11200186 |
| Ghetto World | Track | | USTB11600080 |
| Goin' Way Out feat. Shoestring (Original Mix) | Track | | US25T9920867 |
| Good Cop Bad Cop | Track | | USTB11600054 |
| Good Fellas (Original Mix) | Track | | US25T9920840 |
| Good Girl Gone Bad | Track | | USTB11600050 |
| Gotta Get Mine | Track | | US25T9920817 |
| Gotta Get Mine (feat. 2Pac) | Track | | USTB11600281 |
| Gotta Get Mine (feat. Tupac) (Remix) | Track | | US25T9920842 |

| | | | |
|---|---|---|---|
| Gotta Get Mine (Remix) | Track | | US25T9920809 |
| Great Depressioin | Track | | USTB11600094 |
| Greatest Hits: His Deadliest Verses | Compilation | 661868005561 | |
| Grind, Grind (Original Mix) | Track | | USTB11200112 |
| Groupies (Original ) | Track | | US25T9920736 |
| Groupies (Original Mix) | Track | | USTB11200200 |
| Guanja | Track | | US25T9920789 |
| Hands on My Nine | Track | | USTB11600123 |
| Hard Hitters | Track | | USTB11600056 |
| Haters Keep Hating | Track | | USTB11600058 |
| Have This Ever Happened 2-U | Track | | US25T9920907 |
| Heads or Tails | Track | | USTB11600036 |
| Heaven or Hell (Original Mix) | Track | | US25T9920800 |
| Hell Bound (Original Mix) | Track | | USTB11200102 |
| Here Comes the Mack | Track | | USTB11200214 |
| Here They Come (Original Mix) | Track | | USTB11200103 |
| Here They Come (Original Mix) | Track | | USTB11200196 |
| Hey | Track | | USTB11600032 |
| Hoez in the Club  (Original Mix) | Track | | USTB11200120 |
| Hold Yo Nuts (Original Mix) | Track | | US25T9920828 |
| Homicidal Lifestyle | Album | 892496001018 | |
| Homicidal Lifestyle (Original Mix) | Track | | US25T9920882 |
| Homicidal Lifestyle (Original Mix) | Track | | US25T9920751 |
| Homicidal Lifestyle (Original Mix) | Track | | USTB11200077 |
| Homicidal Lifestyles | Track | | USTB11200252 |
| Homie, You Ain't Got an Ounce of Mac in You | Track | | USTB11200224 |
| Hott (feat. Sons of Funk) (Original Mix) | Track | | USTB11200175 |
| How Deep is Yo Luv (feat. Hollo Point) (Original Mix) | Track | | US25T9920747 |
| I Ain't Going Down (Original Version) | Track | | US25T9920758 |
| I Am (feat. Philley 45) (Original Mix) | Track | | USTB11200163 |
| I Got it Like That (Original Mix) | Track | | USTB11200153 |
| I Got to be a Millionsire | Track | | USTB11200212 |
| I Got What You Want (Original Mix) | Track | | USTB11200114 |
| I Got's No Love (Original Mix) | Track | | USTB11200118 |
| I Keeps it Real | Track | | USTB11200207 |
| I Now Know (Original Mix) | Track | | USTB11200106 |
| I Told You (Original Mix) | Track | | USTB11200127 |
| I Wanna Smoke | Track | | USTB11200251 |
| I Wanna Smoke (feat. Psycho) (Original Mix) | Track | | US25T9920754 |
| I Wanna Smoke (feat. Psycho) (Original Mix) | Track | | US25T9920792 |
| I Wanna Smoke (Original Mix) | Track | | USTB11200070 |
| I Wanna Smoke (Remix) | Track | | US25T9920743 |
| I Want to F*ck | Track | | US25T9920895 |
| I Will Excell | Track | | US25T9920786 |
| I'll Na Na (Original Mix) | Track | | USTB11200189 |
| I'm Still The Gangsta (Original Mix) | Track | | US25T9920855 |
| In Decatur | Track | | USTB11600061 |
| In My Shoes | Track | | USTB11600025 |
| In the Doe | Track | | USTB11200215 |
| Instructions (Original Mix) | Track | | US25T9920742 |
| Interlude (Original Mix) | Track | | USTB11200020 |
| Interlude (Original Mix) | Track | | US25T9920869 |
| Into My Eyes (Original Mix) | Track | | USTB11200024 |
| Intro | Track | | US25T9920894 |

| Intro | Track | | US25T9920767 |
|---|---|---|---|
| Intro | Track | | US25T9920816 |
| Intro | Track | | US25T9920841 |
| Intro | Track | | USTB11200237 |
| Intro | Track | | USTB11600039 |
| Intro (Original Mix) | Track | | USTB11200014 |
| Intro (Original Mix) | Track | | US25T9920865 |
| Intro (Original Mix) | Track | | US25T9920877 |
| Intro (Original Mix) | Track | | US25T9920827 |
| Intro (Original Mix) | Track | | USTB11200149 |
| Intro (Original Mix) | Track | | USTB11200064 |
| Intro (Original Mix) | Track | | USTB11200110 |
| Intro feat. Raise Up Clique (Original Mix) | Track | | USTB11200123 |
| Introduction (Original Mix) | Track | | USTB11200080 |
| Introduction (Original Mix) | Track | | USTB11200003 |
| It's All Good | Track | | US25T9920845 |
| It's All Good | Album | 661868003161 | |
| It's Me (Original Mix) | Track | | USTB11200156 |
| Jackin' Anonymous | Track | | USTB11200217 |
| Jealous Pimp | Track | | USTB11600097 |
| Job Corp | Track | | US25T9920781 |
| Jock Itch (Original ) | Track | | US25T9920730 |
| Jump-Bounce | Track | | USTB11600028 |
| Just Another Clip | Track | | US25T9920820 |
| Just Kickin It | Track | | US25T9920784 |
| Just Tell Me (Original Mix) | Track | | USTB11200017 |
| Just the Way I Like It | Track | | USTB11200230 |
| Just the Way I Like It | Album | 661868005363 | |
| K.G. Pheeno G. and Charles | Track | | USTB11600062 |
| Kakilak | Track | | USTB11600051 |
| Keep it Real (Original Mix) | Track | | USTB11200154 |
| Killa (Skit) | Track | | US25T9920745 |
| Killa Killa (Original Mix) | Track | | US25T9920798 |
| Knees & Boes (Original Mix) | Track | | USTB11200188 |
| Late Night | Track | | USTB11600044 |
| Late Night Creep (Booty Call) | Track | | USTB11600102 |
| Lawless (Original Mix) | Track | | US25T9920868 |
| Lay Me Down (feat. Lil Tee) (Original Mix) | Track | | US25T9920752 |
| Let It Flow | Track | | US25T9920884 |
| Let It Flow (Original Mix) | Track | | US25T9920884 |
| Let It Go (Original Mix) | Track | | USTB11200026 |
| Let Me See Ya Pump It | Track | | USTB11200238 |
| Lets Get it Crackin (feat. Nate Dogg) (Original Mix) | Track | | USTB11200168 |
| Lets Go To Da Club | Track | | US25T9920848 |
| Let's Go to Da Club (feat. Erotic D) | Track | | USTB11600291 |
| Let's Ride | Track | | USTB11200209 |
| Let's Roll (Original Mix) | Track | | USTB11200107 |
| Lets Straighten It Out (Original Mix) | Track | | USTB11200109 |
| Letter from War | Track | | USTB11600043 |
| Life of a Flintstone | Track | | USTB11600096 |
| Life of a Sniper | Track | | US25T9920768 |
| Lil' Power (Original Mix) | Track | | USTB11200157 |
| Listen to 'Em Rumors (Original Mix) | Track | | USTB11200096 |
| Little Child Running Wild | Track | | USTB11600089 |

| Lock Down | Track | | USTB11200220 |
|---|---|---|---|
| Lost Cause (Original Mix) | Track | | USTB11200108 |
| Love the Doe | Track | | USTB11600024 |
| Luv Ones (feat. Delinquents) (Original Mix) | Track | | USTB11200169 |
| M.C. Breed & DFC | Album | 892496001056 | |
| M.C. Breed Presents The Thugz - Volume 1 | Album | 661868004762 | |
| Mack the Jack A Mack the Jack A (Original Mix) | Track | | USTB11200143 |
| Mack the Jack'A | Track | | USTB11200204 |
| Memory Lane | Track | | USTB11600030 |
| Mission to Nowhere (Original ) | Track | | US25T9920737 |
| Mo' Love | Track | | USTB11600118 |
| Mo Money (Paycheck & M.C. Breeed) (Original Mix) | Track | | USTB11200142 |
| Mo Money to Get (feat. Paycheck) | Track | | USTB11600283 |
| Mo Murder (Original Mix) | Track | | US25T9920799 |
| Money Holders   (Original Mix) | Track | | USTB11200191 |
| Money Holders (feat. Mr. No Love) (Original Mix) | Track | | USTB11200148 |
| Money In My Live (Original ) | Track | | US25T9920802 |
| Money, Mack, Murder (Original Mix) | Track | | US25T9920834 |
| More Power | Track | | US25T9920790 |
| Move that Body | Track | | USTB11200235 |
| Mr. President | Track | | US25T9920771 |
| Murder Music | Track | | USTB11600031 |
| Murdur (Original Mix) | Track | | US25T9920755 |
| My Day (Original Mix) | Track | | USTB11200069 |
| My Life is a Battlefield | Track | | USTB11200206 |
| My Name Ain't Rover (Original Mix) | Track | | US25T9920863 |
| My Neighborhood (Original Mix) | Track | | US25T9920858 |
| My Own Boss (Original Mix) | Track | | US25T9920836 |
| Nails Did | Track | | USTB11600070 |
| Nails Did | Track | | USTB11600067 |
| Nails Did | Track | | USTB11600069 |
| Nails Did | Track | | USTB11600068 |
| Nails Did | Track | | USTB11600071 |
| Nails Did (Original Mix) | Track | | USTB11200181 |
| Natural High (Original Mix) | Track | | US25T9920891 |
| Never Leave You Lonely (Original Mix) | Track | | USTB11200023 |
| Next Stop the Ghetto | Album | 661868004564 | |
| Next Stop The Ghetto (Original Mix) | Track | | USTB11200111 |
| Next To You (Original Mix) | Track | | USTB11200021 |
| Niggas in the Street | Track | | USTB11600081 |
| Night Rider | Track | | USTB11600046 |
| No Frontin' Allowed | Track | | USTB11600092 |
| No Future (feat. Bootleg & M.C. Breed) (Original Mix) | Track | | USTB11200146 |
| No Future (feat. Bootleg) | Track | | USTB11600287 |
| No Local (Original ) | Track | | US25T9920804 |
| O.J. Murder Story | Track | | USTB11200254 |
| O.J. Murder Story (Original Mix) | Track | | US25T9920797 |
| Oh!, Oh!, Oh! (Original Mix) | Track | | USTB11200183 |
| Ol' School | Track | | USTB11600114 |
| On My Mind (Time After Time) (Original Mix) | Track | | USTB11200152 |
| On Our Job (feat. 504 Riders) (Original Mix) | Track | | USTB11200164 |
| On the Edge (Original Mix) | Track | | US25T9920837 |
| One Less B---- | Track | | US25T9920778 |
| One Time | Track | | USTB11600105 |

Document Ref: JIGR3-NQUVC-VKUB8-O3XXQ

| | | | |
|---|---|---|---|
| Only Time Will Tell (Original Mix) | Track | | USTB11200190 |
| Organized Crime | Track | | US25T9920772 |
| Organized Crime (Original Version) | Track | | US25T9920760 |
| Out 2 Get Rich | Album | 664602100027 | |
| Out 2 Get Rich (Original Mix) | Track | | US25T9920873 |
| Out of Bounds | Track | | USTB11200216 |
| Outro | Track | | US25T9920826 |
| Outro (Original Mix) | Track | | USTB11200028 |
| Outro (Original Mix) | Track | | USTB11200162 |
| Outro Groove | Track | | USTB11600085 |
| P.G.P.B. | Track | | US25T9920899 |
| P.M.S. feat. Ghetto E from The Dayton Family (Original Mix) | Track | | USTB11200100 |
| P.O.W. (Original Mix) | Track | | USTB11200094 |
| Pain | Track | | USTB11600041 |
| Party Time | Track | | USTB11200241 |
| Party Time | Album | 661868005462 | |
| Pass the Hooter | Track | | USTB11600120 |
| Pat is Back (Original Mix) | Track | | US25T9920796 |
| Payback is Hell | Track | | USTB11200228 |
| Payback's a Motherfucker (Original Mix) | Track | | US25T9920835 |
| Perfect Contender | Track | | USTB11600057 |
| Perfect Contender | Track | | USTB11600063 |
| Pillow Talk (Original Mix) | Track | | USTB11200025 |
| Pimpin Ain't Dead | Track | | USTB11200261 |
| Pimp'N Ain't Dead (Original Mix) | Track | | US25T9920890 |
| Players (Original ) | Track | | US25T9920739 |
| Pop that Booty | Track | | USTB11200247 |
| Potential Murder Suspects | Album | 661868004465 | |
| Preface (Original Mix) | Track | | USTB11200002 |
| Prelude (Original ) | Track | | US25T9920727 |
| Projects (Original Mix) | Track | | US25T9920793 |
| Provider (feat. Se) (Original Mix) | Track | | USTB11200144 |
| Psycho | Album | 661868004663 | |
| Psycho feat. Krazy Z (Original Mix) | Track | | USTB11200126 |
| Push 'Em Up (Original Mix) | Track | | USTB11200160 |
| Put Your Locs On | Track | | USTB11600116 |
| Raise Up Army feat. Corrosion (Original Mix) | Track | | USTB11200134 |
| Real Golddigger | Track | | USTB11200223 |
| Real G's Don't Die (Original Mix) | Track | | US25T9920885 |
| Real Motha ------ | Track | | US25T9920774 |
| Real Motha F..... (Original Version) | Track | | US25T9920764 |
| Rebel Slave | Album | 661868004366 | |
| Rebel Slave | Track | | USTB11600047 |
| Rebel Slave (feat. Southclick) | Track | | USTB11600285 |
| Rebel Slave (Original Mix) | Track | | USTB11200082 |
| Refuse to Loose (Original Mix) | Track | | US25T9920874 |
| Respect | Track | | US25T9920906 |
| Ride Or Die (Original ) | Track | | US25T9920801 |
| Roll with the Clan | Track | | USTB11600124 |
| Root of All Evil | Track | | USTB11600077 |
| Rule No. 1 (feat. Pimp C of UGK) | Track | | US25T9920850 |
| Rumors Pt. 1 | Track | | US25T9920905 |
| Rumors Pt. 2 | Track | | US25T9920911 |
| Saturday Love (feat. Alexander O'Neal) (Original Mix) | Track | | USTB11200027 |

| | | | |
|---|---|---|---|
| Sawed Off Pump | Track | | USTB11600073 |
| Scrilla | Track | | USTB11200221 |
| Sesshead Funk Junky (feat. 8-Ball & MJG) | Track | | USTB11600282 |
| Seven Years | Track | | USTB11600106 |
| Sex, Money & Murder | Track | | USTB11200259 |
| Sex, Money & Murder | Album | 892496001247 | |
| Sex, Money, Murder (Original Mix) | Track | | US25T9920887 |
| Sex, Money, Murder (Original Mix) | Track | | USTB11200073 |
| Shake Dem Silicone Titties | Track | | USTB11200243 |
| She Likes It (Skit) | Track | | US25T9920846 |
| Shootin' from the Hip | Track | | USTB11600108 |
| Shootin' On Narcs (Part II) | Track | | US25T9920886 |
| Shooting on Narcs | Track | | USTB11200249 |
| Shots of Fire | Track | | USTB11600049 |
| Shout Out | Track | | USTB11600098 |
| Show Me Whatcha Twerkin (Original Mix) | Track | | USTB11200176 |
| Shut'em Down (Original Mix) | Track | | USTB11200115 |
| Sick Psychotic Thoughts | Track | | USTB11600079 |
| Sick Psychotic Thoughts (Original Mix) | Track | | USTB11200192 |
| Sick Psychotic Thoughts (Original Mix) | Track | | USTB11200101 |
| Sign of the Times (Original Mix) | Track | | USTB11200081 |
| Simply Beautiful (Original Mix) | Track | | USTB11200086 |
| Skanless (feat. Breed Madam Dame & T-Double of DFC) (Original Mix) | Track | | USTB11200141 |
| Skat'n on Thin Ice (Original Mix) | Track | | USTB11200195 |
| Skit (Original Mix) | Track | | USTB11200074 |
| Slackin' on Yo Pimpin' (Original Mix) | Track | | USTB11200128 |
| Slack'N on Yo Pimpin' (feat. Boss Witch) (Original Mix) | Track | | USTB11200147 |
| Sleepin' With The Enemy (Original Mix) | Track | | USTB11200019 |
| Smoke | Track | | USTB11600045 |
| Smoke (Original Mix) | Track | | USTB11200085 |
| Smoke with a Nigga (Feat. Mr. Ku) | Track | | US25T9920851 |
| Smoke with the Devil (Original Mix) | Track | | US25T9920794 |
| Smokin' | Track | | USTB11600101 |
| Snap Shot (Original Version) | Track | | US25T9920757 |
| Some Folks | Track | | USTB11600055 |
| Something 2 Smoke 2 | Track | | US25T9920825 |
| Sounds Like a Busta (Original Mix) | Track | | USTB11200170 |
| South | Track | | USTB11600053 |
| Southern Poetry | Track | | USTB11600059 |
| Southside Player (Original Mix) | Track | | USTB11200071 |
| Special Delivery | Track | | US25T9920770 |
| Spend The Night (Original Mix) | Track | | US25T9920857 |
| Stay Away From Cali (Original Mix) | Track | | US25T9920854 |
| Still Breath | Track | | USTB11600023 |
| Stop Loving You (Original Mix) | Track | | USTB11200016 |
| Stop Poppin Shit (feat. The Outlaws) (Original Mix) | Track | | USTB11200172 |
| Street Mutha Fuckas (Original ) | Track | | US25T9920728 |
| Street Muthafuckas (Original Mix) | Track | | USTB11200079 |
| Streets is All I Know (Original Mix) | Track | | US25T9920833 |
| Streets is All I Know (Remix) | Track | | US25T9920876 |
| Strictly 4 My Folk | Track | | USTB11600065 |
| Strong In the Game (Original ) | Track | | US25T9920734 |
| Stupid (Original Mix) | Track | | US25T9920889 |
| Superfly | Track | | USTB11600083 |

| | | | |
|---|---|---|---|
| Survivor | Track | | USTB11600026 |
| Swang that Booty (Original Mix) | Track | | USTB11200187 |
| Swoke with a Nigga (Feat. Mr. Ku) | Track | | US25T9920851 |
| Take Yo Time (Original ) | Track | | US25T9920803 |
| Take Your Time to Do Right | Track | | USTB11200229 |
| Talk to the Hands | Track | | USTB11200245 |
| Teach My Kids | Track | | USTB11600103 |
| Tear Da Club Up (Original Mix) | Track | | USTB11200068 |
| Tear It Up (Original Mix) | Track | | USTB11200113 |
| Tear It Up feat. Corrosion (Original Mix) | Track | | USTB11200124 |
| Tear the Club Up | Track | | USTB11200253 |
| Tear the Club Up (Original Mix) | Track | | US25T9920795 |
| Tell Me Why | Track | | USTB11200205 |
| That Girl (Original Mix) | Track | | US25T9920879 |
| That Type (Original Mix) | Track | | US25T9920878 |
| That Type (Original Mix) | Track | | USTB11200159 |
| That Type Of Gangsta (Remix) | Track | | US25T9920892 |
| That's Life | Track | | US25T9920782 |
| The Best | Track | | USTB11600048 |
| The Chair (Original Version) | Track | | US25T9920756 |
| The Deal is Da Funk | Track | | USTB11600107 |
| The Game Ain't Change (Original ) | Track | | US25T9920807 |
| The Message | Track | | USTB11600034 |
| The Music Game: Playing to Win | Album | 661868002065 | |
| The New Breed | Album | 892496001032 | |
| The Projects (Original Mix) | Track | | USTB11200075 |
| The Right Time | Album | 661868002164 | |
| The Right Time (feat. Keith Murray) (Original Mix) | Track | | USTB11200015 |
| The Saga Continues (Original Mix) | Track | | US25T9920883 |
| The Thrill is Gone | Track | | USTB11200246 |
| The True Story | Album | 661868005264 | |
| The Way Life Goes (Original Mix) | Track | | US25T9920872 |
| Them Niggaz Lucky (Original Mix) | Track | | US25T9920839 |
| Thin Ice | Track | | USTB11600078 |
| Thin Line (Original Mix) | Track | | USTB11200193 |
| Thing in Tha Hood | Track | | USTB11600128 |
| Things in Tha Hood | Track | | USTB11600119 |
| Things in Tha Hood | Album | 661868011364 | |
| Think About It (feat. Hardboyz) | Track | | USTB11600290 |
| This About It feat. MC Breed (Original Mix) | Track | | USTB11200097 |
| This Here Thangm | Track | | USTB11200219 |
| This is a Stick Up (Original Version) | Track | | US25T9920762 |
| This is How We Do It 1 | Track | | USTB11600104 |
| This is How We Do It 2 | Track | | USTB11600111 |
| This is Not 4 Free     (Radio Mix) | Track | | USTB11200121 |
| This is Not 4 Free feat. Kilo (Original Mix) | Track | | USTB11200116 |
| Thug Promise (Original Mix) | Track | | USTB11200136 |
| Thugz Like Us (Original Mix) | Track | | USTB11200098 |
| Tight | Track | | US8924960010 |
| Time to Go Legit (Original Mix) | Track | | US25T9920870 |
| Time to Play | Track | | USTB11600084 |
| To the Beat to the Bass | Track | | USTB11200234 |
| Trapped   (Original Mix) | Track | | USTB11200197 |
| Trapped in the Game | Album | 661868011067 | |

Document Ref: JIGR3-NQUVC-VKUB8-O3XXQ

| | | | |
|---|---|---|---|
| Trapped in the Game (feat. Spice 1) | Track | | USTB11600076 |
| Trapped Remix feat. Spice 1 (Original Mix) | Track | | USTB11200104 |
| Tricks (feat. Too $hort) | Track | | US25T9920844 |
| Tricky Brothers | Track | | USTB11200226 |
| Try Me Dog (Original Mix) | Track | | USTB11200137 |
| Tryin' 2 Get It | Album | 661868010862 | |
| U-Eh (Original Mix) | Track | | USTB11200180 |
| Underground Address | Track | | USTB11600099 |
| Underground Hitz | Album | 661868005165 | |
| Underground Slang | Track | | US25T9920780 |
| War Stories (Original Mix) | Track | | USTB11200105 |
| Warning feat. Dj Sticky Boots (Original Mix) | Track | | USTB11200122 |
| Watch Ya Back | Track | | USTB11600066 |
| Watch Yo Back | Track | | USTB11200213 |
| Watch Your Own Back | Track | | US25T9920821 |
| Watookmesolong (Original Mix) | Track | | US25T9920860 |
| We Be Spittin (Original Mix) | Track | | USTB11200095 |
| We Don't Need (Original Mix) | Track | | USTB11200083 |
| Westside Thing (Westside 4th Ward) (Original Mix) | Track | | USTB11200139 |
| What Dem Gon Do (Silent) | Track | | US25T9920761 |
| What They Want (Original Mix) | Track | | USTB11200117 |
| What You Want | Track | | USTB11600100 |
| What You Want feat. Bar-None & Von G (Original Mix) | Track | | USTB11200129 |
| What's the Biz Jones | Track | | USTB11200256 |
| Whenever You Want Me | Track | | USTB11600095 |
| Which Way is Up? | Album | 661868004861 | |
| Who Do You Fear (Original Mix) | Track | | USTB11200099 |
| Who U Fuck'n Wit | Track | | USTB11600038 |
| Why You Hatin' feat. Jason, Coop & Mikes (Original Mix) | Track | | USTB11200125 |
| Will I See (Original Mix) | Track | | USTB11200194 |
| With Me or Against Me (Original Mix) | Track | | USTB11200091 |
| Womb to the Tomb feat Raise Up Clique (Original Mix) | Track | | USTB11200133 |
| Work It From the Bottom | Track | | US25T9920847 |
| You Can Get the Dick | Track | | USTB11600126 |
| You Got to Be Real | Track | | USTB11200225 |
| Young Lungs | Track | | USTB11600027 |
| Zoning (feat. Sho Dawg) (Original Mix) | Track | | USTB11200173 |

# Signature Certificate

Document Ref.: JIGR3-NQUVC-VKUB8-O3XXQ

Document signed by:



## Matthew Smith

Verified E-mail:
m@godfather.com



75.151.87.238        06 Dec 2018 23:08:26 UTC



## Matthew Peach

Verified E-mail
matt.peach@hotmail.com



106.69.196.178        07 Dec 2018 01:22:58 UTC

Document completed by all parties on:
07 Dec 2018 01:22:58 UTC
Page 1 of 1



Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.



# EXHIBIT "D"

# EXHIBIT "D"

# EXHIBIT "D"

10/26/21

## Letter of Direction

To whom it may concern:

As of October 21, 2021, Tommy Boy Distribution is hereby authorized and directed to pay to Power Artist Music Inc. ("Assignee"), 100% of my interest in all "Net Receipts" as defined in and currently payable to me under my distribution agreement with you dated August 15, 2010

This direction shall be irrevocable by me in perpetuity.

Payments to the Assignee should be delivered together with all statements and any other correspondence to the Assignee as follows:

POWER ARTIST MUSIC INC.

3577 Chamblee Tucker Rd Ste 178

Atlanta, Ga 30341

TRIST Bank

Routing:█████████

Account:██████8468███

Tommy Boy Distribution is also hereby authorized and directed to accept all future requests from the Assignee with regard to changes to the payee, bank details, and account information associated with the related payments.

Tommy Boy Distribution's compliance with this letter will constitute an accommodation solely to me. Tommy Boy Distribution shall have no liability by reason of any erroneous payment or any failure to comply with this letter. I will indemnify and hold Tommy Boy Distribution harmless against any and all claims asserted against Tommy Boy Distribution and shall reimburse Tommy Boy Distribution for any and all damages, losses, or expenses incurred by Tommy Boy Distribution by reason of any failure to comply, erroneous payment or otherwise in connection with this letter.

Sincerely,

Leroy McMath

# EXHIBIT "E"

# EXHIBIT "E"

# EXHIBIT "E"

# TOMMY BOY DISTRIBUTION
## New York, NY

Dated: as of December 20, 2021

Power Entertainment Group, Inc.
POB 942161
Atlanta, GA 31141

**RE:    Distribution Agreement dated as of August 15th, 2010 between TommY BoY Distribution and Power Entertainment**

Dear Leroy:

We are parties to a distribution agreement for the exclusive worldwide distribution rights of the Power Entertainment's ("you" or "Power") catalog of master recordings (the "Agreement"). Attached hereto as Exhibit A is a copy of the Agreement.  You have requested TommY BoY Distribution division of TommY BoY Artists, L.L.C. ("TBD") pay an advance against sums that may be otherwise due pursuant to the terms and conditions of the Agreement and make such other changes as contained below.  This agreement shall be referred to as the "Amendment Agreement".  Capitalized terms not otherwise defined herein shall have the meanings set forth in Exhibit A.  In the event of any conflict between any provision of Exhibit A and the corresponding provision of this Amendment Agreement, the provision contained in this Amendment Agreement shall control.

1.      Provided you are not in breach of the Agreement, TBD shall pay you a recoupable advance in the sum of One Hundred Thousand Dollars ($100,000.00) upon the mutual execution and delivery of this Amendment Agreement (the "Advance").  The Advance shall be recoupable against Fifty Percent (50%) of the Net Receipts otherwise payable to you pursuant to the Agreement and the remaining Fifty Percent (50%) of Net Receipts shall be paid through to you.

2.      The Term of the Agreement is hereby extended from the date of execution of this Amendment Agreement and shall terminate three (3) years thereafter or at the end of the monthly period in which the Advance is fully recouped, whichever is later (the "Extended Term").

3.      During the Extend Term you may not sell, assign or otherwise hypothecate the Products or the underlying intellectual rights thereto.

4.      You agree that during the Term, if you receive an offer to sell the rights to the any master recording catalogs owned or controlled by you and distributed by TBD, in whole or in part, during the Term ("Subject Catalog(s)") unless: (a) you agree to notify TBD of all of the material terms and conditions of any such proposed offer ("Catalog Master Agreement"), and (b) TBD shall have the exclusive right, for a period of thirty (30) days, to enter into a Catalog Master Agreement with you on the same (or, if TBD so approves, better) terms than the applicable third party offer.

If TBD does not offer to enter into such Catalog Master Agreement with you within said thirty (30) day period, you may then enter into the Catalog Master Agreement concerned with the same parties mentioned in your notice, provided that such agreement is executed within sixty (60) days thereafter, and on terms no less favorable to you than the most recent third party terms presented by you to TBD. TBD will not be required, as a condition of matching any third-party offer made to you pursuant to this paragraph, to agree to any terms or conditions that cannot be fulfilled by TBD as readily as by any other individual or entity (for example, but without limitation, the engagement of a particular key executive). No failure by TBD to accept an offer made to it under this paragraph will be deemed to waive or otherwise affect any of TBD's other rights herein.

5.    Except as modified herein, the Agreement is ratified and shall remain in full force and effect.

6.    This Amendment Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts together shall constitute one and the same instrument. This Agreement may be executed by e-mail or other digital means of execution.

Very truly yours,

TOMMY BOY DISTRIBUTION
a division of TommY BoY Artists, L.L.C.

By: tom tommy (Dec 20, 2021 17:13 EST)
    Thomas Silverman, CEO

AGREED TO AND ACCEPTED:

POWER ENTERTAINMENT/
POWER ARTIST MUSIC, INC.

By: leroy mcmath (Dec 20, 2021 17:17 EST)
    Leroy McMath, President

**EXHIBIT A TO DECEMBER 20, 2021 AMENDMENT**

# TOMMY BOY DISTRIBUTION
## 120 FIFTH AVENUE
## NEW YORK, NEW YORK 10011

Dated: as of Aug 15th, 2010

Company : Power Entertainment
P.O Box 942161
Atlanta, GA 31141

Gentlemen/Ladies:

The following sets forth the material terms of a distribution agreement between you ("Company") and us ("TBD") (the "Agreement") effective as of the date hereof. Capitalized terms not otherwise defined herein shall have the meanings set forth in Exhibit A hereto.

TBD and Company hereby agree as follows:

1. **Term:** The initial term of this agreement shall be for a three (3) year period, commencing on the date hereof (each, a "Contract Year").

2. **Territory:** The United States of America, including its territories, possessions and Armed Forces Post Exchanges, Mexico and Canada ("Territory"), and in each country in the rest of the world where Products have not been licensed by Company to a third party international licensee ("ROW Territory").

3. **Grant of Rights:**

(a) TBD shall have the exclusive right to distribute, license and sell Products through Normal Distribution Channels, including without limitation through digital technologies, throughout the Territory, subject to the provisions of this agreement. TBD shall also have the exclusive right to export and sell finished goods of Products, and to distribute Products through digital technologies, in the ROW Territory (except that with respect to each country of the ROW Territory, such rights shall be non-exclusive prior to any distribution of Products by TBD in that country). For the avoidance of doubt, TBD's digital distribution rights shall include, without limitation, the exclusive right to license Products or portions thereof for digital streams, downloads, ringtones and other mobile technologies.

(b) TBD shall have the exclusive right to license Products or portions thereof, throughout the Territory and the ROW Territory, including without limitation for synchronization and master use licenses.

4. **Marketing & Label Services:**

At Company's written request, TBD shall consult with Company and assist Company's staff in the areas of marketing and promotion. TBD will consult and cooperate with Company in creating and implementing marketing, promotion and distribution plans for the release of each Company Album, all subject to Company's approval. TBD will not incur marketing and promotion costs (for the avoidance of doubt, excluding retail co-op costs) on behalf of Company without approval of a marketing and promotion budget. For the avoidance of doubt, TBD will be under no obligation to fund any such costs.

5.　**Net Receipts:**

(a)　Sales of physical units of Products; digital, electronic and mobile transmissions of Products or portions thereof; and licenses: Company shall be credited with one hundred percent (100%) of TBD's Net Receipts (as defined in Exhibit A).

(b)　Distribution Fee: TBD's Distribution Fee shall be 30% of Gross Receipts on all physical sales and 3rd party or synch placements, and 20% on digital, mobile and electronic sales.

(c)　Marketing & Label Services Fee (solely if Company requests such services and if TBD agrees): 10% of TBD Gross Receipts, commencing as of the first month during which TBD performs such services at Company's request and continuing through the month during which Company requests that TBD ceases performing such services.

For the avoidance of doubt, the amounts provided in this Agreement to be paid to Company are inclusive of all royalties, mechanical royalties and/or other payments required to be paid to any third parties, including without limitation artists, producers, publishers and any other third parties in connection with the exploitation of Products. Company shall pay over all such amounts due to all such parties.

6.　**Statement and Payments:** TBD shall render monthly statements to Company for Net Receipts within ninety (90) days after the end of each month. Such 90-day period shall be extended day-to-day in the event of special dating approved by Company. Concurrently with the rendition of each statement, TBD shall pay to Company any Net Receipts shown to be due thereby less any reserves on physical sales only permitted to be held by TBD. TBD shall have the right to withhold reasonable reserves for each month which shall not exceed the greater of 25% of Gross Sales or the so-called "SoundScan Pipeline" which is: (a) an amount equal to: (i) the base selling price of units of Products to TBD's customers multiplied by: (ii) the then-current aggregate number of units of Products shipped by TBD to customers less the then-current aggregate number of units of Products sold as reported by unweighted SoundScan, plus (b) the amount of any open, but not yet credited advertising authorizations. . Notwithstanding the foregoing, solely for each month during the last year of the Term, TBD shall have the right to withhold reserves equal to the greater of one and one-half (1 ½) times 25% of Gross Sales, or the SoundScan Pipeline. Each such reserve shall be liquidated as follows: for the first and second Contract Years, one-half within 8 months following the accounting period in which such reserve was established and the balance within 12 months following the accounting period in which such reserve was established; and for the third Contract Year, 12 months following the accounting period in which such reserve was established and the balance within 18 months following the accounting period in which such reserve was established, but in no event shall the total aggregate reserves then held by TBD be reduced below the SoundScan Pipeline. If any statement shall show a balance in TBD's favor, Company shall make a payment of such amount to TBD within five (5) business days after the date of rendition of the statement. If Company does not make such payment then, without limiting any of TBD's other rights and remedies, TBD may elect to extend the Term until the end of the first month during which there is no longer a balance in TBD's favor.

7.　**Miscellaneous:** TBD and Company hereby agree that the definitions, terms, conditions and provisions of TBD's standard distribution agreement, a copy of which is set forth as Exhibit A hereto (including Schedule A thereto), shall be deemed incorporated herein. In the event of any conflict between any provision of Exhibit A and the corresponding provision of this Agreement, the provision contained in this Agreement shall control.

Aug 11 10 Case 1:26-cv-03914-SDG   Document 3-2   Filed 07/13/26   Page 74 of 271 p.3

If the foregoing correctly sets forth our understanding, please so indicate by signing below.

Very truly yours,

TOMMY BOY DISTRIBUTION

By:_____
    An Authorized Signatory

Accepted and Agreed:

Power Entertainment

By:_____
   Leroy Mc Math

# TBD Exhibit A

**STANDARD TERMS AND CONDITIONS**

TOMMY BOY DISTRIBUTION ("TBD")

And

"COMPANY" ("Company")

Capitalized terms not defined where they appear in the text are defined in Paragraph 15.

1.    Appointment as Exclusive Distributor.

(a)    Exclusive Rights.    Except as otherwise provided in the deal memo attached hereto, Company, on behalf of the Company Entities, hereby appoints TBD as Company's exclusive distributor of Products through Normal Distribution Channels during the Term in the Territory in accordance with the terms hereof. Company possesses (and hereby grants TBD) the right to sell Products with the name (legal or assumed), photograph, likeness and biographical material, as supplied by Company, of the artists whose performances are contained therein. With respect to such names, photographs, likenesses and biographical materials, TBD shall abide by any contractual requirements or restrictions imposed upon Company of which TBD is given reasonably sufficient prior written notice.

(b)    TBD's Undertakings.

(i)    TBD shall render Distribution Services and shall distribute and sell Products on Company's behalf through Normal Distribution Channels during the Term in the Territory and shall solicit and fulfill orders for Products in such outlets as shall be selected in good faith by TBD in TBD's sole discretion.

(ii)    TBD shall prepare for Company the same sales, returns, credits and inventory reports as are prepared by TBD for the TBD Distributed Labels and shall supply Company with such reports with the same frequency as such reports are supplied by TBD to the TBD Distributed Labels. Monthly sales and return reports shall include the following information: selection number, artist name, selection title, product configuration, gross units shipped, units actually returned, net units, discounted units, free goods, gross dollars charged, actual gross returned dollar amounts and net returned dollar amounts.

(c)    Distribution Fee.    TBD shall be entitled to retain a distribution fee equal to [as set forth in the deal memo attached hereto], to be retained by TBD for TBD's own account (the "Distribution Fee").

(d)    Marketing & Label Services Fee.    TBD shall be entitled to retain a Marketing & Label Services Fee (if company requests this service) equal to [as set forth in the deal memo attached hereto] (the "Marketing & Label Services Fee").

2. Title. Title (including, without limitation, worldwide copyright therein) to units of Products provided by Company for distribution and sale hereunder shall remain in Company. Units of Products shall be consigned by Company to TBD, subject to the provisions of this Agreement. TBD, as consignee, shall be empowered to pass title to units of Products directly to its customers. TBD shall have the right, as Company's consignee, to accept any and all returns of units of Products from its customers. Upon receipt of units of Products so returned to TBD from its customers, title therein shall revert to Company.

3. Manufacturing and Packaging.

(a) Company shall be solely responsible for the manufacture and delivery of finished units of Products to TDB.

(b) Trade Advertisements, Tip Sheets and Chart Listings. Company shall cause all trade advertisements, tip sheets and chart listings for any Product to identify TBD as the distributor of such Product in the Territory. In the event TBD creates any trade advertisements, tip sheets or chart listings solely for Products hereunder, TBD shall use its reasonable efforts to include reference to Company and/or the Company logo in any such materials, provided that TBD's inadvertent failure to do so in any instance shall not constitute a breach of this agreement.

(c) Notices on Packaging. Packaging for Products shall have printed thereon "Distributed in North America by Tommy Boy Distribution" (or such other identification of distributor as TBD may designate from time to time) together with such logo as TBD may designate.

(d) Parental Advisory Warnings. Company shall have the right to affix a parental advisory warning sticker on Products in a format used customarily by TBD or as may be required by applicable law. If Company does not so designate, but TBD believes in TBD's reasonable business judgment that such a warning is appropriate on a particular Product, TBD may affix such a warning on such Product. Company shall be responsible for and shall pay the costs of applying and affixing the same to or on a Product.

(e) Bar Code on Packaging: All packaging shall have printed thereon a scanable "UPC Box Code" conforming to recording industry standards which specifically identifies the selection and configuration of the Product sold.

(f) ISRC Codes: All Products shall have assigned to them by Company an international standard recording code (i.e., an "ISRC" code).

4. Release Schedules. Company, in consultation with TBD, shall select a reasonable release date for each specific Product from the release dates offered by TBD.

5. Company's Financial Obligations. Company shall be solely responsible for and shall account for and pay: (a) any and all sales and use taxes levied on any of the amounts payable to Company hereunder or on the sale of units of Products or any other taxes relating to units of Products which are in the possession or control of TBD, (b) all costs incurred in the creation of Products, and (c) all monies becoming payable to all parties rendering services or otherwise in respect of sales of units of Products (e.g., artist royalties, mechanical royalties, union costs, producer royalties, etc.). In addition, Company shall obtain all consents and permissions required for the release of Products hereunder and TBD shall have no obligations with regard thereto. For the avoidance of doubt, Company shall not be responsible for payment of: (i) any taxes applicable to the sale of units of Products by TBD's customers

to consumers or (ii) any of TBD's indirect or general overhead charges or the salaries of TBD's regular employees.

6. <u>Other Company Obligations.</u>

(a) <u>Advertising, Marketing and Promotion.</u> The advertising, marketing and promotion of Products hereunder shall be Company's sole responsibility and at Company's sole cost and expense.

(b) <u>Company Reporting.</u> On or before September 1 of each calendar year of the Term, Company will provide TBD with sales projections for Products for the next fiscal year of the Term. Company will provide TBD with an update for each such sales projection on a quarterly basis.

7. <u>Sale of Products.</u>

(a) <u>Determination of Price Categories.</u> Company shall determine the price category designation (e.g., top-line, mid-line, budget, etc.) of Products and/or, if Company so chooses, the suggested retail list prices for Products, it being understood that Company shall use the same price category designation or list prices which TBD uses. Company may change such price category designation and/or suggested retail list price of a Product upon 90 days' written notice to TBD.

(b) <u>Determination of Customer Prices.</u> TBD shall determine the wholesale selling price of Products to customers and the terms of sale for Products, including, without limitation, cash discounts (i.e., discounts for timely or expedited payments from customers) and credit, dating and returns policies; <u>provided, however,</u> that TBD shall obtain Company's consent as to any "special dating" which will result in a delayed payment to Company pursuant to subparagraph 9(a), special program free goods and special sales discounts.

8. <u>Inventory.</u>

(a) <u>Storage and Shrinkage.</u> TBD shall accept and store all Products delivered to TBD hereunder. TBD shall not be responsible for inventory shrinkage of up to 2% of the total volume of all Products in finished good form delivered to TBD during any calendar year of the Term. With respect to inventory shrinkage in excess of 2%, the sole liability shall be payment to Company of the Replacement Cost therefor.

(b) <u>Surplus Units Determination and Removal.</u> Promptly after TBD's written request, Company shall remove from TBD's warehouses, or order the destruction of, at Company's sole expense, the stock of any Surplus Units of Products. Company shall be deemed to have ordered the destruction of Surplus Units if, 45 days after the date of the written request from TBD, Company has not given instructions to TBD for the immediate delivery of such Surplus Units to a public warehouse or other non-TBD location at Company's sole expense and for Company's account.

(c) <u>Marking Inventory.</u> TBD may deface the bar code on or re-bar code all units of Products prior to any removal by Company or delivery to Company of such units of Products, and Company shall reimburse TBD, promptly following TBD's request therefor, with the amount of any direct, out-of-pocket costs incurred by TBD in connection with such defacing or re-bar-coding.

(d) <u>Deletions.</u> On not less than 90 days' written notice to TBD, Company may elect to delete any particular Product from TBD's distribution and sale obligations hereunder when Company determines, in Company's good faith business judgment, such deletion is commercially reasonable. Any

Product so deleted shall not be distributed by Company or any third party, during the Term, in the Territory. Returns of deleted Product will be accepted in accordance with TBD's standard policies and procedures for returns of deleted Products.

9. Statements and Payments.

(a) Rendition of Statements. TBD shall account for and pay to Company Net Receipts as set forth in the deal memo attached hereto.

(b) Audits. Company shall have the right at Company's sole expense to appoint a certified public accountant or chartered accountant who is not then currently engaged in an outstanding audit of TBD to examine TBD's books and records as same pertain to sales of Products; provided, however, that any such examination shall be for a reasonable duration and shall take place at TBD's offices during normal business hours on reasonable prior written notice and shall not occur more than twice in any calendar year or more than once for any statement. Notwithstanding the prior sentence, if TBD notifies Company that the representative designated by Company to conduct an examination of TBD's books and records under this paragraph 9(b) is engaged in an examination on behalf of another TBD Distributed Label ("Other Examination"), Company may nevertheless have Company's examination conducted by its designee, and the running of the time within which such examination may be made shall be suspended until Company's designee has completed the Other Examination, subject to the following conditions:

(i) Company shall notify TBD of its election to that effect within fifteen (15) days after the date of TBD's said notice to Company;

(ii) Company's designee shall proceed in a reasonably continuous and expeditious manner to complete the Other Examination and render the final report thereon to the client and TBD; and

(iii) Company's examination shall not be commenced by Company's designee before the delivery to TBD of the final report on the Other Examination, shall be commenced within thirty (30) days thereafter, and shall be conducted in a reasonably continuous manner.

(c) Objections to Statements. Company shall be deemed to have consented to all accountings rendered by TBD hereunder and said accountings shall be binding upon Company and shall not be subject to any objection by Company for any reason unless specific objection, in writing, stating the basis thereof, is given to TBD within two years after the date rendered, and after such written objection, unless suit is instituted within three years after the date rendered.

10. Post-Term Procedures.

(a) Distribution Services.

(i) Upon the expiration of the Term, TBD shall cause the cessation of all Distribution Services and shall have no further rights or obligations with respect to Products except as provided herein and all unshipped orders for Products shall be canceled. Within 60 days following the expiration of the Term, TBD shall provide Company with a list of all units of Products in TBD's possession on such date.

(ii) Within 60 days following the expiration of the Term, Company shall remove all units of Products in TBD's and other facilities, at Company's sole expense.

(iii)    Prior to the expiration of the Term, TBD and Company shall notify TBD's customers that following the expiration of the Term, TBD shall not accept any further returns of units of Products and that Company or Company's new distributor shall accept such returns. Company agrees that all such returns shall be so accepted and credit given or cash paid to TBD's customer, as appropriate. Company agrees to indemnify TBD from any liability in connection with such returns. Notwithstanding the foregoing, TBD shall honor any open return authorizations. Company shall accept the return from TBD of all units of Products distributed during the Term which are returned by TBD's customers from time to time thereafter pursuant to open return authorizations and Company shall re-purchase such units of Products from TBD for an amount equal to the credit given to TBD's customer for such return. Units of Products returned to TBD after the initial removal of Products by Company shall be removed by Company, at Company's sole expense, within 30 days after written request by TBD.

(iv)    Failure to remove inventory (or to give instructions for its removal within the time periods mentioned in subparagraphs 10(a)(ii) and (iii)) shall be deemed to be an authorization to TBD to destroy such inventory at Company's sole expense.

(b)    Continuing Payment Obligations. The termination of the Term shall not discharge Company or TBD from their obligations to pay any amounts owing hereunder. As long as any amount so owing to TBD by Company, or vice-versa, has not been paid in full, in addition to TBD's other rights and remedies, TBD shall have the right to reimburse itself from amounts owed to Company hereunder or vice-versa.

11.    Warranties, Representations and Indemnities.

(a)    Company's Warranties and Representations. Company warrants and represents:

(i)    Company has the right and power to enter into and fully perform this Agreement,

(ii)    Company has the Exclusive Product Rights;

(iii)    No agreement of any kind heretofore entered into by Company shall interfere in any manner with the complete performance of this Agreement, and

(iv)    Material embodied in Products and the packaging therefor as supplied by Company and any other items furnished to TBD by Company shall not violate any law or infringe upon the rights of any third party. As used herein, "Material" shall include, without limitation, all musical compositions, names, biographical materials and likenesses, photographic, video or motion picture images, sound recordings, intellectual properties, all packaging and artwork and Company's trademarks, tradenames and logos.

(v)    Without limiting the generality of the foregoing, Company is, and will continue to be, entitled exclusively to package, advertise, market, promote, distribute, sell or otherwise exploit all Records embodying the performances of Artists during the Term, and all such Records shall be deemed Products for all purposes under this Agreement.

(b)    Company's Indemnities. Company agrees to and does hereby indemnify, save and hold TBD and its affiliates, and each of their respective officers, directors and employees (collectively, for the purposes of this subparagraph 11(b) only, ("TBD") harmless from any and all loss and damage (including, without limitation, court costs and reasonable attorneys' fees) arising out of, connected with or as a result of any inconsistency with, failure of, or breach or threatened breach by Company of any warranty, representation, agreement, undertaking or covenant contained in this Agreement which is reduced to a final

judgment or settled with Company's prior written consent, which consent shall not be unreasonably withheld. TBD shall give Company prompt notice of any third-party claim to which the foregoing indemnity applies and Company shall assume the defense of any such third party claim through counsel of Company's choice and at Company's sole expense. TBD shall have the right to participate in such defense through counsel of TBD's choice and at TBD's expense. Pending the final determination of any such third party claim, TBD may withhold any sums due to Company hereunder in an amount reasonably consistent with the amount of such claim, unless Company obtains a surety bond from a surety acceptable to TBD in its sole discretion, with TBD as a beneficiary, in an amount reasonably consistent with the amount of such claim. If no action is filed within one (1) year following the date on which such claim was first received by TBD, TBD shall release all sums withheld in connection with such claim, unless TBD, in its reasonable business judgment, believes an action will be filed. Notwithstanding the foregoing, if after such release by TBD of sums withheld in connection with a particular claim, such claim is reasserted, then TBD's rights under this paragraph 11(b) will apply ab initio in full force and effect.

(c)    **TBD's Warranties and Representations.** TBD warrants and represents:

(i)    TBD has the right and power to enter into and fully perform this Agreement, and

(ii)    No agreement of any kind heretofore entered into by TBD shall interfere in any manner with the complete performance of this Agreement.

(d)    **TBD's Indemnities.** TBD agrees to and does hereby indemnify, save and hold Company and its affiliates, and each of their respective officers, directors and employees (collectively, for the purposes of this subparagraph 11(d) only, ("Company") harmless from any and all loss and damage (including, without limitation, court costs and reasonable attorneys' fees) arising out of, connected with or as a result of any inconsistency with, failure of, or breach or threatened breach by TBD of any warranty, representation, agreement, undertaking or covenant contained in this Agreement. Company shall give TBD prompt notice of any third party claim to which the foregoing indemnity applies and TBD shall assume the defense of any such claim through counsel of TBD's choice and at TBD's sole expense. Company shall have the right to participate in such defense through counsel of Company's choice and at Company's expense.

12.    **Security Interest.** To induce TBD to enter into this Agreement, Company hereby irrevocably grants to TBD or its designees a first priority security interest in and to Products, all present and after-acquired inventory of Products and any proceeds derived from the sale of such inventory (the "Collateral") to secure the payment of any amounts which Company is required to pay pursuant to this Agreement. Company shall take all action reasonably necessary or as TBD shall reasonably request to create, confirm or preserve the security interest granted herein, perfect a first priority lien in the Collateral and enable TBD to exercise and enforce the rights, remedies and powers provided to it hereunder, including, without limitation, the execution and delivery to TBD of UCC-1 financing statements and agreements and documents evidencing the security interest in Company's intellectual property, in each case, in appropriate form for filing in all appropriate filing jurisdictions. Company warrants and represents that Company has not granted and shall not grant or allow to exist any security interest or lien of any kind in the Collateral other than the security interest granted herein. Notwithstanding the following, or anything contained herein to the contrary, in the event a UCC-1 has been filed for TBD's benefit, upon termination of the this Agreement, provided all liens, if any, have been paid, TBD will file a UCC-3 terminating its lien on the Collateral.

13.    **Force Majeure.** If because of: act of God, inevitable accident, fire, lockout, strike or other labor dispute, riot or civil commotion, act of public enemy, enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign), failure of technical facilities, failure or delay of transportation facilities, shortage of raw materials, or other cause of a similar or

different nature not reasonably within TBD's or Company's control, as applicable (a "Force Majeure Event"), either party hereto is materially hampered in the performance of its obligations under this Agreement or its normal business operations are delayed or become impossible or commercially impracticable (other than the obligation to pay Net Receipts, unless such Force Majeure Event directly affects TBD's ability to compute such Net Receipts); then, without limiting such party's rights, the party affected by such Force Majeure Event shall have the option, by giving the other party notice, to suspend its obligations hereunder for the duration of any such contingency. No suspension imposed under this paragraph 13 shall exceed six (6) months unless such contingency is industry-wide, in which event TBD shall have the right to suspend the Term for the duration of such contingency. If such suspension is not industry-wide, Company may request TBD by notice in writing given at any time after the expiration of such six (6) month period to terminate the suspension within sixty (60) days following TBD's receipt of Company's said notice. If TBD does not so terminate the suspension, the Term of this agreement will terminate at the end of such sixty (60) day period, or at such earlier date as TBD may designate in writing, and the parties shall be deemed to have fulfilled all their obligations hereunder except those obligations which survive such termination, such as warranties and the obligation to any monies, if payable.

14. <u>Limitation on TBD's Obligations.</u>

(a) TBD shall have the right, without any liability to Company, to decline to distribute and sell (or, as applicable, to cease to distribute or sell):

(i) any Product on the grounds of advocacy of illegal activity, patent offensiveness, invasion of rights of privacy and publicity and/or defamation or other violation of law or infringement of any rights of other persons, including, without limitation, rights of copyright and trademark, and

(ii) any Product if TBD reasonably believes that the distribution and sale of such Product would constitute a material breach by Company of any of the warranties and representations contained herein.

(b) Promptly after any new Product becomes available, Company shall send TBD a copy of such new Product and the artwork therefor. If, for any of the reasons set forth in subparagraph 14(a), TBD elects not to distribute and sell (or to cease to distribute and sell) any particular Product pursuant to this Agreement, then TBD shall promptly notify Company of such election, but in no event later than fifteen (15) days after the date that such Product was submitted to TBD, and with respect to such particular Product, Company shall have the right to exploit and/or to cause any third parties to exploit any or all of the rights otherwise herein granted to TBD in connection therewith without any further obligation to TBD with respect thereto.

15. <u>Definitions.</u>

(a) <u>"TBD"</u> - Tommy Boy Distribution.

(b) <u>"TBD Distributed Labels"</u> - the other record labels distributed by TBD other than TBE or other labels owned, in whole or in part, by TBE.

(c) <u>"TBD Gross Sales"</u> - the number of units of Products shipped (after all rebates, adjustments, settlements, allowances, credits and discounts (other than cash discounts) approved by Company) charged by TBD to TBD's customers for all sales of physical units of Products.

(d)    "TBD Net Sales" - TBD Gross Sales net of actual returns.

(e)    "TBD Gross Receipts" - TBD Gross Sales together with TBD's gross receipts from sales of physical units of Products outside the United States, sales of digital, electronic and mobile transmissions of Products or portions thereof, and licenses of Products or portions thereof.

(f)    "Armed Forces Post Exchanges" - US military posts, ships' stores or other US armed forces facilities.

(g)    "Company Entities" - Company and any other entities owned or controlled, directly or indirectly by Company or by any principal of Company or in which Company or any principal of Company have a direct or indirect income interest other than publicly traded stock or other securities.

(h)    "Confidential Information" - any information or documents regarding or contained in this Agreement. Confidential Information shall not include information or documents known generally to the public or the recorded music industry other than as a result of an unauthorized disclosure by TBD or Company.

(i)    "Distribution Services" - the following distribution services provided by TBD to the TBD Distributed Labels:  (i) solicitation, acceptance and processing of orders from customers, (ii) physical distribution, (iii) processing of returns for scrap or return to inventory, (iv) inventory control and warehousing, (v) invoicing and collection of customer accounts, (vi) processing and issuance of credits to customers; (vii) shipping services for units of Products in orders and quantities requested and/or approved by Company; and (viii) distribution through digital technologies, including without limitation licensing Products or portions thereof for digital streams, downloads, ringtones and other mobile technologies.

(j)    "Exclusive Product Rights" - the exclusive rights:  (i) to advertise, market, promote, distribute, sell or otherwise exploit a particular Product and Records derived therefrom, (ii) to authorize the public performance and broadcasting of such Product and Records derived therefrom, (iii) to utilize all audio-visual works related to such Product and Records derived therefrom which are owned or controlled, directly or indirectly, by the Company Entities to advertise, market and promote such Product and Records derived therefrom, and (iv) to use and publish the names, photographs and likenesses and biographical materials of each artist whose performances are contained on such Product and Records derived therefrom in connection with the foregoing.

(k)    "Net Receipts" - TBD Net Sales, together with TBD's gross receipts from sales of physical units of Products outside the United States, sales of digital, electronic and mobile transmissions of Products or portions thereof, and licenses of Products or portions thereof less:

(i)    the Distribution Fee, the Marketing and Label Services Fee, to be retained by TBD for TBD's own account;

(ii)    all freight charges incurred by or on behalf of TBD for shipping of units of Products at Company's written request other than as regular bulk freight;

(iii)    all freight charges incurred by or on behalf of TBD for the shipping of units of Products referred to in subparagraph 15(h)(vii);

(iv)    all charges set out in Schedule A hereto as such charges may be modified from time to time for all TBD Distributed Labels;

(v)    all other direct, third party costs and/or expenses paid or incurred by TBD, if any, attributable to the sale, marketing, advertising, promotion, distribution and/or exploitation of Products or portions thereof.

(l)    "Normal Distribution Channels" - the distribution channels in the Territory through which TBD normally distributes audio-only and audio-visual music products including Internet and on-line distribution of products in physical form and of products other than in physical form (i.e., digital streams and downloads, ringtones and other mobile technologies), but specifically excluding record clubs, television sales, other mail order sales, special products sales and premium sales.

(m)    "Products" – all audio-only and audio-visual recordings owned or controlled, in whole or in part, directly or indirectly, by the Company Entities that the Company Entities release in the Territory.

(n)    "Records" and "recordings" - all forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for personal use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, magnetic recording tape, film, digital, electronic video recordings and any other medium or device for the production of artistic performances manufactured or sold primarily for personal use, juke box use or use on or in means of transportation, whether embodying (i) sound alone, or (ii) sound synchronized with visual images, e.g. "sight and sound" devices.

(o)    Subparagraph (q) is not used.

(p)    "Surplus Units" - more than a six-month supply (as determined in TBD's good faith business judgment) of units of a particular Product.

(q)    "Term" - [as set forth in the deal memo attached hereto].

(r)    "Territory" and "ROW Territory" [as set forth in the deal memo attached hereto]

(s)    "TBE" – Tommy Boy Entertainment, LLC.

16.    Confidentiality. Neither TBD nor Company shall disclose or reveal to any person or entity any Confidential Information, except as required by law or court order. Either party hereto may disclose Confidential Information to its attorneys under privilege, to its accountants and to any other third parties on a "need to know" basis, provided that the recipients of such Confidential Information (other than attorneys or accountants) are bound in writing by a confidentiality agreement in a form acceptable to the other party hereto and to which the other party hereto is a party. No party hereto shall make a press release or public announcement concerning this Agreement without the written consent of all other parties hereto.

17.    Miscellaneous.

(a)    Entire Agreement, Modification, Waiver. This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all previous agreements or arrangements between the parties hereto relating to the subject matter hereof. This Agreement cannot be changed or terminated except by an instrument signed by the authorized signatories of the parties. A waiver by either party of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations, and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party. Should any provision of this Agreement be adjudicated by a court of competent jurisdiction

as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein.

(b)    Assignment.  Either party hereto (the "Assignor") shall have the right without the consent of the other party (the "Other Party") to assign this Agreement in whole or in part, but only if: (i) the Other Party's rights and interests under this Agreement are not diminished or otherwise altered as a result of the assignment, (ii) the Assignor, in addition to the assignee, shall in all respects remain liable to the Other Party under this Agreement notwithstanding the assignment and (iii) prior to the assignment and at any times thereafter as the Other Party may reasonably require, the Assignor shall cause the assignee to execute and deliver to the Other Party all documents which the Other Party may reasonably require in connection with the assignment and/or this Agreement.

(c)    Breach, Notice and Cure.  Other than a breach of the exclusivity provisions hereof, no breach of this Agreement by Company shall be deemed material unless within 45 days after TBD learns of such breach, TBD serves written notice on Company specifying the nature thereof and Company fails to cure such breach, if any, within 45 days after receipt of such notice (or 10 days in the case of a failure by Company to pay a sum certain).  No breach of this Agreement by TBD shall be deemed material unless within 45 days after Company learns of such breach, Company serves written notice on TBD specifying the nature thereof and TBD fails to cure such breach, if any, within 45 days after receipt of such notice (or 10 days in the case of a failure by TBD to pay a sum certain).

(d)    Further Assurances.  TBD and Company each agree to execute and deliver all such other and additional instruments and documents and to do such other acts and things as may be necessary to more fully effectuate this Agreement.

(e)    Notices.  All notices which any party hereto is required or may wish to give the other shall be given by delivering, mailing or faxing the same to the other at the addresses specified below:

| Company: | Power Entertainment |
| | P.O Box 942161 |
| | Atlanta, GA 31141 |
| | |
| With A Copy to: | Jonathan B. Mason |
| | Mason Law Group, P.C. |
| | P.O. Box 92069 |
| | Atlanta, Georgia 30314 |
| | |
| TBD: | Tommy Boy Distribution |
| | 120 Fifth Avenue, 7th Floor |
| | New York, New York 10011 |
| | Attn: Linda Williams |

All notices shall be deemed effective upon their receipt.

(f)    No Agency.  Company and TBD each shall have the status of an independent contractor and nothing herein contained shall contemplate or constitute Company as TBD's agent or employee or TBD as Company's agent or employee. This Agreement does not constitute or acknowledge any partnership or joint venture between Company and TBD.

(g)      Construction, Jurisdiction, Venue. This Agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within the State of New York, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance or breach of this Agreement. Company and TBD each agree to submit to the jurisdiction of the Federal or State courts located in New York City in any action which may arise out of this Agreement and said courts shall have exclusive jurisdiction over all disputes between TBD and Company pertaining to this Agreement and all matters related thereto.

(h)      Captions. The captions herein contained are inserted solely for reference and shall not constitute a part of this Agreement nor affect its construction, meaning or effect.

If the foregoing is acceptable, please acknowledge the same by signing in the appropriate places below.

TOMMY BOY DISTRIBUTION,
a division of Tommy Boy Entertainment, LLC


By:_____
         An Authorized Signatory


Accepted and Agreed:

Power Entertainment

By:_____
     Leroy Mc Math

# TBD Schedule A

## 1. FULFILLMENT COSTS

Inventory Stock Transfers (Box Lots)          $.25 per unit (inclusive of shipping)
Free Goods Shipments to a TBD account          $.25 per unit +distribution fee

## 2. PROCESSING / INVENTORY COSTS

Process Returns and Destroy          $.05 per unit
Process Returns, Refurbish and Return To Stock          $.30 per unit

Stickering/Labeling (ADA-Supplied Stickers)          $.05 per sticker per unit

Sawcut Promos (Box Lot)          $1.00 per box

Excess Inventory Storage (Excess of 12-month Supply)          $.02 per unit per month

## 3. NEW RELEASE SOLICITATION COSTS

B&W One-Sheet Catalog Printing          No Charge

Street Date Changes After Publication (Bumps)          $500 per selection for each occurrence

Late Solicitation Pages Penalties (excl. singles)          $2,400 + Actual Cost for Insertion/Distribution

Product Bar Code or Item Number Corrections          $2,000+$.50 per unit processing+$.05 per unit labeling

Pricing Corrections after Publication of Solicitation Sheets          $2,500 + Actual Cost of Customer Notification

# Power Entertainment w TBA advance 12202021 clean execution

Final Audit Report

2021-12-20

| | |
|---|---|
| Created: | 2021-12-20 |
| By: | tom tommy (tom@tommyboy.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAWANOkDdsRUoLjTGYrTz0Fcn0P29-lnGR |

## "Power Entertainment w TBA advance 12202021 clean executio n" History

📋 Document created by tom tommy (tom@tommyboy.com)
2021-12-20 - 10:10:59 PM GMT- IP address: 98.116.92.160

✍ Document e-signed by tom tommy (tom@tommyboy.com)
Signature Date: 2021-12-20 - 10:13:45 PM GMT - Time Source: server- IP address: 98.116.92.160

✉ Document emailed to leroy mcmath (leroy@wbaball.net) for signature
2021-12-20 - 10:13:48 PM GMT

📋 Email viewed by leroy mcmath (leroy@wbaball.net)
2021-12-20 - 10:14:39 PM GMT- IP address: 73.106.182.73

✍ Document e-signed by leroy mcmath (leroy@wbaball.net)
Signature Date: 2021-12-20 - 10:17:03 PM GMT - Time Source: server- IP address: 73.106.182.73

✅ Agreement completed.
2021-12-20 - 10:17:03 PM GMT

**Adobe Sign**

# EXHIBIT "F"

# EXHIBIT "F"

# EXHIBIT "F"



# BUSINESS LAW FIRM
of John M. Duffoo, P.C.
Attorney at Law

Telephone: (770) 312-6160

8920 Eves Rd
No. 767355
Roswell, GA 30076
Email: John@Duffoolaw.com
www.Duffoolaw.com

June 8, 2022

LeRoy McMath
411 Beaver Ruin Rd
Lilburn, GA, 30047

LeRoy McMath
3631 Chamblee Tucker Rd.
Ste A, #178,
Atlanta, GA 30341

Re: Purchase Agreements:
-Dated 9/20/2018 Between LeRoy McMath and Matthew Smith
-Dated 12/6/2018 Between Matthew Smith and Matthew Peach

LeRoy McMath:

This law firm represents Matthew Peach. Matthew Peach is the successor in interest to a Purchase Agreement dated 9/20/2018, formerly between you, LeRoy McMath (Seller) and prior buyer, Matthew Smith. (See Exhibit "A") My client subsequently became the assignee of the aforementioned contract on 12/6/2018. (See Exhibit "B") You previously issued a Letter of Direction directing distributions to Royalty Exchange, Inc. (See Exhibit "C") Distributions per said Letter of Direction were being made as demonstrated by Exhibit "D" attached hereto.

It is our understanding that you issued a subsequent letter of direction instructing TOMMY BOY MUSIC, LLC a/k/a Tommy Boy Distribution to divert subsequent distributions to you. Said direction was in breach of those agreement and the 9/20/2018 Letter of Direction.

My client demands that you cease interfering with its contractual and legal rights As you are aware, the Letter of Direction, clearly provides that it was irrevocable. You knew this and have converted property of my client for personal and/or business use. The attached agreements state in relevant part:

> 1.2 - "Seller shall direct its royalty distributor, Tommy Boy ("Distributor"), and any other paying entity to pay the Assigned Royalties directly to Purchaser or Purchaser's administrator. Seller shall execute any document required by any paying entity necessary to assign the Assigned Royalties."

In the Purchase Agreement, it also states:

> 3.6 - "Any royalties collected by Seller after such a change that should have been paid to Purchaser or Purchaser's administrator per this agreement shall be paid directly to the Purchaser by the Seller no later than 15 days after Seller's receipt. Any delay in payment of royalties to the Purchaser will be subject to payment of interest at a rate of 2% per month."

1

Licensed to Practice Law
in Georgia

My client has authorized me to file a lawsuit against you and any other entities that you have used to convert my client's assets and/or engage in fraudulent activity that is the proximate cause of my client's damages. We are preparing a lawsuit to include claims as follows: (1) Breach of Contract and Account; (2) Tortious interference with contractual and/or business relations; (3) Conversion of property; (4) Fraud; (5) Punitive Damages; (6) Interest; (7) Attorney's fees; and (8) Costs.

As you know, Fraud claims are no dischargeable in bankruptcy pursuant to 11 U.S.C. § 523. Based on the documented evidence, we have zero concern on your liability for fraud. Regardless of your conduct to date, my client does not wish to make legal trouble for you, if you cure the default and other wrongdoings.

Therefore, my client has authorized me to make the following settlement offer: Your conduct of converting distributions owed to my client has resulted in distrust in further business dealing with you. Continuing a business relationship with you is no longer possible. As such, my client has authorized me to offer you a settlement that includes releasing you from the amounts that you have converted from my client, believe to be approximately $50,000.00 and paying you an additional amount of $50,000.00 for the masters/copyrights of this music catalog, you relinquishing all control and interest. Total compensation being $100,000.00.

You are requested to reply to this correspondence by June 17, 2022. Further, please provide an accounting of all distributions received by you since the initial Letter of Direction dated 9/20/2018, attached as Exhibit "C" hereto.

Best Regards,

John M. Duffoo
Attorney at Law

Cc: leroy@wbaball.net; contact@seasidegrillellc.com;

2

# EXHIBIT "G"

# EXHIBIT "G"

# EXHIBIT G

# BUSINESS LAW FIRM
of John M. Duffoo, P.C.
Attorney at Law



Telephone: (770) 312-6160
8920 Eves Rd
No. 767355
Roswell, GA 30076
Email: John@Duffoolaw.com
www.Duffoolaw.com

June 14, 2022

## LETTER OF DIRECTION
## AND DEMAND TO CEASE CONVERTING FUNDS

Tommy Boy Entertainment, LLC
220 E 23RD ST
STE 400
NEW YORK NY 10010-4669

THOMAS A SILVERMAN
7 GRAMERCY PARK WEST
Unit #3C
NEW YORK NY  10003

Re: Purchase Agreements:
-Dated 9/20/2018 Between LeRoy McMath and Matthew Smith
-Dated 12/6/2018 Between Matthew Smith and Matthew Peach

Tommy Boy Entertainment, LLC:

This law firm represents Matthew Peach.  Matthew Peach is the successor in interest to a Purchase Agreement dated 9/20/2018, formerly between the seller, LeRoy McMath and prior buyer, Matthew Smith. (See Exhibit "A")  My client subsequently became the assignee of the aforementioned contract on 12/6/2018. (See Exhibit "B")  LeRoy McMath previously issued a Letter of Direction to you directing distributions to Royalty Exchange, Inc. (See Exhibit "C") You were making distributions per said Letter of Direction as demonstrated by Exhibit "D" attached hereto.

It is our understanding that Tommy Boy Entertainment, LLC a/k/a Tommy Boy Distribution was making routine distributions to Royalty Exchange, Inc. pursuant to the letter of direction for several years.  It is also our understanding that in December 2021, LeRoy McMath issued a subsequent letter of direction instructing Tommy Boy Entertainment, LLC a/k/a Tommy Boy Distribution to divert subsequent distributions to him, LeRoy McMath.  Said direction was in breach of those agreements and the initial irrevocable Letter of Direction, wherein it states that the direction shall be **irrevocable** by McMath in **perpetuity**. The Letter of Direction further states: "Tommy Boy Distribution is also hereby authorized and directed to accept all future requests from the Assignee with regard to changes to the payee, bank details, and account information associated with the related payments."

Additionally, each of the contracts assigning royalties to Matthew Peach, contains the following Power of Attorney:

Upon execution of this agreement and upon any change in the paying entity for the Assigned Royalties, Seller shall promptly, at Purchaser's request, execute all documents necessary to allow Purchaser to receive the Assigned Royalties

1

Licensed to Practice Law
in Georgia

("Transfer Documents"). If Purchaser requests Seller to execute a Transfer Document and Seller fails to execute the document within 14 days after the request, **Seller appoints Purchaser, as Seller's true and lawful attorney, to execute all Transfer Documents in Seller's name.** Purchaser shall deliver to Seller copies of all Transfer Documents executed by Purchaser in the exercise of the power of attorney. The power of attorney granted to Purchaser is limited and specific to Transfer Documents.

As such, my client demands that you cease issuing distributions to LeRoy McMath or any company other than Royalty Exchange, Inc. as initially directed in Exhibit "C". Therefore, demand is made that you issue future distributions as follows:

Payments should be delivered together with all statements and any other correspondence to:

Royalty Exchange Inc.
1550 Larimer St. #769
Denver CO 80202
payments@royaltyexchange.com

As you are aware, the Letter of Direction, clearly provides that it was irrevocable. Tommy Boy should not have accepted any subsequent Letters of Direction from LeRoy McMath. The attached agreements state in relevant part:

> 1.2 - "Seller shall direct its royalty distributor, Tommy Boy ("Distributor"), and any other paying entity to pay the Assigned Royalties directly to Purchaser or Purchaser's administrator. Seller shall execute any document required by any paying entity necessary to assign the Assigned Royalties."
>
> 3.6 - "Any royalties collected by Seller after such a change that should have been paid to Purchaser or Purchaser's administrator per this agreement shall be paid directly to the Purchaser by the Seller no later than 15 days after Seller's receipt. Any delay in payment of royalties to the Purchaser will be subject to payment of interest at a rate of 2% per month."

You are requested to reply to this correspondence by June 17, 2022. We are continuing to investigate the involvement of all entities in the improper distribution/conversion of funds. Ignoring this correspondence may subject any entity that has conspired with LeRoy McMath in converting my client's funds to a civil lawsuit. Further, please provide an accounting of all distributions made to anyone other than Royalty Exchange since the initial Letter of Direction dated 9/20/2018, attached as Exhibit "C" hereto. We also request that you provide a copy of the Letter of Direction you relied on to cease making payments as directed in the 9/20/2018 Letter of Direction.

My contact information is (770) 312-6160 or john@duffoolaw.com.

We have made several attempts to contact your company; however no one answers your main number. We have also tried to contact Haylee Palmer without success.

Best Regards,

John M. Duffoo
Attorney at Law

Cc: tom@tommyboy.com

3

# EXHIBIT H

# EXHIBIT H

# EXHIBIT H

 **Outlook**

## Power- masters

**From** leroy wbaball.net <leroy@wbaball.net>

**Date** Mon 10/16/2023 10:00 AM

**To** Thomas Silverman <thomas.silverman@tommyboy.com>

**Cc** leroy wbaball.net <leroy@wbaball.net>

Good morning, Tom, hope all is well. I had a couple more investors follow up with me about Power Records masters. The attorneys are telling me I should sell the rights, which would void any claims peach believes he has with Power, and fight him in court for the back payments.
The investors are aware of the issues with the titles, no current royalty statements and the 35-year law, and say the master's value is fifty percent or less than what they would be if I had clear titles and my paperwork in order, they believe, no one will pay full price.

I had offers over the past three months and all the numbers were very low. One of the company said if I accept their offer, they could have me a check within seven days of accepting offer.
I really feel it would be in my best interest to sell everything, make other investment and move on. Tom, you and TB have always had my back.... Therefore, I feel if I'm going to sale these masters for less than value! I would rather offer to you or one of your entities.

Regards,
Leroy

# EXHIBIT I

# EXHIBIT I

# EXHIBIT I

 **Outlook**

---

## Re: [SPF ERROR] Re: Power-masters

---

**From** leroy wbaball.net <leroy@wbaball.net>

**Date**  Mon 10/30/2023 1:49 PM

**To**     Tom Silverman <thomas.silverman@tommyboy.com>

Tom,
 My loyalty is with TB. Yes, they know about the deal, and royalty liabilities and the $100k,  I sent the investors an email telling them I will have to pass on their deal. Heck if I have to wait three more weeks I guess it want kill me.

Leroy

---

**From:** Tom Silverman <thomas.silverman@tommyboy.com>
**Sent:** Monday, October 30, 2023 1:30 PM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Subject:** Re: [SPF ERROR] Re: Power-masters

If you feel you need to move this week, I guess it's ok. It will take us 3 weeks to complete a deal with you.

Do buyers know about the distribution deal term? Do they know about potential artist royalty liabilities?
Will you have to pay Peach the $100,000 you took as advance to get the suit dropped?
Love Always,
Tom Silverman

> On Oct 30, 2023, at 1:24 PM, leroy wbaball.net <leroy@wbaball.net> wrote:
>
>
> Tom, they are not happy with me at the moment. The buyers think I dragged them out for two months now pulling out the deal. I told them I need a few hours to think about it.
> Are you ok with me selling to someone else?
>
> Leroy

---

> **From:** Tom Silverman <thomas.silverman@tommyboy.com>
> **Sent:** Monday, October 30, 2023 11:17 AM
> **To:** leroy wbaball.net <leroy@wbaball.net>
> **Subject:** Re: [SPF ERROR] Re: Power-masters

We are still interested.  It is just that we only closed the publishing deal a week ago and we need to digest that before we can eat again.  I told you it would take around three or four weeks to digest the publishing. What kind of LOD and what kind of a reduction in payment are they now talking about?

Love Always,
Tom
212-655-9555

---

**From:** Leroy McMath <leroy@wbaball.net>
**Date:** Monday, October 30, 2023 at 11:12 AM
**To:** Thomas Silverman <thomas.silverman@tommyboy.com>
**Subject:** Re: [SPF ERROR] Re: Power-masters

Don't know if this is going to work, they want a 1.) Release  2.) L.O.D and 3.)to pay less than what they agreed to.

1.

---

**From:** leroy wbaball.net <leroy@wbaball.net>
**Sent:** Monday, October 30, 2023 11:01 AM
**To:** Tom Silverman <thomas.silverman@tommyboy.com>
**Subject:** Re: [SPF ERROR] Re: Power-masters

Fred and Brain Mckinsie

---

**From:** Tom Silverman <thomas.silverman@tommyboy.com>
**Sent:** Monday, October 30, 2023 10:55 AM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Subject:** Re: [SPF ERROR] Re: Power-masters

Who is the potential buyer?

Love Always,
Tom
212-655-9555

---

**From:** Leroy McMath <leroy@wbaball.net>
**Date:** Monday, October 30, 2023 at 10:43 AM
**To:** Thomas Silverman <thomas.silverman@tommyboy.com>
**Subject:** [SPF ERROR] Re: Power-masters

He just said if they purchased the masters, I would have to give them a letter stating that you are aware that I'm selling.

---

**From:** leroy wbaball.net
**Sent:** Monday, October 30, 2023 10:16 AM

1/30/26, 9:07 PM                                    Sent Items - leroy wbaball.net - Outlook

**To:** Thomas Silverman <thomas.silverman@tommyboy.com>
**Subject:** Power-masters

Good morning, Tom I heard from the agent over the weekend. He was trying to get me to sign the documents for the master deal. He also said they would need a release letter from TB if I moved forward.
I told them I was looking at other options, $430K would really help my account this week! There seems to be a sense of urgency for them to get this deal done today.
 I will not sign a deal without your knowledge. Let me know your plans for acquiring the masters. Then I will know how to respond back.

Regards,
Leroy

# EXHIBIT J

# EXHIBIT J

# EXHIBIT J

 **Outlook**

---

### Re: [SPF ERROR] Power records- Masters

---

**From** leroy wbaball.net <leroy@wbaball.net>

**Date** Sat 11/11/2023 12:15 PM

**To**   Tom Silverman <thomas.silverman@tommyboy.com>

I ready to sell to you. We can do a small sale price, like $100k. Then you can sell back with a new company as you stated. The sooner the better... so that the agreement with Royalty Exchange terminates, and future payments can be redirected to new owners. I agree the accounting needs to be Kept current, and artist needs to be paid when due.
Regards

---

**From:** Tom Silverman <thomas.silverman@tommyboy.com>
**Sent:** Thursday, November 9, 2023 11:05 AM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Subject:** Re: [SPF ERROR] Power records- Masters

I suggested selling to me and I sell to you with a new company.  I think going forward, accounting to and paying artists regardless of their recoupment position would be necessary in the case of a new company.

Love Always,
Tom
212-655-9555

---

**From:** Leroy McMath <leroy@wbaball.net>
**Date:** Thursday, November 9, 2023 at 9:49 AM
**To:** Thomas Silverman <thomas.silverman@tommyboy.com>
**Subject:** [SPF ERROR] Power records- Masters

Tom, I understand it's hard to get a true value because of the issues with some of MC Breed masters, so where do we go now? the masters have been like this for over 30 years. I know it would take another two to three to clear. As a friend what would you recommend?
If you do not purchase, an entertainment attorney in L.A recommended forming a new company with partners, and sell Power Records to it. Then any agreement that was in place would be void.
thoughts???

# EXHIBIT K

# EXHIBIT K

# EXHIBIT K

 **Outlook**

---

## Re: [SPF ERROR] Re: PowerAPA

---

**From** David Parker <david.parker@tommyboy.com>

**Date** Thu 12/7/2023 10:08 AM

**To**    leroy wbaball.net <leroy@wbaball.net>

**Cc**    Tom Silverman <thomas.silverman@tommyboy.com>

Thank you!  I will prepare the agreement now and it will go thru Docusign for signature.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** leroy wbaball.net <leroy@wbaball.net>
**Sent:** Thursday, December 7, 2023 8:36 AM
**To:** David Parker
**Cc:** Tom Silverman
**Subject:** [SPF ERROR] Re: PowerAPA

Good Morning David,

I accept Tommy Boy offer. Please send over the agreement to be executed, and I will send back today.

Regards,
Leroy

---

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Wednesday, December 6, 2023 7:23 PM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Cc:** Tom Silverman <thomas.silverman@tommyboy.com>
**Subject:** Re: PowerAPA

Hi Leroy,

Thanks for you patience.  Tommy Boy is prepared to significantly raise our offer based on our close and successful business relationship over the years.

a. Purchase Price of $115,000 payable on closing.  We will delete the $20,000 holdback and instead provide for a 90 day period after the closing during which Seller will make available for Buyer inspection and pickup of all tapes, legal papers and related assets; and

b. $75,000 as a bonus payment only 1) no lawsuit is filed naming Tommy Boy, 2) payable 18 months from the Closing Date, and, 3) any and all costs and expenses incurred due to claims (as opposed to the actual filing of a lawsuit) made contrary to the representations and warranties of Seller under the APA, will be deducted from the bonus amount payable.  Of course this provision will not limit Tommy Boy's other rights and remedies under the APA.

I believe that this is a very fair offer in light of the significant risks involved.  I would ask that we hear back from you tomorrow.  I am hoping you can agree to the above so that all parties know where they stand and we can move forward immediately to signing the agreement and paying the Purchase Price.

Thank you and have a good evening.  I look forward to hearing from you tomorrow.

Best,
David

David Parker
Legal & Business Affairs
Tommy Boy Entertainment

The information contained in this email, including any attachments, is confidential and may contain privileged information or work product.  If you have received this email in error, please advise the sender immediately by reply email, destroy all hard copies of the original message and any attachments thereto and delete same from your system. The unauthorized use, distribution, copying, or alteration of this email is prohibited.

---

**From:** leroy wbaball.net <leroy@wbaball.net>
**Sent:** Wednesday, December 6, 2023 11:31 AM
**To:** David Parker
**Subject:** Re: [SPF ERROR] PowerAPA

Good deal. I did not text nor call him, didn't think it was a good idea. If the money is a deal breaker, Brian still has $300k on the table, I could put $50k in the attorney escrow account void the Royalty Exchange agreement and still walk away with $250k with no future expense to Tommy Boy.

Regards.

---

**From:** David Parker <david.parker@tommyboy.com>
**Sent:** Wednesday, December 6, 2023 10:30 AM
**To:** leroy wbaball.net <leroy@wbaball.net>

**Cc:** Tom Silverman <thomas.silverman@tommyboy.com>
**Subject:** Re: [SPF ERROR] PowerAPA

I'm waiting to hear to hear back from Tom.  His decision.
Best,
David

David Parker
Legal & Business Affairs
TommY BoY Entertainment
Direct 917-617-7774

On Dec 6, 2023, at 10:28 AM, leroy wbaball.net <leroy@wbaball.net> wrote:

David, I have a lot going on today. I'm sure does as well. i really appreciate if you could let me know this morning if we are going to close this deal. if what I sent you last night is not acceptable let me know as soon as possible, I have an option that I think could be a solution.

Regards
leroy

# EXHIBIT L

# EXHIBIT L

# EXHIBIT L

FILED 1/3/2025 12:26 PM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

## IN THE SUPERIOR COURT OF DEKALB COUNTY
### STATE OF GEORGIA

| | |
|---|---|
| **MATTHEW PEACH,** | |
| **Plaintiff,** | **Civil Action File No.** |
| | **23CV6869-7** |
| **v.** | |
| **LEROY MCMATH; POWER ENTERTAINTMENT CO. INC.; and POWER ARTIST MUSIC CO.,** | |
| **Defendants.** | |

## ORDER ON VARIOUS MOTIONS

Before the Court for consideration are Plaintiff's Motion for Summary Judgment, Defendants' Motion to Withdraw Admissions, and Defendants' Motion for Summary Judgment.

### DEFENDANTS' MOTION TO WITHDRAW ADMISSIONS

The Court first addresses Defendants' Motion to Withdraw Admissions because it directly affects the parties' cross-motions for summary judgment.

This lawsuit is about a disagreement over royalties to certain musical works. Plaintiff Matthew Peach ("Peach") is suing three Defendants, Leroy McMath ("McMath"), Power Entertainment Co., Inc., and Power Artist Music Co. (jointly referred to as the "Corporate Defendants"), on seven counts: breach of contract and on account, conversion, tortious interference with contractual/business relations, fraud, punitive damages, pre-judgment interest, and attorney's fees under OCGA §§ 13-1-11 and 13-6-11. Defendants counterclaimed for seven counts: unjust enrichment, conversion, fraud, negligent misrepresentation, tortious interference with contract, punitive damages, and contractual attorney's fees.

Peach served discovery requests on each Defendant, including requests for admission ("RFA"). None of the three Defendants responded to the RFA. Based on the unanswered RFA, Peach moved for summary judgment, whereupon Defendants moved to withdraw the admissions.

Under OCGA § 9-11-36 (a) (1), "[a] party may serve upon any other party a written request for the admission. . . of the truth of any matters" that are not privileged and are relevant to the pending action. See also OCGA § 9-11-26 (b) (1). Under OCGA § 9-11-36 (b), "[a]ny matter admitted under this Code section is conclusively established unless the court, on motion, permits withdrawal or amendment of the admission." The standard for withdrawing admissions is summarized in the recent case of *WellPath, LLC v. Cox*, 370 Ga. App. 800, 803-04 (2024):

> There is a two-pronged test to be employed when considering a motion to withdraw admissions. A court may grant a motion to withdraw (1) when the presentation of the merits will be subserved thereby and (2) the party obtaining the admission fails to satisfy the court that the withdrawal will prejudice maintaining his action or defense on the merits. If the movant satisfies the court on the first prong, the burden is on the respondent to satisfy the second prong. Both prongs must be established. If the movant fails to make the required showing to satisfy the first prong of the test, then the trial court is authorized to deny the motion to withdraw the admissions. To demonstrate that the merits of an action would be served by allowing withdrawal of admissions, the moving party must show that the admitted requests either were refutable by admissible evidence having a modicum of credibility or were incredible on their face, *and* that the denial was not offered solely for the purposes of delay.

Id at 803-04 (case citations and punctuation omitted; emphasis original). "The first prong of the test is not perfunctorily satisfied." *Intersouth Properties, Inc. v. Contractor Exch., Inc.*, 199 Ga. App. 726, 727 (2) (1991). A movant's "desire to have a trial, standing alone, is not sufficient to satisfy the test." *JCG Farms of Alabama, LLC v. Morgan*, 348 Ga. App. 629, 631 (2019). Likewise, "[m]erely being forced to go to trial is not such a prejudice as will" satisfy the second prong of the test. *Brankovic v. Snyder*, 259 Ga.App. 579, 583 (2003).

In *WellPath*, the plaintiff suffered injuries from a vehicle collision and sued the driver of the colliding vehicle. After deposing the driver, the plaintiff added WellPath as a defendant under the theory of vicariously liability for the driver's alleged negligence based on the doctrine of respondeat superior. In response to a request for admission, WellPath initially admitted that the driver was its employee/agent but then moved to withdraw the admission based on evidence that the driver was an independent contractor. The trial court denied WellPath's motion to withdraw, and the Court of Appeals reversed because the driver's deposition testimony and an affidavit submitted by WellPath attesting to the driver's status as an independent contractor "had the 'modicum of credibility' required to establish the first prong of the test and was not 'per se incredible.'" 370 Ga. at 805. The Court in *WellPath* also criticized the trial court for ruling only "on the first part of the first prong, . . it did not rule on the second part of the first prong," i.e., whether the denial was offered solely for the purposes of delay.

In contrast to *WellPath*, the evidence in *Crumpton v. Samples*, 365 Ga. App. 143 (2022), was insufficient to withdraw the admissions. In *Crumpton*, a prospective buyer of a business sued Crumpton for the return earnest money. The buyer's RFA went unanswered, and the buyer moved for summary judgment. Crumpton responded, stating an intention to move to withdraw the admissions and requesting oral argument. A hearing was scheduled, and Crumpton had over a month and a half to prepare. Crumpton waited until two days before the hearing to file a motion to withdraw the admissions with a supporting affidavit. The trial court's denial of Crumpton's motion was affirmed on appeal. The denial was supported by the trial court's finding that Crumpton's "affidavit lacked a 'modicum of credibility' and that Crumpton had not offered 'otherwise admissible evidence' to support his position that the admissions should be withdrawn." Id at 147. The trial court also rejected Crumpton's argument that the requests were incredible on

their face, finding instead that the requests were "sufficiently factually tailored to the ultimate issues in this case." Id.

Here, Peach served McMath with discovery requests that included 61 RFA on August 8, 2022, and served each Corporate Defendant with discovery requests that included 62 RFA on October 19, 2022. Because Defendants filed a joint Motion to Dismiss for Improper Venue, discovery was stayed for 90 days until January 4, 2023. OCGA § 9-11-12 (j) (1). Discovery ended on July 6, 2023, without Defendants answering any RFA. On November 17, 2023, Peach moved for summary judgment, relying heavily, though not solely, on the unanswered RFA. On November 20, 2023, over a year after being served with the RFA, Defendants moved to withdraw the admissions

Filed concurrently with Defendants' motion for summary judgment and motion to withdraw admissions was the Affidavit of Leroy McMath, which was filed in two parts, a 31-page filing and a 53-page filing described as "(Continued)." The Affidavit in full contains 53 averments, and Defendants expressly relied on McMath's Affidavit in their Motion for Summary Judgment but not in their Motion to Withdraw Admissions. The 53 averments span six pages, and they reference:

> Exhibit A as the Articles of Incorporation for Power Entertainment Co., Inc;
> Exhibit B as the Articles of Incorporation for Power Artist Music Co.;
> Exhibit C as the August 15, 2010 Distribution Agreement;
> Exhibit D is skipped;
> Exhibit E as the September 18, 2018 Purchase Agreement;
> Exhibit F as the September 20, 2018 Letter of Direction;
> Exhibit G as Power Artists Exclusive Artist Recording Agreements; and
> Exhibit H as Power Artists Songwriter Term Contracts.

The references to Exhibits A, B, and C are accurate. The remaining references do not align with the actual attachments. The Purchase Agreement referenced as Exhibit E is labeled Exhibit D.

The Letter of Direction referenced as Exhibit F is attached twice, once as a low-quality copy that has no exhibit label and is placed before Exhibit C and secondly as a higher quality copy labeled as Exhibit E. The Power Artists Songwriter Term Contracts referenced as Exhibit H are labeled Exhibit G. The Power Artists Exclusive Artist Recording Agreements referenced as Exhibit G are not attached.

To sum up the contents of the record as it pertains to the admissions, Peach submitted 62 admissions in August and October of 2022, and Defendants filed 53 averments with incomplete attachments in November 2023. Defendants offer no explanation or analysis as to how McMath's 53 averments refute any of the 62 admitted requests.

In contrast to *WellPath* and more akin to *Crumpton*, Defendants have failed to carry their burden of proving the first prong. Defendants were required to show that the admitted requests either were refutable by admissible evidence having a modicum of credibility or were incredible on their face. Defendants do not contend, nor is there any evidence to show, that any of the RFA were incredible on their face. Nor have Defendants produced or pointed to admissible, credible evidence rebutting the admissions. Furthermore, Defendants offer no reason for not responding to discovery, for waiting four months after the close of discovery before seeking to withdraw the admissions, or for relying on McMath's 53 averments to deny the 61 RFA posed to McMath and the 62 RFA posed to the Corporate Defendants. Defendants' sole and bare assertion is that "this motion is not being interposed for any purpose of delay. Rather, it is being made to ensure that this case is decided on its merits." Lacking any reason or reasoning to support this assertion, the Court finds that Defendants have not met their burden of satisfying either portion of the first prong of the two-prong test to set aside admissions. Therefore, the Court DENIES the Motion to Withdraw Admissions.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

To prevail at summary judgment under OCGA § 9-11-56(c), the movant must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmovant, without the necessity of weighing the evidence or determining the credibility of the witnesses, warrant judgment as a matter of law. *Lau's Corp., Inc. v. Haskins*, 261 Ga. 491, 491 (1991). "A defendant may do this by either presenting evidence negating an essential element of the plaintiff's claims or establishing from the record an absence of evidence to support such claims. Thus, the rule with regard to summary judgment is that a defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case, but may point out by reference to the evidence in the record that there is an absence of evidence to support any essential element of the nonmoving party's case." *Cowart v. Widener*, 287 Ga. 622, 623 (2010) (citations and punctuation omitted). If the movant meets its burden then the opposing party cannot rest on its pleadings and must come forward with rebuttal evidence giving rise to a triable issue or suffer judgment against him. Id. "[E]vidence offered on motion for summary judgment is held to the same standards of admissibility as evidence at trial." *Taylor v. Golden Corral Corp.*, 255 Ga.App. 860, 862(1) (citation and punctuation omitted). It is the duty of each party to summary judgment to present his case in full. See *Sharfuddin v. Drug Emporium*, 230 Ga.App. 679, 681(2) (1998).

Here, Defendants' admissions along with the pleadings, the Affidavit of Peach with its 37 attached exhibits, and the Affidavit of John M. Duffoo, establish that Peach is entitled to summary judgment in its favor and against Defendants on all of its claims and Defendants' counterclaims.

Peach's claim for breach of contract is established by the Affidavit of Peach, the Affidavit of Duffoo, and RFA 1 to 8 and 55 to 58, with Defendants admitting that they owed Plaintiff

$48,855.67 plus interest of $2,485.57 as of June 20, 2022, inclusive of all credits and/or setoffs, and their steadfast refusal to pay is unjustified by any reason in law or fact.

Peach's claim of "on account" is established by RFA 26 to 28 (28 to 30 for the Corporate Defendants), with Defendants admitting that the amount owed to Plaintiff is accurate, liquidated, and continues month to month.

Peach's claim for conversion is established by the Affidavit of Peach, the Affidavit of Duffoo, and RFA 53 to 60 (54 to 61 for the Corporate Defendants), with Defendants admitting to sending a Letter of Direction that wrongfully redirected royalty payments from Plaintiff to Defendants.

Peach's claim for tortious interference with contractual/business relations is established by the Affidavit of Peach and RFA 49 to 52 (50 to 53 for the Corporate Defendants), with Defendants admitting to (1) improper action or wrongful conduct without privilege; (2) acting purposely and with malice with the intent to injure; (3) causing third parties to fail to meet contractual obligations; and (4) the tortious conduct proximately caused damage to Peach.

Peach's claim for fraud is established by RFA 41 to 48 (42 to 49 for the Corporate Defendants), with Defendants admitting that they (1) made willful and/or reckless false representation(s) as a method of obtaining Peach's royalty payments; (2) acted with scienter; (3) intended to induce Peach and/or third parties to act; (4) that Peach justifiable relied on Defendants' misrepresentations; and (5) Peach suffered damages as a result of Defendants' fraud."

Peach's claim for punitive damages was expressly pled in the Complaint and is established by the Affidavit of Peach and RFA 38 to 40 (39-41 for the Corporate Defendants), with Defendants admitting that Defendants' actions and/or inactions prove by clear and convincing evidence willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise

the presumption of conscious indifference to consequences. OCGA § 51-12-5.1 (b). More specifically, Defendants admitted that they acted with a know or willful disregard of Peach's rights and should pay the maximum amount of $250,000.00 as punishment and deterrence.

Peach's claim for bad faith attorney's fees under OCGA § 13-6-11 is established by the Affidavit of Peach, the Affidavit of Duffoo, and RFA 61 (62 for the Corporate Defendants), with Defendants admitting to being stubbornly litigious.

All defenses to Peach's claims fail. McMath's 17 defenses raised in his answer and the Corporate Defendants' 19 defenses raised in their answer are refuted by RFA 9 to 25 (9 to 27 for the Corporate Defendants), with Defendants admitting that the defenses are unsupported by law or fact.

Finally, Defendants' seven counterclaims are refuted by RFA 29 to 37 (31-38 for the Corporate Defendants), with Defendants admitting that each of their counterclaims fail as a matter of law.

Defendants have failed to come forward with rebuttal evidence giving rise to a triable issue on any of Plaintiff's claims, defenses thereto, or on their counterclaims. The Court hereby GRANTS Peach's Motion for Summary Judgment and DENIES Defendants' Motion for Summary Judgment.

### FINAL HEARING ON DAMAGES

As of November 2023, Peach calculated damages against Defendants in the principal amount of $121,701.50; interest in the amount of $49,875.61; financial damages associated with Defendants' distributor and paid via Peach's royalties in the amount of $15,445.50, punitive damages in the amount of $250,000.00, attorney's fees pursuant to O.C.G.A. §13-1-11 as

calculated by statute in the amount of $17,183.31; attorney's fees pursuant to O.C.G.A. §13-6-11 in the amount of $46,410.00; and costs of $755.12; plus post-judgment interest.

The Court shall hold a final hearing at which the parties shall present full evidence of all damages, including the current principal owed, interest, financial damages, punitive damages, and attorney's fees and costs.

SO ORDERED, this 3rd day of January 2025.

Hon. LaTisha Dear Jackson
DeKalb Superior Court, Div. 7
Stone Mountain Judicial Circuit

eserved:    John M. Dufoo, Esq. – counsel for Plaintiff
            Le'Asa M. Otey, Esq. – counsel for Defendants

# EXHIBIT M

# EXHIBIT M

# EXHIBIT M

FILED 6/24/2025 4:05 PM CLERK OF SUPERIOR COURT DEKALB COUNTY GEORGIA

## IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

MATTHEW PEACH,

     Plaintiff,

v.

LEROY McMATH,
POWER ENTERTAINMENT CO, INC.,
and POWER ARTIST MUSIC CO.,

     Defendants.

              CIVIL ACTION FILE
              NO. 23CV6869-7

## FINAL JUDGMENT

This Court having previously granted Plaintiff judgment on all his claims, including: (1) breach of contract and on account; (2) conversion; (3) tortious interference with contractual business relations; (4) fraud; (5) punitive damages; (6) pre-judgment interest; (7) and attorney's fees under O.C.G.A §§ 13-1-11 and 13-6-11, per the Order entered on January 3, 2025; and this action having been called for trial before the Honorable LaTisha Dear Jackson on the issue of damages; and Plaintiff Matthew Peach having appeared with counsel, Defendant Leroy McMath having appeared self-represented, and co-Defendants Power Entertainment Co, Inc. & Power Artist Music Co. having failed to appear through counsel; and the Court having granted Plaintiff's Motion for Bench Trial; and the case having been duly tried with Plaintiff presenting testimony supported by Plaintiff's Trial Exhibits "A" thought "O" and Defendant McMath having had a full and fair opportunity to challenge Plaintiff's presentation and to present his own evidence and argument; this Court renders the following judgment:

**IT IS HEREBY ORDERED AND ADJUDGED** that Plaintiff MATTHEW PEACH recover from the Defendants LEROY McMATH, POWER ENTERTAINMENT CO, INC., and

POWER ARTIST MUSIC CO., jointly and severally, the amount of **$427,710.30**, which comprises the following:

1. Principal amount of damages owed by Defendants to Plaintiff are: **$121,701.50.**

2. Pre-judgment interest owed by Defendants to Plaintiff is: **$98,817.90.**

3. Additional monetary damages owed by Defendants to Plaintiff are: **$15,445.50.**

4. The Court having previously found that Defendants admitted that they acted with a known or willful disregard of Plaintiff's rights, punitive damages are awarded to Plaintiff in amount of **$100,000.00** as punishment and deterrence pursuant to OCGA § 51-12-5.1.

5. Attorney's fees owed by Defendants to Plaintiff pursuant to OCGA § 13-1-11(a)(2) are: **$22,076.94** (Principal of $121,701.50 plus prejudgment interest of $98,817.90 equals $220,519.40; 15% of the first $500 is $75.00; 10% of the remaining $220,019.40 is $22,001.94; and $75.00 plus $22,001.94 totals $22,076.94).

6. Finding that Defendants acted in bad faith, were stubbornly litigious, and caused Plaintiff unnecessary trouble and expense; and based on evidence of actual costs and fees and the reasonableness of those costs and fees, the expenses of litigation owed by Defendants to Plaintiff pursuant to OCGA § 13-6-11 are: **$69,668.46** (comprising the $90,345.40 as shown in Plaintiff's Trial Exhibit O plus $1,400.00 for the four hours of trial minus the $22,076.94 awarded under OCGA § 13-1-11).[1]

7. Post Judgment interest at the legal rate.

**JUDGMENT ENTERED** this the 24th day of June 2025.

Hon. LaTisha Dear Jackson
DeKalb Superior Court, Div. 7
DeKalb Judicial Circuit

eserved: John M. Duffoó, Esq. – Counsel for Plaintiff
eserved: LeRoy McMath, leroy@wbaball.net

---

[1] When the Court orally pronounced judgment at the end of trial, it awarded expenses of litigation under OCGA § 13-6-11 for the full amount established by Plaintiff's Trial Exhibit O. However, awarding Plaintiff attorney's fees under both OCGA §§ 13-1-11 and 13-6-11 against the same Defendants would constitute an impermissible double recovery. Therefore, this written judgment corrects the oral pronouncement to avoid overlapping attorney's fees awards.

# EXHIBIT N

# EXHIBIT N

# EXHIBIT N

# John Duffoo

| | |
|---|---|
| **From:** | leroy wbaball.net <leroy@wbaball.net> |
| **Sent:** | Wednesday, January 28, 2026 1:42 PM |
| **To:** | John Duffoo |
| **Subject:** | Re: Peach v. McMath, et al.; Post Judgment File No.: 25CV8093-7 - related to CAFN: 23cv6869 |

Resent as a PDF in drop box. I was able to open the files.

Regards,

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Wednesday, January 28, 2026 1:02 PM
**To:** leroy wbaball.net <leroy@wbaball.net>
**Subject:** RE: Peach v. McMath, et al.; Post Judgment File No.: 25CV8093-7 - related to CAFN: 23cv6869

Leroy,

Unfortunately, what you shared is not legible.  This is all I see.

- <!DOCTYPE html>
- <!-- saved from
url=(0497)https://apps.docusign.com/sign/app?ti=71dbbdb0d0bf49749cc3589093feeca1&signing-config=%7B%22SigningAppDisabledFlags%22%3A%22%22%2C%22EnableKazmonTelemetryRecorder%22%3Atrue%2C%22NotaryFetchSettings%22%3A%7B%22LiveoakTokenRequestTimeoutSeconds%22%3A30%2C%22EnableRemoteNotaryAuth%22%3Atrue%2C%22IsThirdPartyNotary%22%3Afalse%2C%22LiveoakTokenExchangeOrigin%22%3A%22%22%7D%2C%22WebFormsSettings%22%3Anull%2C%22OneDSMessagingOrigins%22%3Anull%2C%22FocusedViewSource%22%3Anull%7D&site=NA4.docusign.net -->
- <html lang="en" dir="ltr" class="mouse-active"><head><meta http-equiv="Content-Type" content="text/html; charset=UTF-8">

Plus there is NO documents in the shared folder.  I should see a PDF.  You may need to download the documents from Docusign to your computer in a PDF format and then upload the document to the Dropbox folder.  Example, I'm going to upload the recent court order and you will see what it is supposed to look like.



https://www.dropbox.com/scl/fi/en7o68ir34gfpe0ivwt4t/FILED-Order-on-Discovery-Deadline-and-Compliance-Hearing.pdf?rlkey=t5p7ru8jnhnxnn0so1vgjwt0z&st=zr07q4cx&dl=0


Best Regards,

John M. Duffoo
Business Law Firm of John M. Duffoo, P.C.
8920 Eves Rd.
No.  767355
Roswell, GA 30076
Tele: 770-312-6160
Email: john@jdbusinesslaw.com
Website: www.Duffoolaw.com


---

**From:** leroy wbaball.net <leroy@wbaball.net>
**Sent:** Wednesday, January 28, 2026 12:10 PM
**To:** John Duffoo <john@jdbusinesslaw.com>
**Subject:** Re: Peach v. McMath, et al.; Post Judgment File No.: 25CV8093-7 - related to CAFN: 23cv6869

Attorney Duffoo, I was able to recovered from Docusign the master sales agreement dated December 7th 2023 between Power Artist Records and Tommy Boy Artist LLC.  The contract is 14 pages, and over one hundred additional exhibits. Please advise how you would like to receive? expect answers to the post judgement request on or before Friday January 30th 2026.

Regards,

---

**From:** John Duffoo <john@jdbusinesslaw.com>
**Sent:** Wednesday, January 28, 2026 10:21 AM
**To:** Bilic, Renata <rbilic2@dekalbcountyga.gov>; leroy wbaball.net <leroy@wbaball.net>
**Subject:** RE: Peach v. McMath, et al.; Post Judgment File No.: 25CV8093-7 - related to CAFN: 23cv6869

Thank you, Renata.

2

## John Duffoo

| | |
|---|---|
| **From:** | Dropbox <no-reply@dropbox.com> |
| **Sent:** | Wednesday, January 28, 2026 2:21 PM |
| **To:** | John Duffoo |
| **Subject:** | Leroy McMath sent you a file |

Download them by February 4, 2026 at 11:59 PM GMT-05:00



Easily send large files

Hi John,

**Leroy McMath (leroy@wbaball.net) sent you a file.** It'll be available to download until **February 4, 2026 at 11:59 PM GMT-05:00**.

**Leroy left you a message:**

*"Post Judgement documents. Leroy McMath 1-28-26"*

     Complete_with_DocuSign_ASSET_PURCHASE_AGREEM.pdf
7.91 MB

**Download files**

This email was sent to john@jdbusinesslaw.com. If that isn't your email, <u>report to Dropbox</u>

© 2026 Dropbox

1

ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of December 7, 2023 (the "Effective Date") by and among TOMMY BOY ARTISTS, LLC ("Buyer"), on the one hand, and POWER ARTISTS RECORDS, INC., doing business as POWER PRODUCTION, INC., POWER RECORDS, TRIAD RECORDS, INC., POWER ENTERTAINMENT, INC., WRAP RECORDS, and any other affiliated entities, and LEROY MCMATH, in his individual capacity (jointly and severally referred as the "Seller"), on the other hand.

## WITNESSETH

A.      WHEREAS, Buyer is in the business of acquiring ownership of and the right to receive royalties and all other income derived from sound recordings;

B.      WHEREAS, Seller owns certain rights and interests including but not limited to the copyrights, to the sound recordings performed and recorded by Eric Timmons p/k/a "Freak Nasty", Eric Breed p/k/a "MC Breed", Patrick Hall p/k/a "Gangsta Pat" and others, some of which are listed on the attached Schedule 1 (the "Masters");

C.      WHEREAS, Seller has entered into certain agreements in which all of the ownership interests including but not limited to copyrights, have been acquired, some of which are attached as Exhibit A hereto (the "Artist Agreements"); and

D.      WHEREAS, the Seller wishes to sell and Buyer wishes to acquire from the Seller, (1) one hundred percent (100%) of Seller' right, title and interest in and to the Masters, including but not limited the world-wide copyrights, as renewed and extended, in perpetuity, whether now known or hereafter discovered or developed; (2) all income ownership and collection rights of the Masters, regardless of when earned; (3) all right, title and interest relating to any Samples or derivative works of the Masters; (4) those physical materials of Seller, including all master tapes both physical and digital media, that relate to the Masters described in clause B above, artwork (e.g. record cover designs, films, and other commercial artwork for the promotion of Artist works), photographs, and digital and analog files of images used in manufacturing, production, marketing and promotion, music videos and all paper and computer files (including artist, production, and distribution contracts); and (5) all other rights and benefits of the Seller with respect to the Artist Agreements, production agreements, and any third party licenses for the use of the Masters (the properties and rights described in clauses (1) through (5) are, collectively, the "Assets").

NOW THEREFORE, in consideration of the mutual promises herein contained, and other good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged by the Parties, it is agreed as follows:

1.      **Purchase and Sale.**

     1.1      In each case set forth below, in consideration of and subject to receipt of the Purchase Price, Seller hereby irrevocably, unconditionally, absolutely and in perpetuity grants, sells, transfers and assigns (by way of present and future assignment, if applicable) to Buyer, in each case free and clear of all liens, claims, mortgages, encumbrances, securities interests, pledges, or other restrictions:

     (a)      One Hundred (100%) percent of Seller' economic rights of any nature whatsoever under or pursuant to the Assets, including, without limitation, the right to receive directly from any distributor of the Masters, One Hundred (100%) percent of income and collection rights consisting of income and royalties paid or credited on or after the Closing Date (regardless of when earned); and

     (b)      Absolutely, irrevocably and exclusively, one hundred (100%) percent of Seller' entire right, title and interest (whether vested, future or contingent) in and to the Masters, including, without

1

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

restriction or limitation, the right to own and administer, collect and retain, one hundred (100%) percent of all income of any nature whatsoever from any source throughout the universe related to such Masters (regardless of when earned) which Seller acknowledge may include forms or sources of income which may be later known or developed, including, without limitation, SoundExchange and other neighboring rights collection organizations throughout the world and payable after the Closing Date (regardless of when earned).  In consideration of receipt of the Purchase Price, the rights assigned to Buyer hereunder shall include, without limitation, the sole and exclusive rights throughout the universe, without restriction or limitation, to own and administer in their entirety, the Masters.  Concurrent with the execution of this Agreement, Seller shall execute a short form assignment of copyright, a form of which is attached hereto as Exhibit B, in respect of Buyer's interest in the Masters.

  1.2 The rights assigned to Buyer under this Agreement include, without limitation, Buyer's right, throughout the universe to: (a) Secure copyright in Buyer's name in the Masters in perpetuity and throughout the universe (including all renewals and extensions and revivals thereof); (b) Manufacture, stream, distribute and otherwise re-produce the Masters in any form and by any means, including electronically and digitally; (c) Publicly perform and broadcast and transmit and communicate to the public the Masters by any and all means; (d) Reproduce and exploit the Masters by means of physical and/or digital reproduction; (e) Re-mix, adapt and perform in other languages the Masters and make changes and additions of new matter in the vocals and instrumentation; (f) Grant perpetual and/or limited licenses for the synchronization of the Masters with visual images; (g) Reproduce, encode, use and/or exploit the Masters by way of electronic or digital transmission, broadcast or dissemination including without limitation via the internet; (h) Exercise and authorize others to exercise all other rights of whatsoever nature in and to the Masters; (i) Authorize or license others to exercise any or all of the above rights described in this Paragraph 1.2; (j) Grant so-called "sample" licenses (including, for the avoidance of doubt, the right to control the terms of all such "sample" licenses to be granted); (k) Subject to the terms and conditions hereof, the right to all claims of the Seller in respect of like benefits relating to the Masters; and (l) All other rights in and to the Masters, whether now known or hereafter to become known or developed.

2. The Seller hereby, in favor of Buyer, irrevocably and unconditionally and forever waives, and agrees not to assert, any and all moral or similar rights that the Seller may have in relation to the Masters under the present or future laws of any jurisdiction.

3. The Seller hereby irrevocably grants to Buyer (and Buyer's agents, administrators, and licensees) the non-exclusive right without payment of any kind, to accurately and in good faith use and authorize others to use Seller and Artist names (including professional names), approved likenesses, and approved biographical material, as well as any logos or trademarks related to the Seller and which are owned and or controlled, directly or indirectly, by the Seller (collectively, the "Name and Likeness") (a) in connection with the marketing and/or exploitation of the Masters, and/or (b) in reference to the fact that Buyer has acquired the Assets.  Upon request by Buyer, Seller shall deliver to Buyer approved likenesses of the Seller and Artists and approved biographical material for use by Buyer as expressly set forth herein, in each case with such approval not to be unreasonably withheld by Seller.

  3.1 If following the Closing Date, the Seller, or any other person on the Seller' behalf, receives any monies relating to any interest in or use or exploitation of the Masters on or after the Closing Date, then the Seller shall pay such monies to Buyer within five (5) Business Days of the Seller, the Seller's Representatives or any Person on the Seller's behalf, discovering that such monies have been paid to the Seller, or any such other Person on the Seller's behalf, alongside copies of all accounting statements and other documents actually received by or on behalf of Seller relating to such monies, which payment shall be made to Buyer without deduction or set-off of any kind (in each case, for which

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Buyer shall be responsible for all of such taxable income associated with Buyer's receipt of such payment in accordance with applicable law). For the avoidance of doubt, any failure of the Seller to comply with the obligations set forth in this Paragraph 3.1 shall be deemed a material breach of this Agreement. In the event that any third party to whom a letter of direction is sent pursuant to the terms and conditions of this Agreement refuses to comply with the terms of such letter of direction, then the Parties will discuss in good faith a long-term solution to ensure Buyer's prompt receipt of the royalties or other income payable by such third party, including the possibility of establishing a separate account in Seller's name for receiving such royalties or income, but which account shall be under the exclusive control of Buyer.

      3.2     If (but for or despite this Agreement) the Seller is or becomes entitled pursuant to any applicable rules to exercise and/or enjoy any statutory right of reversion, revival, renewal and/or extension of Copyright in respect of any of the Assets, then: (i) Buyer may exercise and/or enjoy such right in lieu of the Seller in connection with such Assets or, if and to the extent that is not permissible under applicable rules, upon written request and at the sole expense of Buyer, under the direction of Buyer, the Seller shall promptly exercise and/or make arrangements (or cause such other Seller affiliate to exercise and/or make arrangements) in relation to such right in compliance with Buyer's directions; and (ii) the resulting rights so acquired shall, to the fullest extent permissible, form part of the rights granted and assigned to Buyer under this Agreement. For the avoidance of doubt, the Seller (on behalf of the Seller and their respective affiliates, successors, assigns, heirs, and representatives) hereby expressly and irrevocably waive all so-called "termination rights" arising under Sections 203 or 304 of the U.S. Copyright Law in respect of the conveyance of the Assets to the Buyer.

      3.3     Subject to the terms and conditions of this Agreement, on the Closing Date and at all times thereafter, Buyer shall assume and at all times thereafter shall pay and perform, satisfy and otherwise discharge all obligations and liabilities arising or accruing with respect to sales, licensing, exploitation or other activities occurring on or after the Closing Date (the "Assumed Liabilities"), pursuant to which Seller shall have no responsibility therefore, subject to Paragraph 7.3; provided, however, that nothing in this Paragraph 3.3 shall limit, waive or impair Buyer's rights to indemnification set forth under Paragraph 9 of this Agreement.

      3.4     Except as otherwise specifically provided in Paragraph 3.3, Buyer shall not assume and shall in no event be liable for any liabilities or indebtedness of the Seller, or any of their affiliates, whether accrued before or after the Closing Date, absolute, matured, known or unknown, liquidated or unliquidated, contingent or otherwise, including, without limitation, the following (the "Excluded Liabilities"): (a) any liabilities of the Seller or any of its affiliates for federal, state, local or foreign taxes; (b) any liabilities for any amounts owing with respect to sales, exploitation, licensing or other activities involving the Assets and occurring on or before the Closing Date; (c) any liabilities in respect of any claims arising out of, relating to or otherwise in respect of ownership of the Assets or Masters prior to the Closing Date or any allegation of infringement, non-payment of royalties, or any other matter arising or occurring prior to the Closing Date with respect to the Masters; (d) any liabilities arising from overpayments or other errors prior to the Closing Date with respect to the payment or crediting of royalties to the Seller or any of its affiliates by any performance society or any other payor occurring on or before the Closing Date; (e) any liabilities arising from or relating to any actual or alleged breach or violation of any law or contract (whether written or oral) by the Seller or any of its affiliates, or actual or alleged default under any such law or contract by the Seller, or any of its affiliates; and (f) any liabilities of the Seller or any of its affiliates arising out of or in connection with this Agreement or contracts to which the Seller or any of their affiliates are a party or otherwise bound but not expressly assumed hereby.

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

4.      The Seller shall, at Buyer's reasonable request and sole cost and expense from time to time, execute and deliver to Buyer such additional documents, as may from time to time be reasonably necessary or desirable for the purpose of confirming, protecting and exercising any and all rights granted, transferred, assigned and sold to Buyer pursuant to this Agreement, including, without limitation, all documents requested by Buyer in order: (i) to renew and extend the copyrights in the Masters (and to file any related applications) in Buyer's (or its designee's) name; (ii) on the issuance of such renewals and extensions, to execute proper and formal assignments in Buyer's or its designee's name so as to secure to Buyer or its designee such renewals and extensions; and (iii) to exercise all manner of rights in respect of the Assets under the Artist and Production Agreements, any sound recording performance agreements, any licenses, and this Agreement.

4.1     In the event Seller fails to execute and/or deliver to Buyer or fails to cause any of its affiliates to execute and/or deliver to Buyer any such document directly applicable to such affiliate within five (5) business days after Buyer's written request therefor, the Seller hereby irrevocably grants to Buyer the limited right, power and authority as the Seller's attorney-in-fact solely to execute and deliver such applicable document in the Seller's name and on behalf of the Seller and Buyer shall thereafter provide Seller with a copy of each such document executed pursuant to the authority granted hereunder. The foregoing powers of attorney (i) are coupled with an interest and shall be irrevocable and survive the sale, merger, dissolution, or bankruptcy of the Seller granting the same, and (ii) may be exercised by Buyer (and its designees) either by signing separately as attorney-in-fact for the Seller or by a single signature of Buyer (or its designees) acting as attorney for all of the Seller. Concurrent with the execution of this Agreement, the Seller shall execute a power of attorney representing the foregoing in the form of Exhibits C-1 and C-2, and, within five (5) Business Days after Buyer's written request therefor, such other industry standard documents or instruments as Buyer deems necessary or appropriate to carry out the terms of this Agreement. In the event of any inconsistency between the provisions of such separate documents and the provisions of this Agreement, the provisions of this Agreement shall prevail. Buyer shall provide a copy to the Seller of any document that is executed pursuant to the aforesaid right and authority.

5.      **Payment and Closing**

5.1     In consideration of the covenants and agreements contained in this Agreement, Buyer shall pay as the "Purchase Price" the sum of One Hundred Fifteen Thousand Dollars ($115,000.00). The closing (the "Closing") of the transactions contemplated by this Agreement shall occur via electronic means concurrently with the execution and delivery of this Agreement, subject to Paragraph 5.4 hereof. The date the payment described in this Paragraph 5.1 is paid by Buyer is referred to as the "Closing Date." For all purposes hereunder, the effective time of the Closing shall be 12:01 a.m. Eastern Time on the Closing Date.

5.2     Buyer agrees that a payment of Seventy Five Thousand Dollars ($75,000.00) (the "Contingent Payment") will be made to Seller on the date that is eighteen (18) months following the Closing Date; provided, however, the Contingent Payment a) shall not be due or payable in the event a lawsuit is filed in any jurisdiction which names Buyer or any of its affiliates whether or not as a result of or in connection with the matters contained in the lawsuit referred to in paragraph 18.2; and b) the amount of the Contingent Payment shall be reduced by all amounts incurred by Buyer regarding any claim(s) or controversies (as opposed to the actual filing of a lawsuit) covered by Seller's representations and warranties hereunder. Such amounts shall include but not limited to, legal and other professional fees and expenses. This provision will not limit Tommy Boy's other rights and remedies under this Agreement.

4

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

5.2     Seller acknowledges that the Purchase Price shall include and reflect payment of amounts sufficient to fully repay and satisfy any and all unrecouped balances (if any) as of the Closing Date with respect to the Assets and Seller's royalty account with each such payor.

5.3     The payment of the Purchase Price referred to in Paragraph 5.1 shall be made to the Seller by bank wire no later than five (5) Business Days after the full execution and delivery of this Agreement (and all Exhibits, Schedules and Appendices hereto, executed by the Seller, as applicable) and satisfaction or waiver of all of Buyer's conditions to Closing (which, for the avoidance of doubt, shall include the completion by Buyer of all legal "due diligence" to Buyer's satisfaction).

5.4     At or prior to the Closing, the Seller will deliver, or cause to be delivered, to the Buyer (or as otherwise indicated below): (a) A general letter of direction in the form of Exhibit B hereto; (b) The power of attorney in the form of Exhibits C-1 and C-2 hereto; (c) The copyright assignment in the form of Exhibit D hereto; and (d) Such other agreements, instruments and documents reasonably necessary and requested by the Buyer in such form and substance reasonably acceptable to the Buyer (the "Transaction Documents").

5.5     Notwithstanding anything to the contrary contained in this Agreement, Buyer grants to Seller the non-exclusive license in the United States for a term not to exceed five (5) years from the date of closing, to use the name "Power Artists Records" and related logos on tee shirts and other clothing. No other rights are granted to the Power Artists Records name and logos and Seller shall not have the right to further license such name and logos to any third party.  Buyer shall not be liable for any such use by Seller.

5.6     For the period of ninety (90) days from the Closing Date, Seller shall provide Buyer with access to the Assets in the possession and/or control of Seller, wherever located for inspection and/or delivery to Buyer.  Assets shall include all legal files, artist, producer, and all other third party contracts and licenses, audio and video master tapes both analog and digital, cover art and films, promotion and marketing material, artist biographies and approved likenesses, and all other physical and digital material in the possession or control of Seller, wherever located.

6.     **No Royalties and Accountings.**  For the avoidance of doubt, except as otherwise explicitly set forth herein, no payment of royalties or any other sums shall be due from Buyer to the Seller (or any Seller affiliate) in respect of the Assets pursuant to the terms of this Agreement, and neither Buyer nor Seller shall be under any obligation under this Agreement to keep any books and/or records of account or prepare statements of account in relation to the Assets.

7.     **Seller Representations and Warranties.**  The Seller represents and warrants that the statements contained in this Paragraph 7 are correct and complete.

7.1     Seller has the right, power, and authority to enter into and perform this Agreement and to grant to Buyer all of the rights granted and assigned to Buyer under this Agreement, free of any encumbrances of any kind.

7.2     This Agreement (and the other transaction documents to which Seller is a party) has been duly and validly executed and delivered by or on behalf of and constitutes the valid and legally binding obligation of the Seller, enforceable against the Seller, in accordance with its terms and conditions.

7.3     Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated by this Agreement or the transaction documents to be executed and are delivered by the Seller will (a) violate any applicable rule or order to which the Seller are subject or (b) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any contract to which the Seller are a party or by which it is bound or to which any of the Assets are subject (or result in the imposition

5

of any encumbrance upon any of the Assets).  Seller is not required to give any notice to make any filing with, or obtain any authorization, consent, or approval of any governmental agency or any other person (including, without limitation, a party to any contract) in order for the Parties to consummate the transactions contemplated by this Agreement or the other transaction documents.

7.4      At the Closing, Seller shall have good and marketable title to the Assets (including, without limitation, Seller's title in all copyrights, including all extensions, renewals, and continuations thereof) throughout the world.  All of the Seller's interests in the Assets are fully and freely assignable. Seller is the valid holder of the Assets and is the valid recipient of all royalties payable to the Seller with respect to the Masters.  After giving effect to the Closing, Buyer will have good and marketable title to 100% of the Assets throughout the world.

7.5      Schedule 1 is a true, complete, and correct list of all Masters as of the Closing Date.

7.6      To the knowledge of the Seller, no Person is exploiting copyrights that infringe upon any of the Masters.

7.7      The consummation of the transactions contemplated by this Agreement will not result in the termination or impairment of any Person's rights in or to any of Masters and the registrations with respect thereto under the terms of any applicable contract to which the Seller is a party or otherwise bound, or by operation of law.  No Person holds a power of attorney on behalf of the Seller or relating to any interest in any of the Assets, which power of attorney could have the effect of diminishing the rights of Buyer in the Assets after the Closing Date.

7.8      No action by or with the authority or consent of the Seller or any of Seller's affiliate has been taken or omitted which would destroy or impair the protection of any of the Masters under U.S. Copyright Law.

7.9      No Person other than the Seller have any right (by contract, statute or otherwise) to assign, license, exploit, dispose of, transfer, use or grant rights to any other person with respect to the Assets.

7.10     The Masters are original and are unencumbered works capable of copyright protection under U.S. Copyright Law and (to the extent that the Masters were first published or simultaneously published in a country that had at the time of such publication acceded to the Berne Convention for the Protection of Literary and Artistic Works) the Berne Convention for the Protection of Literary and Artistic Works.  To the knowledge of the Seller, the copyrights in each of the Masters is validly subsisting.

7.11     The Masters do not and will not (a) infringe the copyright or any other legally protected rights of any third party or (b) knowingly contain anything that is criminally obscene or defamatory, nor any other unlawful content.  The Masters are original and are unencumbered works capable of copyright protection under U.S. Copyright Law.  Except as set forth on the attached disclosure schedules, there are no settlement agreements or similar documents applicable to any of the Masters in respect of any claims arising from or related to any claim of ownership.  To the best of Seller' knowledge, there are no allegations asserted by any third party of infringement, non-payment of royalties, or any other matters with respect to the Masters except as listed on the Schedules.

7.12     Buyer shall not be required to obtain the approval or consent of or consult with any person with respect to the exploitation of the Masters by any means or in any manner whether now known or hereafter invented or otherwise howsoever after the date of this Agreement.

7.13     Seller is the sole owner of all of the rights expressed to be granted and assigned to Buyer under this Agreement in respect of the Assets, and Seller has not previously assigned, licensed, charged or otherwise dealt with or encumbered any right, title or interest in or to any sound recording work comprising the Masters so that the rights granted to Buyer under this Agreement would be impaired, and will not purport to do so hereafter.

6

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

7.14    Seller has not filed or received from any Artist (or threatened to file or receive from any Artist) any notices of termination of transfers for any of the Assets pursuant to Sections 203(a) and 304(c) of the United States Copyright Act (17 U.S.C. 101, et seq.) or their foreign equivalents.

7.15    To the knowledge of the Seller, no direct license for the public performance of the Masters has been issued, and the Seller has not been paid (directly or through its agents) any direct license fee in respect of the public performance of any of the Masters.

7.16    a. Seller is not insolvent, and Seller has no intention to file any voluntary petition initiating any proceeding under the United States Bankruptcy Code or the insolvency laws of any state or the making of an assignment for the benefit of creditors.

b. No custodian or receiver has been appointed or any distress, execution or other process been levied in respect of Seller's right (as applicable) to receive any sums under the Publishing Agreements, the Society Agreements, the Recording Agreements, or other Contract in connection with the Assets, and no events have occurred (or shall occur through the Closing Date in accordance with the terms and conditions of this Agreement), which would justify any such proceedings.

c. No Order has been made by, or petition presented to, any court of competent jurisdiction for the appointment of an administrator in respect of Seller or Seller's Affiliates, and no such Order shall be made through the Closing Date in accordance with the terms and conditions of this Agreement.

d. No administrator of Seller has been appointed by any Person entitled to appoint such an administrator pursuant to any insolvency or bankruptcy statute or rule or otherwise, nor have any documents been filed with any court of competent jurisdiction for the appointment of such an administrator, nor has any notice of intention to appoint such an administrator been given by any such person, and none of the foregoing shall take place through the Closing Date in accordance with the terms and conditions of this Agreement.

7.17    Buyer shall not assume any liability, debt, or obligation of Seller.

7.18    Seller has not entered into any contract which would have the effect of reducing the monies that would otherwise be payable to or collectable in respect of the Assets, and Seller shall not enter into such a contract after the date hereof.

7.19    There are no unrecouped advances or other recoupable sums paid to or on behalf of Seller or any person on Seller' behalf in connection with the Masters that may in any way, directly or indirectly, adversely impact the Assets, or have any adverse effect on Buyer's rights and interests under this Agreement, including, without limitation, Buyer's right to be paid by any royalty payor without regard to recoupment of any sums.

7.20    Except as set forth on the Schedules, Seller is not, directly, or indirectly, liable, responsible, or required (by contract or otherwise) to account to or make royalty or other payments to any mixer, producer, side artist, engineer, musician, or any other person in respect of the exploitation of the Masters, or receipt of any royalties related thereto.

7.21    Each Artist and production third party agreement is valid and binding on the Seller in accordance with its terms and is in full force and effect.  Neither the Seller nor, to Seller' knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) or has provided or received any notice of any intention to terminate, any Artist and production third party agreement.  No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Artist and production third party agreement or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.  There are no disputes pending or threatened under any Artist and production third party agreement.

7.22    Seller has been advised by Buyer to take independent legal advice in relation to this Agreement and Seller has, in fact, taken such independent legal advice.

7

7.23     The execution hereof and the consummation of the transaction contemplated hereby shall not cause the Buyer to be required to make any payments of any nature to acquire the Assets other than as set forth herein, or trigger any royalties, fees, compensation or other payments of any type, nature or description whatsoever to be made under any third party agreement or otherwise, except for royalty and other contractually required payments in the ordinary course of business.

7.24     The transaction contemplated by this Agreement does not constitute a so- called "bulk sales transaction" or require Seller or Buyer to give notice to any of Seller's creditors.

7.25     After the Closing Date, there will be no indebtedness or liabilities pertaining to or affecting the Assets except for those contracts with the Artists, producers, or other third parties who are entitled to royalties based on the use of the Masters.

7.26     There are no letters of direction regarding payments pertaining to the Assets.

7.27     No person has any so-called "first negotiation right," "right of first refusal," or "matching right" with regard to the Assets or any portion thereof.

8.     **Buyer's Representations and Warranties.**  Buyer represents and warrants that:

8.1     Buyer is a limited liability company duly formed and validly existing under the laws of Delaware.  Buyer has the power and authority to execute and deliver this Agreement and perform its obligations pursuant to this Agreement including, without limitation, the timely payment of the Purchase Price.

8.2     This Agreement has been duly executed and delivered on behalf of Buyer and, assuming the due authorization, execution and delivery hereof by Seller, constitutes a legal, valid and binding agreement enforceable against Buyer in accordance with its terms except (a) as such enforceability may be subject to bankruptcy, moratorium, insolvency, reorganization, voidable preference, fraudulent conveyance and other similar laws affecting the rights and remedies of creditors and obligations of debtors generally, and (b) rules of law or equity governing specific performance, injunctive relief, and other equitable remedies.

8.3     Neither the execution and the delivery of this Agreement or the transaction documents by the Buyer nor the consummation of the transactions contemplated by this Agreement or the transaction documents will (i) violate any law or order to which the Buyer is subject or any provision of its governing or formation documents or (ii) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice to or consent under any contract to which the Buyer is a party or by which it is bound or to which any of its assets is subject.

8.4     Buyer is not a party to any claim or order which is reasonably likely to adversely affect its ability to consummate the transactions contemplated by this Agreement;

8.5     Buyer is solvent and able to pay its debts as they fall due and shall be solvent and able to pay its debts as they fall due through the Closing Date; and

8.6     Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement, and Buyer is not subject to any contract with any third party which would result in any claw back, refund or forfeiture of the Purchase Price from the Seller after the Closing.

9.     **Indemnification**

9.1     All of the representations and warranties of Seller contained in this Agreement shall survive the Closing and continue in full force and effect for a period of six years thereafter, provided, that the representations and warranties in Paragraphs 7.1, 7.4, 7.12, 7.16, and 7.27, shall survive indefinitely. All of the representations and warranties of the Buyer contained in Paragraph 8 shall survive the Closing and continue in full force and effect for a period of three years thereafter.  All covenants and agreements

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

of the Parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.  Notwithstanding the foregoing, if written notice of any matter setting forth in reasonable detail a claim for a breach of any representation or warranty is given to the Buyer or Seller, as the case may be, in writing pursuant to this Agreement prior to the end of the applicable survival period, any such representation or warranty that would otherwise terminate shall be deemed to survive solely with respect to such matter until such matter is resolved.

9.2     Seller shall indemnify, hold harmless and defend the Buyer, its affiliates and representatives from and against the entirety of any and all losses which the Buyer, its affiliates or representatives may suffer, directly or indirectly, through and after the date of the claim for indemnification resulting from, arising out of, relating to, in the nature of, or caused by: (a) any breach of (or in the event any third party alleges facts that, if true, would mean Seller have breached) any representation or warranty of Seller contained in this Agreement (including, without limitation, in any Schedule, Exhibit or other document furnished or to be furnished to Buyer pursuant to this Agreement), provided, however, that for the purposes of determining the breach of any representation or warranty for purposes of Paragraph 7, or the amount of any losses suffered by Buyer, its affiliates and representatives, "materiality" and similar qualifications set forth in such representations and warranties shall be ignored; (b) any breach of (or in the event any third party alleges facts that, if true, would mean Seller has breached) any material covenant or agreement of Seller contained herein; (c) any Excluded Liabilities; (d) any act or unexcused omission of Seller which results in any uncured breach, rejection and/or termination of any third party agreement affecting the Assets; and (e) any third-party claims described on the Schedules; provided, that Buyer makes a written claim for indemnification against Seller within the applicable survival period.

9.3     Buyer shall indemnify, hold harmless and defend the Seller from and against the entirety of any and all losses which Seller may suffer, directly or indirectly, through and after the date of the claim for indemnification resulting from, arising out of, relating to, in the nature of, or caused by: (a) any breach of (or in the event any third party alleges facts that, if true, would mean Buyer has breached) any representation or warranty of Buyer contained in this Agreement (including, without limitation, in any schedule, certificate, exhibit or other document furnished or to be furnished to Seller pursuant to this Agreement), provided, however, that for the purposes of determining the breach of any representation or warranty for purposes of Paragraph 8, or the amount of any losses suffered by Seller, "materiality" and similar qualifications set forth in such representations and warranties shall be ignored; (b) any breach of (or in the event any third party alleges facts that, if true, would mean Buyer has breached) any covenant or agreement of Buyer contained herein; and (c) any Assumed Liabilities; provided, that Seller makes a written claim for indemnification against Buyer within the survival period.

10.     **Third Party Claims.**

(a) If any third party shall notify any Party (the "Indemnified Party") with respect to any matter (a "Third Party Claim") which may give rise to a claim for indemnification against any other Party (the "Indemnifying Party") under this Paragraph 10, then the Indemnified Party shall issue a Claim Notice (as defined below) to the Indemnifying Party with respect thereto.

(b) Any Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party so long as (i) the Indemnifying Party notifies the Indemnified Party in writing within ten (10) Business Days following the receipt of the Claim Notice that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Losses which the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim, (ii) the Third Party Claim involves only money damages and does not seek an injunction or other equitable relief, a determination of the validity or enforceability of any intellectual property rights of Buyer, or any criminal or civil remedy sought by a

ASSET PURCHASE AGREEMENT for power masters .04 execution version 12072023.docx

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Governmental Authority, (iii) settlement of, or an adverse judgment with respect to, the Third Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice adverse to the continuing business interests or the reputation of the Indemnified Party, and (iv) the Indemnifying Party conducts the defense of the Third Party Claim actively and diligently, provided, however, that if counsel defending such Third Party Claim shall advise the Parties of a potential conflict of interest arising from the existence of one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party or its affiliates, then the Indemnified Party may retain separate counsel to defend it and in that event the reasonable fees and expenses of such separate counsel shall be paid by the Indemnifying Party if applicable under this Paragraph 10.

(c) So long as the Indemnifying Party is conducting the defense of the Third Party Claim in accordance with Paragraph 10(b), (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim, (ii) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party, which consent will not be unreasonably withheld and (iii) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party, which consent will not be unreasonably withheld, except the Indemnifying Party may consent to the entry of judgment or settlement without the consent of the Indemnified Party if the judgment or settlement is solely for money damages which will be borne entirely by the Indemnifying Party.

(d) In the event any of the conditions in Paragraph 10(b) is or becomes unsatisfied, (i) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim in any manner it reasonably may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, any Indemnifying Party in connection therewith), (ii) the Indemnifying Party will advance and reimburse the Indemnified Party promptly and periodically for the actual, documented, reasonable costs of defending against the Third Party Claim (including reasonable outside attorneys' fees and expenses), and (iii) the Indemnifying Party will remain responsible for any Losses which the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Paragraph 10.

(e) A Party suffering losses or a party that determines that any occurrence or claim may result in losses that gives or could give rise to a claim for indemnification under this Paragraph 10 shall promptly notify the other party thereof in writing (a "Claim Notice") in accordance with Paragraph 13.1. The Claim Notice shall contain a brief description of the nature of the losses suffered and, if practicable, an aggregate dollar value estimate of the losses which may be suffered in the future. No delay in the issuance of a Claim Notice shall relieve any party from any obligation under this Paragraph 10, unless and solely to the extent such party is thereby materially prejudiced.

11.    In respect of any claim by one party against the other for any direct breach or violation of this Agreement (as opposed to a Third Party Claim), neither party will be liable to the other party for any losses until such claim is either settled pursuant to a binding, written settlement agreement or the subject of a definitive ruling of a court of competent jurisdiction in accordance with paragraph 16.

12.    The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its

10

Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation or warranty is, was or might be inaccurate.

12.1     Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this Paragraph 12, the Indemnifying Party shall satisfy its obligations within ten (10) Business Days of such agreement or adjudication by wire transfer of immediately available funds.  The Parties hereto agree that should an Indemnifying Party not make full payment of any such obligations within such ten (10) Business Day period, any amount payable shall accrue interest from and including the date of agreement of the Indemnifying Party or adjudication to but excluding the date such payment has been made at a rate equal to eight percent (8%) per annum.  Such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed, compounding daily.

13.    **Notices.**

13.1     Any notice to be given under this Agreement shall be in writing, sent by pre-paid overnight internationally recognized courier service, with signature of receipt required (e.g., Fed Ex, UPS, DHL), personal delivery, or by certified mail, return receipt requested, postage prepaid, or via electronic mail of a PDF document with a copy sent via the overnight courier, and shall be served: (a) To Buyer: Thomas Silverman, 149 East 23rd St., Suite 6, New York, NY 10156 and a simultaneous email copy to david.parker@tommyboy.com.  (b) to Seller: Power Artist Records, Inc., Leroy McMath, 3577 Chamblee Tucker Rd., Suite A178, Atlanta, Georgia 30341 and a simultaneous email copy to leroy@wbaball.net or such other address as the recipient may designate by notice given in accordance with this Paragraph 13.1.

13.2     A notice shall be deemed to have been received on the date on which such notice is delivered by personal delivery, the next Business Day after being deposited with an internationally recognized courier service, five (5) days after depositing in the mail, and on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient.

14.    **Confidentiality.** The Parties acknowledge that this Agreement and the terms and conditions herein contained are and shall be confidential and shall not be disclosed by any Party at any time, other than as required by legal process, applicable law or in an action to enforce the terms hereof, or to comply with the terms hereof, or to perform such Party's obligations hereunder (including disclosure to various third parties solely to the extent necessary to effect the transactions contemplated by this Agreement).  Notwithstanding anything contained in the preceding sentence, the terms hereof may be disclosed by any Party (a) to its Representatives, so long as the recipient of the disclosure is first advised of the aforesaid confidentiality obligations and agrees to be bound thereby, (b) as required by applicable Law to be disclosed, provided that the Party required to make such disclosure gives the other Party prompt written notice of such requirement prior to such disclosure (to the extent legally permissible) and assistance in obtaining an order protecting the information from public disclosure, (c) in connection with any legal proceeding to enforce the terms of this Agreement, or (d) as necessary to register a copyright or file an assignment of copyright with the U.S. Copyright Office or any foreign societies or registries.  Furthermore, the first sentence of this Paragraph 14 shall not limit in any way the ability of Buyer, or any Buyer affiliate, following Seller' receipt of the Purchase Price, to undertake the commercial exploitation of the Assets, including by recording assignments in the United States Copyright Office, sending "letters of direction", and exercising its rights hereunder.  Additionally, Buyer and Seller shall each have the right to make media statements regarding Buyer's acquisition of the Assets, provided that each Party shall have the right to pre-approve the text of the other Party's release(s) (and that no release which identify the Seller, or the Assets purchased shall include the Purchase Price), which approval neither Party shall unreasonably withhold or delay.  In connection with the foregoing, it is agreed that

11

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Buyer, subject to the Seller' aforesaid pre-approval of Buyer's text, shall have the right to issue the first media release pertaining to the acquisition of the Assets and Buyer shall have the right to approve the timing of any release which Seller wish to make, which approval Buyer shall not unreasonably withhold or delay.

15.    **Assignment.**  Subject to the terms and conditions of this Agreement, this Agreement is binding on the Parties and their respective successors and permitted assigns, including, without limitation, the Buyer affiliates.  Subject to the terms and conditions of this Agreement, including, without limitation, third party rights, Seller shall not: (a) assign, charge or otherwise dispose of any or all of its rights under this Agreement; or (b) delegate any or all of Seller' obligations under this Agreement without the prior written approval of Buyer.  Buyer has the right to assign this Agreement and/or Buyer's rights and/or obligations under this Agreement (in whole or in part, and including to one or more co-investors, financing sources or other financial participants) without restriction, provided, that any assignee of Buyer's rights must assume Buyer's applicable obligations under this Agreement.

16.    **Governing Law.**  This Agreement and any related dispute or claim (contractual or non-contractual) shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles.

  (a) ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURT OF THE UNITED STATES OF AMERICA, SOUTHERN DISTRICT OF NEW YORK OR THE COURTS OF THE STATE OF NEW YORK, CITY OF NEW YORK AND COUNTY OF NEW YORK, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

  (b) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 16.

17.    Seller agrees that irreparable damage would occur if any provision of this Agreement were not performed by Seller in accordance with the terms hereof and that Buyer shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which it is entitled at law or in equity, provided, that nothing herein shall be interpreted to mean Seller cannot oppose such relief.

18.     Notwithstanding anything to the contrary contained herein, the parties acknowledge that Tommy Boy Publishing, LLC an affiliate of Buyer, ("Publisher") has previously been granted the non-exclusive right to negotiate and grant master use sound recording licenses for the Masters on behalf of and owned or controlled by Seller, or any other entity owned or controlled by Leroy McMath, its successors and assigns, including but not limited to licenses for synchronizations, samples, and game use, throughout the world and in any and all media now known or hereafter to become known or developed.  Publisher's non-exclusive right is for a period of fifteen (15) years.  For the avoidance of doubt, all sums due under such licenses shall be split equally between Publisher as musical composition owner and Buyer as master sound recording owner and Publisher shall instruct each licensee to directly pay the master recording owner's share to Buyer.

        18.1     The Masters are exclusively distributed throughout world by Tommy Boy Distribution (the "Distribution Agreement").  The Assets are subject to and shall remain under the terms and conditions of the Distribution Agreement, as renewed and extended.

        18.2     Leroy McMath is a party to a civil action filed by Matthew Peach on June 20, 2022, in the Superior Court, Gwinnett County, Georgia, civil case number 22-A-05274-3.  Notwithstanding anything to the contrary contained herein, Seller shall hold harmless and indemnify Buyer for all costs and expenses including attorney fees and court costs that Buyer may incur or may arise as a result of this action or enforcement of any judgement or settlement.

19.     **Miscellaneous.**

        19.1     No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.

        19.2     No failure to exercise or delay in exercising any right or remedy under this Agreement shall operate as a waiver of that or any other right or remedy.  Any waiver by either Party of any right or remedy under this Agreement shall not be deemed to be a waiver of such right or remedy for the future.  All rights and remedies under this Agreement are cumulative and, except as otherwise stated in this Agreement, do not exclude, or limit any other rights or remedies of either Party.

        19.3     This Agreement (including any Schedules, Exhibits and/or other attachments) contains the entire agreement of the Parties, and supersedes all prior or contemporaneous agreements (whether oral or written) between the Parties, in relation to the subject matter of this Agreement and cannot be changed, modified, amended, cancelled, or terminated except by an express written instrument signed by the Party against which the instrument is to be enforced.  In entering into this Agreement, neither Party is relying on any representation or other assurance except as expressly set out or referred to in this Agreement, although nothing in this Agreement shall limit or exclude any liability for fraud.

        19.4     The illegality, invalidity, unenforceability, or incompleteness of any provision of this Agreement shall not affect the continuation in force of the remainder of this Agreement.  The Parties shall negotiate in good faith to replace any such provision, or (in the absence of agreement) any such provision shall apply with whatever modification is necessary to make it lawful, valid, and enforceable, while giving effect (to the greatest extent possible) to the intention of the Parties.

        19.5     Nothing in this Agreement constitutes a partnership, joint venture, relationship of agency or contract of employment between the Parties (or between either Party and any other Person referred to in this Agreement).  Neither Party shall be bound by any representation and/or omission of the other and nothing in this Agreement shall in any way authorize either Party to incur expenses on the other Party's behalf and/or for its account.

        19.6     This Agreement may be executed with digital or electronic signatures and may be entered into in any number of counterparts (including, if electronically transmitted, by scanned copies sent by email).

**IN WITNESS WHEREOF,** the parties have executed this Agreement the date first above written.

**POWER ARTIST RECORDS, INC.** doing business as POWER PRODUCTION, INC., POWER RECORDS, TRIAD RECORDS, INC., POWER ENTERTAINMENT, INC., WRAP RECORDS, and any other affiliated entities

**TOMMY BOY ARTISTS, LLC**

By: _DocuSigned by:_ thomas silverman
BAC1B3F016ED420...
Thomas Silverman, CEO

By: _DocuSigned by:_
6792D7C4914A431...
Leroy McMath, CEO

_DocuSigned by:_
6792D7C4914A431...
**LEROY McMATH,** in his individual capacity

14

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# SCHEDULE 1

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET AL.
DATED
DECEMBER 7, 2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| ARTIST/Writer | ALBUM | YEAR |
|---|---|---|
| **FREAK NASTY/ERIC TIMMONS** | **CONTROVERSEE 1996** | |
| | Intro<br>I Want 2 F*ck<br>Dirty Mouth<br>Bump That Rump<br>Commercial<br>P.G.P.B.<br>Da' Dip<br>Boot Up (Who Ya Wit)<br>Controversee (Start)<br>Down Low<br>Boom Boom Bomb<br>Rumors Pt. 1<br>Respect<br>Have This Ever Happened 2-U<br>Deep Deep South<br>F*ckie S*ckie (At Freaknasty Party)<br>Cut Up<br>Rumors Pt. 2 | |
| **FREAK NASTY/ERIC TIMMONS** | **WHICH WAY IS UP 2000** | |
| | Intro<br>Everyday Thing<br>Bring it On<br>On My Mind (Time After Time)<br>I Got it Like That<br>Keep it Real<br>Do What U Feel<br>It's Me<br>Lil' Power<br>Bounce 2 This (Groove<br>That Type<br>Push 'Em Up<br>Do What U Feel | |
| | | |
| | | |

| | | |
|---|---|---|
| | | |
| **MC BREED/ERIC BREED** | **FUNKAFIED 1994** | |
| | Underground Address<br>What You Want<br>Smokin'<br>Late Nite Creep (Booty Call)<br>Teach My Kids<br>This Is How We Do It 1<br>One Time<br>Seven Years<br>The Deal Is Da Funk<br>Shootin' From The HIp<br>Break Yourself<br>Back Up in Ya!<br>This Is How We Do It 2<br>Flava Uv Phony<br>B.R. Double E.D.<br>Ol' School | |
| MC BREED/ERIC BREED | **IT'S ALL GOOD 1999** | |
| | Intro<br>Gotta Get Mine<br>Gangsta Shit<br>Tricks<br>It's All Good<br>She Likes It<br>Work It From the Bottom<br>Let's Go to da Club<br>Business Never Personal<br>Rule No.1<br>Smok Wit a Nigga<br>Boom Boom | |
| | | |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | THE NEW BREED 1993 | |
|---|---|---|
| MC BREED/ERIC BREED | Intro<br>Tight<br>Gotta Get Mine<br>Flashbacks<br>Comin' Real Again<br>Just Another Clip<br>Watch Your Own Back<br>Conversations<br>Everyday Ho<br>Ain't 2 Good<br>Something 2 Smoke 2<br>Outro | |
| | MC BREED& DFC 1991 | |
| **MC BREED/ERIC BREED** | Underground Slang<br>Job Corp<br>That's Life<br>Ain't No Future In Yo' Frontin'<br>Just Kickin It<br>Better Terms<br>I Will Excel<br>Get Loose<br>Black For Black<br>Guanja<br>More Power | |
| | | |
| | | |
| | | |
| | | |
| | | |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  | 20 Below 1992 |  |
|---|---|---|
| **MC BREED/ERIC BREED** | Life of a Flintstone<br>Shout Out<br>No Frontin' Myself<br>Jealous Pimp<br>Whenever You Want Me<br>Be Myself<br>Great Depression<br>Little Child Runnin Wild<br>Ain't to Be Fucked With<br>Dis Mode<br>Flash's Groove<br>Ain't Too Much Worried<br>20 Below |  |
| **GHETTO MAFIA** | **DRAW THE LINE 1994** |  |
| **RODERICK BABER/FRED PILGRIM** | Intro<br>Downtown Glory<br>Facts of Life<br>Draw The Line<br>A-Town<br>Mr. President<br>Cost to Be the Boss<br>Special Delivery<br>One Less B----<br>Everyday Thang In Da Hood<br>Organized Crime<br>Real Motha-----<br>Life of a Sniper |  |
| **GHETTO MAFIA** | **FULL BLOODED NIGGAZ 1995** |  |
| **RODRICK BABER/FRED PILGRIM** | The Chair<br>Organized Crime<br>Snap Shot<br>I Ain't Going Down<br>This Is a Stick Up<br>Clean Getaway<br>Real Motha Fuckas<br>All Out<br>What Dem Gon Do<br>Creepin |  |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| STEADY MOBBIN' | CRIME BUDDIES 2001 | |
|---|---|---|
| | I Am (feat. Philley 45)<br>On Our Job (feat. 504 Riders)<br>Band to Dis (feat. Butch Cassidy)<br>Big Fishes (feat. Messy Marv)<br>Call It What You Want<br>Lets Get it Crackin (feat. Nate Dagg)<br>Luv Ones (Feat. Delinquents)<br>Sounds Like a Busta<br>Flipside (feat. S. Knight)<br>Stop Poppin Shit (feat. The Outlaws)<br>Zoning (feat. Sho Dawg)<br>A Favor (feat. Guce)<br>Hott (feat. Sons of Funk)<br>Show Me Whatcha Twerkin<br>Bang with Me (Feat. Black Mafia Family)<br>Fuck Whatcha Talkin Bout<br>Crime Buddies | |
| GANGSTA PAT | ALL ABOUT COMIN UP 1992 | |
| PATRICK HALL | All About Comin Up<br>Stay Away from Cali<br>I'm Still the Gangsta<br>Gangsta Groove<br>Spend the Night<br>My Neighborhood<br>Gangsta Boogie<br>Watookmesolong<br>Fatal Attraction<br>Gangstas need Love Too<br>My Name Ain't Rover<br>Dedication | |
| | | |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  | SEX, MONEY & MURDER 1994 |  |
|---|---|---|
| **GANGSTA PAT PATRICK HALL** | Intro<br>That Type<br>That Girl<br>Can<br>Can't Mess Wit Me<br>Blunted Up<br>Homicidal Lifestyle<br>The Saga Continues<br>Let it Flow<br>Real G's Don't Die<br>Shootin' on Narcs Part II<br>Sex, Money, Murder<br>Gangsta Luv<br>Stupid<br>Pimp'N Ain't Dead<br>Natural High<br>That Type of Gangsta Remix<br>Dedication |  |
| **GANGSTA PAT & STREET** | **HOMICIDAL LIFESTYLE 1997** |  |
| **PATRICK HALL** | Instructions<br>I Wanna Smoke<br>Creep with a Nigga (feat. Lil Tee)<br>Killa<br>Empty tha Clip<br>How Deep is Yo Luv (feat. Hollo Point)<br>Boddies on My 9<br>Dead Presidents<br>Blunted Up<br>Homicidal Lifestyle<br>Lay Me Down (feat. Lil Tee)<br>Deadly Verses '97 (feat. Lil Tee)<br>I Wanna Smoke (feat. Psycho)<br>Murdur |  |
|  |  |  |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | DEADLY VERSES 1995 | |
|---|---|---|
| GANGSTA PAT<br>PATRICK HALL | Deadly Verses (feat. The Villian)<br>I Wanna Smoke (feat. Psycho)<br>Projects<br>Smoke with the Devil<br>Tear the Club Up<br>Pat is Back<br>O.J. Murder Story<br>Killa Killa<br>Mo Murder<br>Heaven or Hell | |
| | | |
| | | |
| CHERRELLE | RIGHT TIME 1999 | |
| CHERYL NORTON | Intro<br>The Right Time (feat. Keith Murray)<br>Stop Loving You<br>Just Tell Me<br>Don't<br>Sleepin' With The Enemy<br>Interlude<br>Next To You<br>Baby Come To Me (feat. Alexander O'Neal)<br>Never Leave You Lonely<br>Into My Eyes<br>Pillow Talk<br>Let It Go<br>Saturday Love (feat. Alexander O'Neal)<br>Outro | |
| | | |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| **THE HARD BOYZ** | **TRAPPED IN THE GAME 1996** | |
|---|---|---|
| DARRELL GILBERT<br>CHARLES HOOD | G' State Soldier<br>Root of All Evil<br>4 Niggas in 1<br>Ghetto World<br>Trapped in the Game<br>Niggas in the Street<br>Time to Pray<br>Sick Psychotic Thoughts<br>Armed Robbery (Intro)<br>Thin Ice<br>Sawed Off Pump<br>Outro Groove<br>(How Ya Gonna)Jacka Jacka<br>Superfly | |
| **DFC** | **THINGS IN THA HOOD 1994** | |
| ALPHA BREED<br>BOBBY THOMPSON | A Piece of Mind<br>Put your Loc On<br>Caps Get Peeled<br>Mo Love<br>Things in tha Hood<br>Pass the Hotter<br>2-2 the chest<br>Death b-4 Dishonesty<br>Hands on My Nine<br>Roll With the Calan<br>Digga bigga Ditch<br>You can Get the Dick<br>Da Bomb<br>Things in tha Hood | |

| Release Artist | Release Title | Release ISRC |
|---|---|---|
| Black Dave | Big Mama (Original Mix) | USTB11200119 |
| | Grind, Grind (Original Mix) | USTB11200112 |
| | Hoez in the Club  (Original Mix) | USTB11200120 |
| | I Got What You Want (Original Mix) | USTB11200114 |
| | I Got's No Love (Original Mix) | USTB11200118 |
| | Intro (Original Mix) | USTB11200110 |
| | Next Stop The Ghetto (Original Mix) | USTB11200111 |
| | Shut'em Down (Original Mix) | USTB11200115 |
| | Tear It Up (Original Mix) | USTB11200113 |
| | This is Not 4 Free     (Radio Mix) | USTB11200121 |
| | This is Not 4 Free feat. Kilo (Original Mix) | USTB11200116 |
| | What They Want (Original Mix) | USTB11200117 |
| | | |
| Bone & C-Breezy & Rapping 4 Tay | Ride Or Die (Original ) | US25T9920801 |
| | | |
| Bossman | Ain't No Love (Original ) | US25T9920811 |
| | | |
| Candy Fresh | Another Weekend Night | USTB11200236 |
| | Bad to the Bone | USTB11200233 |
| | Black Widow (with X-2-C) | USTB11200227 |
| | Do it Again | USTB11200231 |
| | Get Off | USTB11200232 |
| | Homie, You Ain't Got an Ounce of Mac in You | USTB11200224 |
| | Just the Way I Like It | USTB11200230 |
| | Move that Body | USTB11200235 |
| | Payback is Hell | USTB11200228 |
| | Real Golddigger | USTB11200223 |
| | Take Your Time to Do Right | USTB11200229 |
| | To the Beat to the Bass | USTB11200234 |
| | Tricky Brothers | USTB11200226 |
| | You Got to Be Real | USTB11200225 |
| | | |
| Cherrelle | Baby Come To Me (feat. Alexander O'Neal) (Original Mix | USTB11200022 |
| | Don't (Original Mix) | USTB11200018 |
| | Interlude (Original Mix) | USTB11200020 |
| | Into My Eyes (Original Mix) | USTB11200024 |
| | Intro (Original Mix) | USTB11200014 |
| | Just Tell Me (Original Mix) | USTB11200017 |
| | Let It Go (Original Mix) | USTB11200026 |
| | Never Leave You Lonely (Original Mix) | USTB11200023 |
| | Next To You (Original Mix) | USTB11200021 |
| | Outro (Original Mix) | USTB11200028 |
| | Pillow Talk (Original Mix) | USTB11200025 |
| | Saturday Love (feat. Alexander O'Neal) (Original Mix) | USTB11200027 |
| | Sleepin' With The Enemy (Original Mix) | USTB11200019 |
| | Stop Loving You (Original Mix) | USTB11200016 |
| | The Right Time | (blank) |
| | The Right Time (feat. Keith Murray) (Original Mix) | USTB11200015 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | | |
|---|---|---|
| DFC | 2-2 the Chest | USTB11600121 |
| | A Piece of Mind (Intro) | USTB11600115 |
| | Caps Get Peeled | USTB11600117 |
| | Da Bomb | USTB11600127 |
| | Death B4 Dishonesty | USTB11600122 |
| | Digga Bigga Ditch | USTB11600125 |
| | Hands on My Nine | USTB11600123 |
| | Mo' Love | USTB11600118 |
| | Pass the Hooter | USTB11600120 |
| | Put Your Locs On | USTB11600116 |
| | Roll with the Clan | USTB11600124 |
| | Thing in Tha Hood | USTB11600128 |
| | Things in Tha Hood | USTB11600119 |
| | You Can Get the Dick | USTB11600126 |
| | | |
| DJ Stag | Da Mississippi Pop | USTB11200244 |
| | Dance the Way You Like Making Love | USTB11200240 |
| | Deejays Get Lonely Too | USTB11200242 |
| | Dis is for Dem Booty Shakers | USTB11200239 |
| | Intro | USTB11200237 |
| | Let Me See Ya Pump It | USTB11200238 |
| | Party Time | USTB11200241 |
| | Pop that Booty | USTB11200247 |
| | Shake Dem Silicone Titties | USTB11200243 |
| | Talk to the Hands | USTB11200245 |
| | The Thrill is Gone | USTB11200246 |
| | | |
| Don Baller | Tongue Out (feat. Yung Joc) | QZ8QS1800182 |
| | Tongue Out (feat. Yung Joc) (Radio Edit) | QZ8QS1800181 |
| | | |
| Down South | 2 Much Booty (Original Mix) | USTB11200182 |
| | Bump that Rump (Original Mix) | USTB11200184 |
| | Get Down on It (Original Mix) | USTB11200185 |
| | Getting' Money (Original Mix) | USTB11200186 |
| | I'll Na Na (Original Mix) | USTB11200189 |
| | Knees & Boes (Original Mix) | USTB11200188 |
| | Nails Did (Original Mix) | USTB11200181 |
| | Oh!, Oh!, Oh! (Original Mix) | USTB11200183 |
| | Swang that Booty (Original Mix) | USTB11200187 |
| | U-Eh (Original Mix) | USTB11200180 |
| | | |
| Frankie | Frankie Leg (Radio Edit) | USTB11104206 |
| | | |
| Frankie Lons | Frankie Leg | USTB11104213 |
| | | |
| Freak Nasty | Boom Boom Bomb | US25T9920904 |
| | Boot Up (Who Ya Wit) | US25T9920901 |
| | Bounce 2 This (Groove) (Original Mix) | USTB11200158 |
| | Bring it On (Original Mix) | USTB11200151 |
| | Bump That Rump | US25T9920897 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  |  |  |
|---|---|---|
|  | Commercial | US25T9920898 |
|  | Controversee (Start) | US25T9920902 |
|  | Controversee...That's Life...And That's the Way It Is | (blank) |
|  | Cut Up | US25T9920910 |
|  | Da' Dip | US25T9920900 |
|  | Deep Deep South | US25T9920908 |
|  | Dirty Mouth | US25T9920896 |
|  | Do What U Feel (Freaky Mix) | USTB11200155 |
|  | Do What U Feel (Original Mix) | USTB11200161 |
|  | Down Low (Remix) | US25T9920903 |
|  | Everyday Thing (Original Mix) | USTB11200150 |
|  | F*ckie S*ckie (At Freaknasty Party) | US25T9920909 |
|  | Have This Ever Happened 2-U | US25T9920907 |
|  | I Got it Like That (Original Mix) | USTB11200153 |
|  | I Want to F*ck | US25T9920895 |
|  | Intro | US25T9920894 |
|  | Intro (Original Mix) | USTB11200149 |
|  | It's Me (Original Mix) | USTB11200156 |
|  | Keep it Real (Original Mix) | USTB11200154 |
|  | Lil' Power (Original Mix) | USTB11200157 |
|  | On My Mind (Time After Time) (Original Mix) | USTB11200152 |
|  | Outro (Original Mix) | USTB11200162 |
|  | P.G.P.B. | US25T9920899 |
|  | Push 'Em Up (Original Mix) | USTB11200160 |
|  | Respect | US25T9920906 |
|  | Rumors Pt. 1 | US25T9920905 |
|  | Rumors Pt. 2 | US25T9920911 |
|  | That Type (Original Mix) | USTB11200159 |
| G.A.N. | Controversey | USTB11600035 |
|  | Creep | USTB11600033 |
|  | Get Away | USTB11600037 |
|  | Get It How U Live | USTB11600029 |
|  | Heads or Tails | USTB11600036 |
|  | Hey | USTB11600032 |
|  | In My Shoes | USTB11600025 |
|  | Jump-Bounce | USTB11600028 |
|  | Love the Doe | USTB11600024 |
|  | Memory Lane | USTB11600030 |
|  | Murder Music | USTB11600031 |
|  | Still Breath | USTB11600023 |
|  | Survivor | USTB11600026 |
|  | The Message | USTB11600034 |
|  | Who U Fuck'n Wit | USTB11600038 |
|  | Young Lungs | USTB11600027 |
| Gangsta Pat | #1 Suspect | USTB11200255 |
|  | All About Comin' Up (Original Mix) | US25T9920853 |
|  | Blunted Up (Original Mix) | US25T9920881 |
|  | Blunted Up (Skit) | US25T9920750 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | |
|---|---|
| Boddies on My 9 (Original Mix) | US25T9920748 |
| Bodies on My 9 | USTB11200257 |
| Bouncing to a Murder | USTB11200260 |
| Can't Mess Wit Me (Original Mix) | US25T9920880 |
| Creep wit a Nigga (feat. Lil Tee) (Original Mix) | US25T9920744 |
| Dead Presidents | USTB11200258 |
| Dead Presidents (Original Mix) | US25T9920749 |
| Deadly Verses | USTB11200248 |
| Deadly Verses '97 (feat. Lil Tee) (Original Mix) | US25T9920753 |
| Deadly Verses (feat. The Villian) (Original Mix) | US25T9920791 |
| Dedication (Original Mix) | US25T9920864 |
| | US25T9920893 |
| Empty tha Clip (Original Mix) | US25T9920746 |
| Fatal Attraction (Original Mix) | US25T9920861 |
| Gangsta Boogie (Original Mix) | US25T9920859 |
| Gangsta Groove (Original Mix) | US25T9920856 |
| Gangsta Luv (Original Mix) | US25T9920888 |
| Gangsta's Need Love 2 | USTB11200250 |
| Gangstas Need Love Too (Original Mix) | US25T9920862 |
| Get Ya Weight Up | USTB11200262 |
| Heaven or Hell (Original Mix) | US25T9920800 |
| Homicidal Lifestyle (Original Mix) | US25T9920751 |
| | US25T9920882 |
| Homicidal Lifestyles | USTB11200252 |
| How Deep is Yo Luv (feat. Hollo Point) (Original Mix) | US25T9920747 |
| I Wanna Smoke | USTB11200251 |
| I Wanna Smoke (feat. Psycho) (Original Mix) | US25T9920754 |
| | US25T9920792 |
| I Wanna Smoke (Remix) | US25T9920743 |
| I'm Still The Gangsta (Original Mix) | US25T9920855 |
| Instructions (Original Mix) | US25T9920742 |
| Intro (Original Mix) | US25T9920877 |
| Killa (Skit) | US25T9920745 |
| Killa Killa (Original Mix) | US25T9920798 |
| Lay Me Down (feat. Lil Tee) (Original Mix) | US25T9920752 |
| Let It Flow | US25T9920884 |
| Mo Murder (Original Mix) | US25T9920799 |
| Murdur (Original Mix) | US25T9920755 |
| My Name Ain't Rover (Original Mix) | US25T9920863 |
| My Neighborhood (Original Mix) | US25T9920858 |
| Natural High (Original Mix) | US25T9920891 |
| O.J. Murder Story | USTB11200254 |
| O.J. Murder Story (Original Mix) | US25T9920797 |
| Pat is Back (Original Mix) | US25T9920796 |
| Pimp'N Ain't Dead (Original Mix) | US25T9920890 |
| Pimpin Ain't Dead | USTB11200261 |
| Projects (Original Mix) | US25T9920793 |
| Real G's Don't Die (Original Mix) | US25T9920885 |
| Sex, Money & Murder | USTB11200259 |
| Sex, Money, Murder (Original Mix) | US25T9920887 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  |  |  |
|---|---|---|
|  | Shootin' On Narcs (Part II) | US25T9920886 |
|  | Shooting on Narcs | USTB11200249 |
|  | Smoke with the Devil (Original Mix) | US25T9920794 |
|  | Spend The Night (Original Mix) | US25T9920857 |
|  | Stay Away From Cali (Original Mix) | US25T9920854 |
|  | Stupid (Original Mix) | US25T9920889 |
|  | Tear the Club Up | USTB11200253 |
|  | Tear the Club Up (Original Mix) | US25T9920795 |
|  | That Girl (Original Mix) | US25T9920879 |
|  | That Type (Original Mix) | US25T9920878 |
|  | That Type Of Gangsta (Remix) | US25T9920892 |
|  | The Saga Continues (Original Mix) | US25T9920883 |
|  | Watookmesolong (Original Mix) | US25T9920860 |
|  | What's the Biz Jones | USTB11200256 |
|  |  |  |
| Gangsta Pat & DFC | 2-2 The Chest (Original Mix) | USTB11200076 |
|  | Body on My 9 (Original Mix) | USTB11200072 |
|  | Caps Get Peeled (Original Mix) | USTB11200067 |
|  | Dead Presidents (Original Mix) | USTB11200078 |
|  | Deadly Verses (Original Mix) | USTB11200066 |
|  | Get Heated (Original Mix) | USTB11200065 |
|  | Homicidal Lifestyle (Original Mix) | USTB11200077 |
|  | I Wanna Smoke (Original Mix) | USTB11200070 |
|  | Intro (Original Mix) | USTB11200064 |
|  | My Day (Original Mix) | USTB11200069 |
|  | Sex, Money, Murder (Original Mix) | USTB11200073 |
|  | Skit (Original Mix) | USTB11200074 |
|  | Southside Player (Original Mix) | USTB11200071 |
|  | Street Muthafuckas (Original Mix) | USTB11200079 |
|  | Tear Da Club Up (Original Mix) | USTB11200068 |
|  | The Projects (Original Mix) | USTB11200075 |
|  |  |  |
| George Clinton | This is How We Do It 1 | USTB11600104 |
|  | This is How We Do It 2 | USTB11600111 |
|  |  |  |
| Ghetto Mafia | A-Town | US25T9920777 |
|  | All Out (Original Version) | US25T9920763 |
|  | Bonus Track (Original Version) | US25T9920766 |
|  | Clean Getaway (Original Version) | US25T9920759 |
|  | Cost to be the Boss | US25T9920775 |
|  | Creepin (Original Version) | US25T9920765 |
|  | Downtown Glory | US25T9920779 |
|  | Draw the Line | US25T9920773 (blank) |
|  | Everyday Thang in Da Hood | US25T9920769 |
|  | Facts of Life | US25T9920776 |
|  | Full Blooded Niggaz | (blank) |
|  | I Ain't Going Down (Original Version) | US25T9920758 |
|  | Intro | US25T9920767 |
|  | Life of a Sniper | US25T9920768 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  |  |  |
|---|---|---|
| | Mr. President | US25T9920771 |
| | One Less B---- | US25T9920778 |
| | Organized Crime | US25T9920772 |
| | Organized Crime (Original Version) | US25T9920760 |
| | Real Motha ------ | US25T9920774 |
| | Real Motha F..... (Original Version) | US25T9920764 |
| | Snap Shot (Original Version) | US25T9920757 |
| | Special Delivery | US25T9920770 |
| | The Chair (Original Version) | US25T9920756 |
| | This is a Stick Up (Original Version) | US25T9920762 |
| | What Dem Gon Do (Silent) | US25T9920761 |
| | | |
| Ice Buck | Back that Country Thang on Me (feat. Nellie "Tiger" Trav | QZ8QS2100003 |
| | Back that Country Thang on Me (feat. Nellie "Tiger" Trav | QZ8QS2100004 |
| | | |
| Jake The Flake | Dayton Don't Play (Original Mix) | US25T9920871 |
| | Drug Dealer (Original Mix) | US25T9920866 |
| | F.A.N.G. feat. Shoestring from the Dayton Family & D.F.( | US25T9920875 |
| | Goin' Way Out feat. Shoestring (Original Mix) | US25T9920867 |
| | Interlude (Original Mix) | US25T9920869 |
| | Intro (Original Mix) | US25T9920865 |
| | Lawless (Original Mix) | US25T9920868 |
| | Out 2 Get Rich | (blank) |
| | Out 2 Get Rich (Original Mix) | US25T9920873 |
| | Refuse to Loose (Original Mix) | US25T9920874 |
| | Streets is All I Know (Remix) | US25T9920876 |
| | The Way Life Goes (Original Mix) | US25T9920872 |
| | Time to Go Legit (Original Mix) | US25T9920870 |
| | | |
| Jake the Flake & The Flint Thugs | Ain't No Superman (Original Mix) | US25T9920832 |
| | Bouncin to a Murder (Original Mix) | US25T9920838 |
| | Chromotose in the Brain (Original Mix) | US25T9920830 |
| | Fake as a Snack Cake (Original Mix) | US25T9920829 |
| | Fang (Original Mix) | US25T9920831 |
| | Good Fellas (Original Mix) | US25T9920840 |
| | Hold Yo Nuts (Original Mix) | US25T9920828 |
| | Intro (Original Mix) | US25T9920827 |
| | Money, Mack, Murder (Original Mix) | US25T9920834 |
| | My Own Boss (Original Mix) | US25T9920836 |
| | On the Edge (Original Mix) | US25T9920837 |
| | Payback's a Motherfucker (Original Mix) | US25T9920835 |
| | Streets is All I Know (Original Mix) | US25T9920833 |
| | Them Niggaz Lucky (Original Mix) | US25T9920839 |
| | | |
| Jessie Clay | You Changed | QZ8QS1800190 |
| | | |
| Leroy McMath & Curtis Butler | About the Author (Original Mix) | USTB11200013 |
| | Acknowledgements (Original Mix) | USTB11200001 |
| | Ch 1: The Game (Original Mix) | USTB11200004 |
| | Ch 2: How Labels Grow (Original Mix) | USTB11200005 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | | |
|---|---|---|
| | Ch 3: Finding the Right Artist (Original Mix) | USTB11200006 |
| | Ch 4: Artist Advances (Original Mix) | USTB11200007 |
| | Ch 5: Calling the Shots (Original Mix) | USTB11200008 |
| | Ch 6: Marketing Your Label and Your Artist (Original Mix | USTB11200009 |
| | Ch 7: Distribution (Original Mix) | USTB11200010 |
| | Ch 8: Becoming a Music Millionaire (Original Mix) | USTB11200011 |
| | Ch 9: Final Words (Original Mix) | USTB11200012 |
| | Introduction (Original Mix) | USTB11200003 |
| | Preface (Original Mix) | USTB11200002 |
| Lil  D 50% | Ball Ball (Original ) | US25T9920810 |
| Mack the Jack'A | Back to the States | USTB11200203 |
| | Connections | USTB11200208 |
| | | USTB11200210 |
| | Dreaming (Replay Version of Am I Dreaming) | USTB11200211 |
| | Family Touchings | USTB11200218 |
| | Fuck' Em All | USTB11200222 |
| | Here Comes the Mack | USTB11200214 |
| | I Got to be a Millionsire | USTB11200212 |
| | I Keeps it Real | USTB11200207 |
| | In the Doe | USTB11200215 |
| | Jackin' Anonymous | USTB11200217 |
| | Let's Ride | USTB11200209 |
| | Lock Down | USTB11200220 |
| | Mack the Jack'A | USTB11200204 |
| | My Life is a Battlefield | USTB11200206 |
| | Out of Bounds | USTB11200216 |
| | Scrilla | USTB11200221 |
| | Tell Me Why | USTB11200205 |
| | This Here Thangm | USTB11200219 |
| | Watch Yo Back | USTB11200213 |
| MC Breed | 2 for the Show | (blank) |
| | 2-2 Da Chest (feat. DFC) | USTB11600284 |
| | 20 Below | USTB11600087 |
| | Ain't 2 Good | US25T9920824 |
| | Ain't to be Fucked With | USTB11600086 |
| | Ain't Too Much Worried | USTB11600091 |
| | B.R. Double E.D. | USTB11600113 |
| | Babysittin' (Original Mix) | USTB11200140 |
| | Back Up in Ya! | USTB11600110 |
| | Be Myself | USTB11600093 |
| | Better Now (feat. Big Mike) | USTB11600288 |
| | Bitches (feat. Too Short & Richie Rich) (Original Mix) | USTB11200138 |
| | Boom Boom | US25T9920852 |
| | Break Yourself | USTB11600109 |
| | Business Never Personal | US25T9920849 |
| | Comin' Real Again | US25T9920819 |
| | Conclusion (feat. Too Short) | USTB11600289 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | | |
|---|---|---|
| | Conversations | US25T9920822 |
| | Dis Mode | USTB11600088 |
| | Everyday Ho | US25T9920823 |
| | Everyday Thang in Da Hood (feat. Ghetto Mafia) | USTB11600286 |
| | Flash's Groove | USTB11600090 |
| | Flashbacks | US25T9920818 |
| | Flava Uv Phony | USTB11600112 |
| | Funkafied | (blank) |
| | Gangsta Gansta (Original Mix) | USTB11200145 |
| | Gangsta Shit | US25T9920843 |
| | Gotta Get Mine | US25T9920817 |
| | Gotta Get Mine (feat. 2Pac) | USTB11600281 |
| | Gotta Get Mine (feat. Tupac) (Remix) | US25T9920842 |
| | Great Depressioin | USTB11600094 |
| | Intro | US25T9920816 |
| | | US25T9920841 |
| McBreed | It's All Good | US25T9920845 |
| | Jealous Pimp | USTB11600097 |
| | Just Another Clip | US25T9920820 |
| | Late Night Creep (Booty Call) | USTB11600102 |
| | Let's Go to Da Club (feat. Erotic D) | USTB11600291 |
| | Lets Go To Da Club | US25T9920848 |
| | Life of a Flintstone | USTB11600096 |
| | Little Child Running Wild | USTB11600089 |
| | M.C. Breed Presents The Thugz - Volume 1 | (blank) |
| | Mack the Jack A Mack the Jack A (Original Mix) | USTB11200143 |
| | Mo Money (Paycheck & M.C. Breeed) (Original Mix) | USTB11200142 |
| | Mo Money to Get (feat. Paycheck) | USTB11600283 |
| | Money Holders (feat. Mr. No Love) (Original Mix) | USTB11200148 |
| | No Frontin' Allowed | USTB11600092 |
| | No Future (feat. Bootleg & M.C. Breed) (Original Mix) | USTB11200146 |
| | No Future (feat. Bootleg) | USTB11600287 |
| | Ol' School | USTB11600114 |
| | One Time | USTB11600105 |
| | Outro | US25T9920826 |
| | Provider (feat. Se) (Original Mix) | USTB11200144 |
| | Rebel Slave (feat. Southclick) | USTB11600285 |
| | Rule No. 1 (feat. Pimp C of UGK) | US25T9920850 |
| | Sesshead Funk Junky (feat. 8-Ball & MJG) | USTB11600282 |
| | Seven Years | USTB11600106 |
| | She Likes It (Skit) | US25T9920846 |
| | Shootin' from the Hip | USTB11600108 |
| | Shout Out | USTB11600098 |
| | Skanless (feat. Breed Madam Dame & T-Double of DFC) | USTB11200141 |
| | Slack'N on Yo Pimpin' (feat. Boss Witch) (Original Mix) | USTB11200147 |
| | Smoke with a Nigga (Feat. Mr. Ku) | US25T9920851 |
| | Smokin' | USTB11600101 |
| | Something 2 Smoke 2 | US25T9920825 |
| | Teach My Kids | USTB11600103 |
| | The Deal is Da Funk | USTB11600107 |

|  |  |  |
|---|---|---|
|  | The New Breed | (blank) |
|  | Think About It (feat. Hardboyz) | USTB11600290 |
|  | Thug Promise (Original Mix) | USTB11200136 |
|  | Tight | US8924960010 |
|  | Tricks (feat. Too $hort) | US25T9920844 |
|  | Try Me Dog (Original Mix) | USTB11200137 |
|  | Underground Address | USTB11600099 |
|  | Watch Your Own Back | US25T9920821 |
|  | Westside Thing (Westside 4th Ward) (Original Mix) | USTB11200139 |
|  | What You Want | USTB11600100 |
|  | Whenever You Want Me | USTB11600095 |
|  | Work It From the Bottom | US25T9920847 |
| MC Breed & DFC | Ain't No Future In Yo' Frontin' | US25T9920783 |
|  | Better Terms | US25T9920785 |
|  | Black For Black | US25T9920788 |
|  | Get Loose | US25T9920787 |
|  | Guanja | US25T9920789 |
|  | I Will Excell | US25T9920786 |
|  | Job Corp | US25T9920781 |
|  | Just Kickin It | US25T9920784 |
|  | M.C. Breed & DFC | (blank) |
|  | More Power | US25T9920790 |
|  | That's Life | US25T9920782 |
|  | Underground Slang | US25T9920780 |
| MC Breed & Too Short | Do Thang (Original ) | US25T9920805 |
| MC Breed & Tupac | Gotta Get Mine (Remix) | US25T9920809 |
| Ray Ray | Nails Did | USTB11600067 |
|  |  | USTB11600068 |
|  |  | USTB11600069 |
|  |  | USTB11600070 |
|  |  | USTB11600071 |
| Sang | Bonus Track (Original ) | US25T9920814 |
|  |  | US25T9920815 |
| Sang & C-Breezy | All My Niggas (Original ) | US25T9920813 |
|  | Fuck Everybody (Original ) | US25T9920812 |
| Sang & Coyleone | The Game Ain't Change (Original ) | US25T9920807 |
| Soullow | I.F.W.U. (feat. Mony Karlo & JMon) | QZ8QS1800174 |
|  |  | QZ8QS1800175 |
| South Click | Beyond the Millenium (Original Mix) | USTB11200088 |
|  | Breakout (Original Mix) | USTB11200089 |
|  | Busta Free (Original Mix) | USTB11200087 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

|  |  |  |
|---|---|---|
|  | Carolina Backwoods (Original Mix) | USTB11200093 |
|  | Carolina Bounce | USTB11600042 |
|  | Comtemplated the Crime (Original Mix) | USTB11200090 |
|  | Daze of Old (Original Mix) | USTB11200084 |
|  | December 31, 1999 | USTB11600040 |
|  | Donnie Damon | USTB11600052 |
|  | First Blow (Original Mix) | USTB11200092 |
|  | Good Cop Bad Cop | USTB11600054 |
|  | Good Girl Gone Bad | USTB11600050 |
|  | Intro | USTB11600039 |
|  | Introduction (Original Mix) | USTB11200080 |
|  | Kakilak | USTB11600051 |
|  | Late Night | USTB11600044 |
|  | Letter from War | USTB11600043 |
|  | Night Rider | USTB11600046 |
|  | P.O.W. (Original Mix) | USTB11200094 |
|  | Pain | USTB11600041 |
|  | Rebel Slave | USTB11600047 |
|  | Rebel Slave (Original Mix) | USTB11200082 |
|  | Shots of Fire | USTB11600049 |
|  | Sign of the Times (Original Mix) | USTB11200081 |
|  | Simply Beautiful (Original Mix) | USTB11200086 |
|  | Smoke | USTB11600045 |
|  | Smoke (Original Mix) | USTB11200085 |
|  | Some Folks | USTB11600055 |
|  | South | USTB11600053 |
|  | The Best | USTB11600048 |
|  | We Be Spittin (Original Mix) | USTB11200095 |
|  | We Don't Need (Original Mix) | USTB11200083 |
|  | With Me or Against Me (Original Mix) | USTB11200091 |
| Southside Hustlaz | 365 Days | USTB11600060 |
|  | Friendz | USTB11600064 |
|  | Hard Hitters | USTB11600056 |
|  | Haters Keep Hating | USTB11600058 |
|  | In Decatur | USTB11600061 |
|  | K.G. Pheeno G. and Charles | USTB11600062 |
|  | Perfect Contender | USTB11600057 |
|  |  | USTB11600063 |
|  | Southern Poetry | USTB11600059 |
|  | Strictly 4 My Folk | USTB11600065 |
|  | Watch Ya Back | USTB11600066 |
| Spuddy-G | Game First (Original ) | US25T9920808 |
| Steady Mobb'n | A Favor (feat. Guce) (Original Mix) | USTB11200174 |
|  | Band to Dis (feat. Butch Cassidy) (Original Mix) | USTB11200165 |
|  | Bang with Me (feat. Black Mafia Family) (Original Mix) | USTB11200177 |
|  | Big Fishes (feat. Messy Marv) (Original Mix) | USTB11200166 |
|  | Call it What You Want (Remix) | USTB11200167 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | | |
|---|---|---|
| | Crime Buddies (Original Mix) | USTB11200179 |
| | Flipside (feat. S. Knight) (Original Mix) | USTB11200171 |
| | Fuck Whatcha Talkin Bout (Original Mix) | USTB11200178 |
| | Hott (feat. Sons of Funk) (Original Mix) | USTB11200175 |
| | I Am (feat. Philley 45) (Original Mix) | USTB11200163 |
| | Lets Get it Crackin (feat. Nate Dogg) (Original Mix) | USTB11200168 |
| | Luv Ones (feat. Delinquents) (Original Mix) | USTB11200169 |
| | On Our Job (feat. 504 Riders) (Original Mix) | USTB11200164 |
| | Show Me Whatcha Twerkin (Original Mix) | USTB11200176 |
| | Sounds Like a Busta (Original Mix) | USTB11200170 |
| | Stop Poppin Shit (feat. The Outlaws) (Original Mix) | USTB11200172 |
| | Zoning (feat. Sho Dawg) (Original Mix) | USTB11200173 |
| Tha Boss Bitch | Boss Bitch (Original Mix) | USTB11200130 |
| | Can't Nobody do it Better feat. Corrosion & Kokaine (Ori | USTB11200135 |
| | Cock It Man (Original Mix) | USTB11200132 |
| | Creepin' feat. Corrosion (Original Mix) | USTB11200131 |
| | I Told You (Original Mix) | USTB11200127 |
| | Intro feat. Raise Up Clique (Original Mix) | USTB11200123 |
| | Psycho | (blank) |
| | Psycho feat. Krazy Z (Original Mix) | USTB11200126 |
| | Raise Up Army feat. Corrosion (Original Mix) | USTB11200134 |
| | Slackin' on Yo Pimpin' (Original Mix) | USTB11200128 |
| | Tear It Up feat. Corrosion (Original Mix) | USTB11200124 |
| | Warning feat. Dj Sticky Boots (Original Mix) | USTB11200122 |
| | What You Want feat. Bar-None & Von G (Original Mix) | USTB11200129 |
| | Why You Hatin' feat. Jason, Coop & Mikes (Original Mix) | USTB11200125 |
| | Womb to the Tomb feat Raise Up Clique (Original Mix) | USTB11200133 |
| The Botany Boyz | Money In My Live (Original ) | US25T9920802 |
| The Hard Boys | 3 Counts (Original ) | US25T9920732 |
| | A-Town Hard Heads | (blank) |
| | A-Town Hard Heads (Original ) | US25T9920733 |
| | Armed Robery (Original ) | US25T9920738 |
| | At 2 O'Clock (Original ) | US25T9920740 |
| | Crimminal Behavior (Original ) | US25T9920735 |
| | Death Row (Original ) | US25T9920741 |
| | Ez Pimpin (Original ) | US25T9920729 |
| | Fletch (Original ) | US25T9920731 |
| | Groupies (Original ) | US25T9920736 |
| | Hell Bound (Original Mix) | USTB11200102 |
| | Here They Come (Original Mix) | USTB11200103 |
| | I Now Know (Original Mix) | USTB11200106 |
| | Jock Itch (Original ) | US25T9920730 |
| | Let's Roll (Original Mix) | USTB11200107 |
| | Lets Straighten It Out (Original Mix) | USTB11200109 |
| | Listen to 'Em Rumors (Original Mix) | USTB11200096 |
| | Lost Cause (Original Mix) | USTB11200108 |
| | Mission to Nowhere (Original ) | US25T9920737 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| | | |
|---|---|---|
| | P.M.S. feat. Ghetto E from The Dayton Family (Original N | USTB11200100 |
| | Players (Original ) | US25T9920739 |
| | Prelude (Original ) | US25T9920727 |
| | Sick Psychotic Thoughts (Original Mix) | USTB11200101 |
| | Street Mutha Fuckas (Original ) | US25T9920728 |
| | Strong In the Game (Original ) | US25T9920734 |
| | This About It feat. MC Breed (Original Mix) | USTB11200097 |
| | Thugz Like Us (Original Mix) | USTB11200098 |
| | Trapped Remix feat. Spice 1 (Original Mix) | USTB11200104 |
| | War Stories (Original Mix) | USTB11200105 |
| | Who Do You Fear (Original Mix) | USTB11200099 |
| The Hard Boyz | (How Ya Gonna) Jacka Jacka | USTB11600074 |
| | 4 Niggas in 1 (feat. Loose Screws & D.F.C.) | USTB11600075 |
| | A-Town Hard Heads (Original Mix) | USTB11200199 |
| | Armed Robbery | USTB11600072 |
| | Come Real (Original Mix) | USTB11200198 |
| | G State Soldier | USTB11600082 |
| | Ghetto World | USTB11600080 |
| | Groupies (Original Mix) | USTB11200200 |
| | Here They Come (Original Mix) | USTB11200196 |
| | Money Holders   (Original Mix) | USTB11200191 |
| | Niggas in the Street | USTB11600081 |
| | Only Time Will Tell (Original Mix) | USTB11200190 |
| | Outro Groove | USTB11600085 |
| | Root of All Evil | USTB11600077 |
| | Sawed Off Pump | USTB11600073 |
| | Sick Psychotic Thoughts | USTB11600079 |
| | Sick Psychotic Thoughts (Original Mix) | USTB11200192 |
| | Skat'n on Thin Ice (Original Mix) | USTB11200195 |
| | Superfly | USTB11600083 |
| | Thin Ice | USTB11600078 |
| | Thin Line (Original Mix) | USTB11200193 |
| | Time to Play | USTB11600084 |
| | Trapped   (Original Mix) | USTB11200197 |
| | Trapped in the Game | (blank) |
| | Trapped in the Game (feat. Spice 1) | USTB11600076 |
| | Will I See (Original Mix) | USTB11200194 |
| The Looters | Take Yo Time (Original ) | US25T9920803 |
| Unorthodox | No Local (Original ) | US25T9920804 |
| Warlox | Ballin (Original ) | US25T9920806 |

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# EXHIBIT A

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET AL.
DATED
DECEMBER 7, 2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER PRODUCTION, INC.
P.O. BOX 485
SAGINAW, MICHIGAN 48605


## AGREEMENT

AGREEMENT dated the __OCT. 6th 1990__ by and between the
__ERIC BREED D.B.A / MC BREED and DFC__
_____ Michigan (herein referred to as "you") and Power Production,
Inc., Company, Saginaw, Michigan, (herein referred to as "Company").

### WITNESSETH

In Consideration of the mutual promises and covenants herein
contained, the parties hereby agree as follows:


1.   **TERM**

(a.)  The term hereof (the "Term") shall consist of an initial
period of one (1) year commencing on the date hereof (the "First
Contract Year") plus the additional "Contract Years", if any, for which
such Term may be extended by Company's exercise of one or more of the
options granted to Company below (unless otherwise extended or suspended
as provided herein).

(b.)  You hereby irrevocably grant to Company four (4)
separate consecutive options to extend the Term for a "Second", "Third",
"Fourth", and a "Fifth" Contract Year, respectively, such Contract Years
to consist of one (1) year each. Each such option shall be deemed to be
exercised by Company unless it shall give you written notice to the
contrary at least thirty (30) days prior to the date that the then
current Contract Year would otherwise expire.


2.   **RECORDING SERVICES**

During the Term of this Agreement you shall render to Company
your exclusive services as a recording artist for the purpose of making
Master Recordings and as otherwise set forth herein.

3.   **RECORDING COMMITMENT**

(a.)  During each Contract Year, you shall render your
services to Company in accordance with the terms and conditions hereof
in connection with recording the minimum number of Sides (the "Minimum
Recording Commitment") set forth in the following schedule:


**EXHIBIT "A"**

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| CONTRACT YEAR | MINIMUM RECORDING COMMITMENT |
|---|---|
| First | One (1) Album |
| Second | One (1) Album |
| Third | One (1) Album |
| Fourth | One (1) Album |
| Fifth | One (1) Album |

4.    RECORDING PROCEDURE

(a)    In connection with Master Recordings to be made hereunder, the following matters shall be determined by Company:

(i)    Selection of the producer.

(ii)    Selection of material to be recorded (including the number of Compositions to be recorded), and

(iii)    Selection of dates of recording and studios where recording is to take place, including the cost of recording therein.  The scheduling and booking of all studio time will be done by Company.

(b)    Each Master Recording made hereunder shall be subject to Company's approval as satisfactory for the manufacture and sale of Phonograph Records.

5.    RECORDING COSTS

(a)    Company will pay all minimum union scale payments required to be made to you in connection with Master Recordings made hereunder, all costs of all non-royalty instrumental, vocal and other personnel and all costs for arrangements and copying incurred by Company hereunder, and all other amounts which are required to be paid by Company pursuant to any applicable law or any collective bargaining agreement between Company and any union representing persons who render services in connection with Master Recordings made hereunder.

(b)    All amounts described in Paragraph 5(a) above plus all other amounts paid by Company representing expenses incurred in connection with the making of Master Recordings hereunder (including, without limitation, all studio and engineering charges) are herein sometimes called "Recording Costs" and shall constitute Advances.

(c)    You agree that such payments will be declared production costs and shall not become due and payable until company receives production cost from one of the record companies referred in schedule A" Attached hereto.

DocuSign Envelope ID: 206877E6-AC3F-4E26-9CB6-B3D1CCD2AD8C

6.    ADVANCES

All monies paid to you, or on your behalf, with reference to this Agreement, other than royalties paid pursuant to Paragraph 8 hereof, shall constitute Advances unless otherwise expressly agreed in writing by an authorized officer of Company.

7.    GRANT OF RIGHTS

(a)    All Master Recordings made hereunder from the inception of recording thereof, and Phonograph Records manufactured therefrom, together with the performances embodied thereon, shall be the sole property of Company, free from any claims whatsoever by you or any other Person, and Company shall have the exclusive right to copyright such Master Recordings in its name as the owner and author thereof and to secure any and all renewals and extensions of such copyright.  Solely for the purposes of any applicable copyright law, all Persons rendering services in connection with the recording of such Master Recordings shall be deemed "employees for hire" of Company.

(b)    Without limiting the generality of the foregoing, Company and any Person authorized by Company shall have the unlimited right, throughout the world, to manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made hereunder, and to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing.

(c)    Company and any Licensee of Company each shall have the right, and may grant to others the right, to reproduce, print, publish, or disseminate in any medium your name, portraits, pictures and likeness and biographical material concerning you, as news or information, or for the purposes of trade, or for advertising purposes; provided, however, that no direct endorsement by you of any product or service shall be used without your written consent.  During the Term of this Agreement, you shall not authorize any Party other than Company to use your name or likeness in connection with the advertising or sale of Phonograph Records.  As used in this Agreement, "your name" shall include any professional names or sobriquets.

8.    ROYALTIES

Conditioned upon your full and faithful performance of all the terms and conditions hereof, you will be paid royalties on Net sales of records as hereinafter set forth less all royalties paid to producer/producers as set forth in Paragraph 18.

(a)    Company will pay you as a basic royalty, the percentage set forth in the following schedule, of the applicable Royalty Base Price in respect of One Hundred (100%) percent of Net Sales of Phonograph Records in disc form, consisting entirely of Master Recordings performed by you and recorded hereunder and sold by Company or its Licensees through normal retail channels for distribution in the United States of America.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

| CONTRACT YEAR | BASIC ROYALTY RATE |
|---|---|
| First | 1st year 12% percent of Retail Selling Price or Royalty rate negotiated by Company with one of the record distributors set forth in Schedule "A" whichever is greater |

(b)  In respect of Phonograph Records sold in the form of prerecorded tape, the royalty payable to you therefor shall be the same as the applicable royalty rate which would have been payable to you if such Records were sold in disc form, and such royalties shall at all times be computed on the basis of One Hundred (100%) percent Net Sales of such Records.

(c)  In respect of Phonograph Records sold to consumers through any mail order or record club operation (the "Club Operation"), the royalty rate shall be one-half ($\frac{1}{2}$) of the otherwise applicable royalty rate (but in no event shall you be entitled to receive in excess of fifty (50%) percent of Company's net royalty receipts from such Club Operation after deduction of all royalties payable to the producers of such Master Recordings and all RPM and other applicable third party payments), and such royalties shall at all times be computed on the basis of eighty-five (85%) percent of Net Sales of such Records. Notwithstanding the foregoing, no royalty shall be payable to you with respect to (i) Phonograph Records received by members of any such Club Operation in an introductory offer in connection with joining it or upon recommending that another join it or as a result of the purchase of a required number of Records, including, without limitation, Records distributed as "bonus" or "free" Records, or (ii) Phonograph Records for which such Club Operation is not paid.

(d)  In respect of Master Recordings leased by Company to others for the distribution of Phonograph Records through broadcast or other advertisements utilizing key-outlet distributors, the royalty payable to you shall be thirty( 30 ) percent of the net royalties

Page 4

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

received by Company from such key-outlet distributors after deduction of all royalties payable to the producers of such Master Recordings and all AFM and other applicable third party payments.

(e)  In respect of Phonograph Records sold to educational institutions or libraries or to armed forces post exchanges, the royalty shall be one-half (½) of the otherwise applicable royalty rate, and such royalties shall at all times be computed on the basis of One Hundred (100%) percent of Net Sales of such Records.

(f)  With respect to Phonograph Records bearing a special label or a suggested retail list price which is at least $3.00 less than the suggested retail list price used for the top line Phonograph Records released by Company or by its Licensees in any territory, the royalty rate payable to you in respect of such Phonograph Records shall be one-half (½) of the otherwise applicable royalty rate, and such royalty shall at all times by computed on the basis of One Hundred (100%) percent of Net Sales of such Records.

(g)  In respect of Phonograph Records sold by Company or its Licensees for distribution outside of the United States of America, or licensed or otherwise furnished by Company or its Licensees to others for its manufacture and distribution outside of the United States of America, the royalty rate payable to you therefor shall be one-half (½) of the applicable royalty rate which would have been payable to you therefor if such Records had been sold for distribution in the United States of America, and such royalties shall at all times be computed on the basis of One Hundred (100%) percent of Net Sales of such Records.

9.    MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in Paragraph 8 hereof:

(a)  (i)  With respect to Phonograph Records embodying Master Recordings made hereunder, together with other master recordings, the royalty rate payable to you shall be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides contained thereon embodying Master Recordings made hereunder and the denominator of which is the total number of Sides contained on such Record, and

(ii) With respect to Phonograph Records embodying Master Recordings made hereunder which embody your performances, together with the performances of another artist(s) to whom Company is obligated to pay royalties in respect of the sale of Phonograph Records derived from such Master Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodies on such Master Recording.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

(b) (i)  No royalties shall be payable to you in respect of Phonograph Records sold by Company or its Licensees until payment for such Records has been received by Company, or for Phonograph Records sold as cut-outs after the listing of such Records has been deleted from the catalog of Company or the particular Licensee, or for scrap at a salvage or close-out price, or for less than fifty (50%) percent of Company's or its Licensees' regular wholesale price for such Records, or in respect of Phonograph Records distributed for promotional purposes or Phonograph Records distributed to radio stations or for use on transportation carriers and facilities to promote or stimulate the sale of Phonograph Records, or in respect of Phonograph Records sold or distributed as "free" or "no-charge" or "bonus" Records (whether or not intended for resale), and

(ii)  Notwithstanding anything to the contrary contained in Paragraph 9(b)(i) above, in respect of the sale by Company to its dealers or distributors of Phonograph Records subject to a discount or merchandising plan, the number of Records deemed to have been sold shall be determined by reducing the number of Records shipped by the percentage of discount granted, and if a discount is granted in the form of "free" or "no-charge" Records, such "free" or "no-charge" Records shall not be deemed included in the number of Records sold. However, such discounts (or "free" or "no-charge" Records) shall not exceed twenty (20%) percent of Records shipped for LPs, computed on a cumulative basis, and thirty (30%) percent of Records shipped for single Records, computed on a cumulative basis.

(c) No royalty shall be payable to you unless and until Company has recouped all Advances and all Recording Costs in connection with the Master Recordings made hereunder from the royalties payable to you in respect of Net Sales of Phonograph Records embodying such Master Recordings, and after such recoupment, royalties shall be paid to you only on those Records sold by Company or its Licensees after such recoupment.

(d) Company shall have the right to withhold a portion of your royalties as a reserve for returns and/or credits, which reserve shall be determined by Company in its reasonable judgment.

(e) The royalty rate applicable to a given Master Recording shall be the royalty rate specified herein for the Contract Year in which such Master Recording was recorded.

10.  ROYALTY ACCOUNTINGS

(a) Company shall compute royalties payable to you hereunder as of June 30th and December 31st for each preceding six (6) month period during which Records as to which royalties are payable hereunder are sold, and will render a statement and pay such royalties, less any unrecouped Advances and any other permissible offsets prior to each succeeding September 30th and March 31st, respectively.  Company may deduct from any royalty or other payment under this agreement any amount you may owe Company under this Agreement or any other agreement between you and Company or Company's subdivisions or affiliates.

(b) Royalties for Records sold for distribution outside of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

the United States of America (herein "foreign sales") shall be computed in the national currency in which Company is paid by its licensees and shall be paid to you at the same rate of exchange at which Company is paid. For accounting purposes, foreign sales shall be deemed to occur in the same semi-annual accounting periods in which Company's licensees account to Company therefor. If Company is unable, for reasons beyond its control, to receive payment for such sales in United States dollars in the United States of America, royalties therefor shall not be credited to your account during the continuance of such inability; if any accounting rendered to you hereunder during the continuance of such inability requires the payment of royalties to you, Company will, at your request and if Company is able to do so, deposit such royalties to your credit in such foreign currency in a foreign depository at your expense.

(c) At any time within one (1) year after any royalty statement is rendered to you hereunder, you shall have the right to give Company written notice of your intention to examine Company's books and records with respect to such statement. Such examination shall be commenced within three (3) months after the date of such notice, at your sole cost and expense, by any certified public accountant or attorney designated by you, provided he is not then engaged in an outstanding examination of Company's books and records on behalf of a person other than you. Such examination shall be made during Company's usual business hours at the place where Company maintains the books and records which relate to you and which are necessary to verify the accuracy of the statement or statements specified in your notice to Company and your examination shall be limited to the foregoing. Your right to inspect Company's books and records shall be only as set forth in this Paragraph 10(c) and Company shall have no obligation to produce such books and records more than once with respect to each statement rendered to you.

(d) Unless notice shall have been given to Company as provided in Paragraph 10(c) hereof, each royalty statement rendered to you shall be final, conclusive and binding on you and shall constitute an account stated. You shall be foreclosed from maintaining any action, claim or proceeding against Company in any forum or tribunal with respect to any statement or accounting rendered hereunder unless such action, claim or proceeding is commenced against Company in a court of competent jurisdiction within two (2) years after the due date of such statement or accounting.

(e) You acknowledge that Company's books and records contain confidential trade information. Neither you nor your representatives will communicate to others or use on behalf of any other person any facts or information obtained as a result of such examination of Company's books and records.

11.  **WARRANTIES, REPRESENTATIONS, RESTRICTIONS AND INDEMNITIES**

(a) You warrant and represent that:

(1) You have the right and power to enter into and fully perform this Agreement;

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

(ii)   Company shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Company pursuant to this Agreement, except as specifically provided in this Agreement;

(iii)   You are, or will become, and will remain (to the extent necessary to enable the performance of this Agreement) a member in good standing of all labor unions or guilds, which may be lawfully required for the performance of your services hereunder; and

(iv)   Neither the "Materials" nor any use of the Materials by Company will violate or infringe upon the rights of any Person. "Materials" as used in this subparagraph means any musical, artistic and literary materials, ideas and other intellectual properties, furnished by you and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

(b)   (i)   During the Term of this Agreement, you will not enter in to any agreement which would interfere with the full and prompt performance of you obligations hereunder, and you will not perform or render any services for the purpose of making Phonograph Records or Master Recordings for any person other than Company. After the expiration of the Term of this Agreement, for any reason whatsoever, you will not perform any Composition which shall have been recorded hereunder for any person other than Company for the purpose of making Phonograph Records or Master Recordings prior to the date five (5) years subsequent to the expiration date of the Term of this Agreement.

(ii)   You will not at any time record, manufacture, distribute or sell, or authorize or knowingly permit your performances to be recorded by any party for any purpose without an express written agreement prohibiting the use of such Recording on Phonograph Records in violation of the foregoing restrictions.

(c)   In the event that you shall become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing recording restrictions, you shall notify Company thereof and shall cooperate with Company in the event that Company commences any action or proceeding against such third party.

(d)   Your services hereunder are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and Company shall be entitled to injunctive relief to enforce the provisions of this Agreement.

(e)   You will at all times indemnify and hold harmless Company and any Licensee of Company from and against any and all claims, damages, liabilities, costs and expense, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty, representation or agreement made by you herein. You will reimburse Company and/or its Licensees on demand for any payment made at any time after the date hereof in respect of any liability or claim in respect of which Company or its Licensees are entitled to be indemnified.

Page 8

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

## 12. DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below:

(a) "Master Recording" - each and every recording of sound whether or not coupled with a visual image, by any method and on any other substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

(b) "Person" and "Party" - any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

(c) "Records", "Phonograph Records" and "Recordings" - all forms of reproductions, now or hereafter known, manufactured or distributed primarily for home use, school use, juke box use, or use in means of transportation, embodying (i) sound alone; or (ii) sound coupled with visual images, e.g. "sight and sound" devices.

(d) "Retail Selling Price" - with respect to Records sold for distribution in the United States of America, the suggested retail selling price or suggested retail list price, as the case may be, except that the suggested retail selling price for 12-inch 45 rpm single records shall be deemed to be the suggested retail selling price of a 7-inch 45 rpm single record; and with respect to Records sold for distribution outside of the United States of America, the suggested retail list price of such Records, in, at Company's election, the country of manufacture, the United States of America or the country of sale.

(e) "Royalty Base Price" - the applicable suggested Retail Selling Price of Phonograph Records less all taxes and less the applicable Container Charge.

(f) "Container Charge" - (i) with respect to disc Phonograph Records, twelve (12%) percent of the applicable Retail Selling Price of such Phonograph Records; and (ii) with respect to Phonograph Records in non-disc configurations, twenty-four (24%) percent of the applicable Retail Selling Price of such Phonograph Records; and (iii) with respect to 7-inch "single" Phonograph Records contained in non-standard color sleeves, ten (10%) percent of the applicable Retail Selling Price of such Phonograph Records.

(g) "Net Sales" - gross sales less returns and credits of any nature.

(h) "Advance" - amount recoupable by Company from royalties to be paid to you or on your behalf pursuant to this or any other agreement.

(i) "Composition" - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

Page 9

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

(j) "Controlled Composition" - a composition written, owned or controlled by you and/or any Person in which you have a direct or indirect interest.

(k) "Album" - one (1) twelve-inch, 33-1/3 rpm Record, or the equivalent thereof, embodying thereon not less than with (8) Sides nor more than eleven (11) Sides, whether or not released, which are recorded in connection with a specific album project.

(l) "Side" - a Recording of sufficient playing time to constitute one (1) Side of a 45 rpm Record, but not less than two and one-quarter (2-¼) minutes of continuous sound.

(m) "Sales Through Normal Retail Channels in the United States of America" - sales other than as described in subparagraphs 8(c), (d), (e), (f) and (g) hereof.

(n) "Licensees" - includes, without limitation, subsidiaries, wholly or partly owned, and other divisions of Company and any of Company's licensees.

### 13. SUSPENSION AND TERMINATION

(a) If at any time you fail (except solely for Company's refusal without cause to allow you to perform) to fulfill your recording commitment herein within the times set forth herein, then, without limiting Company's rights, Company shall have the option, exercisable by notice to you to extend the expiration date of the then current period of the Term hereof, and/or to suspend Company's obligation to you hereunder (including, without limitation, Company's obligation to make payments to you hereunder) for the period of the default, plus such additional time as is necessary so that Company shall have no less than sixty (60) days after completion of your recording commitment within which to exercise its option, if any, for the next following Contract Year.

(B) If in respect of any Contract Year of the Term of this Agreement, Company fails, without cause, to allow you to fulfill your Minimum Recording Commitment and if, within thirty (30) days after the expiration date of such Contract Year you shall notify Company of your desire to permit you to fulfill said Minimum Recording Commitment, then Company shall permit you to fulfill said Minimum Recording Commitment, then Company shall permit you to fulfill said Minimum Recording Commitment by notice to you to such effect within sixty (60) days of Company's receipt of your notice. Should Company fail to give such notice, you shall have the option within thirty (30) days after the expiration of said sixty (60) day period to give notice that you wish to terminate the Term of this Agreement. Upon receipt by Company of such notice, the Term of this Agreement shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obligations which survive the separation of the Term (e.g. warranties, rerecording restrictions and obligation to pay royalties). In the event you fail to give Company either notice within the period specified therefor, Company shall be under no obligation to you for failing to permit you to fulfill such Minimum Recording Commitment.

Page 10

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

by the terms of such agreement, to be included in this Agreement shall be deemed incorporated herein.

(c) No breach of this Agreement on the part of Company shall be deemed material, unless you shall have given Company notice of such breach and Company shall fail to discontinue the practice complained of or otherwise cure such breach, within sixty (60) days after receipt of such notice, if such breach is reasonably capable of being fully cured within such sixty (60) day period, or, if such breach is not reasonably capable of being fully cured within such sixty (60) day period, if Company commences to cure such breach within such sixty (60) day period and proceeds with reasonable diligence to complete the curing of such breach.

(d) This Agreement has been entered into in the State of Michigan, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of Michigan applicable to contracts entered into and performed entirely within the State of Michigan, with respect to the determination of any claim, dispute or disagreement, which may arise out of the interpretation, performance, or breach of this Agreement. Any process in any action or proceeding commenced in the courts of the State of Michigan or elsewhere arising out of any such claim, dispute or disagreement, may, among other methods, be served upon you by delivering or mailing the same, via registered or certified mail, addressed to you at the address first above written or such other address as you may designate pursuant to Paragraph 15 hereof. Any such delivery or mail service shall be deemed to have the same force and effect as personal service with the State of Michigan or the jurisdiction in which such action or proceeding may be commenced.

(e) If any part of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having the jurisdiction to make such determination, the remainder of this Agreement shall remain in full force and effect.

17. Any royalty rate that Company receives from any record company listed in Schedule "A" in respect to Paragraph 8A, 8B, 8C, 8D, 8E, 8F, 8G that is increased, the increased royalty rate shall apply and replace any or all royalty rates in those paragraphs.

18. (a) On the first LP and second LP and all configurations from singles from these LP's including but not limited to 7" records, 12" records, tapes, cassettes, CD's, etc. The company will receive a royalty of four (4%) percent of the retail sale price of all product sold.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

(b) If royalties are paid on a pro-rated basis per Paragraphs 8A, 8B, 8C, 8D, 8E, 8F, 8G, then The Company's royalties will be paid on a like pro-rated basis.

(c) The Company's fee for producing Each LP equal to 80% percent of the production budget.

19. Company will use their best efforts to sign an agreement with one of the record companies listed in Schedule "A:.

20. You will receive an Artist Advance equal to twenty (20%) percent of the production budget on LP on each LP

on EACH LiP

21. When Company enters into an Agreement for manufacture, distribution or any reason pertaining to You with a third party, You agree to consent to all changes that may be necessary in order to conform to such third party agreement.

22. (a) (i) All Selections embodied in any Masters recorded hereunder which are written or composed by you, Artist, or the individual producer(s), in whole or in part, alone or in collaboration with others, or which are owned or controlled, in whole or in part, directly or indirectly, by you, Artist, or the individual producer(s) or any person, firm or corporation in which you, Artist, or the individual producer(s) have a direct or an indirect interest are hereinafter collectively referred to as "Controlled Compositions." Each Controlled Composition is hereby licensed to us, for the United States, at a rate equal to three-fourths (3/4) of the minimum compulsory license rate under the copyright law of the United States in effect at the time of the completion of the recording of the Master embodying such Controlled Composition (hereinafter the "U.S. Rate"). Each Controlled Composition is hereby licensed to us, for Canada, at a rate of two (2¢) cents (hereinafter the "Canadian Rate"). Copyright royalties in respect of Controlled Compositions shall be paid on the basis of records sold, less returns and credits, except that: (A) the copyright royalty rate in respect of sales of records on a budget record line or mid-priced record line or in respect of records sold through a record club shall be of the United States or Canadian rate, as the case may be; and (B) no copyright royalties shall be payable with respect to the following: records furnished as free or bonus records to members, applicants, or other participants in any record club or other direct mail distribution method; records distributed for promotional purposes to radio stations,

Page 13

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

television stations or networks, record reviewers, or other customary recipients of promotional records; so-called "promotional sampler" records; records sold as scrap or "cut-outs"; or records furnished on a so-called "no charge" or "free goods" basis or sold at less than fifty (50%) percent of their regular wholesale price to distributors, subdistributors, dealers, or others, whether or not the recipients thereof are affiliated with us or the distributor of records hereunder.

     In witness whereof, the parties hereto have executed this Agreement as of the day and year first indicated above.

POWER PRODUCTION, INC.

By: _____
     Leroy McMath

_____
ARTIST

_____
ARTIST

_____
ARTIST

_____
ARTIST

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

**POWER RECORDS**
**6350 McDONOUGH DRIVE, SUITE A**
**NORCROSS, GEORGIA 30093**

Mr. Eric Timmons
C/O Hard Hood Recordings
P.O. Box 1203
Jonesboro, Georgia 30237-1203

Re: Modification of Record Distribution Agreement between Power Records (Company) and Eric Timmons d/b/a Hard Hood Recordings (Manufacturer)

Dear Mr. Timmons:

In consideration of the exchange of the sum of ten dollars ($10) between and among the parties hereto and the premises and mutual promises set forth below, this document when signed by you shall serve as a Modification of the Record Distribution Agreement (the Agreement) made effective as of _March 26th_, 1996, by and between Power Records (Company) and Eric Timmons d/b/a Hard Hood Recordings (Manufacturer) for the commercial distribution Masters embodying the performances of the recording artist and/or group principally comprising Eric Timmons, professionally known as "Freak Nasty" (Artist). Artist has signed below as an inducement for Company to enter into this Modification with Manufacturer. Artist's signature also signifies Artist's acceptance of obligations specific to Artist as set forth herein.

Company, Manufacturer and eric Timmons hereby agree to the following modifications and new contractual terms and conditions:

1.    Company has received from Manufacturer and Artist a First Album under the Agreement, which First Album Company has caused to be distributed for sale. Company agrees to pay to Eric Timmons as Artist and Manufacturer for and on behalf of Manufacturer an Advance recoupable from amounts payable to Manufacturer for a Second Album and a Third Album, if requested by Company, to be distributed under the Agreement. Each said Advance shall be paid in accordance with the following schedule:

| Album | Amount of Advance |
|---|---|
| Second Album | $50,000 |
| Third Album | $50,000 |

2.    Company, Manufacturer and Artist agree, acknowledge and confirm that the recording services of Artist during the term of the Agreement are exclusive to Manufacturer, and, further, that all Recordings thereby created through the performance of Artist shall be exclusively distributed by Company in accordance with the terms and conditions of said Agreement. All of said Recordings of Artist the creation of which have been or are financed by Company through payment of said Advances described above, or otherwise financed by mutual agreement of the parties, including the First Album distributed under the Agreement which First Album is under titled "Controversee ... That's Life ... And That's The Way It Is" released by Company through distribution arrangements

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

with Triad Records, Inc. as product no. TR 2111-2 (all of which Recordings may sometimes hereinafter for convenience be referred to as "Company-financed Recordings"), shall be the sole, exclusive and perpetual property of Company subject to payment by Company to Manufacturer for distribution therefor in accordance with the terms and conditions of the Agreement and this Modification. Company's ownership rights in said Company-financed Recordings entitles Company among other things to all right title and interest in the copyright in and to the Recordings. If permissible under copyright law the Recordings shall be considered works-made-for-hire for Company. Further, and particularly if such Recordings are not considered as works-made-for-hire for Company, said Recordings are deemed transferred to Company under the Agreement and this Modification together with all rights and title in and to same. Manufacturer and Artist agree to execute any documents which may be necessary to carry out the intent of this provision including any documents necessary to evidence Company's exclusive rights under US copyright law. Manufacturer shall obtain or solicit Company's assistance in obtaining full ownership rights in Recordings created through the services of third party producers (that is, producers other than Artist) not later than delivery of the masters for said Recordings to Company and preferably prior to creation of said masters by said third-party producers. Manufacturer shall take all measures, or solicit Company's assistance in taking all measures, necessary to perfect Company's full ownership rights in Recordings hereunder under US copyright law such that the rights granted to Company hereunder shall be fully effective.

3. Eric Timmons individually, as Artist and as a duly authorized representative of Eric Timmons Music or such other music publishing entity controlled or owned by him hereby assigns, conveys and grants to Company or Company's publishing designee and their successors and assigns one-half (1/2) of the worldwide right, title and interest, including all copyright, the right to copyright and any and all renewal rights, in the Compositions written wholly or in part by Eric Timmons which Compositions are embodied in said Recordings. The intent of this provision is that Company or its publishing designee shall serve as Co-Publisher of said Compositions with Eric Timmons' publishing designee. The Compositions shall be registered for copyright by Company, or Company's publishing designee, jointly in the name of Company, or its publishing designee, and Eric Timmons' publishing designee. In the event that Eric Timmons either individually or through Eric Timmons Music or such other publishing designee of Eric Timmons has previously registered for copyright any Compositions to which this provision is applicable, particularly any Compositions embodied in the Recordings of the First Album (titled "Controversee ... That's Life ... And That's The Way It Is" released by Company through distribution arrangements with Triad Records, Inc. as product no. TR 2111-2), Eric Timmons, Eric Timmons Music or such other publishing designee of Eric Timmons shall execute all documents necessary under copyright law to transfer one-half (1/2) that interest in said previously registered Composition to Company or Company's publishing designee to be administered hereunder. Company or its publishing designee as Administrator has the sole, exclusive and worldwide right to perform publisher duties and responsibilities including but not limited to the rights to administer and exploit the

Power Records/Hard Wood/Bod/February 2, 1997

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Compositions, to print, publish, sell, dramatize, use and license any and all uses of the Compositions, to execute in its own name any and all licenses and agreements whatsoever affecting or respecting the Compositions. Company or its publishing designee is entitled to receive and collect all Gross Receipts derived from the Compositions and shall pay to Eric Timmons as writer one-half (or 50%) of the Net Income thereby derived, and, further, shall pay to Eric Timmons' publishing designee as co-publisher one-fourth (or 25%) of the Net Income thereby derived. Net Income is Gross Income less an Administration Fee (which Administration Fee is not to exceed 10% of the Gross Receipts), copyright registration fees, royalties legally required to be paid to third parties, costs associated with advertising/promotion/exploitation of the Compositions, legal fees and other costs attributed solely to the Compositions. Eric Timmons as writer/author/composer of the Compositions and Eric Timmons' publishing designee as co-publisher of the Compositions shall receive their public performance royalties throughout the world directly from their own affiliated performing rights society, as is customary in the music industry, and shall have no claim whatsoever against Company or Company's publishing designee for any royalties received by Company or Company's publishing designee from any performing rights society which makes payment directly (or indirectly other than through Company or Company's publishing designee) to writers, authors and composers and/or co-publishers. Company or Company's publishing designee shall make payments and render accounting statements to Eric Timmons and Eric Timmons' publishing designee under this paragraph with-in ninety (90) days after the last days of June and December in each year. Objections, questions or disputes relating to any accounting statements shall be waived unless received in writing by Company or its publishing designee within one (1) year after receipt thereof. With respect to payments to be made to Eric Timmons, Eric Timmons Music or such other publishing designee of Eric Timmons it is understood and agreed by the parties that because of the relationship existing between Artist and Manufacturer, neither Company nor Company's publishing designee shall not be required to pay mechanical license fees on behalf of Manufacture to Eric Timmons or Eric Timmons' publishing designee.

4.    Upon proper notification by Manufacturer to Company that samples of third party recordings have been incorporated into the Recordings hereunder Company shall assist Manufacturer in clearing said samples.

5.    Company may in its sole discretion, upon notice to Manufacturer, arrange for advertising and promotional services to be provided by third parties to further the commercial exploitation of the Recordings. Costs for such third-party advertising and promotional services shall be paid for by Company and shall be recoupable from amounts payable to Manufacture and/or Artist under the Agreement.

6.    Manufacturer and Artist shall execute, acknowledge and deliver to Company or Company's publishing designee, or shall cause the execution, acknowledgment and delivery to Company or Company's publishing designee of, and hereby grants Company and its publishing designee an irrevocable power of attorney to execute on behalf of Manufacturer and Artist, such further instruments as Company or Company's publishing designee shall

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

deem necessary to effect the intent and purpose of this Modification and Agreement(s).

7.    The terms and conditions of any agreement entered into by Company with a third party (Third Party Agreement) to facilitate the distribution and sale of Manufacturer's recordings shall supersede any conflicting terms and conditions which are contained in the Record Distribution Agreement and/or this Modification.

8.    Eric Timmons agrees to produce one (1) album for each of two (2) artists to be designated by Company, that is, a total of two (2) albums, upon payment of a Producer's Advance of $15,000.  Company and Eric Timmons agree to enter into a more formal Producer's Agreement at the time said albums are produced, however, for expediency, the basic terms and conditions are set forth in this paragraph and shall be controlling unless and until a more formal agreement is entered into.  It is agreed that one of said two artists shall be the recording artist professionally known as DJ SHAGG.  Eric Timmons shall be paid a Producer's Royalty of three percent (3%) of the Retail List Price less Company's customary applicable costs for, including but not limited to, taxes, mechanical license fees, container charges, from which Producer's Royalty said Producer's Advance shall be recoupable.  Payments and statements shall be rendered with-in ninety (90) days after the last days of June and December in each year.  Compositions written or controlled by Eric Timmons as Producer under this provision shall be co-published by Company's publishing designee and Eric Timmons' publishing designee under the same terms as conditions set forth in paragraph 3, above.  Eric Timmons as Producer shall execute, acknowledge and deliver to Company or its designee all documents necessary to perfect Company's full ownership in masters produced hereunder and hereby grants Company and its publishing designee an irrevocable power of attorney to execute on his behalf such further instruments as Company or Company's publishing designee shall deem necessary to effect the intent and purpose of this agreement for Producer's services.

Acceptance of the terms and conditions of this Modification and new contractual terms and conditions is indicated by the signatures below.

For Company:
Power Records

Leroy McMath, President                Manufacture                Date

3/26/96

Power Records/Hard Hood/Mod/February 2, 1997.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318

## EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this _18_ day of _MARCH_, 19_93_ by and between Power Artists Records, Inc., C/O Law Offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, GA 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and _ALPHA (CAPONE) BREED_ professionally known as _DFC_ (hereinafter referred to as the "Artist(s)").

### WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and

WHEREAS, the Artist is a singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for such period of time as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the particular period in which such failure to record occurs. The dates, therefore, for the exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs.

The musical compositions to be recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 2

performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minumum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minumum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the Company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performaces hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to, based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

(a) A royalty of __twenty__ (_20_) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 3

production for the promotion or advertising purposes;

(b)    One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

(c)    With respect to phonograph records which embody compositions in addition to the composition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

(d)    One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.    Notwithstanding anything to the contrary contained herein,

(a)    In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records;

(b)    No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;

(c)    If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.    Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records had been sold separately and not so packaged. Company shall charge seven per cent (7%) of retail list price of records manufactured as its 'container deduction' and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist preconsents to a higher cost.

7.    The Company will compute such royalties within sixty (60)

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 4

days after June 30th and December 31st of each year, during which records made hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any unrecouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.  All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of _____ ALPHA BREED and payments and statements rendered to 4794 WOODSPRING DRIVE MARIETTA GA. 30066 at the following address: _____

shall be deemed rendered to and received by the Artist hereunder.

9.  All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the foregoing or any rights granted herein, but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

(a)  The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use throughout the world, or to refrain therefrom the performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

(b)  The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "EXCLUSIVE POWER ARTISTS RECORDS RECORDING ARTIST" or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by it;

(c)  The sole and exclusive right in, title to and ownership

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 5

of all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

(d) The sole and exclusive right, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

(e) The right to incorporate in records to be made hereunder, instrumentations, orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and artist does hereby agree to record commercials whenever requested by company during the term or any extension of this agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respect to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of ONE ( 1 ) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for FOUR ( 4 ) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of a minimum of TWO ( 2 ) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 6

15. The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which a bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16. This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this agreement.

17. For the purposes of this agreement, the following definitions shall apply:

Recording Costs: Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

Record: All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

Production Expenses: All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18. INDEMNIFICATION

(a) Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will be given a reasonable opportunity to defend any such claim.

(b) Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense of any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 7

thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISION AND APPLICABLE LAW.

(a) If any clause, sentence, paragraph or part of this agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

(b) The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

(c) Any claim and the relationship of the parties hereto arising out of this Agreement or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration Association governing one-member panels. The parties hereto agree to be bound by the award of such arbitration and judgement upon the award rendered by the artibrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay one-half (1/2) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 8

## 22. OWNERSHIP OF MASTERS

Artist hereby acknowledges and agrees that each master recorded under the attached Exclusive Artists Recording Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) is prepared as part of an LP-Master which constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered a work made for hire. I further acknowledge that Company is the exclusive owner of copyright with respect to each such master and any "sound recording" or "phonorecord" or "copy" manufactured therefrom (individually and collectively called the "Work"), and that Company has the right to exercise all rights of the copyright proprietor with respect thereto, including, but not limited to, all exclusive rights specified in 17 U.S.C. 106 and the exclusive right to register copyright in the name of Company.

Notwithstanding any other provisions hereof, I agree that to the extent, if any, that I may be deemed an "author" of any Work, I hereby grant and assign the Company, exclusively, perpetually and throughout the universe, all exclusive right, title and interest in and to such Work, including, but not limited to, all exclusive rights of the copyright owner as specified in 17 U.S.C. 106. I hereby grant to Company a power of attorney irrevocable and coupled with an interest to execute for me and in my name, all documents and instruments necessary or appropriate to effectuate the intents and purposes of this Paragraph 22 and to accomplish, evidence and perfect the rights granted to Company pursuant to this Paragraph 22, including but not limited to documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to Company.

23. Notwithstanding paragraph 4, or any other provision of this Agreement, if Company enters into an agreement under which Company acts as a production company for delivery of a master or masters containing Artist's performances, then the royalty payments provided for under paragraph 4 are inapplicable and Artist shall be paid one-half of "Net Royalties" received from the commercialization of said master or masters. To determine Net Royalties, Company shall be allowed to deduct any unreimbursed costs incurred by it in preparing said masters that are designated as recoupable costs under this Agreement.

## 24. CO-PUBLSHING

You and we agree to co-publish any and all compositions written by you, alone or in collaboration with others, to the extent of your authorship, which are written by you or recorded as a master demo during the term of this agreement. The publisher's share on all such compositions shall be divided in a manner whereby our publishing designee shall own fifty percent (50%) and your publishing designee shall own fifty percent (50%), with our publishing designee having administration rights thereto, for which an administration fee of no greater than ten percent (10%) of the gross receipts shall be charged.

25. **ADVANCEMENT:**    Company hereby agrees to advance to artist(s) the amount of Two Thousand Dollars ($2,000.00) as a signing bonus, to be distributed as follows:   One Thousand Dollars ($1,000.00) upon signing agreement and One Thousand Dollars ($1,000.00) the day the artist (s) starts recording.

**VIDEO:**    Company hereby agrees to produce promotional videos with an approved production budget of Fifteen Thousand Dollars ($15,000.00).   The decision to produce videos for all LP's hereunder shall be within the sole discretion of the company.   All advances for the production of videos hereunder shall be fifty percent (50%) recoupable from artist's royalties hereunder (excluding mechanicals), and one hundred percent (100%) recoupable from royalties earned by artist in respect of the exploitation of the video.

**PROMOTIONS/MARKETING:**    Company hereby agrees to provide independent promotions and marketing for the initial LP hereunder, with an approved budget up to a maximum of Twenty Thousand Dollars ($20,000.00).   The decision to hire independent promotion and market for all subsequent LP hereunder shall be within the sole direction of company.

28. All payments hereunder shall be paid directly to artist(s) from distributed label upon being due.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

IN WITNESS WHEREOF, the duly authorized individuals, representatives, officers of the parties hereto have executed and delivered this agreement the day and year hereinabove first written.

Attest:      ARTIST:  _Bobby T Thompson_

Witness

By: _Bobby T Thompson_

_633 W. Flint Park Blvd_
_Flint Mi_
(Address)

(Telephone Number)

(Date of Birth)

By: _Alpha Breed_

_4794 Woodspring Drive_
_Marietta Ga 30066_
(Address)

(Social Security No.)

(Date of Birth)

Attest:      COMPANY: POWER ARTISTS RECORDS, INC.

_Alpha Breed_

By: _Leroy McMath_
LEROY MCMATH, PRESIDENT

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318

## EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this _18_ day of _MARCH_, 1993 by and between Power Artists Records, Inc., C/O Law Offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, GA 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and _Bobby T. Double E Thompson_ professionally known as _D.F.C_ (hereinafter referred to as the "Artist(s)").

## WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and

WHEREAS, the Artist is a singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for such period of time as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the particular period in which such failure to record occurs. The dates, therefore, for the exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs.

The musical compositions to be recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 2

performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minumum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minumum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the Company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performaces hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to, based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

(a) A royalty of ___twenty___ ( 20 ) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

**Page 3**

production for the promotion or advertising purposes;

(b)    One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

(c)    With respect to phonograph records which embody compositions in addition to the composition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

(d)    One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.    Notwithstanding anything to the contrary contained herein,

(a)    In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records;

(b)    No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;

(c)    If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.    Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records had been sold separately and not so packaged. Company shall charge seven per cent (7%) of retail list price of records manufactured as its 'container deduction' and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist preconsents to a higher cost.

7.    The Company will compute such royalties within sixty (60)

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 4

days after June 30th and December 31st of each year, during which records made hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any unrecouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.    All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of _____

Bobby TERRELL ThompSON

and    payments    and    statements    rendered    to

633 W Flint Park Blud

Flint mich

at    the    following    address:

shall be deemed rendered to and received by the Artist hereunder.

9.    All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company.    Without limiting the foregoing or any rights granted herein, but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

(a)    The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use throughout the world, or to refrain therefrom the performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

(b)    The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "EXCLUSIVE POWER ARTISTS RECORDS RECORDING ARTIST" or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by it;

(c)    The sole and exclusive right in, title to and ownership

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 5

of all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

(d) The sole and exclusive right, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

(e) The right to incorporate in records to be made hereunder, instrumentations, orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and artist does hereby agree to record commercials whenever requested by company during the term or any extension of this agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respect to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of __ONE__ ( 1 ) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for __FOUR__ ( 4 ) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of a minimum of __TWO__ ( 2 ) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 8

15.    The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company.  For the period in which a bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16.    This agreement is subject to all rules and regulations of any union having jurisdiction.  No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this agreement.

17.    For the purposes of this agreement, the following definitions shall apply:

Recording Costs:         Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

Record:   All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

Production Expenses:   All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.   INDEMNIFICATION

(a)   Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract.  Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will be given a reasonable opportunity to defend any such claim.

(b)   Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder.   Upon the written request of an indemnitee, the indemnitor will assume the defense of any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense

Page 7

thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISION AND APPLICABLE LAW.

(a) If any clause, sentence, paragraph or part of this agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdition to be invalid, such judgement shall not affect the remainder of this agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

(b) The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

(c) Any claim and the relationship of the parties hereto arising out of this Agreement or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration Association governing one-member panels. The parties hereto agree to be bound by the award of such arbitration and judgement upon the award rendered by the artibrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay one-half (1/2) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 8

## 22. OWNERSHIP OF MASTERS

Artist hereby acknowledges and agrees that each master recorded under the attached Exclusive Artists Recording Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) is prepared as part of an LP-Master which constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered a work made for hire.  I further acknowledge that Company is the exclusive owner of copyright with respect to each such master and any "sound recording" or "phonorecord" or "copy" manufactured therefrom (individually and collectively called the "Work"), and that Company has the right to exercise all rights of the copyright proprietor with respect thereto, including, but not limited to, all exclusive rights specified in 17 U.S.C. 106 and the exclusive right to register copyright in the name of Company.

Notwithstanding any other provisions hereof, I agree that to the extent, if any, that I may be deemed an "author" of any Work, I hereby grant and assign the Company, exclusively, perpetually and throughout the universe, all exclusive right, title and interest in and to such Work, including, but not limited to, all exclusive rights of the copyright owner as specified in 17 U.S.C. 106.  I hereby grant to Company a power of attorney irrevocable and coupled with an interest to execute for me and in my name, all documents and instruments necessary or appropriate to effectuate the intents and purposes of this Paragraph 22 and to accomplish, evidence and perfect the rights granted to Company pursuant to this Paragraph 22, including but not limited to documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to Company.

23. Notwithstanding paragraph 4, or any other provision of this Agreement, if Company enters into an agreement under which Company acts as a production company for delivery of a master or masters containing Artist's performances, then the royalty payments provided for under paragraph 4 are inapplicable and Artist shall be paid one-half of "Net Royalties" received from the commercialization of said master or masters.  To determine Net Royalties, Company shall be allowed to deduct any unreimbursed costs incurred by it in preparing said masters that are designated as recoupable costs under this Agreement.

24. CO-PUBLISHING
You and we agree to co-publish any and all compositions written by you, alone or in collaboration with others, to the extent of your authorship, which are written by you or recorded as a master demo during the term of this agreement.  The publisher's share on all such compositions shall be divided in a manner whereby our publishing designee shall own fifty percent (50%) and your publishing designee shall own fifty percent (50%), with our publishing designee having administration rights thereto, for which an administration fee of no greater than ten percent (10%) of the gross receipts shall be charged.

25. <u>ADVANCEMENT</u>:    Company hereby agrees to advance to artist(s) the amount of Two Thousand Dollars ($2,000.00) as a signing bonus, to be distributed as follows:  One Thousand Dollars ($1,000.00) upon signing agreement and One Thousand Dollars ($1,000.00) the day the artist (s) starts recording.

<u>VIDEO</u>:    Company hereby agrees to produce promotional videos with an approved production budget of Fifteen Thousand Dollars ($15,000.00).  The decision to produce videos for all LP's hereunder shall be within the sole discretion of the company.  All advances for the production of videos hereunder shall be fifty percent (50%) recoupable from artist's royalties hereunder (excluding mechanicals), and one hundred percent (100%) recoupable from royalties earned by artist in respect of the exploitation of the video.

<u>PROMOTIONS/MARKETING</u>:    Company hereby agrees to provide independent promotions and marketing for the initial LP hereunder, with an approved budget up to a maximum of Twenty Thousand Dollars ($20,000.00).  The decision to hire independent promotion and market for all subsequent LP hereunder shall be within the sole direction of company.

26. All payments hereunder shall be paid directly to artist(s) from distributed label upon being due.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

IN WITNESS WHEREOF, the duly authorized individuals, representatives, officers of the parties who have executed and delivered this Agreement the day and year hereinabove first written.

Attest:        ARTIST: *Alpha BREED*

_____
Witness                         By: _____

                                4794 WOODSPRING DRIVE
                                MARIETTA GA 30066
                                        (Address)

                                _____
                                    (Telephone Number)

                                _____
                                    (Date of Birth)

                                By: _____

_____
Witness

                                _____

                                _____
                                        (Address)

                                _____

                                    (Social Security No.)

                                _____
                                    (Date of Birth)

Attest:        COMPANY: POWER ARTISTS RECORDS, INC.

_____        By: _____
                                    LEROY MCMATH, PRESIDENT

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318

## EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 9th day of June , 19 92 by and between Power Artists Records, Inc., C/O Law Offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, GA 30318 and/or it's associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and PATRICK ALEXANDER HALL professionally known as "GANGSTA PAT" (hereinafter referred to as the "Artist(s)").

### WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and

WHEREAS, the Artist is a singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for such period of time as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the particular period in which such failure to record occurs. The dates, therefore, for the exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs.

The musical compositions to be recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D7CCD2AD8C

Page 2

performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minumum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minumum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the Company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performaces hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to, based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder;

(a) A royalty of <u>twenty</u> (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 3

production for the promotion or advertising purposes;

(b)   One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

(c)   With respect to phonograph records which embody compositions in addition to the composition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

(d)   One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.   Notwithstanding anything to the contrary contained herein,

(a)   In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records;

(B)   No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;

(c)   If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.   Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records had been sold separately and not so packaged. Company shall charge seven per cent (7%) of retail list price of records manufactured as its "container deduction" and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist preconsents to a higher cost.

7.   The Company will compute such royalties within sixty (60)

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 4

days after June 30th and December 31st of each year, during which records made hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any unrecouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.     All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of _____ Patrick A. Hall
and payments and statements rendered to Patrick A. Hall
at the following address: 4884 Autumn Leaf Drive, Memphis, Tennessee 38116
shall be deemed rendered to and received by the Artist hereunder.

9.     All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the foregoing or any rights granted herein, but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

(a)     The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use throughout the world, or to refrain therefrom the performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

(b)     The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", by any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by it;

(c)     The sole and exclusive right in, title to and ownership

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 5

of all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

(d) The sole and exclusive right, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

(e) The right to incorporate in records, to be made hereunder, instrumentations, orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respect to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of ___one___ (_1_) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for __two__ (_2_) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of a minimum of __two__ (_2_) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 6

15.   The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company.   For the period in which a bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16.   This agreement is subject to all rules and regulations of any union having jurisdiction.   No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this agreement.

17.   For the purposes of this agreement, the following definitions shall apply:

Recording Costs:   Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

Record:   All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

Production Expenses:  All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.   INDEMNIFICATION

(a)   Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract.   Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies.   Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will be given a reasonable opportunity to defend any such claim.

(b)   Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder.   Upon the written request of an indemnitee, the indemnitor will assume the defense of any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 7

thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISION AND APPLICABLE LAW.

(a) If any clause, sentence, paragraph or part of this agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

(b) The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

(c) Any claim and the relationship of the parties hereto arising out of this Agreement or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration Association governing one-member panels. The parties hereto agree to be bound by the award of such arbitration and judgement upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay ~~xxxxxxxxxxxxxx~~ three-quarters (3/4) the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

INITIALS _PH_    INITIALS _PH_

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 8

IN WITNESS WHEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTAND THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARILY WAIVED YOUR RIGHT TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO AGREEMENT WITHOUT THE BENEFIT OF LEGAL REPRESENTATION.

Attest:   ARTIST

_William B. Seale_
WITNESS   _Attorney at Law_

BY: _Patrick Q. Hall_
ARTIST

_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_

Attest:   COMPANY

_____

BY: _Leroy McMath_   President

ORIGINAL

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318

EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this _18_ day of _MARCH_ , 19_93_ by and between Power Artists Records, Inc., C/O Law Offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, GA 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred _ALPHA (CAPONE) BREED_ as "Company") and professionally _DFC_ known as (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and

WHEREAS, the Artist is a singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1.    That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for such period of time as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the particular period in which such failure to record occurs. The dates, therefore, for the exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs.

The musical compositions to be recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 2

performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minumum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minumum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the Company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performaces hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to, based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

(a) A royalty of ___twenty___ ( 20 ) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 3

production for the promotion or advertising purposes;

(b)   One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

(c)   With respect to phonograph records which embody compositions in addition to the composition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

(d)   One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.   Notwithstanding anything to the contrary contained herein,

(a)   In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records;

(b)   No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;

(c)   If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.   Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records had been sold separately and not so packaged. Company shall charge seven per cent (7%) of retail list price of records manufactured as its 'container deduction' and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist preconsents to a higher cost.

7.   The Company will compute such royalties within sixty (60)

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 4

days after June 30th and December 31st of each year, during which records made hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any unrecouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.   All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of _____ ALPHA BREED and payments and statements rendered at the following address: 4794 WOODSPRING DRIVE MARIETTA GA. 30066

shall be deemed rendered to and received by the Artist hereunder.

9.   All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the foregoing or any rights granted herein, but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

    (a)   The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use throughout the world, or to refrain therefrom the performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

    (b)   The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "EXCLUSIVE POWER ARTISTS RECORDS RECORDING ARTIST" or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by it;

    (c)   The sole and exclusive right in, title to and ownership

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 5

of all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

(d) The sole and exclusive right, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

(e) The right to incorporate in records to be made hereunder, instrumentations, orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and artist does hereby agree to record commercials whenever requested by company during the term or any extension of this agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respect to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of __ONE__ ( 1 ) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for __FOUR__ ( 4 ) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of a minimum of __TWO__ ( 2 ) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 6

15.    The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company.  For the period in which a bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16.    This agreement is subject to all rules and regulations of any union having jurisdiction.  No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this agreement.

17.    For the purposes of this agreement, the following definitions shall apply:

Recording Costs:    Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

Record:  All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

Production Expenses:  All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.  INDEMNIFICATION

(a)    Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract.  Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies.  Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will be given a reasonable opportunity to defend any such claim.

(b)    Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder.  Upon the written request of an indemnitee, the indemnitor will assume the defense of any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense

Page 7

thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19.   LEGALITY OF PROVISION AND APPLICABLE LAW.

(a)   If any clause, sentence, paragraph or part of this agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdition to be invalid, such judgement shall not affect the remainder of this agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

(b)   The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

(c)   Any claim and the relationship of the parties hereto arising out of this Agreement or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration Association governing one-member panels. The parties hereto agree to be bound by the award of such arbitration and judgement upon the award rendered by the artibrators may be entered in any court having jurisdiction thereof.

20.   The Company agrees to pay one-half (1/2) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21.   ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 8

## 22. OWNERSHIP OF MASTERS

Artist hereby acknowledges and agrees that each master recorded under the attached Exclusive Artists Recording Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) is prepared as part of an LP-Master which constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered a work made for hire. I further acknowledge that Company is the exclusive owner of copyright with respect to each such master and any "sound recording" or "phonorecord" or "copy" manufactured therefrom (individually and collectively called the "Work"), and that Company has the right to exercise all rights of the copyright proprietor with respect thereto, including, but not limited to, all exclusive rights specified in 17 U.S.C. 106 and the exclusive right to register copyright in the name of Company.

Notwithstanding any other provisions hereof, I agree that to the extent, if any, that I may be deemed an "author" of any Work, I hereby grant and assign the Company, exclusively, perpetually and throughout the universe, all exclusive right, title and interest in and to such Work, including, but not limited to, all exclusive rights of the copyright owner as specified in 17 U.S.C. 106. I hereby grant to Company a power of attorney irrevocable and coupled with an interest to execute for me and in my name, all documents and instruments necessary or appropriate to effectuate the intents and purposes of this Paragraph 22 and to accomplish, evidence and perfect the rights granted to Company pursuant to this Paragraph 22, including but not limited to documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to Company.

23. Notwithstanding paragraph 4, or any other provision of this Agreement, if Company enters into an agreement under which Company acts as a production company for delivery of a master or masters containing Artist's performances, then the royalty payments provided for under paragraph 4 are inapplicable and Artist shall be paid one-half of "Net Royalties" received from the commercialization of said master or masters. To determine Net Royalties, Company shall be allowed to deduct any unreimbursed costs incurred by it in preparing said masters that are designated as recoupable costs under this Agreement.

24. CO-PUBLSHING
You and we agree to co-publish any and all compositions written by you, alone or in collaboration with others, to the extent of your authorship, which are written by you or recorded as a master demo during the term of this agreement. The publisher's share on all such compositions shall be divided in a manner whereby our publishing designee shall own fifty percent (50%) and your publishing designee shall own fifty percent (50%), with our publishing designee having administration rights thereto, for which an administration fee of no greater than ten percent (10%) of the gross receipts shall be charged.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

25. <u>ADVANCEMENT</u>:    Company hereby agrees to advance to artist(s) the amount of Two Thousand Dollars ($2,000.00) as a signing bonus, to be distributed as follows:  One Thousand Dollars ($1,000.00) upon signing agreement and One Thousand Dollars ($1,000.00) the day the artist (s) starts recording.

<u>VIDEO</u>:    Company hereby agrees to produce promotional videos with an approved production budget of Fifteen Thousand Dollars ($15,000.00).  The decision to produce videos for all LP's hereunder shall be within the sole discretion of the company.  All advances for the production of videos hereunder shall be fifty percent (50%) recoupable from artist's royalties hereunder (excluding mechanicals), and one hundred percent (100%) recoupable from royalties earned by artist in respect of the exploitation of the video.

<u>PROMOTIONS/MARKETING</u>:    Company hereby agrees to provide independent promotions and marketing for the initial LP hereunder, with an approved budget up to a maximum of Twenty Thousand Dollars ($20,000.00).  The decision to hire independent promotion and market for all subsequent LP hereunder shall be within the sole direction of company.

28. All payments hereunder shall be paid directly to artist(s) from distributed label upon being due.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

IN WITNESS WHEREOF, the duly authorized individuals, representatives, officers of the parties hereto have executed and delivered this agreement the day and year hereinabove first written.

Attest:   ARTIST: Bobby T Thompson

_____   By: Bobby T Thompson
Witness

633 W. Flint Park Blvd
Flint MI
(Address)

_____
(Telephone Number)

_____
(Date of Birth)

By: Alpha Breed

4794 Woodspring Drive
Marietta GA 30066
(Address)

_____
(Social Security No.)

_____
Witness

_____
(Date of Birth)

Attest:   COMPANY: POWER ARTISTS RECORDS, INC.

Alpha Breed         By: Leroy McMath
                         LEROY MCMATH, PRESIDENT

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318

## EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 6th day of June, 1990 by and between Power Artist Records, Inc., C/O Law offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, Ga 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and Eric Breed professionally known as M.C Breed (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and WHEREAS, the Artist is singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for period of time as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the particular period in which such failure to record occurs. The dates, therefore, for exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The Company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs.

   The musical compositions to recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company,

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to , based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:
    a. A royalty of twenty (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of production for the promotion or advertising purposes;
    b. One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;
    c. With respect to phonograph records which embody compositions in addition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;
    d. One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5. Notwithstanding anything to the contrary contained herein,
    a. In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records.
    b. No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;
    c. If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing



DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6. Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records have been sold separately and not so packaged. Company shall charge seven percent (7%) of retail list price of records manufactured as its container deduction and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist pre-consents to a higher cost.

7. The Company will compute such royalties whit sixty (60) days after June 30th and December 31st of each year, during which records mad hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any recouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8. All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of Eric Breed _4794 WOO Spring DRIVE Marrietta GA 30066_ and payments and statements rendered to _____ at the following address: _____ _____shall be deemed rendered to and received by the Artist hereunder.

9. All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the forgoing or any rights granted herein but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

 a. The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

 b. The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by its;

 c. The sole and exclusive right in, title to and ownership of all masters, matrices, records or other reproductions of the performances embodies in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

 d. The sole and exclusive rights, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

e.   The right to incorporate in records to be made hereunder, instrumentations orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10.   Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and Artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this Agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11.   The Artist does hereby agree to perform exclusively for the Company for films and/or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12.   The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respects to his right to execute this agreement and perform its terms and conditions hereunder.

13.   The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14.   This agreement shall be for a period of two (2) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for three (3) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of aa minimum of ten (10) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

15.   The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company.  For the period in which bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16.   This agreement is subject to all rules and regulations of any union having jurisdiction.  No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this Agreement.

17.   For the purposes of this Agreement, the following definitions shall apply:
RECORDING COST:    Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.
RECORD:    All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.
PRODUCTION EXPENSES:    All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.   INDEMNIFICATION
a.   Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will b given a reasonable opportunity to defend any such claim.

    b. Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense o any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISIONS AND APPLICABLE LAW.

    a. If any clauses, sentence, paragraph or part of this Agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this Agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

    b. The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

    c. Any claim and the relationship of the parties hereto arising out of this Agreement, or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration association governing one-member panels. The parties hereto agree to be bound by the award arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

IN WITNESS HWEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTANT THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SEERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL



DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

OR HAVE KNOWINGLY AND VOLUNTARITLY WAIVED YOUR RIGHTS TO SUCH LEGAL COUNSEL AND
DESIRE TO ENTER INTO AGREEMENT WITHOU THE BENEFIT OF LEGAL REPRESENTATION.

WITNESS

BY:

Attest: COMPANY

BY:
LEROY MCMATHV/President

6-6-1990

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318


EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 6th day of April 1996 by and between Power Artist Records, Inc., C/O Law offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, Ga 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and Eric Timmons professionally known as **Freak Nasty** (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and WHEREAS, the Artist is singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for period as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the period in which such failure to record occurs. The dates, therefore, for exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The Company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs. The musical compositions to recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the company shall be entitled to equitable and injunctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to , based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:
   a. A royalty of twenty (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of production for the promotion or advertising purposes. Advance of ($15,000) to be recouped from royalties.
   b. One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;
   c. With respect to phonograph records which embody compositions in addition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;
   d. One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5. Notwithstanding anything to the contrary contained herein,
   a. In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records.
   b. No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records.
   c. If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.    Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records have been sold separately and not so packaged, Company shall charge seven percent (7%) of retail list price of records manufactured as its container deduction and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist pre-consents to a higher cost.

7.    The Company will compute such royalties whit sixty (60) days after June 30th and December 31st of each year, during which records mad hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any recouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.    All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of Eric Timmons, _____ and payments and statements rendered to _____ _____ at the following address: 2181 East Point St._____ East Point GA 30344_____ shall be deemed rendered to and received by the Artist hereunder.

9.    All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the forgoing or any rights granted herein but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

    a.    The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of performances to be recorded hereunder, upon such terms and conditions as the Company may approve.

    b.    The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by its;

    c.    The sole and exclusive right in, title to and ownership of all masters, matrices, records or other reproductions of the performances embodies in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

    d.    The sole and exclusive rights, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

e.   The right to incorporate in records to be made hereunder, instrumentations orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10.  Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and Artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this Agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11.  The Artist does hereby agree to perform exclusively for the Company for films and/or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12.  The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respects to his right to execute this agreement and perform its terms and conditions hereunder.

13.  The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however, no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14.  This agreement shall be for a period of two (2) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for three (3) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof, the Artist will perform for the Company for the recording of aa minimum of ten (10) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

15.  The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16.  This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this Agreement.

17.  For the purposes of this Agreement, the following definitions shall apply:
RECORDING COST:   Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.
RECORD:   All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.
PRODUCTION EXPENSES:   All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.  INDEMNIFICATION
a.   Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will b given a reasonable opportunity to defend any such claim.

b. Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense o any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISIONS AND APPLICABLE LAW.

a. If any clauses, sentence, paragraph or part of this Agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this Agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

b. The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

c. Any claim and the relationship of the parties hereto arising out of this Agreement, or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration association governing one-member panels. The parties hereto agree to be bound by the award arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

IN WITNESS HWEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTANT THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SEERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

OR HAVE KNOWINGLY AND VOLUNTARITLY WAIVED YOUR RIGHTS TO SUCH LEGAL COUNSEL AND
DESIRE TO ENTER INTO AGREEMENT WITHOU THE BENEFIT OF LEGAL REPRESENTATION.

Attest: ARTIST

WITNESS

Attest: COMPANY

BY: Eric Timmions d/b/a Hard Hood Recordings

ET

BY: LEROY MCMATH / President

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS CO, INC.
568 FOURTEEN STREET, NW
ATLANTA, GA 30318

EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 5th day of April 1992 by and between Power Artist Music Co, Inc., 568 Fourteen street, NW Atlanta, Ga 30318 and/or its associates, subsidiaries, nominees, successors, and assign (hereinafter referred to as "Company") and Darrell Gilbert and Charles Hood professionally known as **The Hard Boys** (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and WHEREAS, the Artist is singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1.  That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for period as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the period in which such failure to record occurs. The dates, therefore, for exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The Company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs. The musical compositions to recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2.  During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company; and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique,

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

and extraordinary and the company shall be entitled to equitable and injunctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to , based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

   a. A royalty of twenty (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of production for the promotion or advertising purposes. Advance of ($5,000) to be recouped from royalties.

   b. One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned.

   c. With respect to phonograph records which embody compositions in addition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

   d. One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5. Notwithstanding anything to the contrary contained herein,

   a. In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records.

   b. No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records.

   c. If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6. Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records have been sold separately and not so packaged, Company shall charge seven percent (7%) of retail list price of records manufactured as its container deduction and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist pre-consents to a higher cost.

7. The Company will compute such royalties whit sixty (60) days after June 30th and December 31st of each year, during which records mad hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any recouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8. All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of Charles Hood and Darrell Gilbert, and payments and statements rendered to Hard Boys Production P.O Box 942161 Atlanta, Ga 31141, shall be deemed rendered to and received by the Artist hereunder.

9. All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the forgoing or any rights granted herein but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

   a. The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of performances to be recorded hereunder, upon such terms and conditions as the Company may approve.

   b. The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by its;

   c. The sole and exclusive right in, title to and ownership of all masters, matrices, records or other reproductions of the performances embodies in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

   d. The sole and exclusive rights, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise.

   e. The right to incorporate in records to be made hereunder, instrumentations orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

recordings made hereunder, and Artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this Agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and/or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respects to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however, no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of two (2) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for two (2) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof, the Artist will perform for the Company for the recording of aa minimum of ten (10) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

15. The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16. This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this Agreement.

17. For the purposes of this Agreement, the following definitions shall apply:

RECORDING COST:   Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

RECORD:   All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

PRODUCTION EXPENSES:   All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18. INDEMNIFICATION

a. Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

advised thereof and each party will b given a reasonable opportunity to defend any such claim.

    b. Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense o any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISIONS AND APPLICABLE LAW.

    a. If any clauses, sentence, paragraph or part of this Agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this Agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

    b. The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

    c. Any claim and the relationship of the parties hereto arising out of this Agreement, or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration association governing one-member panels. The parties hereto agree to be bound by the award arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

IN WITNESS HWEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTANT THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SEERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARITLY WAIVED YOUR RIGHTS TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO AGREEMENT WITHOU THE BENEFIT OF LEGAL REPRESENTATION.

Attest: ARTIST

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

BY: _Charles Hart_

WITNESS

By: _Derrek Gilbert_

Attest: COMPANY

BY: _LEROY MCMATH / President_

April 5TH 1992

CH

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318


EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 6th day of July 1992 by and between Power Artist Records, Inc., C/O Law offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, Ga 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and Roderick barber and Fred Pilgrim professionally known as **Ghetto Mafia** (hereinafter referred to as the "Artist(s)").
WITNESSETH:
WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and WHEREAS, the Artist is singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for period as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the period in which such failure to record occurs. The dates, therefore, for exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The Company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs. The musical compositions to recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the company shall be entitled to equitable and injunctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3. The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to , based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4. The Company agrees to pay the Artist for the services rendered hereunder:

   a. A royalty of twenty (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of production for the promotion or advertising purposes.

   b. One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

   c. With respect to phonograph records which embody compositions in addition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

   d. One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5. Notwithstanding anything to the contrary contained herein,

   a. In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records.

   b. No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records.

   c. If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6. Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records have been sold separately and not so packaged, Company shall charge seven percent (7%) of retail list price of records manufactured as its container deduction and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist pre-consents to a higher cost.

7. The Company will compute such royalties whit sixty (60) days after June 30th and December 31st of each year, during which records mad hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any recouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8. All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of Roderick Barber and Fred Pilgrim, _____,and payments and statements rendered to _____ _____. at the following address: _____ _____shall be deemed rendered to and received by the Artist hereunder.

9. All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the forgoing or any rights granted herein but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

a. The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of performances to be recorded hereunder, upon such terms and conditions as the Company may approve.

b. The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by its;

c. The sole and exclusive right in, title to and ownership of all masters, matrices, records or other reproductions of the performances embodies in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

d. The sole and exclusive rights, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

    e. The right to incorporate in records to be made hereunder, instrumentations orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and Artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this Agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and/or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respects to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of two (2) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for three (3) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof, the Artist will perform for the Company for the recording of aa minimum of ten (10) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

15. The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16. This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this Agreement.

17. For the purposes of this Agreement, the following definitions shall apply:
    RECORDING COST:  Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.
    RECORD:  All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.
    PRODUCTION EXPENSES:  All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18. INDEMNIFICATION
    a. Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will b given a reasonable opportunity to defend any such claim.

b. Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense o any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISIONS AND APPLICABLE LAW.

a. If any clauses, sentence, paragraph or part of this Agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this Agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

b. The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

c. Any claim and the relationship of the parties hereto arising out of this Agreement, or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration association governing one-member panels. The parties hereto agree to be bound by the award arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

IN WITNESS HWEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTANT THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SEERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL

OR HAVE KNOWINGLY AND VOLUNTARITLY WAIVED YOUR RIGHTS TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO AGREEMENT WITHOU THE BENEFIT OF LEGAL REPRESENTATION.

Attest: ARTIST

_____    BY: _____
WITNESS                                                  ARTIST

Attest: COMPANY

_____    BY: _____
                                                  LEROY MCMATH / President

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS RECORDS, INC.
C/O LAW OFFICES OF MICHAEL DREW
568 FOURTEENTH STREET, NW
SUITE 100
ATLANTA, GEORGIA 30318

## EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this *18* day of *MARCH*, 19*93* by and between Power Artists Records, Inc., C/O Law Offices of Michael Drew, 568 Fourteenth St., NW, Ste. 100, Atlanta, GA 30318 and/or its associates, subsidiaries, nominees, successors, and assigns (hereinafter referred to as "Company") and Bobby T. Double E Thompson , professionally D.F.C known as (hereinafter referred to as the "Artist(s)").

### WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and

WHEREAS, the Artist is a singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1.   That the Artist will render his exclusive personal services

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 2

performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minumum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minumum number of record sides required to be recorded during any subsequent period.

2.    During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique, and extraordinary and the Company shall be entitled to equitable and injuctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3.    The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performaces hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to, based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4.    The Company agrees to pay the Artist for the services rendered hereunder:

      (a)    A royalty of ____twenty____ (_20_) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 3

production for the promotion or advertising purposes;

(b)    One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

(c)    With respect to phonograph records which embody compositions in addition to the composition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

(d)    One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America.  Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.    Notwithstanding anything to the contrary contained herein,

(a)    In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records;

(b)    No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records;

(c)    If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.    Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records had been sold separately and not so packaged. Company shall charge seven per cent (7%) of retail list price of records manufactured as its 'container deduction' and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist preconsents to a higher cost.

7.    The Company will compute such royalties within sixty (60)

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

**Page 4**

days after June 30th and December 31st of each year, during which records made hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any unrecouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.   All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of _____
_Bobby TERRELL Thompson_
and   payments   and   statements   rendered   to
_633 W Flint Park Blvd_
_Flint mich_
at   the   following   address:
_____

shall be deemed rendered to and received by the Artist hereunder.

9.   All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the foregoing or any rights granted herein, but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

(a)   The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of use throughout the world, or to refrain therefrom the performances to be recorded hereunder, upon such terms and conditions as the Company may approve;

(b)   The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "EXCLUSIVE POWER ARTISTS RECORDS RECORDING ARTIST" or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by it;

(c)   The sole and exclusive right in, title to and ownership

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 5

of all masters, matrices, records or other reproductions of the performances embodied in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

(d) The sole and exclusive right, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise;

(e) The right to incorporate in records to be made hereunder, instrumentations, orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10.    Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of recordings made hereunder, and artist does hereby agree to record commercials whenever requested by company during the term or any extension of this agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11.    The Artist does hereby agree to perform exclusively for the Company for films and or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12.    The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respect to his right to execute this agreement and perform its terms and conditions hereunder.

13.    The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14.    This agreement shall be for a period of ___ONE___ ( _1_ ) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for _FOUR_____ ( _4_ ) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof the Artist will perform for the Company for the recording of a minimum of _TWO_____ ( _2_ ) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 6

15.   The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company.  For the period in which a bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16.   This agreement is subject to all rules and regulations of any union having jurisdiction.  No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this agreement.

17.   For the purposes of this agreement, the following definitions shall apply:

Recording Costs:        Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

Record:   All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

Production Expenses:  All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.   INDEMNIFICATION

     (a)   Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract.  Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies.  Each party will notify the other of any such claim, demand or action promptly after having been formally advised thereof and each party will be given a reasonable opportunity to defend any such claim.

     (b)   Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder.  Upon the written request of an indemnitee, the indemnitor will assume the defense of any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 7

thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISION AND APPLICABLE LAW.

(a) If any clause, sentence, paragraph or part of this agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdition to be invalid, such judgement shall not affect the remainder of this agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

(b) The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

(c) Any claim and the relationship of the parties hereto arising out of this Agreement or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration Association governing one-member panels. The parties hereto agree to be bound by the award of such arbitration and judgement upon the award rendered by the artibrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay one-half (1/2) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Page 8

## 22. OWNERSHIP OF MASTERS

Artist hereby acknowledges and agrees that each master recorded under the attached Exclusive Artists Recording Agreement embodying the results and proceeds of my services (i) is prepared within the scope of Company's engagement of my personal services and is a work made for hire, or (ii) is prepared as part of an LP-Master which constitutes a work specially ordered by Company for use as a contribution to a collective work and shall be considered a work made for hire.  I further acknowledge that Company is the exclusive owner of copyright with respect to each such master and any "sound recording" or "phonorecord" or "copy" manufactured therefrom (individually and collectively called the "Work"), and that Company has the right to exercise all rights of the copyright proprietor with respect thereto, including, but not limited to, all exclusive rights specified in 17 U.S.C. 106 and the exclusive right to register copyright in the name of Company.

Notwithstanding any other provisions hereof, I agree that to the extent, if any, that I may be deemed an "author" of any Work, I hereby grant and assign the Company, exclusively, perpetually and throughout the universe, all exclusive right, title and interest in and to such Work, including, but not limited to, all exclusive rights of the copyright owner as specified in 17 U.S.C. 106.  I hereby grant to Company a power of attorney irrevocable and coupled with an interest to execute for me and in my name, all documents and instruments necessary or appropriate to effectuate the intents and purposes of this Paragraph 22 and to accomplish, evidence and perfect the rights granted to Company pursuant to this Paragraph 22, including but not limited to documents to apply for and obtain all registration of copyrights in and to any such Work, and documents to assign such copyrights to Company.

23. Notwithstanding paragraph 4, or any other provision of this Agreement, if Company enters into an agreement under which Company acts as a production company for delivery of a master or masters containing Artist's performances, then the royalty payments provided for under paragraph 4 are inapplicable and Artist shall be paid one-half of "Net Royalties" received from the commercialization of said master or masters.  To determine Net Royalties, Company shall be allowed to deduct any unreimbursed costs incurred by it in preparing said masters that are designated as recoupable costs under this Agreement.

## 24. CO-PUBLSHING

You and we agree to co-publish any and all compositions written by you, alone or in collaboration with others, to the extent of your authorship, which are written by you or recorded as a master demo during the term of this agreement.  The publisher's share on all such compositions shall be divided in a manner whereby our publishing designee shall own fifty percent (50%) and your publishing designee shall own fifty percent (50%), with our publishing designee having administration rights thereto, for which an administration fee of no greater than ten percent (10%) of the gross receipts shall be charged.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

25. **ADVANCEMENT:**  Company hereby agrees to advance to artist(s) the amount of Two Thousand Dollars ($2,000.00) as a signing bonus, to be distributed as follows:  One Thousand Dollars ($1,000.00) upon signing agreement and One Thousand Dollars ($1,000.00) the day the artist (s) starts recording.

**VIDEO:**  Company hereby agrees to produce promotional videos with an approved production budget of Fifteen Thousand Dollars ($15,000.00).  The decision to produce videos for all LP's hereunder shall be within the sole discretion of the company.  All advances for the production of videos hereunder shall be fifty percent (50%) recoupable from artist's royalties hereunder (excluding mechanicals), and one hundred percent (100%) recoupable from royalties earned by artist in respect of the exploitation of the video.

**PROMOTIONS/MARKETING:**  Company hereby agrees to provide independent promotions and marketing for the initial LP hereunder, with an approved budget up to a maximum of Twenty Thousand Dollars ($20,000.00).  The decision to hire independent promotion and market for all subsequent LP hereunder shall be within the sole direction of company.

28. All payments hereunder shall be paid directly to artist(s) from distributed label upon being due.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

IN WITNESS WHEREOF, the duly authorized individuals, representatives, officers of the parties to have executed and delivered this Agreement the day and year hereinabove first written.

Attest:    ARTIST: _Alpha Breed_

_____      By: _Alpha Breed_

Witness

                                    _4794 WOODSPRING DRIVE_
                                    _MARIETTA GA 30066_
                                    (Address)

                                    _____
                                    (Telephone Number)

                                    _____
                                    (Date of Birth)

                            By: _Bobby T Thompson_

Witness

                                    _____
                                    (Address)

                                    _____

                                    (Social Security No.)

                                    _____
                                    (Date of Birth)

Attest:    COMPANY: POWER ARTISTS RECORDS, INC.

_Bobby T Thompson_      By: _Jimmy McMath_
                            LEROY MCMATH, PRESIDENT

DocuSign Envelope ID: 2D6877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTIST MUSIC DBA

POWER RECORDINGS

This RECORD COMPANY hereinafter referred to as the "Agreement" executed and effective this 26th day of September 2000, by and between Steady Mobb'n (Billy Moore and Aaron Edmonds) (hereinafter referred to as the "Artist"} and POWER ARTIST MUSIC DBA (POWER RECORDINGS) (hereinafter referred to as the "Company"):

## IT IS HEREBY UNDERSTOOD

a.    Company is an organization, which specializes in the management, recording, recording distribution and representation of musical artists;

b.    Company is familiar with the musical abilities of Artist and has the expertise, ability, industry contacts and resources to assist Artist in the furtherance of his/her career.

c.    Artist performs under the name "(Steady Mobb'n)"

d.    Company and Artist wish to enter into this Agreement to provide for the production and distribution of the Recording.

## IT IS, THEREFORE, AGREED AS FOLLOWS:

A.    **TERM.** The effectiveness of this Agreement shall commence with its execution by all of the parties and shall continue thereafter for a period of 2 and 2 options (1)years.

B.    **PRODUCTION OF RECORDING.** The Recording shall be produced in the following manner:

1.    **PRODUCTION.** Company agrees to produce one master recording consisting of songs written Artist and Staff writers, Performed by Artist (hereinafter referred to as the "Songs"). The resulting recording (hereinafter referred to as the "Recording") shall include music of not less than forty (40) minutes in playing duration and shall be of a quality which is equal to master recordings normally produced for commercial distribution.

2.    **CONTRIBUTION BY ARTIST.** Artist agrees to fully cooperate with the Company, in good faith, in the production of the Recording; to contribute to such production the music and lyrics embodied in the Songs; to arrange, direct and perform the Songs in such a manner as to facilitate the production of the Recording; and to observe the remaining duties and obligations of this Agreement otherwise strictly.

3.    **COST.** Company shall be responsible for all costs incurred in the production of the Recording, including the prepayment of all travel, hotel and meal costs incurred by Artist in attending the recording sessions referenced in Section B.5 herein. Company may recover such receipted expenses pursuant to the production of master recordings or advancement of the Artist's career. Company's production, promotion, manufacturing and all other bonafide expenses relating to Artist are deemed recoupable from gross income.

4.    **ARTIST CONTROL.** Company and Artist shall be jointly responsible for all decisions regarding the artistic content of the Recording.

5.    **DATES AND LOCATION OF RECORDING SESSIONS.** The recording sessions necessary to produce the Recording shall occur at studios and facilities chosen by Company in Chicago (city) Ill (State),

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

6. **ADDITIONAL MUSICIANS.** Company shall provide and compensate sufficient and competent musicians to properly perform the Songs, as arranged and directed by Artist and Producer. Company may recover such cost pursuant to Section B3. Herein.

7. **TITLE.** The title of the Recording shall be chosen by agreement between the Company and the Artist.

8. **COMPLETION AND RELEASE.** The Recording shall be completed and prepared for release and distribution on or before October, 2000. Company and Artist acknowledge that time is of the essence in the completion of the Recording, and each agree to exercise all reasonable means to achieve such completion.

9. **ASSIGNMENT OF EXCLUSIVE RIGHTS BY ARTIST.** Upon the timely occurrence and performance of all material events and obligations required to produce the Recording, Artist shall assign to the Company all of his/her rights, title, and interest in and to the following property, for distribution an commercial exploitation in the United States and Canada:
   a.   The Songs
   b.   Artist's performance of the Songs contained in the Recording,
   c.   The title of the Recording.

10. **LICENSE FOR USE OF NAME AND IMAGE.** Upon the timely occurrence and performance of all material events and obligations required to produce the Recording, Artist shall grant to the Company the exclusive license to use the name "Steady Mobb'n (Billy Moore and Aaron Edmond)", and the Artist's photographic image, in the promotion and distribution of the Recording.

11. **FORM OF ASSIGNMENT AND LICENSE DOCUMENTS.** The form of documents to be executed by artist, pursuant to Section C and D herein shall be identical to the "Assignments" and "License" respectively attached hereto s Exhibits "C" and "D", and incorporated herein by this reference.

12. **COPYRIGHT.** Upon Artist's assignment of the Songs pursuant to Section C herein, Company shall proceed to obtain and secure a copyright for each of the said Songs. Each such copyright shall be the sole property of the Company.

13. **DISTRIBUTION.** Commencing with the completion of the Recording and continuing for the term of the Agreement, Company will diligently use its best efforts to secure distribution of the Recording throughout the world, through one or more major distribution companies (including record companies, film companies, or any other company). Any such contract entered into between Company and any such record distribution company shall be subject to the terms of this Agreement.

14. **ROYALTIES.** In accordance with the rights granted by Artist to Company herein, Company intends to contract with a record distribution company for distribution of the Recording. Company will be entitled to receive royalties or licensing fees (herein collectively referred to as the "Royalties") as a result of such contract. Royalties shall include ny compensation received by Company pursuant to Section B3 and B6 , herein. In the event that Royalties are insufficient to complete such reimbursement, Artist shall not be liable for such costs. The remainder of such Royalties, if any, shall be allocated and distributed between Company and Artist, in the following proportion:

_____ (75%) Percent to Company

_____ (25%) Percent to Artist

15. **B.M.I. MEMBERSHIP.** Within a reasonable time after the execution of this Agreement, Artist shall apply for registration and membership with Broadcast Music Inc.(BMI), a music licensing organization. Company shall b responsible for any cost or expense associated with such application

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

or with the Artist's membership in BMI during the term of this Agreement and the Distribution Period. Company may recover such costs pursuant to Section B#, herein.

16.    **NON-CICUMVENTION.** Artist shall not detrimentally interfere with the efforts of Company to distribute the Recording through one or more distribution companies or enter into any contract inconsistent with the rights of distribution assigned to Company hereunder. Artist shall not contact any such potential distribution company except through the office of the Company.

17.    **ADDITIONAL PERSONL SERVICES.** For the term of this Agreement, Artist agrees to appear at one or more performances to promote the distribution of the Recording. Company shall schedule and arrange such performances, but Artist shall have the right of prior approval of the location, date and time of each such performance. The total number of performances during the term of this Agreement shall not exceed ___. Company shall be responsible for travel, hotel and meal costs incurred by Artist in attending each such performance, Artist shall be paid one-half (1/2) of the net revenues received by Company for such performances. Such compensation shall be received by Artist within fifteen (15) days fro Company's receipt thereof. Company may recover such costs (including travel costs and compensation paid to Artist) pursuant to Section B3, herein.

18.    **ASSIGNMENT BY COMPANY.** Prior to completion of the Recording, the rights and obligations of the Company existing hereunder are personal and unique, and shall not be assigned without the prior written consent of Artist. Subsequent to the completion of the Recording, Company may assign its rights and obligations existing hereunder without the consent of Artist.

19.    **ASSIGNMENT BY ARTIST.** The rights and obligations of Artist existing hereunder are personal and unique, and shall not be assigned without prior written consent of Company.

20.    **CONDITION SUBSEQUENT.** If Company does not enter into a binding contract for the distribution of the Recording during the Distribution Period, the assignment and license from Artist to Company granted pursuant to Sections C and D hereunder shall be deemed rescinded by the agreement of the parties.

21.    **RIGHTS OF INSPECTION.** At any time during the term of this Agreement upon prior written notice to Company, Artist or his/her designated representative shall be permitted access to the books and records of Company which in any way pertain to Artist, for inspection by Artist or Artist's designated representative. Such books and records shall include, but shall not be limited to, any documents or records which evidence the receipt or disbursements of Royalties. Company shall maintain such books and records at its principal office.

22.    **MISCELLANEOUS.**
      a)    **BINDING EFFECT.** This Agreement shall be binding upon the successors and assigns of the parties.
      b)    **ARBITRATION.** In the event of a dispute between Company and Artist regarding the terms, construction or performance of this Agreement, such dispute shall be settled by binding arbitration in Atlanta(city, state) Ga, according to the rules of the American Arbitration Association for the settlement of commercial disputes, then in effect. The award or decision resulting therefrom shall be subject to immediate enforcement in Georgia (state) court of competent jurisdiction.
      c)    **JURISDICTION/APPLICABLE LAW.** Company and Artist hereby submit to the jurisdiction of the courts of Illinois (state) for the enforcement of this Agreement or any arbitration award or decision arising herefrom. This Agreement shall be enforced or construed according to the laws of the State of Georgia.
      d)    **ATTORNEY'S FEES.** In the event that a party is forced to obtain an attorney to enforce the terms of this Agreement, the party prevailing in such action of enforcement shall be entitled to the recovery of attorney's fees incurred in such action.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

e) **COVENANT OF GOOD FAITH AND FAIR DEALING.** Company and Artist agree to perform their obligations under this Agreement, in all respects, in good faith.

f) **INDEPENDENT CONTRACTOR.** In the performance of his/her obligations of this Agreement, Artist shall be deemed an independent contractor.

g) **INCORPORATION OF RECITALS.** The recitals contained at the beginning of this Agreement are incorporated herein by this reference.

23. **NOTICES.** Any notices or delivery required herein shall be deemed completed when hand-delivered, delivered by agent, or placed in the U.S. Mail, postage prepaid, to the parties at the addresses listed herein.

**THE PARTIES AGREE** to the terms and obligations and so execute on the day and date first above mentioned.

_____      _____
Artist                                                    Company

_____
Artist

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

POWER ARTISTS MUSIC CO, INC.
6121 Oakbrook PWY
Norcross, Ga 30093


EXCLUSIVE ARTIST RECORDING AGREEMENT

THIS AGREEMENT made this 10th day of April 1999 by and between Power Artist Music Co, Inc., 6121 Oakbrook PWY Norcross Ga, 30093 and/or its associates, subsidiaries, nominees, successors, and assign(hereinafter referred to as "Company") and Cheryl Norton professionally known as **CHERRELLE** (hereinafter referred to as the "Artist(s)").

WITNESSETH:

WHEREAS, the Company is engaged in the business of manufacturing, producing, recording, selling and distributing phonograph records; and WHEREAS, the Artist is singer/musician.

NOW, THEREFORE, in consideration of the mutual promises and agreements hereinbefore and hereafter contained, the parties hereto agree as follows:

1. That the Artist will render his exclusive personal services during the term hereof for the recording and making of phonograph records at such studios as the Company may designate, at times and places to be mutually agreed upon by and between the parties hereto. Should the Artist for any reason be unavailable for rendering such services, the term of this agreement, shall, at the Company's sole option, be automatically extended for period as the Artist shall have been unavailable. All such extensions of the period of this agreement apply consecutively to the end of the term of the period in which such failure to record occurs. The dates, therefore, for exercise of subsequent options and the dates for the commencement of the renewal terms thereof shall accordingly be extended. The Company shall notify the Artist of all such extensions and the limiting dates thereof, by Registered Mail, at least Fifteen (15) days prior to the original termination of the period during which such failure of the Artist to make himself available occurs. The musical compositions to recorded shall be selected by the Company or Artist and the recordings shall be subject to the approval of the Company as satisfactory as to the quality and commercial value for the manufacture and sale of phonograph records. The Artist will perform for the recording of a minimum number of musical compositions hereinafter specified, shall be performed by the Artist, and recorded by the Company at the election of the Company. The Artist agrees to re-record each selection to be made hereunder until a commercially satisfactory "master" record thereof shall have been obtained. In the event that during the term of this agreement, or during any option period, the Company, with the Artist's consent, records more than the minimum number of sides required to be recorded in such period, as provided for herein, then such sides as may be recorded in excess of said minimum may be applied, at the Company's sole option, to reduce the minimum number of record sides required to be recorded during any subsequent period.

2. During the term of this Agreement or any extension or extensions thereof the Artist will not perform for the purpose of making phonograph records for any person, firm or corporation other than the Company, and after expiration of this agreement, the Artist will not perform any musical composition recorded hereunder for any person, firm, or corporation other than the Company, for the purpose of making phonograph records, for a period of five (5) years from and after expiration of this agreement; and the Artist acknowledges that the Artist's services are unique,

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

and extraordinary and the company shall be entitled to equitable and injunctive relief to enforce the provisions of this paragraph, in addition to any other available remedies.

3.  The Company shall specify and pay the costs of the Artist's accompaniment, instrumental arrangements, copying and studio costs, in connection with performances hereunder; and all such costs or payments shall be charged against the Artist's royalties. Without limiting the generality of the foregoing, also included among costs or payments which the company shall be entitled to charge against the Artist's royalties under this or any other agreement between the parties hereto, if and when earned, shall be any and all amounts which are paid by the Company pursuant to the requirements of any collective bargaining agreement, trust agreement, or any other agreement between the Company and any union, guild or association representing the Artist or other persons or paid directly to the union, guild, association, trustee, and whether or not such amounts are related to , based upon or computed by reference to union scale payments for services rendered by the Artist or such persons, providing that said payments are due either as a result of recordings hereunder or the manufacture and/or sale of phonograph records embodying performances hereunder.

4.  The Company agrees to pay the Artist for the services rendered hereunder:

    a.  A royalty of twenty (20) percent of the wholesale selling price of ninety (90) percent of all phonograph records embodying on both sides thereof the compositions performed by the Artist and recorded hereunder, manufactured, sold and paid for, and not returned, other than those records given away or sold by the Company at approximately the cost of production for the promotion or advertising purposes. Advance of ($15,000) to be recouped from royalties.

    b.  One-half (1/2) of the preceding amount of ninety (90) percent of all phonograph records embodying such compositions on only one side thereof, so manufactured, sold and paid for and not returned;

    c.  With respect to phonograph records which embody compositions in addition or compositions performed by the Artist and recorded hereunder, royalties shall be computed upon that fraction of the wholesale selling price as the number of recordings by the Artist contained therein bears to the total number of recordings contained therein;

    d.  One-third (1/3) of such respective preceding amounts with respect to ninety (90) percent of all records manufactured, sold and paid for, and not returned, outside the limitations of the United States of America. Royalties for records sold outside of the United States of America shall be computed in the national currency of the country where sold upon the retail prices as herein stated in either the country of manufacture or the country of sale, at Company's sole option, and are to be payable only in the United States and in the dollar equivalent at the rate exchange at the time the Company received payment.

5.  Notwithstanding anything to the contrary contained herein,

    a.  In respect to phonograph records sold and paid for, and not returned, through any Record Club or by mail order or premium play, the royalty payable to the Artist shall be one-half (1/2) the royalty otherwise payable to the Artist with respect to such phonograph records.

    b.  No royalty shall be payable to the Artist with respect to phonograph records which are distributed to members of any Record Club either as a result of joining such Club and/or as a result of the purchase of a required number of records, including records distributed as "bonus" and/or "free" records.

    c.  If the Artist's performances embodied on recordings released through any Record Club or by mail order or premium plan shall not exceed fifty (50) percent of the total playing

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

time of all performances embodied on such recordings, the Artist shall not be entitled to a royalty for such record.

6.  Royalties on phonograph records included in albums, jackets, boxes, or any other style of package or container, shall be determined as if such records have been sold separately and not so packaged, Company shall charge seven percent (7%) of retail list price of records manufactured as its container deduction and will charge Artist no more than two thousand dollars ($2000) for cover art unless Artist pre-consents to a higher cost.

7.  The Company will compute such royalties whit sixty (60) days after June 30th and December 31st of each year, during which records mad hereunder are sold, for the preceding six (6) month period and will pay such royalties, including any foreign royalties received and credited to the Company's accounts, less any recouped advances or production expenses incurred by the Company under this Agreement to the date of such royalty statement.

8.  All royalty statements and all other accounts then rendered by the Company to the Artist shall be binding upon the Artist and not subject to any objection by the Artist for any reason, unless specific objection in writing, stating the basis thereof, is given to the Company within ninety (90) days from the date of such statements.

All payments hereunder shall be to the order of Career Builders, and payments and statements rendered to Lil Can Production 9101 w Sarah Las Vegas NV 89117 shall be deemed rendered to and received by the Artist hereunder.

9.  All recordings hereunder and all derivatives made therefrom, together with the performances embodied thereon, shall be the sole and exclusive property of the Company. Without limiting the forgoing or any rights granted herein but in addition thereto and without further payment, other than as herein provided, the Artist grants to the Company:

    a.  The right to manufacture, advertise, sell, lease, license or otherwise use or dispose of, in any or all fields of performances to be recorded hereunder, upon such terms and conditions as the Company may approve.

    b.  The right to use and publish, and to permit others to use and publish, the Artist's name and likeness and all other biographical material concerning the Artist; to write and publish, and to permit others to write and publish, articles concerning the Artist for advertising or trade purposes in connection with the sale and exploitation of the Company's products or otherwise, without restriction, and to use as descriptive of the Artist the phrase, "Exclusive Ichiban Recording Artist", or any label or Company name or names designated by the Company, or any other similar appropriate phrase, it being agreed that the Company may release or sell records and masters of selections made hereunder under its name and/or any other name which, from time to time, may be selected by its;

    c.  The sole and exclusive right in, title to and ownership of all masters, matrices, records or other reproductions of the performances embodies in such recordings by any method, electronic, magnetic, mechanical or other, now or hereafter known, obtained from recordings made hereunder and the performances embodied therein;

    d.  The sole and exclusive rights, if the Company so desires to publicly perform the records and to permit public performances thereof, by means of radio broadcast or otherwise.

    e.  The right to incorporate in records to be made hereunder, instrumentations orchestrations and arrangements owned by the Artist at the time of recording, without payment therefor.

10. Included in the performances to be rendered hereunder by Artist, is the recording of commercials to be used in connection with Television or Radio as the same relates to the exploitation of

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

recordings made hereunder, and Artist does hereby agree to record commercials whenever requested by Company during the term or any extension of this Agreement. These recordings shall be in addition to the minimum requirements as set forth herein.

11. The Artist does hereby agree to perform exclusively for the Company for films and/or videos that may be reproduced for the purpose of being used in synchronization with any recordings made hereunder.

12. The Artist hereby warrants and represents that he is under no disability, restriction, or prohibition in respects to his right to execute this agreement and perform its terms and conditions hereunder.

13. The Company may, at its election, assign this agreement, or any of its rights hereunder, to any domestic or foreign company in which it has an interest or with which it is affiliated; however, no assignment or transfer of this agreement shall be valid unless the assignee agrees to assume the Company's obligations hereunder.

14. This agreement shall be for a period of two (2) year(s) from the date of execution hereof. The Artist hereby grants to the Company the option to extend this Agreement for three (3) additional periods of one (1) year each under the same terms and conditions hereof. Such options shall be considered exercised by the Company unless the Company gives the Artist notice to the contrary, in writing, at least thirty (30) days prior to the expiration of the preceding term hereof. During each yearly contract period thereof, the Artist will perform for the Company for the recording of aa minimum of ten (10) satisfactory record sides or their equivalent. Determination as to the satisfactory nature of a particular musical composition shall be at the sole discretion of the Company.

15. The parties hereto specifically agree that, should the Artist violate this agreement, all royalties, due or to become due, to the Artist shall be considered liquidated damages and shall be forfeited by the Artist to the Company. For the period in which bona fide dispute exists between the Company and the Artist, the Company shall report on, but not be required to pay, royalties.

16. This agreement is subject to all rules and regulations of any union having jurisdiction. No failure of the Company to perform because of such rules and regulations shall be deemed a breach of this Agreement.

17. For the purposes of this Agreement, the following definitions shall apply:

RECORDING COST:    Any costs incurred in or incident to the recording of the Artist's performance, including but not limited to musicians', singers', and actors' salaries and fees, fees payable to unions and to union trust funds, cost of arrangements, copying charges, cartage of musical instruments.

RECORD:    All devices now or hereafter known, used for the reproduction of sound by electrical, mechanical, magnetic or other means.

PRODUCTION EXPENSES:    All expenses incurred in or incident to the direct production of phonograph records for manufacture or sale, including but not limited to studio costs, producer costs, mixing costs, layout and artwork costs, promotion and video costs.

18.    INDEMNIFICATION

a.    Each of the parties hereby agree to and do hereby indemnify, save and hold the other harmless from any and all damages, liabilities, costs, losses and expenses (including legal costs and reasonable attorney's fees) arising out of or connected with any claim, demand or action by a third party which is inconsistent with any of the warranties, representations or covenants made by the respective party in this contract. Each party agrees to reimburse the other, for any payment made at any time with respect to any damage, liability, cost, loss or expense to which the foregoing indemnity applies. Each party will notify the other of any such claim, demand or action promptly after having been formally

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

advised thereof and each party will b given a reasonable opportunity to defend any such claim.

b. Termination of this Agreement shall not affect the continuing obligation of each of the parties as indemnitors hereunder. Upon the written request of an indemnitee, the indemnitor will assume the defense o any claim, demand or action against such indemnitee and will upon the request of the indemnitee, allow the indemnitee to participate in the defense thereof, such participation to be at the expense of the indemnitee. Settlement by the indemnitee without the indemnitor's prior written consent shall release the indemnitor from the indemnity as to the claim, demand or action so settled.

19. LEGALITY OF PROVISIONS AND APPLICABLE LAW.

a. If any clauses, sentence, paragraph or part of this Agreement or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgement shall not affect the remainder of this Agreement, which shall continue in full force and effect but such judgement shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgement shall have been rendered and to the person involved.

b. The parties agree that this agreement shall be interpreted and governed pursuant to the Laws of the State of Georgia even though one party hereto may be a resident of another state.

c. Any claim and the relationship of the parties hereto arising out of this Agreement, or the breach thereof shall be settled by arbitration in the City of the principal place of business of the party against whom a claim is sought to be enforced, in accordance with the rules and regulations then obtaining of the American Arbitration association governing one-member panels. The parties hereto agree to be bound by the award arbitrators may be entered in any court having jurisdiction thereof.

20. The Company agrees to pay three-quarters (3/4) of the statutory per selection rate (inclusive of playing time formula, if any) to Artist as mechanical royalties for records sold on any song written or controlled by Artist.

21. ENTIRETY OF AGREEMENT.

This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon Artist or Company unless confirmed by written instrument signed by an officer of the Company and Artist. No waiver of any provision of or default under this agreement shall affect the rights of either party thereafter.

IN WITNESS HWEREOF, the duly authorized individuals, representatives, or officers of the parties hereto have executed and delivered this Agreement the day and year hereinabove first written.

22. YOU UNDERSTANT THAT THIS IS AN IMPORTANT LEGAL DOCUMENT PURSUANT TO WHICH YOU GRANT TO COMPANY CERTAIN EXCLUSIVE SEERVICES FOR A PERIOD. YOU HEREBY REPRESENT AND WARRANT THAT YOU HAVE BEEN ADVISED OF YOUR RIGHTS TO RETAIN INDEPENDENT LEGAL COUNSEL IN CONNECTION WITH NEGOTIATION AND EXECUTION OF THIS AGREEMENT AND THAT YOU HAVE EITHER RETAINED AND HAVE BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAVE KNOWINGLY AND VOLUNTARITLY WAIVED YOUR RIGHTS TO SUCH LEGAL COUNSEL AND DESIRE TO ENTER INTO AGREEMENT WITHOU THE BENEFIT OF LEGAL REPRESENTATION.

Attest: ARTIST

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

C.N

BY: _____

_____

**WITNESS**                                    ARTIST


**Attest: COMPANY**


_____

BY: _____   L. M

                                        LEROY MCGMATH / President

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# EXHIBIT B

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET
AL. DATED
DECEMBER 7, 2023

## LETTER OF DIRECTION

From:  Power Artists Records, Inc.

TO:  ALL RECORD DISTRIBUTORS, DSPS AND THIRD PARTY LICENSEES

TO:  ALL OTHER PARTIES IN INTEREST

TO:  SOUNDEXCHANGE AND OTHER CMOS

Dated: December 7, 2023

Ladies and Gentlemen:

This letter is being delivered in connection with Power Artists Records, Inc. (the "Assignor") in respect of Assignor's interests in the sound recordings set out in Schedule 1 (to the extent of Assignor's interests, the "Masters").

Please be advised that Assignor has, among other things, assigned and granted to Tommy Boy Artists, LLC ("Assignee"), its licensees, successors, administrators, representatives and assigns, the exclusive right throughout the world with respect to the Masters subject to that certain asset purchase agreement dated as of December 7, 2023, by and between Assignee, on the one hand, and the Assignor, for itself and on behalf of its present and future sound recording designees:

1. To license and cause others to license the use of the Masters;

2. To administer and grant rights in and to the Masters and the copyrights therein;

3. To collect all monies payable solely with respect to exploitations of the Masters occurring before or after the date hereof; and.

With effect from the date of this letter, Assignor hereby irrevocably direct you to pay Assignee one hundred percent (100%) of all royalties and income earned or credited to Assignor solely with respect to exploitations of the Masters occurring before or after the date hereof solely in respect of Assignor's interests in the Masters.

Please send copies of full royalty statements in relation to the Masters to Assignee at 149 East 23rd St., Suite 6, New York, NY 10159, Attn: Thomas Silverman and a simultaneous email copy to thomas.silverman@tommyboy.com or as Assignee shall direct.

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

Payment to Assignee should be made to the following account, details of which are:

Bank Name:
Account Name:
ABA Routing No.:
Account No.:
Reference:

Email Address for Statements: thomas.silverman@tommyboy.com

The foregoing authorization and direction shall remain in full force and effect until modified or terminated by the Assignee.

Very truly yours,

POWER ARTISTS RECORDS, INC.

By: _____
Leroy McMath, President

ACCEPTED AND AGREED:

TOMMY BOY ARTISTS, LLC

By: _____
Thomas Silverman, CEO

# EXHIBIT C-1

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET
AL. DATED
DECEMBER 7, 2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

## POWER OF ATTORNEY
## OF
## LEROY MCMATH

Reference is hereby made to that certain asset purchase agreement dated as of December 7, 2023 (the "APA"), whereby I, Leroy McMath ("I," "me," "my" or "McMath"), having a principal address located at 3577 Chamblee Tucker Rd., Suite A178, Atlanta, Georgia 30341, sold to Tommy Boy Artists, LLC, a Delaware limited liability company ("Attorney-in-Fact" or "Tommy Boy"), and Tommy Boy acquired from me certain interests in certain sound recordings. Subject to the terms and conditions of the APA, I hereby do make, constitute and appoint Tommy Boy to act in my name and on my behalf in any lawful way solely with respect to the following purposes, only in the event that I shall fail to execute and deliver any of the same within five (5) business days after my receipt of Attorney-in-Fact's written request to me therefore:

(i)    the preparation, execution, submission and filing of those documents and forms relating to the renewal or extension of any of the copyrights relating to those sound recordings set forth on Schedule 1 hereto (the "Masters") (and to file any and all related applications) (collectively, the "Renewals") in Tommy Boy's (or its designee's) name;

(ii)    upon the issuance of such Renewals, the preparation and execution of proper and formal assignments in Tommy Boy's (or its designee's) name so as to secure such Renewals;

(iii)    subject to the terms and conditions of the APA to exercise all manner of permitted rights solely with respect to the Masters under those certain Agreements listed on Exhibit A (the "Agreements");

(iv)    subject to the terms and conditions of the APA to execute such other documents or instruments as Tommy Boy reasonably deems necessary or appropriate to carry out the terms of the APA.

This Power of Attorney shall start immediately upon its full execution and the full execution of the APA. This Power of Attorney and all authority conferred hereby are granted solely for the limited purposes of completing those transactions contemplated under the APA. This Power of Attorney is subject to all of the terms and conditions of the APA.

In case any provision of this Power of Attorney shall be invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

[Signature Page Follow]

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

This Power of Attorney shall be governed and construed by the laws of the State of New York.

Date: December    , 2023

_____
        LEROY MCMATH

## **ACKNOWLEDGMENT**

STATE OF GEORGIA         )
                         )   ss:
COUNTY OF FULTON         )

Subscribed and sworn to (or affirmed) before me on this _____ day of December, 2023, Leroy McMath proved to me on the basis of satisfactory evidence to be the person who appeared before me by physical presence. I certify under PENALTY OF PERJURY under the laws of the State of Georgia that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Signature _____
            Signature of Notary

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# EXHIBIT C-2

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET
AL. DATED
DECEMBER 7, 2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# POWER OF ATTORNEY
## OF
## POWER ARTISTS RECORDS, INC.

Reference is hereby made to that certain asset purchase agreement dated as of December 7, 2023 (the "APA"), whereby I, Leroy McMath, owner and president of Power Artists Records, Inc. doing business as Power Production, Inc., Power Records, Triad Records, Inc., and Power Entertainment ("Power"), having a principal place of business located at 3577 Chamblee Tucker Rd., Suite A178, Atlanta, Georgia 30341, sold to Tommy Boy Artists, LLC, a Delaware limited liability company ("Attorney-in-Fact" or "Tommy Boy"), and Tommy Boy acquired from Power certain interests in certain sound recordings. Subject to the terms and conditions of the APA, Power hereby makes, constitutes and appoints Tommy Boy to act in my name and in my capacity in any lawful way solely with respect to the following purposes, only in the event that I shall fail to execute and deliver any of the same within five (5) business days after my receipt of Attorney-in-Fact's written request to me therefore:

(i)     the preparation, execution, submission and filing of those documents and forms relating to the renewal or extension of any of the copyrights relating to those sound recordings set forth on Schedule 1 hereto (the "Masters") (and to file any and all related applications) (collectively, the "Renewals") in Tommy Boy's (or its designee's) name;

(ii)    upon the issuance of such Renewals, the preparation and execution of proper and formal assignments in Tommy Boy's (or its designee's) name so as to secure such Renewals;

(iii)   subject to the terms and conditions of the APA to exercise all manner of permitted rights solely with respect to the Masters under those certain Agreements listed on Exhibit A (the "Agreements");

(iv)    subject to the terms and conditions of the APA to execute such other documents or instruments as Tommy Boy reasonably deems necessary or appropriate to carry out the terms of the APA.

This Power of Attorney shall start immediately upon its full execution and the full execution of the APA. This Power of Attorney and all authority conferred hereby are granted solely for the limited purposes of completing those transactions contemplated under the APA. This Power of Attorney is subject to all of the terms and conditions of the APA.

In case any provision of this Power of Attorney shall be invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

[Signature Page Follows]

This Power of Attorney shall be governed and construed by the laws of the State of New York.

Date: December     , 2023

Power Artists Records, Inc. doing business as
Power Production, Inc., Power Records, Triad
Records, Inc., Power Entertainment, Inc., and Wrap Records
("Power")


By: _____
　　　　LEROY McMATH, President and Owner


## ACKNOWLEDGMENT


STATE OF GEORGIA　　　　)
　　　　　　　　　　　　　　　　)　ss:
COUNTY OF FULTON　　　　)


Subscribed and sworn to (or affirmed) before me on this _____ day of December, 2023, by Leroy McMath in his capacity as President and Owner of Power Artists Records, Inc., a Georgia corporation, and proved to me on the basis of satisfactory evidence to be the person who appeared before me by physical presence. I certify under PENALTY OF PERJURY under the laws of the State of Georgia that the foregoing paragraph is true and correct.


Witness my hand and official seal.


Signature _____
　　　　　　　　Signature of Notary

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

# EXHIBIT D

ASSET PURCHASE AGREEMENT
BETWEEN
TOMMY BOY ARTISTS, LLC AND POWER ARTIST RECORDS, INC. ET AL.
DATED
DECEMBER 7,  2023

DocuSign Envelope ID: 206877E8-AC3F-4E26-9CB6-B3D1CCD2AD8C

## ASSIGNMENT OF COPYRIGHTS

Power Artists Records, Inc. doing business as Power Production, Inc., Power Records, Triad Records, Inc., Power Entertainment, Inc. and Wrap Records ("Assignor"), for good and valuable consideration, receipt of which is hereby acknowledged, hereby irrevocably and unconditionally forever assigns, sells, transfers and conveys to Tommy Boy Artists, LLC ("Assignee"), its successors and assigns, effective as of the date hereof, one hundred percent (100%) of the Assignor's entire right, title and interest throughout the world and the universe, in and to the sound recordings listed on the attached Schedule 1 including, without limitation, an undivided one hundred percent (100%) of Assignor's ownership interest in and to the copyrights and any other rights now known or which may hereafter be recognized or come into existence relating to the sound recordings listed on the attached Schedule 1, and any and all renewals, extensions and revivals of such copyrights, reversionary interests and all other rights and interests of every kind whatsoever under and subject to applicable laws, treaties, regulations and directives now or hereafter enacted or in effect.

IN WITNESS WHEREOF, Assignor has executed this instrument on this ___ day of December, 2023.

**Power Artists Records, Inc. doing business as
Power Production, Inc., Power Records,
Triad Records, Inc., Power Entertainment, Inc.
and Wrap Records**

By: _____
      Leroy McMath, President and Owner

## ACKNOWLEDGEMENT

STATE OF GEORGIA          )
                          )   ss:
COUNTY OF                 )

Subscribed and sworn to (or affirmed) before me on this _____ day of December, 2023, Leroy McMath, President and Owner of Power Artists Records, Inc., a Georgia corporation, on behalf of the corporation and proved to me on the basis of satisfactory evidence to be the person who appeared before me by physical presence. I certify under PENALTY OF PERJURY under the laws of the State of Georgia that the foregoing paragraph is true and correct.

Witness my hand and official seal.

Signature _____
                Signature of Notary

# EXHIBIT O

# EXHIBIT O

# EXHIBIT O

## John Duffoo

| | |
|---|---|
| **From:** | Dropbox <no-reply@dropbox.com> |
| **Sent:** | Saturday, January 31, 2026 8:57 PM |
| **To:** | John Duffoo |
| **Subject:** | Leroy McMath sent you 31 files |

Download them by February 7, 2026 at 11:59 PM GMT-05:00



Easily send large files

Hi John,

**Leroy McMath (leroy@wbaball.net) sent you 31 files.** They'll be available to download until **February 7, 2026 at 11:59 PM GMT-05:00.**

**Leroy left you a message:**

*"Sorry it to so long. This was a lot. Tom, ask me to delete these emails. For some reason I did not. I will take a break and start sending scans.*
*"*



Sent Items - leroy wbaball.net - 6.pdf
130.18 KB

Sent Items - leroy wbaball.net - 16.pdf
91.37 KB

David Parker leroy wbaball.net - 3.pdf
137.22 KB

David Pleroy wbaball.net - #1.pdf
117.91 KB

Sent Items - leroy wbaball.net - 14.pdf
122.45 KB

and 26 more items

Download files

This email was sent to john@jdbusinesslaw.com. If that isn't your email, <u>report to Dropbox</u>

1